**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C., | |
| Plaintiffs, | |
| and | |
| TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A., | |
| Consolidated Plaintiffs, | |
| and | |
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; AND IPSCO TUBULARS INC., | |
| Plaintiff-Intervenors, | Consol. Court No. 22-00344 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE USA INC., | |
| Defendant-Intervenors. | |

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris

Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A., (collectively, "Tenaris") hereby move for judgment on the agency record, requesting that the Court hold that the final determinations issued by the U.S. International Trade Commission ("Commission") in the antidumping duty ("AD") investigations involving oil country tubular goods ("OCTG") from Argentina and Mexico are neither supported by substantial evidence nor in accordance with law.  The contested determinations were styled and published as *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, 87 Fed. Reg. 69,331 (Nov. 18, 2022), and accompanying views of the Commission, entitled, *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022).

As set forth in the accompanying brief in support of this motion, and on the basis of the record made before the Commission in the underlying proceeding:  (1) the Commission failed to properly consider the conditions of competition in its injury analysis, as required by the statute, such that its findings regarding volume, price, and impact, were unsupported by substantial evidence on the record and otherwise not in accordance with law; (2) the Commission's determination to cumulate subject imports from Argentina, Mexico, South Korea, and Russia was unsupported by substantial evidence and otherwise not in accordance with law; (3) the Commission's analysis of and findings related to subject import volume were unsupported by substantial evidence and otherwise not in accordance with law; (4) the Commission's determination that subject imports had adverse price effects was unsupported by substantial evidence and otherwise not in accordance with law; and (5) the Commission's determination that the domestic industry was injured by reason of subject imports was unsupported by substantial evidence and otherwise not in accordance with law.

For these reasons, which are more fully set forth in the accompanying Memorandum of Points and Authorities, Plaintiffs respectfully request that this Court grant judgment in their favor, remand this action to the Commission for disposition consistent with the Court's final opinion, and enter an order in the form attached hereto.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
Colin Alejandro Dilley
Cristina M. Cornejo

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A.*

May 22, 2023

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C., <br><br> Plaintiffs, <br><br> and <br><br> TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A., <br><br> Consolidated Plaintiffs, <br><br> and <br><br> TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; AND IPSCO TUBULARS INC., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE USA INC., <br><br> Defendant-Intervenors. | Consol. Court No. 22-00344 <br><br> # NON-CONFIDENTIAL <br><br> **Business Proprietary Information has been deleted in the Table of Contents and from Pages 3, 5, 11-17, 20-23, 28, 31-37, 40-41, 43, 45-46.** |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
Colin Alejandro Dilley
Cristina M. Cornejo

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

May 22, 2023

NON-CONFIDENTIAL VERSION

TABLE OF CONTENTS

I.  STATEMENT PURSUANT TO USCIT R. 56.2(c) ............................................................ 1

    A.  Administrative Determination Sought to Be Reviewed ......................................... 1

    B.  Questions Presented and Summary of Argument .................................................. 1

        1.  Did the Commission properly consider the conditions of competition
           in its injury analysis such that it could properly assess whether subject
           imports caused the alleged injury to the domestic industry? ...................... 1

        2.  Is the Commission's decision to cumulate subject imports from
           Argentina, Mexico, South Korea and Russia supported by substantial
           evidence and otherwise in accordance with law? ........................................ 2

        3.  Is the Commission's analysis of subject import volume supported by
           substantial evidence and otherwise in accordance with law? ..................... 2

        4.  Is the Commission's determination that subject imports had adverse
           price effects supported by substantial evidence and otherwise in
           accordance with law? ................................................................................. 3

        5.  Is the Commission's determination that the domestic industry was
           injured by reason of subject imports supported by substantial evidence
           and otherwise in accordance with law? ...................................................... 3

II.  STATEMENT OF FACTS ............................................................................................... 3

III.  JURISDICTION .............................................................................................................. 8

IV.  STANDARD OF REVIEW ............................................................................................. 8

V.  ARGUMENT ................................................................................................................... 9

    A.  The Commission Failed to Conduct its Injury Analysis Within the Context
        of the Unprecedented Conditions of Competition Prevailing During the
        POI. ......................................................................................................................... 9

        1.  The Statute Mandates an Injury Analysis Within the Context of the
           Conditions of Competition Distinctive to the Industry ............................. 10

        2.  Record Evidence Established Historic Collapse of Demand Followed
           by Substantial Increase in Demand ........................................................... 11

         3.  The Record Evidence Established Significant Supply Constraints .......... 12

i

NON-CONFIDENTIAL VERSION

a.     U.S. Distributors' High OCTG Inventory Levels Delayed Ramp Up of Domestic Production ................................................. 13

b.     Prices for Hot-Rolled Coil Increased Dramatically ...................... 14

c.     The U.S. Industry Suffered Labor Shortages ................................ 15

4.     Prior to the Petitions, Tenaris Became the Largest U.S. OCTG Producer and Imported to Satisfy Demand Due to Supply Constraints ..... 16

a.     Tenaris' $10 Billion Plus Investment and Rig Direct® Model ......................................................................................... 16

b.     Intra-Industry Competition in the U.S. Market ............................ 17

B.     The Commission's Decision to Cumulate Subject Imports Is Unsupported by Substantial Evidence and Otherwise Not in Accordance With Law ............... 18

1.     The Commission's Fungibility Findings Are Unsupported by Substantial Evidence ................................................................... 18

2.     The Commission's Channels of Distribution Findings Are Unsupported by Substantial Evidence ....................................... 21

3.     The Commission's Failure to Consider the Existing AD Order on Subject Imports from Korea and its Reliance on Non-Subject Data for South Korea Is Not In Accordance With Law ........................................... 23

4.     The Commission's Determination to Cumulate Subject Imports from Russia with Other Subject Imports is Unsupported by Substantial Evidence .......................................................................................... 24

C.     The Commission's Analysis of Subject Import Volumes Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ................ 25

1.     The Commission's Determination that the Volume of Subject Imports Was "Significant" Ignores Conditions of Competition ........................... 25

2.     The Commission's Failure to Consider Import Volume in Assessing Post-Petition Effects Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ...................................................... 26

a.     The Statute Mandates Considering Changes in "Volume," not Market Share, in Assessing Post-Petition Effects ................... 27

b.     The Commission Relied Solely on Market Share and Did Not Consider Volume in Assessing Post-Petition Effects ............. 28

NON-CONFIDENTIAL VERSION

|   | c. | The Post-Petition Increase in Import Volume Justified Relying on Post-Petition Data........................................................29 |

| D. | | The Commission's Determination That Subject Imports Had Significant Adverse Price Effects Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law...............................................30 |
| | 1. | No Commission Finding Regarding Price Suppression...........................30 |
| | 2. | The Commission Failed to Consider Record Evidence Countering Petitioners' Lost Sales and Lost Revenue Claims ....................................32 |
| | 3. | The Commission Failed to Account for Price Lags Resulting from Tenaris' Long-Term Contracts or [          ] ...........................................35 |

| E. | | The Commission's Determination That the Domestic Industry Was Injured by Reason of Subject Imports Was Unsupported By Substantial Evidence and Otherwise Not in Accordance with Law ..........................................37 |
| | 1. | The Commission Failed To Evaluate Impact Within the Context Of Conditions Of Competition Distinctive To U.S. OCTG Industry .............38 |
| | | a. | The Commission Failed to Consider the Impact of Russia/Saudi Oil Supply War and COVID-19 Pandemic..............38 |
| | | b. | The Commission Dismissed the Evidence of Supply Constraints ....................................................................................39 |
| | | | i. | Inventory Overhang ..........................................................39 |
| | | | ii. | Hot-Rolled Coil Prices......................................................40 |
| | | | iii. | Labor Shortages ................................................................41 |
| | | c. | The Commission Failed to Consider Tenaris' Role in the U.S. OCTG Market and Intra-Industry Competition....................42 |
| | 2. | The Domestic Industry Began To Recover Before the Petitions were Filed ........................................................................................................44 |
| | 3. | The Commission Relied on Qualitative Information That Included Non-subject Imports from South Korea....................................................47 |

| VI. | | CONCLUSION AND RELIEF SOUGHT .......................................................49 |

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States,*
  112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ....................................................................8, 34

*Altx, Inc. v. United States,*
  167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) ...........................................................................25

*Altx, Inc. v. United States,*
  26 C.I.T. 709 (2002),
  *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004) ......................................................................................25

*Angus Chem. Co. v. United States,*
  944 F. Supp. 943 (Ct. Int'l Trade 1996),
  *aff'd*, 140 F.3d 1478 (Fed. Cir. 1998) ......................................................................................25

*Arlanxeo USA LLC v. United States,*
  389 F. Supp. 3d 1330 (Ct. Int'l Trade 2019),
  *aff'd*, 819 Fed. Appx. 925 (Fed. Cir. 2020) ............................................................................25

*Atlantic Sugar, Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984).................................................................................................8

*Celanese Chems. Ltd. v. United States,*
  31 C.I.T. 279 (2007) ...........................................................................................................23, 48

*Chemours Co. FC, LLC v. United States,*
  443 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2020) ............................................................28, 29

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984)...............................................................................................................8, 27

*CP Kelco US, Inc. v. United States,*
  38 C.I.T. 1511 (2014) ..............................................................................................................27

*Dak Ams. LLC v. United States,*
  456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) .....................................................18, 21, 39, 47

*Gerald Metals, Inc. v. United States,*
  132 F.3d 716 (Fed. Cir. 1997)..............................................................................................39, 41

*Hontex Enters. v. United States,*
  248 F. Supp. 2d 1323 (Ct. Int'l Trade 2003) ...........................................................................9

*Huaiyin Foreign Trade Corp. v. United States,*
    322 F.3d 1369 (Fed. Cir. 2003)..................................................................8

*Hynix Semiconductor, Inc. v. United States,*
    431 F. Supp. 2d 1302 (Ct. Int'l Trade 2006) .................................................43, 44

*Nevinnomysskiy Azot v. United States,*
    565 F. Supp. 2d 1357 (Ct. Int'l Trade 2008) .................................................10, 40

*Nippon Steel Corp. v. United States,*
    182 F. Supp. 2d 1330 (Ct. Int'l Trade 2001) .......................................................25

*NSK Corp. v. United States,*
    637 F. Supp. 2d 1311 (Ct. Int'l Trade 2009) .......................................................41

*Octal Inc. v. United States,*
    539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) .......................................................30

*Swiff-Train Co. v. United States,*
    904 F. Supp. 2d 1336 (Ct. Int'l Trade 2013) .................................................30, 31

*Timken Co. v. United States,*
    699 F. Supp. 300 (Ct. Int'l Trade 1988) .............................................................22

*Ulasim Sanayi, A.S. v. United States,*
    429 F. Supp. 3d 1353 (Ct. Int'l Trade 2020) ........................................................8

*Usinor v. United States,*
    26 C.I.T. 767 (2002) ..............................................................................18, 21

*Zhaoqing New Zhongya Aluminum Co. v. United States,*
    929 F. Supp. 2d 1324 (Ct. Int'l Trade 2013) ........................................................8

## STATUTES AND REGULATIONS

19 U.S.C. § 1516a(a)(2)(B)(i).....................................................................8

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................8

19 U.S.C. § 1677(7)(I).........................................................................26, 27

19 U.S.C. § 1677(7)(C)(i).........................................................................25

19 U.S.C. § 1677(7)(C)(ii)........................................................................30

19 U.S.C. § 1677(7)(C)(iii).......................................................................10

19 U.S.C. § 1677(7)(G)(i).....................................................................18, 23

28 U.S.C. § 1581(c) ...................................................................................................8

Statement of Administrative Action to the Uruguay Round Agreements Act..................18, 21, 27

Trade Expansion Act of 1962 § 232 ...................................................................6, 24

## ADMINISTRATIVE DETERMINATIONS

*Certain Aluminum Plate From South Africa*,
   Inv. No. 731-TA-1056 (Final),
   USITC Pub. 3734 (Nov. 2004) ..............................................................................29

*Certain Corrosion-Resistant Steel Products from China, India, Italy, South Korea, and Taiwan*,
   Inv. Nos. 701-TA-534-537 and 731-TA-1274-1278 (Review),
   USITC Pub. 5337 (Aug. 2022) .............................................................................14

*Certain Preserved Mushrooms from China, India, and Indonesia*,
   Inv. Nos. 731-TA-777-779 (Final),
   USITC Pub. 3159 (Feb. 1999) ..............................................................................23

*Certain Steel Wire Rod From Canada, Germany, Trinidad & Tobago, and Venezuela*,
   Inv. Nos. 731-TA-763-766 (Final),
   USITC Pub. 3087 (Mar. 1998) .............................................................................46

*Emulsion Styrene-Butadiene Rubber from Brazil, Korea, Mexico, and Poland*,
   Inv. Nos. 731-TA-1334-1337 (Final),
   USITC Pub. 4717 (Aug. 2017) .............................................................................29

*Emulsion Styrene-Butadiene Rubber from Czechia and Russia*,
   Inv. Nos. 731-TA-1575 and 731-TA-1577(Final),
   USITC Pub. 5392 (Jan. 2023)...............................................................................38

*Greenhouse Tomatoes From Canada*,
   Inv. No. 731-TA-925 (Final),
   USITC Pub. 3499 (Apr. 2002) ..............................................................................47

*Hardwood Plywood from China*,
   Inv. Nos. 701-TA-490 and 731-TA-1204 (Final),
   USITC Pub. 4434 (Nov. 2013) ..............................................................................46

*Large Diameter Welded Pipe from China and India*,
   Inv. Nos. 701-TA-593-594 and 731-TA-1402 and 1404 (Final),
   USITC Pub. 4859 (Jan. 2019)...............................................................................29

*Magnesium from Israel*,
   Inv. Nos. 701-TA-614 and 731-TA-1431 (Final),
   USITC Pub. 5009 (Jan. 2020)...............................................................................43

*Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico,*
    Inv. Nos. 731-TA-711 and 713-716 (Second Review),
    USITC Pub. 3923 (June 2007)...............................................................................42

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping*
    *Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the*
    *Russian Federation,*
    87 Fed. Reg. 70,785 (Nov. 21, 2022)........................................................................1

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea,*
    87 Fed. Reg. 69,331 (Nov. 18, 2022)........................................................................1

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea,*
    86 Fed. Reg. 67,491 (Nov. 26, 2021)........................................................................3

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea,*
    Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final),
    USITC Pub. 5381 (Nov. 2022) ........................................................................ passim

*Organic Soybean Meal from India,*
    Inv. Nos. 701-TA-667 and 731-TA-1559 (Final),
    USITC Pub. 5321 (May 2022)..................................................................................27

*Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands,*
    *Saudi Arabia, Taiwan, Turkey, and the United Arab Emirates,*
    Inv. Nos. 701-TA-646 and 731-TA-1502-1504, 1508-1509, 1512, 1514, and 1516 (Final),
    USITC Pub. 5153 (Jan. 2021)..................................................................................27

*Raw In-Shell Pistachios from Iran,*
    Inv. No. 731-TA-287 (Second Review),
    USITC Pub. 4701 (June 2017)..................................................................................24

*Silicomanganese from Australia,*
    Inv. No. 731-TA-1269 (Final),
    USITC Pub. 4600 (Apr. 2016)..................................................................................46

*Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan,*
    Inv. Nos. 701-TA-379 and 731-TA-788, 790-793 (Second Review),
    USITC Pub. 4248 (Aug. 2011) .................................................................................42

*Steel Nails from India, Oman, Sri Lanka, and Turkey,*
    Inv. Nos. 701-TA-673-675 and 677 (Final),
    USITC Pub. 5370 (Oct. 2022) .................................................................................38

*Steel Wheels from China,*
    Inv. Nos. 701-TA-602 and 731-TA-1412 (Final),
    USITC Pub. 4892 (May 2019)..................................................................................29

*Urea Ammonium Nitrate Solutions from Russia and Trinidad and Tobago*,
   Inv. Nos. 701-TA-668-669 and 731-TA-1565-1566 (Final),
   USITC Pub. 5338 (Aug. 2022) ...............................................................................................31

## LEGISLATIVE MATERIALS

H.R. Rep. No. 103-316, vol. 1 (1994)..................................................................................18

H.R. Rep. No. 103-826, pt. 1 (1994)...................................................................................27

NON-CONFIDENTIAL VERSION

## I.    STATEMENT PURSUANT TO USCIT R. 56.2(C)

### A.    Administrative Determination Sought to Be Reviewed

Plaintiffs contest certain aspects of the affirmative final determination issued by the U.S. International Trade Commission ("Commission") in the antidumping duty ("AD") investigations involving oil country tubular goods ("OCTG") from Argentina and Mexico.  The contested determinations were published as *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea,* 87 Fed. Reg. 69,331 (Nov. 18, 2022), and accompanying views of the Commission, entitled, *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea,* Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022) ("Final Determination") (P.R. 165).  AD orders were imposed by the Department of Commerce ("Commerce").  *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70,785 (Dep't Commerce Nov. 21, 2022).

### B.    Questions Presented and Summary of Argument

#### 1.    Did the Commission properly consider the conditions of competition in its injury analysis such that it could properly assess whether subject imports caused the alleged injury to the domestic industry?

No.  The statute mandates that the Commission conduct its injury analysis within the context of the conditions of competition distinctive to the U.S. OCTG industry.  The Commission did not do so.  The record evidence established that the period of investigation ("POI") was characterized by unprecedented demand and supply conditions.  The evidence also established intra-industry competition within the domestic industry, and that Tenaris, the largest U.S. producer, also sold subject OCTG from Argentina and Mexico using its unique Rig Direct® business model.  The Commission did not address certain conditions at all and it failed to

1

NON-CONFIDENTIAL VERSION

consider the relevance of the conditions in its volume, price and impact analyses. These deficiencies led the Commission to reach several conclusions that were unsupported by substantial evidence.

> **2.     Is the Commission's decision to cumulate subject imports from Argentina, Mexico, South Korea and Russia supported by substantial evidence and otherwise in accordance with law?**

No. The record evidence confirms that subject imports from Argentina and Mexico should not have been cumulated with subject imports from South Korea because they were not fungible and were not sold in the same channels of distribution. Subject imports from Russia also should not have been cumulated with other subject imports because they did not compete in the same manner in the U.S. market due to restrictions imposed as a result of Russia's invasion of Ukraine. The Commission's decision to cumulate subject imports from Argentina and Mexico with imports from South Korea and Russia is not supported by substantial evidence and otherwise not in accordance with law. Further, the Commission failed to consider that subject imports from South Korea were under an existing AD order, and, separately, relied on non-subject data for South Korea.

> **3.     Is the Commission's analysis of subject import volume supported by substantial evidence and otherwise in accordance with law?**

No. The Commission failed to analyze subject import volume in the context of the high demand for OCTG and its determination that the volume was "significant" is not supported by substantial evidence and is otherwise not in accordance with law. The Commission's decision to consider decreasing subject market share rather than increasing subject import volume in assessing post-petition effects is contrary to the statute, Commission practice, and this Court's decisions.

NON-CONFIDENTIAL VERSION

    **4.**    **Is the Commission's determination that subject imports had adverse price effects supported by substantial evidence and otherwise in accordance with law?**

No.  The Commission's price analysis did not include the statutorily-mandated price suppression analysis.  The Commission also failed to, consider record evidence countering Petitioners' lost sales/lost revenue claims, account for price lags resulting from Tenaris' long-term contracts, or [                                                                                                ].  The Commission's price analysis is not supported by substantial evidence and is otherwise not in accordance with law.

    **5.**    **Is the Commission's determination that the domestic industry was injured by reason of subject imports supported by substantial evidence and otherwise in accordance with law?**

No.  The Commission failed to evaluate the impact of subject imports within the context of the demand, supply, and other conditions distinctive to the U.S. OCTG industry.  In addition, the Commission improperly discounted the 2022 interim data for the domestic industry, which demonstrated that, even as subject imports increased, the health of the U.S. OCTG industry improved, thereby breaking the causal nexus between subject imports and any harm to the domestic industry.  The Commission also relied on qualitative information that included non-subject imports from South Korea.  The Commission's impact analysis is not supported by substantial evidence and is otherwise not in accordance with law.

## II.    STATEMENT OF FACTS

On October 6, 2021, petitions were filed for the imposition of AD and countervailing duties ("CVD") on OCTG from Argentina (AD), Mexico (AD), Korea (CVD), and Russia (AD/CVD).  *Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country*

*Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia* (Oct. 6, 2021) ("Petitions") (C.R. 1; P.R. 1).[1]

The Commission preliminarily determined that there was a "reasonable indication that an industry in the United States is materially injured by reason of imports of oil country tubular goods from Argentina, Mexico, Russia, and South Korea{.}"  *See Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, 86 Fed. Reg. 67,491 (Nov. 26, 2021) (P.R. 72).

The Commission found that the U.S. industry "is materially injured by reason of imports" of subject OCTG from Argentina, Mexico, Russia, and South Korea.  Final Determination.

The Commission stated that "Commerce calculated a *de minimis* rate for only Hyundai Steel in its final determination … Thus, OCTG imports from this firm are not subject to these investigations, and Commission staff have accordingly adjusted the import data.…"  Final Determination at 4 n.9.  The Staff Report, however, includes data and information that reflect both subject and non-subject imports.  *See, e.g.*, Final Determination at 22; Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea—Staff Report (Final and Preliminary) (Oct. 14, 2022) (Public Version) at Table II-14 at II-33, 35-36, 39, Table IV-17 at IV-33-34 ("PSR") (P.R. 161).

Regarding conditions of competition during the POI, record evidence shows that demand collapsed to an historic low following the Russia-Saudi Arabia oil supply war and COVID-19 pandemic, but started to recover in August 2020.  *See, e.g.*, *Tenaris Prehearing Brief* at 16-18, 20-23 and Ex. 15-16, 26-35 (Sept. 14, 2022) ("Tenaris Prehearing Br.") (C.R. 405; P.R. 128); *Tenaris Posthearing Brief* at 3-4 (Sept. 29, 2022) ("Tenaris Posthearing Br.") (C.R. 418; P.R.

---

[1] Citations to the administrative record indicate the public and confidential record document numbers ("P.R." and "C.R.").

144); *Tenaris Final Comments* at 9 (Oct. 21, 2022) ("Tenaris Final Comments") (C.R. 437; P.R. 164). Record evidence also shows that significant supply constraints, including distributors' high inventories, high prices for hot-rolled coil ("HRC"), the main input for welded OCTG, and labor shortages prevented the domestic industry from meeting OCTG demand. *See, e.g.*, Tenaris Prehearing Br. at 23-33, Ex. 36-55; Tenaris Posthearing Br. at 4-5, Ex. 1 at 64-67 (Question#14).

Tenaris invested more than $10 billion, including its $1.1 billion acquisition of IPSCO Tubulars Inc. ("IPSCO") in 2020, to become the largest U.S. producer of OCTG. Tenaris Prehearing Br. at 8-9. Record evidence shows that approximately [    ] of the subject imports came from Argentina and Mexico in 2021, and that nearly all of these imports were produced by Tenaris. Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea—Staff Report (Final and Preliminary) (Oct. 14, 2022) (Confidential Version) at I-4, II-9 Table IV-3 at IV-5 ("CSR") (C.R. 431); Tenaris Prehearing Br. at 6. The record further shows that Tenaris imported OCTG to complement its growing U.S. production, that it used an innovative Rig Direct® model, and that it sold OCTG at one price, regardless of origin. *See* Tenaris Prehearing Br. at 7-15 and Ex. 1-13; Tenaris Final Comments at 1-2, 14. As a result, when market participants complained of losing sales to Tenaris, the Commission's record did not allow the Commission to distinguish between Tenaris' growing U.S. production and its declining imports from Argentina and Mexico.

Plaintiffs argued that subject imports from Argentina and Mexico should not be cumulated with subject imports from South Korea and Russia because of limited competition between such imports. Plaintiffs explained that subject imports from Argentina and Mexico were not fungible with, and were sold in different channels of distribution from, the subject imports from South Korea. Tenaris Prehearing Br. at 35-40; Tenaris Posthearing Br. at 6-8 and

NON-CONFIDENTIAL VERSION

Ex. 1 at 57-59 (Question#12), Ex. 23. Tenaris and TMK Group ("TMK") also explained that competition with subject imports from Russia was limited due to U.S. measures in response to Russia's invasion of Ukraine, including denying American Petroleum Institute ("API") certification to Russian OCTG producers, revoking Russia's permanent normal trade relations ("PNTR") status, Section 232 duties, and sanctions. *See, e.g.*, Tenaris Prehearing Br. at 40-41; Tenaris Posthearing Br. at Ex. 1 at 3-6 (Question#1); *TMK's Post-Hearing Brief* at 2-9 (Sept. 29, 2022) (C.R. 417; P.R. 145). Certain data and qualitative information in three Staff Report tables cited by the Commission included non-subject imports. *See* Final Determination at 19 nn.90-91, 22 n.111; PSR at Table II-16 at II-41; Table II-19 at II-44; Table IV-17 at IV-33-34. The Commission considered all subject imports on a cumulated basis. Final Determination at 19-23.

The Commission found that the volume of cumulated subject imports was "significant in absolute terms and relative to consumption in the United States." Final Determination at 33. The Commission's analysis of subject import volumes reflects no consideration of the conditions of competition in the OCTG market. *See id.* at 32-33. In assessing whether to rely on the post-petition data, the Commission considered the decrease in subject market share rather than the increase in the volume of subject imports during interim 2022, and accorded less weight to post-petition data in interim 2022. *Id.* at 32-33 n.184.

The Commission found that cumulated subject imports "significantly undersold the domestic like product." *Id.* at 39. The Commission reached no conclusion regarding price suppression. *See id.* Relying on a flawed market share table and "contemporaneous communications" provided by Petitioners, the Commission found "some evidence that domestic producers lost sales to subject imports on the basis of price." *Id.* at 36-37. The Staff Report acknowledged the market share table may have double counted OCTG shipments. *See* PSR, note

to Table V-18 at V-40.   Plaintiffs addressed each of Petitioners' lost sales/lost revenues allegations. *See* Tenaris Posthearing Br. at Ex. 1 at 68 (Question#15), Ex. 19-20.  Plaintiffs also presented evidence showing that Tenaris' contracts specify one price for domestically-produced OCTG and imported OCTG products at the time of the contract, which could create an inaccurate comparison with market prices at the time of delivery.  Tenaris Prehearing Br. at 53; Tenaris Posthearing Br. at Ex. 1 at 35-40 (Question#7).   Plaintiffs proposed a quarterly lag adjustment for price comparisons. *See* Tenaris Prehearing Br. at 54, Ex. 63; Tenaris Posthearing Br. at Ex. 1 at 47-50 (Question#10).  The Commission rejected Tenaris' proposed adjustment and concluded that underselling led to the domestic industry's decrease in market share.  Final Determination at 34-39.

Plaintiffs explained that any injury to the U.S. industry is attributable to the conditions of competition in the U.S. OCTG market during the POI and intra-industry competition, rather than subject imports.  Tenaris Prehearing Br. at 6.  Record evidence shows that, in a proceeding decided earlier the same year, in January 2022, the Canadian International Trade Tribunal ("CITT") relied on these conditions of competition and intra-industry competition to make a negative injury finding regarding OCTG from Mexico.  Tenaris Prehearing Br. at 6, 62 (citing *Oil Country Tubular Goods*, Canadian International Trade Tribunal Finding, Inquiry No. NQ-2021-004 (26 January 2022), and accompanying Statement of Reasons (10 February 2022)).

In contrast to the CITT decision, the Commission failed to consider the conditions of competition, including intra-industry competition, and concluded that subject imports "had a significant impact on the domestic industry."  Final Determination at 47.  The Commission concluded that any weak domestic industry performance could be causally linked to subject

imports, and any industry improvements could be attributed to the filing of the petitions. *See id.* at 43.

## III.   JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(i).

## IV.   STANDARD OF REVIEW

In reviewing a Commission determination in an AD proceeding, the Court "shall hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law{.}"   19 U.S.C. § 1516a(b)(1)(B)(i).

The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ("taking into account *the entire record* …") (emphasis added)).   "{I}t is … well-established that {the agency's} total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders {its} determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000).

The court determines whether an agency action is "in accordance with law" based on the two-prong test established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984).   *See, e.g., Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 429 F. Supp. 3d 1353, 1357 (Ct. Int'l Trade 2020).   The agency's decision "must be authorized

by the statute, and consistent with the agency's regulations{,}" for it to be in accordance with law. *Zhaoqing New Zhongya Aluminum Co. v. United States*, 929 F. Supp. 2d 1324, 1326 (Ct. Int'l Trade 2013) (citing *Hontex Enters. v. United States*, 248 F. Supp. 2d 1323, 1340 (Ct. Int'l Trade 2003)).

## V.   ARGUMENT

### A.   The Commission Failed to Conduct its Injury Analysis Within the Context of the Unprecedented Conditions of Competition Prevailing During the POI.

The Commission's flawed conditions of competition analysis led to erroneous volume, price, and impact determinations. The record compels the conclusion that any injury to the domestic industry resulted from the conditions of competition that characterized the OCTG market during the POI, and not from subject imports. These unprecedented conditions of competition included:

- Severely reduced demand for petroleum (and therefore OCTG) resulting from both the Russia/Saudi oil price/supply war and the global pandemic.

- Market factors suppressing domestic production, including high inventory levels held by U.S. distributors, de-stocking of those inventories, a meteoric rise in prices for HRC (the major input for welded OCTG production), and labor shortages.

- Tenaris' emergence as the largest U.S. OCTG producer after investment of more than $10 billion in U.S. production facilities, including its POI acquisition of IPSCO, that coincided with the POI demand and supply shocks.

- Tenaris' innovative approach to domestic supply through its Rig Direct® program, featuring long-term contracts with sales at "one price" tied to U.S. market prices, regardless of whether the OCTG was produced at Tenaris' U.S. mills or imported.

- Twenty-four consecutive months of increasing OCTG prices (including for over a year in advance of the filing of the petitions).



Tenaris' USITC Hearing Witness Testimony, at Attachment to Testimony of Dr. Thomas J. Prusa (Sept. 21, 2022) (P.R. 132).

These conditions are discussed in more detail below and in Section V.E.

### 1. The Statute Mandates an Injury Analysis Within the Context of the Conditions of Competition Distinctive to the Industry

The statute provides that the Commission "shall evaluate all relevant economic factors… within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii).  The Commission's "analysis does not occur in a vacuum, but rather, 'within the context of the business cycle and the conditions of competition that are distinctive to the affected industry.'"  *Nevinnomysskiy Azot v. United States*, 565 F. Supp. 2d 1357, 1373 (Ct. Int'l Trade 2008) (internal citation omitted).

NON-CONFIDENTIAL VERSION

  **2. Record Evidence Established Historic Collapse of Demand Followed by Substantial Increase in Demand**

  The Russia/Saudi oil price/supply war during March 2020 disrupted the oil market and, in turn, the OCTG market. The CEO of Pioneer Natural Resources Company testified before Congress that "national oil companies in Saudi Arabia, Russia and other OPEC+ member countries chose to compete for market share based on price" and that "oil stood well below $40 per barrel, and actually turned negative for a period of time." *See* Tenaris Prehearing Br. at Ex. 50 at 3-4 (congressional testimony).

  The COVID-19 pandemic further suppressed demand during 2020 for OCTG. *See* PSR at II-19-21. Active U.S. rig count, the principal driver of OCTG demand, fell from 1083 in December 2018 to 790 in February 2020, before falling to 251 in July 2020. *See* Tenaris Prehearing Br. at 17; *see also* PSR at Table II-5 at II-20, Figure II-2 at II-21. Operational consumption of OCTG [    ] net tons in January 2019, to [  ] in February 2020, [     ] net tons in August 2020. CSR at Table II-6 at II-22.

  The Commission's commentary is limited: "Petitioners and Tenaris agree that OCTG demand in the United States, after declining through August 2020 due to the COVID-19 pandemic, recovered thereafter through the end of the POI." Final Determination at 27. The Commission did not even mention the Russia/Saudi price war.

  After the historic collapse, demand and prices for OCTG substantially increased before the filing of the petition. Rig count increased from 250 rigs in August 2020 to 560 in November of 2021, reaching 764 rigs in August 2022. PSR at Table II-5 at II-20. Operational consumption of OCTG [    ] net tons in August 2020 to [  ] net tons in November of 2021 and [  ] net tons in June of 2022. *See* CSR at Table II-6 at II-22. In the first half of 2022, shipments by domestic producers [    ], while shipments of imported pipe

11

**NON-CONFIDENTIAL VERSION**

[                                        ] compared to the same period in 2021).  Tenaris Prehearing Br.

at Ex. 15 at 50 ([                                        ]).  Reflecting the OCTG demand increase,

between October 2020 and October 2021 – the year preceding the petition – average prices for

seamless OCTG [                                        ], while welded OCTG

[                                        ].  Tenaris Prehearing Br. at 20, Ex. 28 at 4 ([

                        ]).  By August 2022, seamless [                        ] and welded [

        ], [        ]% and [        ]% [        ] than October 2020 prices.  Tenaris Prehearing Br. at

Ex. 26 at 4 ([                                        ]).

### 3.    The Record Evidence Established Significant Supply Constraints

When demand began to increase, oil and gas companies could not obtain sufficient

OCTG.  In a Texas Alliance of Energy Producers survey completed in March/April 2022, 87.5%

of consumers indicated the lack of OCTG availability in 2022 "ma{de} it difficult to ramp up

drilling activities and production of crude oil and/or natural gas{,}" with 77.5% calling supply

constraints "highly significant."  Tenaris Prehearing Br. at Ex. 44 (survey at Questions 1 and 2).

The Dallas Fed. Energy Survey also documented 50 oil and gas executives reporting a

"significant shortage" of steel tubular goods in June 2022.  *See* Tenaris Prehearing Br. at 31-32,

Ex. 54.

U.S. purchasers confirmed supply constraints, with 18 of 28 reporting that firms "had

refused, declined or been unable to supply" OCTG between January 1, 2019 and October 5, 2021

(*i.e.*, the petition filing date).  CSR/PSR at II-14.  Purchasers explained that U.S. mills reduced

their capacity in 2020 and had difficulty restoring it due to [

                        ].  CSR/PSR at II-14.  After the Petitions were filed, 26 out of 27

purchasers observed similar trends they attributed in part to "preexisting supply tightness."

**NON-CONFIDENTIAL VERSION**

CSR/PSR at II-14-15; U.S. Purchasers' QR at Question III-13(a) ([



]) (C.R. 316); ([

]) (C.R. 324); ([

])

(C.R. 322).

The Commission mentioned U.S. plant closings, shutdowns, and curtailments during the POI, and noted the majority of U.S. producers reported supply constraints since 2019. *See* Final Determination at 28. However, the Commission dismissed the impact of the supply constraints evidence.

### a.   U.S. Distributors' High OCTG Inventory Levels Delayed Ramp Up of Domestic Production

Record evidence shows (1) a significant inventory buildup by U.S. distributors in mid-2020 due to the historic decline in demand and (2) subsequent destocking that delayed the ramp up of U.S. OCTG production for U.S. producers as demand improved in 2021. Following the market collapse and plummeting consumption, U.S. distributors increased their inventories above the industry standard of about four months' supply. *See* USITC Preliminary Conference Transcript at 158 (Curá) (Oct. 27, 2021) (P.R. 34). Inventory rose sharply from [ ] months of supply in March 2020 to [ ] months in September 2020 before dropping to just over [ ] months in December 2020 and eventually returning to [ ] months of supply in December 2021. *See* Tenaris Prehearing Br. at 28 (chart depicting US OCTG Inventory, Prices, & Months of Supply 2017-2022, derived from [                                                    ]), Ex. 26, Ex. 28; *see also* CSR at II-16, Table II-4 at II-17, Figure II-1 at II-18; Tenaris Prehearing Br. at Ex. 62

**NON-CONFIDENTIAL VERSION**

(Dr. Prusa explaining [

        ]).

  As demand recovered, U.S. distributors [

                    ], which initially prevented the return of U.S. production. *See* CSR at II-

15 ("[          ] described the U.S. market for OCTG as being oversupplied in 2020," which

"led to many U.S. producers curtailing or even shuttering production"). The [

                    ] caused OCTG inventories to [                    ] in September

2020 to [                    ] in September 2021, [                              ].

*See* Tenaris Prehearing Br. at 27-28, Ex. 28 at 2, 7 ([                        ]).

Supply issues emerged as inventory levels decreased relative to surging demand. *See e.g.*,

Tenaris Prehearing Br. at Ex. 45.

   **b.**  **Prices for Hot-Rolled Coil Increased Dramatically**

  From August 2020 through August 2021, the price of HRC rose dramatically, sometimes

even eclipsing the price of welded OCTG. *See* Tenaris Prehearing Br. at 24-25, Ex. 26 at 5

([

                              ]). HRC prices remained at elevated

levels throughout the POI, [                    ]/ST in August 2020 to a [          ]/ST in

September 2021, [                    ]/ST in June 2022. *See* Tenaris Posthearing Br. at Ex.

5; CSR at Table V-1 at V-4. The Commission recognized the significant HRC price increases

relative to downstream steel products during 2021 in other cases. *See Certain Corrosion-

Resistant Steel Products from China, India, Italy, South Korea, and Taiwan*, Inv. Nos. 701-TA-

534-537 and 731-TA-1274-1278 (Review), USITC Pub. 5337 at 45, 54 (Aug. 2022).

**NON-CONFIDENTIAL VERSION**

Welded OCTG producers, including Tenaris, faced difficult production decisions given high HRC costs. Petitioners conceded they could not pass on increasing HRC costs to their OCTG customers. *See* USITC Hearing Transcript at 27 (Mandel), 32 (Hart) (Oct. 11, 2022) ("Tr.") (P.R. 149) ("being unable to pass along our cost increases, we decided not to produce more tons and sell them at prices that end up losing money on every sale"). Several welded OCTG producers halted production. *See* Tenaris Prehearing Br. at Ex. 39. From August 2020 through August 2021, as HRC prices rose dramatically, domestic shipments of welded OCTG remained low, and only with falling HRC prices in September 2021 did domestic shipments of welded OCTG rise. *See* Tenaris Prehearing Br. at 25.

The Commission ignored the high HRC prices that constrained welded OCTG production. Final Determination at 30-31 (simply noting: "U.S. price for HRC decreased irregularly from 2019 to mid-2020, then increased substantially through mid-2021, before falling irregularly to the end of the POI"); *cf.* Tenaris Posthearing Br. at Ex. 5; CSR at Table V-1 at V-4, Figure V-1 at V-5.

### c. The U.S. Industry Suffered Labor Shortages

U.S. OCTG producers idled operations and laid off workers in 2020 due to COVID-19 and the demand collapse. The Staff Report lists [     ] by U.S. OCTG producers, including [                    ]. *See* CSR at Table III-5 at III-5-9, Table III-6 at III-9-11. When demand increased in 2021, U.S. market participants confirmed the difficulties U.S. producers faced fulfilling orders because of the challenge of hiring OCTG workers. CSR/PSR at II-4-5, II-13-14 ([                                        ] reported that labor shortages contributed to supply constraints from 2020, through the rest of the POI). After demand dropped, Tenaris suspended certain operations and reduced employees, but as

NON-CONFIDENTIAL VERSION

market conditions improved "{Tenaris'} challenge {was} hiring enough qualified workers to ramp up U.S. production quickly enough to meet the increased demand for OCTG of {its} U.S. customers." Tr. at 177 (Schnurbusch); *see also* Tenaris Posthearing Br. at Ex. 1 at 21-22, 28-29 (Questions#4-5), Ex. 8-9.  Tenaris documented that it faced [          ] in [



].  Tenaris Posthearing Br. at Ex. 1 at 21-22 (Question#4).

### 4. Prior to the Petitions, Tenaris Became the Largest U.S. OCTG Producer and Imported to Satisfy Demand Due to Supply Constraints

#### a. Tenaris' $10 Billion Plus Investment and Rig Direct® Model

Tenaris became the largest U.S. OCTG producer in the months prior to the petition. *See, e.g.*, Tenaris Posthearing Br. at Ex. 1 at 7 (Question#2).  The [                    ]. Confidential Views of the Commission at 19 (Nov. 15, 2022) ("Final Determination (CV)") (C.R. 439); *see also* Tenaris Prehearing Br. at 8-9 (chart depicting Tenaris' over $10 billion investment in the OCTG industry from 2006 through POI).  The Commission's statement that [

].  Final Determination (CV) at 21.

Tenaris explained to the Commission that its Rig Direct® model is fundamentally different from the other U.S. producers' model that requires unaffiliated U.S. distributors.  Under Rig Direct®, *Tenaris controls all* production, processing, and distribution functions to supply its end user customers, prioritizing Tenaris' U.S. OCTG production facilities in which it has invested so heavily.  Imports from other Tenaris mills play a limited and diminishing role:

NON-CONFIDENTIAL VERSION

primarily complementing Tenaris' U.S. production when necessary. *See e.g.*, Tr. at 171-74

(Zanotti), 179 (Lange); Tenaris Prehearing Br. at Ex. 13 (overview of Rig Direct®).

Tenaris prices its entire OCTG offering to the U.S. market – both domestically produced

and imported – at one price. *See* Tenaris Posthearing Br. at 11; Tenaris Prehearing Br. at 15; Tr.

at 171 (Zanotti). The record confirms that [    ]% of Tenaris USA's shipments of OCTG in the

United States are sold pursuant to supply agreements with [


] *See* Tenaris Prehearing Br. at

15, 53.

### b.    Intra-Industry Competition in the U.S. Market

The Commission acknowledged that Tenaris offered its U.S. customers [


]. *See* Final Determination (CV) at 51 & n.215. The Commission

simply stated: "we are unpersuaded by Tenaris's argument that intra-industry competition

explains any injury to the domestic industry. Intra-industry competition cannot explain the

domestic industry's loss of market share to subject imports from 2020 to 2021." Final

Determination at 47.   In contrast, Canadian authorities analyzing similar conditions of

competition and Tenaris' business model made a negative injury finding. *See* Tenaris Prehearing

Br. at Ex. 61 at 25-26.

The Commission's analysis of the conditions of competition in this case is woefully

inadequate and legally insufficient. As demonstrated through specific examples in Sections V.C

– E below, the Commission's failure to consider properly the conditions of competition led to a

determination that is both unsupported by substantial evidence and not in accordance with law.

NON-CONFIDENTIAL VERSION

**B.      The Commission's Decision to Cumulate Subject Imports Is Unsupported by Substantial Evidence and Otherwise Not in Accordance With Law**

The Commission cumulated subject imports after finding a "reasonable overlap of competition between and among domestically produced OCTG and imports from each subject country{.}"   Final Determination at 23.   The Commission's analysis is unsupported by substantial evidence and otherwise contrary to law.

The statute provides that "the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries .... if such imports compete with each other and with domestic like products in the United States market."   19 U.S.C. § 1677(7)(G)(i).   The Statement of Administrative Action to the Uruguay Round Agreements Act ("SAA") states that:  "the statutory requirement is satisfied if there is a reasonable overlap of competition{.}"   *See* H.R. REP. NO. 103-316, vol. 1 at 848 (1994).   The Commission typically considers four factors in determining whether subject imports compete with each other and with domestic like products in the U.S. market.   *See* Final Determination at 17.   Plaintiffs challenge the Commission's findings regarding two factors:    (1) fungibility; and (2) channels of distribution.

**1.      The Commission's Fungibility Findings Are Unsupported by Substantial Evidence**

The Commission found that subject imports from Argentina, Mexico, South Korea, and Russia were fungible with each other and with the domestic like product.  *Id.* at 21.  The record evidence detailed below shows that (1) nearly all subject imports from Argentina and Mexico consisted of seamless OCTG, whereas subject imports from South Korea consisted almost entirely of welded OCTG, (2) seamless OCTG and welded OCTG are not interchangeable in key applications, and (3) average unit values ("AUVs") for seamless OCTG were consistently higher

than welded OCTG.  The Commission's failure to account for evidence that weighs against its determination renders its fungibility finding unsupported by substantial evidence.  *See Dak Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1357–58 (Ct. Int'l Trade 2020); *Usinor v. United States,* 26 C.I.T. 767, 773, 778 (2002) (cumulation decision unsupported by substantial evidence "{d}ue to Commission's total failure to analyze or rebut" evidence that weighed against cumulation).

OCTG imports from Argentina and Mexico during the POI were essentially *all* seamless, whereas OCTG imports from South Korea were nearly *all* welded:

**Seamless and Welded OCTG - Percent of Subject Imports by (based on KGs)**

| Country | Seamless or Welded | 2019 | 2020 | 2021 | Jan-June 2021 | Jan-June 2022 |
|---------|--------------------|------|------|------|---------------|---------------|
| Argentina | Seamless | 100% | 100% | 100% | 100% | 100% |
|           | Welded | 0% | 0% | 0% | 0% | 0% |
| Mexico | Seamless | 98% | 99% | 100% | 100% | 100% |
|        | Welded | 2% | 1% | 0% | 0% | 0% |
| Korea | Seamless | 5% | 1% | 8% | 10% | 10% |
|       | Welded | 95% | 99% | 92% | 90% | 90% |

*Source*:  USITC Dataweb (based on HTS item numbers in petitions)

*See* Tenaris Prehearing Br. at 37; *see also* CSR at Table IV-5 at IV-11-12, Table IV-6 at IV-14-15.  Although the Commission acknowledged this stark lack of overlap, it found "there remains a sufficient degree of fungibility between the imports for purposes of cumulation."  Final Determination at 20.  The Commission found the record to "indicate{} that welded and seamless OCTG can be used interchangeably in most if not all other applications."  *Id.*  The Commission ignored the record evidence that contradicted its assessment.

U.S. Steel testified:  "{t}here are a few grades, Gulf of Mexico applications and some sour service grades, that do require seamless."  Tr. at 50 (Beltz).  Tap Rock testified:  "Tap Rock requires seamless OCTG on production and deep intermediate sections{.}"  Tr. at 272 (Lange). Commission Staff reported:  "seamless OCTG generally is required for use in high-pressure or

sour service environments."  PSR at I-14.  Tenaris' [

                                                          ].  *See Oil Country*

*Tubular Goods from Argentina, Mexico, Russia, and South Korea, Invs. Nos. 701-TA-671-672*

*and 731-TA-1571-1573 (Preliminary): Tenaris Post-Conference Brief*, at Ex. 11 (Nov. 1, 2021)

(C.R. 140; P.R. 41).  OCTG purchaser [                    ] stated that "[

                                                          ]."  CSR at Table V-19 at V-41.  The

increased use of seamless in production casing sections reflects an increase in U.S. consumption

of seamless OCTG.  *See* Tenaris Posthearing Br. at Ex. 23 at 3 (Senior Commercial Director of

Tenaris USA explaining "domestic consumption of welded/seamless for the production casing

section of the well *(that normally represents more tha{n} 50% of the total OCTG consumption)*

has changed from a ratio of approximately 70:30 back in 2015 to 20:80 during 2021") (emphasis

added).

      Further, AUVs for seamless subject imports from Argentina and Mexico [          ]

AUVs for welded subject imports from South Korea and from Russia, in [          ] of the POI.

*Compare* CSR at Table IV-5 at IV-11 *with* CSR at Table IV-6 at IV-14.  These prices (1)

[

      ] and (2) [

                                                          ].  U.S. mills' net sales data also showed that

AUVs for seamless OCTG exceeded the AUVs for welded OCTG sold by U.S. mills in every

year of the POI.  *See* PSR at Table VI-8 at VI-24.

      Dismissing AUV differences as "unpersua{sive}," the Commission found that "there is a

substantial degree of fungibility between and among subject imports from all four sources{.}"

NON-CONFIDENTIAL VERSION

Final Determination at 21.  The AUV difference belies the Commission's finding of fungibility between seamless and welded and, consequently, between subject imports.   Tenaris testified: "why would anybody pay a premium for seamless pipe if this was not needed?"  Tr. at 277.

In light of this evidence, the Commission's finding of "a sufficient degree of fungibility" is not supported by substantial evidence.

### 2.    The Commission's Channels of Distribution Findings Are Unsupported by Substantial Evidence

The Commission found that "importers of subject merchandise from Argentina and Mexico primarily sold OCTG to [          ] while also selling a smaller amount to [            ]," whereas "{d}omestic producers and importers of subject merchandise from Russia and South Korea primarily sold OCTG to [            ] over the POI while also selling a smaller amount to [          ]."  Final Determination (CV) at 28.  The Commission (1) failed to consider representative data from the POI as a whole and (2) did not consider record evidence that Tenaris sold subject imports from Argentina and Mexico and its U.S.-produced OCTG to its U.S. customers mainly using its unique Rig Direct® program.  The failure to consider all relevant evidence and to address the conflicting evidence renders the Commission's decision unsupported by substantial evidence.  *See Dak Ams.*, 456 F. Supp. 3d at 1357–58; *Usinor*, 26 C.I.T. at 773.

Commission Staff Report data demonstrate that subject imports from Argentina were sold [                    ] (*i.e.*, greater than [   ]% of the time) to [            ] in every year from 2019-2021 and the [            ] of subject imports from Mexico were sold to [          ] throughout the POI, and during 2019 ([      ]%) and 2020 ([      ]%) in particular.  CSR at Table II-1 at II-7. In contrast, in [                          ], more than [      ]% of subject imports from South Korea were sold to [            ].  *Id.*

**NON-CONFIDENTIAL VERSION**

The Commission relied on a "small" overlap: "Domestic producers and importers of subject merchandise from Russia and South Korea primarily sold OCTG to [          ] over the POI while also selling a smaller amount to [          ]." Final Determination (CV) at 28. "Importers of subject merchandise from Argentina and Mexico primarily sold OCTG to [

] while also selling a smaller amount to [          ]." *Id.* Finding a "small" overlap is insufficient to meet the "reasonable overlap" standard. *See* SAA at 848.

The Commission also pointed to data from a single year, 2021, rather than the POI overall, showing for Mexico that [     ]% of subject imports were sold via distributors. *See* Final Determination (CV) at 28 n.108 ("[               ] share of subject imports from Argentina ([   ] percent in 2021), were sold to distributors, as were [     ] subject imports from both Russia and South Korea"). The Commission's reliance on 2021 is unrepresentative. For 2019 through interim 2021, the typical share of subject imports from Mexico sold to end users was approximately [   ]%, and from Argentina, the share was approximately [   ]%. *See* CSR at Table II-1 at II-7. The share of subject imports sold to end users from South Korea was approximately [ ]% from 2019 through interim 2021. *See id.* The reliance on 2021 data overstated the overlap, and is contrary to the record evidence as a whole. *See id.*; *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) ("{t}he 'whole record' means that the Court must consider both sides of the record").

The Commission also failed to address the evidence related to Tenaris' Rig Direct® model that permits Tenaris to provide the complete range of services from production to delivery of OCTG to customers' rigs. *See* Tenaris Prehearing Br. at 11. Testimony confirms the difference between Tenaris' model and that of other U.S. producers and distributors: "the basic concept is that in this market there has always been mills, processors, and distributors. And

NON-CONFIDENTIAL VERSION

when we came with idea of Rig Direct was okay, we going to do this job altogether. And nobody can do that." Tr. at 285 (Zanotti). U.S. purchaser [            ] concurred from the customer's perspective: "[



]." *See*

[            ] U.S. Purchasers' QR at V-1 (C.R. 317).

The Commission previously has declined to cumulate subject imports in investigations where subject imports were sold "predominantly" or "overwhelmingly" through different channels of distribution. *See Certain Preserved Mushrooms from China, India, and Indonesia,* Inv. Nos. 731-TA-777-779 (Final) USITC Pub. 3159 at 8-9 (Feb. 1999). The Commission's opposite action in this case is reversible error.

> **3.     The Commission's Failure to Consider the Existing AD Order on Subject Imports from Korea and its Reliance on Non-Subject Data for South Korea Is Not In Accordance With Law**

The Commission failed to consider that OCTG imports from Korea were already under an existing AD order prior to the filing of petitions, and that imports subject to the discipline of an AD order compete in the U.S. market under different conditions than imports that are not subject to an order. Tenaris' Final Comments at 9 & n.46.

Separately, certain data and qualitative information in three Staff Report tables cited and relied on by the Commission (Table II-16; Table II-19; and Table IV-17) in its cumulation analysis improperly included non-subject imports from the responses of Hyundai Steel U.S.A., Hyundai's U.S. importer. *See* CSR at Table II-16 at II-41, Table II-19 at II-44; PSR at Table IV-17 at IV-33-34. Commission Staff acknowledged that Table IV-17 included "nonsubject merchandise from Hyundai Steel Corporation." *See* PSR, note to Table IV-17 at IV-34.

NON-CONFIDENTIAL VERSION

The statute, referring to subject imports, requires the Commission to determine if "such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i). The Commission's reliance on non-subject data violates the statute and warrants remand. *See Celanese Chems. Ltd. v. United States*, 31 C.I.T. 279, 293 (2007) (remanding where Commission failed to exclude out of scope non-subject imports).

    **4.**    **The Commission's Determination to Cumulate Subject Imports from Russia with Other Subject Imports is Unsupported by Substantial Evidence**

Record evidence demonstrates the obvious: subject imports from Russia competed differently in the U.S. market than other subject imports and should not have been cumulated with other subject imports. Remarkably, the Commission was "unpersuaded by Tenaris's and TMK's argument that measures taken in response to Russia's February 2022 invasion of Ukraine have prevented subject imports from Russia from competing in the U.S. market such that cumulation of these imports is inappropriate." Final Determination at 22. The measures targeting Russia include the loss of API certification for OCTG produced in Russia, revocation of PNTR status for Russia, Section 232 duties, and sanctions imposed on Russian entities and individuals. Tenaris Prehearing Br. at 19-20; Tenaris Posthearing Br. at Ex. 1 at 3-6 (Question#1). Testimony confirmed that "in the United States and in the rest of international market, no reasonable operator or end user would ever run the risk of running casing or tubing into their wells without an API monogram." Tr. at 248 (Zanotti). Of the subject imports, only OCTG from Russia is subject to Section 232 duties, and Russia is the only subject source that has lost PNTR status. *TMK's Pre-Hearing Br.* at 6-8 (Sept. 14, 2022) (C.R. 406; P.R. 122) ("TMK Pre-Hearing Br.").

The Commission relied on *Raw In-Shell Pistachios from Iran* ("*Pistachios*")*, in which the Commission rejected arguments by respondents regarding the effect of U.S. sanctions targeting Iran and made an affirmative injury determination.  Final Determination at 23 & n.115 (citing *Raw In-Shell Pistachios from Iran*, Inv. No. 731-TA-287 (Second Review), USITC Pub. 4701 at 19 (June 2017)).  Reliance on *Pistachios* is misplaced for two reasons: (1) cumulation was not relevant as the case involved only Iran, and (2) only sanctions were involved in *Pistachios*, whereas sanctions *plus* other measures limited market access for OCTG from Russia.

The multiple barriers to entry for OCTG from Russia mean that TMK "has {no} plans to sell OCTG in the US market for the foreseeable future."  *See* TMK's Pre-Hearing Br. at Ex. 1 at 5.  The Commission's failure to account for the combined impact of U.S. market access barriers renders its affirmative cumulation finding as to Russia unsupported by substantial evidence.  *See Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).

## C.  The Commission's Analysis of Subject Import Volumes Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

### 1.  The Commission's Determination that the Volume of Subject Imports Was "Significant" Ignores Conditions of Competition

The courts have held that the Commission must consider conditions of competition in analyzing whether subject import volume is "significant" under 19 U.S.C. § 1677(7)(C)(i).  *See, e.g.*, *Altx, Inc. v. United States*, 26 C.I.T. 709, 719 (2002), *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004) (quoting *Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330, 1335 (Ct. Int'l Trade 2001)) ("'For the Commission's findings under 1677(7)(C)(i) to be supported by substantial evidence, the Commission must analyze the volume and market share data in the context of the conditions of competition' to determine if subject import volume is significant"); *Angus Chem. Co. v. United States*, 944 F. Supp. 943, 952 (Ct. Int'l Trade 1996), *aff'd*, 140 F.3d 1478 (Fed. Cir.

1998); *see also Arlanxeo USA LLC v. United States*, 389 F. Supp. 3d 1330, 1338 (Ct. Int'l Trade 2019), *aff'd*, 819 Fed. Appx. 925 (Fed. Cir. 2020).

The Commission failed to consider the OCTG market conditions in its analysis and merely described the volume of subject imports and their market share to conclude: "Based on the foregoing, we find that the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to consumption in the United States." Final Determination at 32-33.

The volume of subject imports was not significant when considered in the context of the unique conditions of competition. As discussed in Section V.A., following the historic demand collapse, U.S. producers could not supply the surging demand in 2021 and imports were needed. The Commission's failure to analyze volume in the context of these conditions is not in accordance with law, and its determination is unsupported by substantial evidence.

> ## 2. The Commission's Failure to Consider Import Volume in Assessing Post-Petition Effects Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

The volume of subject imports increased in interim 2022 at the same time that the financial condition of the domestic industry significantly improved. *See, e.g.*, PSR at Table C-1 at C-4, C-5, Table IV-19 at IV-41, Table VI-1 at VI-3. In assessing the effects of the filing of the petition, the Commission considered only that import *market share* decreased, ignoring the increased import volume. The Commission's decision not to consider the change in import volume is contrary to the statute and inconsistent with the Commission's normal practice of finding that a post-petition increase in the volume of subject imports justifies relying on post-petition data in the injury analysis. The Commission improperly accorded less weight to post-petition data.

NON-CONFIDENTIAL VERSION

a.    The Statute Mandates Considering Changes in "Volume," not
Market Share, in Assessing Post-Petition Effects

The statute requires that the Commission consider whether "any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition … is related to the pendency of the investigation{.}"  19 U.S.C. § 1677(7)(I).  If the Commission finds a "change" is related to the investigations, it "may reduce the weight accorded to the data for the period after the filing of the petition in making its determination of material injury, threat of material injury, or material retardation of the establishment of an industry in the United States." *Id.*  The statutory language is clear; it identifies "change in the volume," and does not reference market share.  *Id.*; *Chevron*, 467 U.S. at 842–43.  The SAA confirms the statutory mandate to consider changes in import *volume* and makes no reference to market share.  *See* SAA at 854; *see also* H.R. REP. NO. 103-826, pt. 1 (1994).

This Court has noted that the Commission's "hallmark vectors for evaluating … post-petition effect {are} volume and price," and volume in particular.  *CP Kelco US, Inc. v. United States*, 38 C.I.T. 1511, 1529 (2014).  The Commission's practice confirms that it normally considers volume changes when analyzing post-petition effects.  *See, e.g.*, *Organic Soybean Meal from India*, Inv. Nos. 701-TA-667 and 731-TA-1559 (Final), USITC Pub. 5321 at 22 n.111 (May 2022) (considering "the volume of subject imports … in interim 2021"); *Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi Arabia, Taiwan, Turkey, and the United Arab Emirates*, Inv. Nos. 701-TA-646 and 731-TA-1502-1504, 1508-1509, 1512, 1514, and 1516 (Final), USITC Pub. 5153 at 21 n.111 (Jan. 2021).

b.    **The Commission Relied Solely on Market Share and Did Not Consider Volume in Assessing Post-Petition Effects**

The post-petition volume of subject imports increased in interim 2022 from interim 2021.

*See* PSR at Table C-1 at C-4; Final Determination (CV) at 42 ("cumulated subject import volume was [    ] percent greater in interim 2022, at [        ] short tons, than in interim 2021, at [        ] short tons").  Commissioner Kearns stated that the increase in subject imports after the petition was not a strong case for post-petition effects:

> {S}ubject import volumes from Argentina, Mexico, and Russia increased in the first half of 2022 over the first half of 2021. Their market share went down, *but their imports increased, which I wouldn't usually think that that's a really strong case for showing post petition effects*.

Tr. at 121 (Kearns) (emphasis added).  He and Commissioners Karpel and Schmidtlein requested the parties address the issue of post-petition effects.  Tr. at 153 (Kearns); Tr. at 153-54 (Karpel); Tr. at 144 (Schmidtlein).

In a footnote in its volume analysis, the Commission referenced Petitioners' argument that the Commission should consider decreasing market share and Tenaris' argument that the Commission should consider the increase in volume in addressing post-petition effects:

> Petitioners contend that the filing of the petitions reduced subject import market penetration in interim 2022 relative to interim 2021, and request that the Commission accord reduced weight to post-petition data in these investigations. … Tenaris argues that there is no basis for the Commission to accord less weight to post-petition data, noting that, in absolute terms, the volume of cumulated subject imports increased in interim 2022 relative to interim 2021.

Final Determination at 32-33 n.184.  The Commission proceeded to rely only on market share data:

> {W}e find that the decline in subject import market share in interim 2022 relative to interim 2021 was related to the pendency of the investigations and place less weight on interim 2022 market share data in determining that that the volume of subject imports is significant.

*Id.* at 33 n.184.  The Commission simply adopted Petitioners' approach of relying on market share without considering the increased import volume.  In these circumstances, in *Chemours Co. FC, LLC v. United States*, the Court found that the Commission (which relied on price rather than volume in accordance with the statutory language) failed to address relevant evidence:

> The Commission in its Views did not address the increase in subject import prices in the final quarter of 2017.  Because the Commission failed to address this evidence, it is not clear, based on the Commission's Views, that the Commission considered all of the evidence on the record … the Commission's determination must address and provide an explanation for how those data are consistent with the Commission's decision not to discount the data for the fourth quarter of 2017.

443 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2020) (citations omitted).  The Court remanded for the Commission to "explain its lack of findings with respect to subject import prices in the Commission's post-petition analysis."  *Id*.  The Commission's failure to consider the volume here warrants remand.

### c.    The Post-Petition Increase in Import Volume Justified Relying on Post-Petition Data

In past cases, the Commission has declined to discount post-petition data if the volume of subject imports is higher relative to the year prior, remains unchanged, "was declining prior to the filing of the petition," or only "declined slightly."  *See, e.g., Steel Wheels from China*, Inv. Nos. 701-TA-602 and 731-TA-1412 (Final), USITC Pub. 4892 at 18 n.97 (May 2019) (declining to reduce the weight accorded to post-petition data "in particular due to the nearly unchanged level of shipments of subject imports in interim 2018 compared to interim 2017"); *Large Diameter Welded Pipe from China and India*, Inv. Nos. 701-TA-593-594 and 731-TA-1402 and 1404 (Final), USITC Pub. 4859 at 41 n.287 (Jan. 2019); *Certain Aluminum Plate From South Africa*, Inv. No. 731-TA-1056 (Final), USITC Pub. 3734 at 24 (Nov. 2004); *Emulsion Styrene-*

NON-CONFIDENTIAL VERSION

*Butadiene Rubber from Brazil, Korea, Mexico, and Poland*, Inv. Nos. 731-TA-1334-1337 (Final), USITC Pub. 4717 at 36 n.8. (Aug. 2017).

The focus on declining market share rather than import volume led the Commission in its impact analysis to discount favorable domestic industry performance data in interim 2022, data that coincided with rising import volumes and changing market conditions and demonstrated that subject imports were not the cause of harm to the domestic industry.  The Commission's failure to follow the statute to consider import volume is critical to the assessment of post-petition effects and the 2022 interim data, and warrants remand.

> D.     **The Commission's Determination That Subject Imports Had Significant Adverse Price Effects Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

> 1.     **No Commission Finding Regarding Price Suppression**

The statute requires the Commission to make a determination regarding price effects that includes findings related to price underselling, price depression, and price suppression.  The Commission "shall consider whether":

> (I)     there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
> (II)    the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  The Commission explicitly ignored its statutory mandate to make a price suppression finding:  "Given the significant underselling and the market share shift, we do not reach a conclusion as to whether the domestic producers would have been able to further increase prices to a significant degree than they did but for subject imports."   Final Determination at 39.

**NON-CONFIDENTIAL VERSION**

The Commission is "required by statute to *consider both* underselling, and price suppression and depression." *Octal Inc. v. United States*, 539 F. Supp. 3d 1291, 1303 (Ct. Int'l Trade 2021).   This Court emphasized that "the plain language of the statute" provides that an analysis of underselling, on the one hand, and price suppression and price depression, on the other, are "two statutorily-mandated discrete inquiries." *Id.* at 1302 (citations omitted).  Failure to make a price suppression finding warrants remand. *See Swiff-Train Co. v. United States*, 904 F. Supp. 2d 1336, 1343 (Ct. Int'l Trade 2013) (remanding where "the Commission … did not make an explicit finding of significant price depression (and no finding at all regarding price suppression)").

The record evidence confirms no price suppression.  Although AUVs of subject imports increased over the course of the POI by [    ]%, the AUVs of domestic net sales increased [

], by 12.5% over the same period.  *See* CSR at IV-4, Table VI-2 at VI-5. Despite an increase in-the COGS-to-net sales ratio from 96.8% in 2019 to 117.2% in 2020, the ratio declined to 109.2% during interim 2021 and to 98.0% for full year 2021, before reaching a low of 77.4% in interim 2022.  *See* PSR at Table VI-1 at VI-3.  As the OCTG market recovered in 2021 and domestic producers were able to increase their prices, their ratio improved, thus undermining any suggestion that price suppression occurred.  *See id.*; Tenaris Prehearing Br. at 51-52.  Similar trends in the ratio and prices have led the Commission to find a lack of significant price effects.  *See, e.g., Urea Ammonium Nitrate Solutions from Russia and Trinidad and Tobago*, Inv. Nos. 701-TA-668-669 and 731-TA-1565-1566 (Final), USITC Pub. 5338 at 29-33 (Aug. 2022) (citing increasing prices and a decreasing COGS-to-net sales ratio toward the end of the POI despite opposite trends earlier in the POI).

**NON-CONFIDENTIAL VERSION**

The record evidence compelled a finding of no price suppression in this case.  By failing to make any price suppression finding, the Commission's price effects analysis is contrary to law and unsupported by substantial evidence, and should be remanded with instructions for the Commission to make a price suppression finding.

### 2.   The Commission Failed to Consider Record Evidence Countering Petitioners' Lost Sales and Lost Revenue Claims

The Commission stated that it found "some evidence that domestic producers lost sales to subject imports on the basis of price" and relied on a market share table and what it called "contemporaneous communications" provided by Petitioners.  Final Determination at 36-37.  However, the market share table was flawed, and the Commission ignored contrary record evidence that detracted from the probative value of evidence on which it relied.

The Commission supported its finding of "some evidence that domestic producers lost sales to subject imports on the basis of price" by relying on Table V-18.  *Id.* at 37 & n.204.  Tenaris explained the Table V-18 deficiencies.  *See* Tenaris Posthearing Br. at Ex. 1 at 52-53 (Question#11).  The Commission's staff added a warning note to the table:  "Because some of these purchasers are end users and some are distributors, some data in the table may represent shipments of the same OCTG."  PSR, note to Table V-18 at V-40.  Despite the flaw, the Commission relied on Table V-18.  Final Determination at 37 n.204.  This reliance on Table V-18 is a basis to remand the lost sales decision.

Tenaris also provided detailed evidence countering Petitioners' lost sales/lost revenues claims.  Petitioners alleged that they "lost sales" to [      ] to Tenaris.  *See Petitioners' Posthearing Brief*, at II-31, Ex. 4, Attachment D (Sept. 29, 2022) (C.R. 419; P.R. 143) ("Petitioners' Posthearing Br.").  Tenaris provided [

**NON-CONFIDENTIAL VERSION**

]:

[

]

Tenaris Posthearing Br. at Ex. 20.  The Commission did not consider this contrary evidence.

*Tenaris rebutted Petitioners' claim that* [                              ] *decision to switch to Tenaris*

*was based primarily on price.*  *See* Petitioners' Posthearing Br. at Ex. 4, Attachment E; Ex. 5.

Tenaris  provided  [

] refuting Petitioners' allegation:

[

]

Tenaris Posthearing Br. at Ex. 19.  The Commission did not acknowledge the contrary evidence

of  [                              ],  and  simply  accepted  Petitioners'  claims.   *See*  Final

Determination at 37.

*Tenaris  rebutted  Petitioners'  allegation  of  lost  sales  to*  [

**]**.  *See* Petitioners' Posthearing Br. at Ex. 3, Attachment G.  Tenaris explained that this

allegation  was  based  on  a  [

]:

[

].  In  fact,  [

**NON-CONFIDENTIAL VERSION**

]. Thus, even if Tenaris did
win [
    ]

Tenaris Final Comments at 4-5.  The Commission did not address this contrary evidence.

    ***Tenaris rebutted* [**

        **].**  *See* Petitioners' Posthearing Br. at Ex. 10.  Tenaris demonstrated that this
[                                  ]:

[

                  ]

Tenaris Final Comments at 5 (citations omitted).  The Commission did not consider this contrary evidence.

    ***Finally, Tenaris explained there was no basis to find that* [**

        **].**  *See* Petitioners' Posthearing
Br. at Ex. 14.  Tenaris explained that: "Equally unpersuasive are the [

        ]."  Tenaris Final Comments at 6 (citation omitted).
As with Tenaris' other rebuttal arguments and supporting evidence regarding lost sales/lost revenues, the Commission failed to address this contrary evidence.

    The agency's "failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders {its} determination unsupported by substantial evidence." *Allegheny*, 112 F. Supp. 2d at 1165.  Because the Commission failed to

NON-CONFIDENTIAL VERSION

address the contrary record evidence, its determination regarding lost sales/lost revenues is unsupported by substantial evidence.

### 3.      The Commission Failed to Account for Price Lags Resulting from Tenaris' Long-Term Contracts or [
                                                             ]

Using its standard analysis to compare quarterly pricing data collected from U.S. producers and importers for select products, the Commission found that "cumulated subject imports significantly undersold the domestic like product{,}" causing "the domestic industry to lose market share to subject imports." Final Determination at 39. Record evidence demonstrated (1) a price lag effect for comparisons with Tenaris' OCTG sold pursuant to long-term contracts, and (2) the Commission's analysis [

                                           ]. The Commission failed to account for these conditions, rendering its comparison methodology fundamentally flawed, unsupported by substantial evidence, and not in accordance with law.

The [              ] of Tenaris' subject imports during the POI were sold pursuant long-term contracts, featuring [


], such that deliveries made in a given quarter will reflect market conditions prevailing in the prior quarter. *See* Tenaris Posthearing Br. at Ex. 1 at 38-39, 72-88 (Questions#7, #17). [



]. *See* Tenaris Posthearing Br. at Ex. 1 at 39-40 (Question#7). [



]. *See id.* at Ex. 1 at

NON-CONFIDENTIAL VERSION

72-88 (Question#17).  Tenaris proposed that, under this unique condition of competition, the Commission apply a "one-quarter lag" in its price comparisons to compare subject import prices from a given quarter to domestic prices from the prior quarter, and it offered several alternative adjustments in its posthearing brief.  *See* Tenaris Prehearing Br. at 54, Ex. 63; Tenaris Posthearing Br. at Ex. 1 at 72-88 (Question#17).

The Commission dismissed Tenaris' proposal, asserting that the lag "would largely be limited to subject imports from Argentina and Mexico" and that it was conducting a cumulative analysis.  Final Determination at 35.  The Commission made no adjustments even though it recognized that "the vast majority of Tenaris's U.S. shipments of subject imports during the POI" were made pursuant to such long-term contracts, and it did not address the alternative adjustments proposed by Tenaris.  *Id.* at 34-35.

The Commission's price comparisons also fail to [


].  *See* Tenaris Posthearing Br. at Ex. 1 at 80 (Question#17).  Tenaris explained that: (1) Tenaris has a one-price model (*i.e.*, it quotes the same price to a customer regardless of where the OCTG is sourced) and (2) [


].  *See id*.  Tenaris proposed that a more accurate methodology to evaluate the pricing products would be to exclude Tenaris' domestic shipments from the pricing product calculations.  *See id*. at Ex. 1 at 80 (Question#17), Ex. 21.

Once Tenaris' domestic production is excluded, the [


].  For example, [


].  *Id.* at Ex. 1 at 81, 88 (Question#17).  These [

NON-CONFIDENTIAL VERSION

].

*Id.* The [

]. *Id.* [

] short tons over the period. *Id.* at 88. When compared with

domestic shipments of [            ] short tons, [

]. *Id.* at 81. The [

] makes relying on the pricing products to infer underselling – even

without accounting for the lag issue – problematic.

The Commission's price comparisons reflect prices established during different quarters,

[                                                                              ], and [

]. The Commission's underselling finding is unsupported by substantial

evidence and not in accordance with law.

### E.    The Commission's Determination That the Domestic Industry Was Injured by Reason of Subject Imports Was Unsupported By Substantial Evidence and Otherwise Not in Accordance with Law

First, the Commission failed to evaluate the impact of subject imports within the context

of the conditions of competition distinctive to the U.S. OCTG industry, as required by the

statute. Subject imports did not injure the domestic industry. Any harm resulted from the

conditions of competition that characterized the POI. Second, the Commission erroneously

attributed the positive health of the industry in interim 2022 to post-petition effects and placed

less weight on the interim period data that showed that the domestic industry had recovered and

was performing well consistent with the changing market conditions. Rather than discounting it,

the Commission should have considered the positive interim 2022 data, which provided the basis

for a negative injury determination.  Finally, the Commission improperly relied on qualitative information relating to non-subject Korean imports in its impact analysis.

      **1.**      **The Commission Failed To Evaluate Impact Within the Context Of Conditions Of Competition Distinctive To U.S. OCTG Industry**

The Commission found a "casual nexus between cumulated subject imports and the domestic industry's weak performance relative to the strong growth in apparent U.S. consumption from 2020 to 2021." Final Determination at 43.  However, the Commission failed to account for the conditions of competition during the POI in assessing the cause of any harm to the domestic industry and its improvement in interim 2022.  The record evidence does not support a causal nexus between the subject imports and the domestic industry's performance.

      **a.**      **The Commission Failed to Consider the Impact of Russia/Saudi Oil Supply War and COVID-19 Pandemic**

The Commission failed to address the Russia/Saudi oil supply war at all, and de-emphasized COVID-19, in assessing the impact of subject imports.  Final Determination at 27. In contrast, the Commission recognized the COVID-19 demand shock as a key condition of competition in contemporaneous cases.  *See, e.g.*, *Steel Nails from India, Oman, Sri Lanka, and Turkey*, Inv. Nos. 701-TA-673-675 and 677 (Final), USITC Pub. 5370 at 31-32, 34, 36, 38, 40-41, 57 n.225 (Oct. 2022) (negative determination noting "changes in supply and demand as affected by the COVID-19 pandemic"); *Emulsion Styrene-Butadiene Rubber from Czechia and Russia*, Inv. Nos. 731-TA-1575 and 731-TA-1577 (Final), USITC Pub. 5392 at 33, 43 (Jan. 2023) (same).  Similarly, the CITT recognized the impact of these factors on OCTG demand in its analysis.  *See* Tenaris Prehearing Br. at Ex. 61 at 28 ("the Canadian OCTG market fell in 2019 and in 2020 due to lower demand caused by . . . ***the Russia-Saudi Arabia oil price war*** and ***COVID-19 containment measures***") (emphasis added).

38

b.    **The Commission Dismissed the Evidence of Supply Constraints**

The Commission dismissed evidence of supply constraints, instead pointing to: (1) Petitioners' self-reported excess capacity, (2) purchasers rating the availability of domestically produced OCTG as "superior" or "comparable" to that of subject imports, and (3) subject import underselling in 2021. *See* Final Determination at 44-45. These do not account for the contrary record evidence related to the inventory overhang, the high price of HRC, and labor shortages that necessitated imports discussed in Section V.A. Here, the Commission has made a "mere assertion of 'evidence which in and of itself justified {the Commission's determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (internal citation omitted).

i.    **Inventory Overhang**

The Commission acknowledged that "{i}nventories may have had some effect on delaying domestic producers' resumption of production and shipments" but then erroneously determined "inventories, or inventories alone, cannot explain why additional demand in 2021 was satisfied by increased subject imports, rather than domestic producers and nonsubject imports." Final Determination at 45-46. No one suggested inventories should be considered alone; rather the combination of inventories, high HRC prices and labor shortages constrained supply. Moreover, record evidence confirmed that the significant inventory held by U.S. distributors prevented them from placing orders with U.S. producers – and this impeded the domestic industry's ability to recover. *See* Section V.A.3.a. Evidence also established that Tenaris' Rig Direct® program allows Tenaris to maintain lean inventory. *See* Tenaris Posthearing Br. at Ex. 1 at 57-59 (Question#12). Without addressing this evidence, the

**NON-CONFIDENTIAL VERSION**

Commission incorrectly determined that "the record does not establish whether inventory increases necessarily affected domestic producers' customers more than they affected Tenaris and its customers." Final Determination at 45 n.255. The Commission "must respond to 'significant arguments and evidence which seriously undermine its reasoning and conclusions.'" *Dak Ams.*, 456 F. Supp. 3d at 1352 (citation omitted).

The Commission relied on data from [

], which purported to show [                    ] despite evidence of [

] with [              ] data. *See* Final Determination (CV) at 60 & n.255 (citing CSR/PSR at II-16, Table II-4); *see also* Tenaris Prehearing Br. at 29, Ex. 15 at 55 ([

]), Ex. 43 at 51 ([

]).

Still, the Commission Staff reported that months-on-hand inventory rose from [   ] months in January 2019 to [   ] months in August 2020. *See* CSR at II-16 n.18. The Commission viewed the evidence regarding inventory "in a vacuum," however, rather than "'within the context of the business cycle and the conditions of competition that are distinctive to the affected industry.'" *Nevinnomysskiy Azot*, 565 F. Supp. 2d at 1373 (internal citation omitted).

### ii.   Hot-Rolled Coil Prices

The record shows that domestic producers admitted that they could not pass on higher HRC prices to their customers and confirms that HRC prices limited welded OCTG production. *See* Section V.A.3.b. Dismissing record evidence, the Commission instead speculated that "{d}omestic producers of seamless OCTG were fully capable of serving the increase in OCTG demand from 2020 to 2021 in light of their low rate of capacity utilization, . . . and the

interchangeability of seamless OCTG for welded OCTG." *See* Final Determination at 46 (citing CSR/PSR at Tables III-7-8).

The Commission ignored the severe effect of high HRC prices on welded producers. Even if the Commission were permitted to focus only on the health of seamless producers, the Staff Report acknowledges that Petitioners and Tenaris "differed on how often seamless and welded OCTG were used interchangeably," PSR at II-1, and the Commission did not demonstrate that domestic producers used seamless OCTG to fill the supply gap after HRC prices rose during the POI. "{T}he substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the Commission's determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals*, 132 F.3d at 720 (internal citation omitted). "To provide the requisite support, the agency must offer more than conjecture …." *NSK Corp. v. United States*, 637 F. Supp. 2d 1311, 1318 (Ct. Int'l Trade 2009).

### iii.   Labor Shortages

Record evidence confirms labor shortages. *See, e.g.*, CSR/PSR at II-14 ("[                    ] explained that U.S. mills reduced their capacity in 2020 and have had difficulty restoring that capacity due to shortages of labor and raw materials."). Tenaris provided evidence regarding its struggles to hire workers during the POI. *See* Tr. at 177 (Schnurbusch); Tenaris Posthearing Br. at Ex. 8-9. The Commission dismissed this evidence and relied on Petitioner's self-serving statements regarding their ability to hire employees. *See* Final Determination at 46-47 & n.265 (citing CSR/PSR at II-13, Table III-5; Tr. at 67 (Beltz), 68 (Dorn)). The Commission's "mere assertion of 'evidence which in and of itself justified'" its determination that labor shortages had no impact on the OCTG market, "'without taking into account contradictory evidence or

evidence from which conflicting inferences could be drawn'" renders its determination unsupported by substantial evidence. *Gerald Metals*, 132 F.3d at 720 (internal citation omitted).

### c.      The Commission Failed to Consider Tenaris' Role in the U.S. OCTG Market and Intra-Industry Competition

The record evidence confirms Tenaris is the largest U.S. producer of OCTG, and that, due to its investments of more than $10 billion to produce and sell OCTG in the United States, it would not import in a manner that would harm the U.S. industry, which includes its own investments. *See* Section V.A.4.  The Commission recognized exactly this in the 2007 second sunset review when it treated Tenaris' lower level of investment at that time as a "substantial investment" in the domestic industry:

> Tenaris's likely behavior in the U.S. market will take into account, among other factors, its desire to protect its recent substantial investment in Maverick. . . . We consequently do not believe that Tenaris's overall interest would be served by offering subject imports from Argentina, Italy, and Mexico at prices below those prevailing for the domestic like product.

*Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico*, Inv. Nos. 731-TA-711 and 713-716 (Second Review), USITC Pub. 3923 at 34 (June 2007).  In a different OCTG sunset review, the petitioners recognized that domestic producers import OCTG "for varied reasons" and that Tenaris would import OCTG "to complement its U.S. production."  *See* Tenaris Prehearing Br. at 14-15, Ex. 14 at II-31-32 (Domestic Producers' Posthearing Br. in *Oil Country Tubular Goods from India. Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review) (June 2, 2020)).

In other cases, the Commission has determined a foreign producer's investments in the domestic industry supports a negative determination.  *See, e.g., Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan*, Inv. Nos. 701-TA-379 and 731-TA-788, 790-

793 (Second Review), USITC Pub. 4248 at 17-18, 37 (Aug. 2011) ("We find that ThyssenKrupp's local supply strategy coupled with a unified sales network will likely limit subject imports from Italy to noninjurious levels"). The Commission ignored this precedent in its final determination.

Tenaris provided evidence describing its Rig Direct® program, and that it (1) controls all production, processing and distribution functions to supply its end user customers, (2) imports OCTG from non-U.S. mills to complement its U.S. production, and (3) sells OCTG at "one price," regardless of whether Tenaris produced it at a U.S. mill or a foreign mill. *See* Section V.A.4. The Commission disregarded this evidence and relied on Petitioners' assertion that the services they provided were the same as Tenaris. *See* Final Determination at 46 (citing CSR/PSR at Table II-14; Petitioners' Posthearing Br. at Ex. 3 and 4). The Commission's finding ignores statements from customers describing the different Tenaris model. *See* Tenaris Posthearing Br. at Ex. 19 at ¶10 ("[


]").

Noting Tenaris is one of the largest Canadian OCTG producers and sold OCTG in Canada at one price regardless of origin, the CITT attributed injury in part to intra-industry competition and reached a negative injury determination. *See* Tenaris Prehearing Br. at Ex. 61 at 25-26. The CITT concluded that intra-industry competition, the Saudi/Russia price war, COVID-19, the market downturn in 2020, and inventory destocking, not imports, were "primarily responsible" for the domestic industry's harm. *See id.* at Ex. 61 at 32-35.

The Commission did not address ***any*** record evidence when discussing intra-industry competition, noting simply "we are unpersuaded by Tenaris's argument that intra-industry

competition explains any injury to the domestic industry. Intra-industry competition cannot explain the domestic industry's loss of market share to subject imports from 2020 to 2021." Final Determination at 47 (footnote omitted). The Commission previously has attributed injury to intra-industry competition when record evidence establishes that U.S. producers have lost sales to other domestic producers. *See, e.g.*, *Magnesium from Israel*, Inv. Nos. 701-TA-614 and 731-TA-1431 (Final), USITC Pub. 5009 at 31 & n.153, 37 (Jan. 2020). The Commission's "conclusory assertion" that intra-industry competition "did not play a major role in causing a material injury" to the domestic industry does not meet the substantial evidence standard. *Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1320 (Ct. Int'l Trade 2006).

### 2. The Domestic Industry Began To Recover Before the Petitions were Filed

As discussed in Section V.C.2 above, consistent with past cases in which domestic industry improvements coincided with an increase in the volume of subject imports, the Commission should have given full weight to the evidence of the domestic industry's recovery. Moreover, the Commission normally considers (1) improvements that began before the petition was filed as a basis to consider post-petition data, such as the interim 2022 data, and (2) improvements to the domestic industry's condition during the interim period as a basis to find no adverse impact.

As established in Section V.A., prices had been increasing for more than a year before the petition was filed. Moreover, as discussed below, the domestic industry's condition was improving in the interim 2022 period even as the volume of subject imports increased.

U.S. production increased by 16.9% from 2020 to 2021 and by 84.4% during the interim period. PSR at Table C-1 at C-4. The domestic industry's net sales increased by 2.2% from 2020 to 2021, and then by 69.2% from interim 2021 to 2022. *Id.* at Table C-1 at C-5. The

domestic industry, having experienced a gross profit in 2019, followed by a loss in 2020, recovered to realize a profit in 2021 and interim 2022. ***Its gross profits in interim 2022, at $700.2 million, were almost five times*** those of full year 2019 (at $146.6 million). *Id.* Likewise, in interim 2022 the domestic industry experienced operating income [            ]. CSR at Table C-1 at C-5.

The AUVs of domestic net sales increased by 12.5% during the interim period – ***almost*** [            ] the increase in subject AUVs of [    ]%. *Id.* at Table C-1 at C-4-5.

The domestic industry's COGS-to-net-sales ratio declined from 117.2% in 2020, to 98.0% in 2021 (almost matching the 96.8% of 2019), before reaching a low of 77.4% in interim 2022. PSR at Table C-1 at C-5.

The domestic industry's cash flow [        ] from $[            ] in 2020 to $[            ] in 2021, before [                ] to $[            ] in interim 2022. CSR at Table VI-1 at VI-3. Thus, in the first half of 2022 alone, cash flow [      ] by [      ]% from annual 2021. *Id.* Moreover, the domestic industry expanded its market share during the interim period from 50.6 to 51.2% – notably, as subject producers' market share [            ] from [      ] to [      ]%. *Id.* at Table IV-19 at IV-41.

After a POI low of 4,128 production and related workers ("PRW") in interim 2021, as labor shortages eased, employment climbed to 6,118 PRW in interim 2022 – a 48.2% increase. PSR at Table C-1 at C-4.

Wages also increased in interim 2022 by 67.7%, from an aggregate $165.1 million in interim 2021 to $276.8 million in interim 2022. *Id.* This translated into a 7.4% increase in hourly wages, from $31.11 per hour in interim 2021 to $33.40 per hour in interim 2022. *Id.* Net assets [        ] by [    ]%, from a value of $[            ] in 2020 to $[            ] in 2021.

CSR at Table C-1 at C-5.   Capital expenditures increased by [      ]%, from $[              ] in interim 2021 to $[              ] in interim 2022.  *Id.*

Finally, record evidence does not indicate that the domestic industry was suffering any "actual or potential negative effects on … existing development and production efforts" or "efforts to develop a derivative or more advanced version of the domestic like product":  [

   ] U.S. producers reported R&D spending during the POI, which [

                                                                              ].  *See* Tenaris Prehearing Br. at 74-76 (citing CSR at Table VI-18 at VI-45).

The Commission's favorable data corroborate the public statements by members of the domestic industry that they were experiencing "best ever" financial results involving "continued improvements in profitability."  *See* Tenaris Prehearing Br. at 21-23, Ex. 30-35.

All of these positive indicators occurred while import volumes were increasing, and while demand (as measured by rig count) and prices were continuing a steadily increasing trend that began before the October 2021 petition.   The Commission's conclusion that the U.S. industry's performance during the interim period was a result of the petition is contrary to the record evidence.

When the domestic industry's condition improved pre-petition, the Commission previously has found the petition is not the source of improvement, and has given full weight to such trends.  *See, e.g.*, *Hardwood Plywood from China*, Inv. Nos. 701-TA-490 and 731-TA-1204 (Final), USITC Pub. 4434 at 25 (Nov. 2013) (finding that financial indicators were "improving" prior to the filing of the petition, so "the pendency of the{} investigations {could not} fully explain{} the improvement in the industry's condition"); *Certain Steel Wire Rod From Canada,*

NON-CONFIDENTIAL VERSION

*Germany, Trinidad & Tobago, and Venezuela*, Inv. Nos. 731-TA-763-766 (Final), USITC Pub. 3087 at 15 n.69, 21 (Mar. 1998) (same).

The Commission also has recognized that improvements to the domestic industry's condition during the interim period support a finding of no adverse impact. *See Silicomanganese from Australia*, Inv. No. 731-TA-1269 (Final), USITC Pub. 4600 at 24-27 (Apr. 2016) (although the domestic industry's performance indicators "reflect declines for most of the POI," its "improved experience in interim 2015 reflects a lack of correlation between the presence of subject imports in the U.S. market and the domestic industry's output and financial performance"); *see also Greenhouse Tomatoes From Canada*, Inv. No. 731-TA-925 (Final), USITC Pub. 3499 at 23-27, 29 & n.233 (Apr. 2002).

The Commission ignored its practice and record evidence that improvements in the domestic industry's condition occurred pre-petition filing. Instead, the Commission decided the domestic industry "improved its performance by nearly every measure between the interim periods" because "subject imports competed less aggressively in the U.S. market" after the petition was filed. Final Determination at 43. The Commission's failure to consider the evidence "which seriously undermine{s} its reasoning and conclusions" renders the Commission's impact determination unsupported by substantial evidence. *Dak Ams.*, 456 F. Supp. 3d at 1352 (internal citation omitted).

### 3. The Commission Relied on Qualitative Information That Included Non-subject Imports from South Korea

The Commission's impact determination should be remanded to eliminate qualitative information relating to non-subject imports from South Korea. Although the Commission recognized that imports from Hyundai are non-subject OCTG, as discussed in Section II above, the Commission relied on information that included non-subject imports. *See* Final

NON-CONFIDENTIAL VERSION

Determination at 44 & n.250 (citing CSR/PSR at Table II-14).  The Staff Report does not

separate qualitative information regarding subject and non-subject imports from South Korea

collected from questionnaire responses.  *See e.g.*, CSR/PSR at II-33, II-35-36, II-39-44.  Thus, in

determining that U.S. purchasers rated the availability of domestically produced OCTG as

"superior" or "comparable" to that of subject imports when dismissing the effect of supply

constraints on the U.S. OCTG market, the Commission included the views of U.S. purchasers on

non-subject imports as representative of subject imports.  *See* Final Determination at 44 & n.250,

45.  The Commission's analysis is not in accordance with the law.  *See Celanese Chems*, 31

C.I.T. at 293.

**NON-CONFIDENTIAL VERSION**

## VI.   CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, Plaintiffs respectfully request that the Court:

1)      Enter judgment in favor of Plaintiffs;

2)      Hold and declare that the Commission's Final Determination is unsupported by substantial evidence and otherwise not in accordance with law;

3)      Remand this matter to the Commission to issue a revised Final Determination in conformity with the Court's decision; and

4)      Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
Colin Alejandro Dilley
Cristina M. Cornejo

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A.*

May 22, 2023

CERTIFICATE OF COMPLIANCE

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for the Rule 56.2 Brief of Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A., as computed by the White & Case word processing system (Microsoft Word 2016) and manual talley, is 13,972 (13,837 in the text of the brief and 135 words within the screenshots on pages 10 and 19).

/s/Gregory J. Spak
Gregory J. Spak

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C.,<br><br>     Plaintiffs,<br><br>     and<br><br>TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A.,<br><br>     Consolidated Plaintiffs,<br><br>     and<br><br>TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; AND IPSCO TUBULARS INC.,<br><br>     Plaintiff-Intervenors,<br><br>     v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>     and<br><br>UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE USA INC.,<br><br>     Defendant-Intervenors. | Consol. Court No. 22-00344 |

## <u>ORDER</u>

Upon consideration of Plaintiffs' motion for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this Court, the Court, having reviewed the papers and pleadings on file herein, and after due deliberation, hereby:

1

**ORDERS** that Plaintiffs' motion is granted; and further

**ORDERS** that this matter is remanded to the United States International Trade Commission for disposition consistent with the Court's final opinion.

**SO ORDERED.**

Dated: _____, 2023
    New York, New York                         _____
                                               Jennifer Choe-Groves, Judge