**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC., MAVERICK TUBE CORP., IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., AND SIDERCA S.A.I.C., <br><br> Plaintiffs, <br> and <br><br> TMK GROUP, AND TUBOS DE ACERO DE MEXICO, S.A., <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br> and <br><br> UNITED STATES STEEL CORP., BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC., <br><br> Defendant-Intervenors. | Consol. Court No. 22-00344 |

**ORDER**

Upon consideration of the Rule 56.2 motions for judgment on the agency record filed by

Tenaris Bay City, Inc., Maverick Tube Corp., IPSCO Tubulars Inc., Tenaris Global Services

(U.S.A.) Corp., Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (together collectively,

"Tenaris") (ECF Doc. 45), and TMK Group (ECF Doc. 41), all responses thereto, and all other

relevant papers and proceedings herein, it is hereby:

ORDERED that Tenaris' and TMK Group's Rule 56.2 motions for judgment on the

agency record are DENIED; and it is further

ORDERED that the final determination of the U.S. International Trade Commission as

set forth in *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, 87

Fed. Reg. 69,331 (Nov. 18, 2022), and *Oil Country Tubular Goods from Argentina, Mexico,*

*Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC

Pub. 5381 (Nov. 2022), is AFFIRMED in all challenged respects.

SO ORDERED.

Date:_____          Signed:_____
      New York, New York                                               Jennifer Choe-Groves, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC., MAVERICK TUBE CORP., IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., AND SIDERCA S.A.I.C.,<br><br>           Plaintiffs,<br>     and<br><br>TMK GROUP, AND TUBOS DE ACERO DE MEXICO, S.A.,<br><br>           Consolidated Plaintiffs,<br><br>     v.<br><br>UNITED STATES,<br><br>           Defendant,<br>     and<br><br>UNITED STATES STEEL CORP., BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC.,<br><br>          Defendant-Intervenors. | Consol. Court. No. 22-00344<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information Removed from Brackets on Pages 2-3, 5-6, 8, 13-16, 18, 23, 27, 29-30, 32, 36, and 38-44. |

**DEFENDANT-INTERVENORS' RULE 56.2 RESPONSE BRIEF**

1

Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301

*Counsel to United States Steel Corporation*

Roger B. Schagrin
Jeffrey D. Gerrish
Luke A. Meisner

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
Phone: (202) 223-1700
Fax: (202) 429-2522

*Counsel to Borusan Mannesmann Pipe U.S.
Inc., PTC Liberty Tubulars LLC, United
Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial
and Service Workers International Union,
AFL-CIO, CLC, and Welded Tube USA Inc.*

Dated:   August 24, 2023

# Table of Contents

Page

RULE 56.2 STATEMENT ................................................................................................ 2

I.   Administrative Determination ................................................................................ 2

II.  Issues Presented ..................................................................................................... 2

III. Statement of Facts .................................................................................................. 3

    A.   Cumulation ...................................................................................................... 4

    B.   Material Injury ................................................................................................ 5

SUMMARY OF ARGUMENT ....................................................................................... 7

ARGUMENT ................................................................................................................... 9

I.   Standard of Review ................................................................................................ 9

II.  The Commission Supported with Substantial Evidence Its Finding of a "Reasonable Overlap of Competition" Among Imported and Domestically-Produced OCTG and Lawfully Cumulated Subject Imports ................................................................... 10

    A.   Tenaris Asks the Court to Re-Weigh Evidence Concerning Fungibility and Channels of Distribution ............................................................................... 11

        1.   Fungibility ............................................................................................. 12

            i.   Administrative Exhaustion ............................................................. 12

            ii.  Substantively, the Commission Provided a Reasoned Determination ......... 13

        2.   Distribution Channels ........................................................................... 15

    B.   The Commission's Decision to Cumulate Russia Is Lawful and Reasonable ... 17

    C.   The Preexisting Antidumping Order on South Korean OCTG Does Not Undermine the Cumulation Determination ................................................... 20

III. The Commission's Determination That Significant Volumes of Low-Priced Subject Imports Materially Injured the Domestic Industry Was Lawful and Supported by Substantial Evidence ............................................................................................. 23

    A.   Substantial Evidence Demonstrates that Subject Import Volumes Were Significant ..................................................................................................... 23

i

      1.    The Commission Lawfully Assessed the Significance of Subject Import Market Share Gains and Found No Evidence of Domestic Supply Constraints ................................................................................ 24

      2.    The Commission Lawfully Accorded Less Weight to Post-Petition Market Share Data ................................................................................ 26

  B.   The Commission's Finding of Significant Adverse Price Effects Was Based on Substantial Evidence and in Accordance with Law ...................................... 28

      1.    The Commission's Underselling Analysis Adequately Addressed Tenaris' Alternative Pricing Data................................................................... 29

      2.    The Commission's Price Effects Analysis Adequately Addressed Evidence of Lost Sales ................................................................................ 31

      3.    The Commission's Treatment of Price Suppression Comports with the Statute ................................................................................ 33

  C.   Substantial Evidence Supported the Commission's Lawful Finding that Subject Imports Adversely Impacted the Domestic Industry ................................... 36

      1.    Tenaris Misunderstands the Statute; The Commission Lawfully Considered Conditions of Competition in Assessing Subject Imports' Impact and its Conclusions Were Supported by Substantial Evidence................. 36

          i.    Demand ...................................................................... 37

          ii.    Intra-Industry Competition................................................. 38

          iii.   Supply Constraints ....................................................... 40

      2.    The Commission's Treatment of Post-Petition Impact Data Was Lawful........... 43

      3.    The Commission's Analysis of Purchaser Responses Was Supported by Substantial Evidence ..................................................................... 47

CONCLUSION.................................................................................... 48

# Table of Authorities

Page(s)

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ................................................................................9

19 U.S.C. § 1677(7)(A) ....................................................................................23

19 U.S.C. § 1677(7)(B) ....................................................................................31

19 U.S.C. § 1677(7)(B)(i) .................................................................................23

19 U.S.C. § 1677(7)(B)(i)(I) ........................................................................24, 28

19 U.S.C. § 1677(7)(B)(i)(II) .....................................................................28, 31, 34

19 U.S.C. § 1677(7)(C) .............................................................................25, 31

19 U.S.C. § 1677(7)(C)(i) .........................................................................24, 27-28

19 U.S.C. § 1677(7)(C)(iii) .......................................................................24-25, 37

19 U.S.C. § 1677(7)(G)(i) ...........................................................................10, 19

19 U.S.C. § 1677(7)(I) ............................................................................5, 27, 44

19 U.S.C. § 3512(d) .........................................................................................9

28 U.S.C. § 2637(d) ........................................................................................13

**Court Decisions**

*Altx, Inc. v. United States*, 26 C.I.T. 709 (2002) ...........................................25

*AWP Indus., Inc. v. United States*, 35 C.I.T. 774 (2011) ...............................19

*Celanese Chemicals, Ltd. v. United States*, 31 C.I.T. 279 (2007) .................22

*Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137 (Fed. Cir. 1987) .........................................................................................................34

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ...........................................................................................9

*CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015) ..........................................9, 19, 34

*Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348 (Fed. Cir. 2010) ...............................................................................................21

*Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898 (Ct. Int'l Trade), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988) .................................................10

*Goss Graphics Sys., Inc. v. United States*, 216 F.3d 1357 (Fed. Cir. 2000) ...........................................................................................10

*Granges Metallverken AB v. United States*, 716 F. Supp. 17 (Ct. Int'l Trade 1989) ..........................................................................................15

*Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States*, 181 F. Supp. 3d 1265 (Ct. Int'l Trade 2016) .......................................................21

*Intercargo Ins. Co. v. United States*, 83 F.3d 391 (Fed. Cir. 1996) .......................23

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ......................................................9

*LG Elecs., Inc. v. USITC*, 26 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) .......................28

*Nevinnomysskiy Azot v. United States*, 32 C.I.T. 642 (2008) ...........................34

*Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330 (Ct. Int'l Trade 2001) ..........................................................................................25

*Nitrogen Sols. Fair Trade Comm. v. United States*, 29 C.I.T. 86 (2005) .......................38

*Nucor Corp. v. United States*, 28 C.I.T. 188 (2004) .........................15, 36, 46

*Nucor Corp. v. United States*, 414 F.3d 1331 (Fed. Cir. 2005) ........................9, 34

*Nucor Fastener Div. v. United States*, 37 C.I.T. 749 (2013) .........................33

*Octal Inc. v. United States*, 539 F. Supp. 3d 1291, 1303 (Ct. Int'l Trade 2021) ..........................................................................................35

*Ratzlaf v. United States*, 510 U.S. 135 (1994) ...............................................27

*SeAH Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017) ..........................................................................................13

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ..........................................................................................22

*Swiff-Train Co. v. United States*, 904 F. Supp. 2d 1336 (Ct. Int'l Trade 2013) ..........................................................................................35-36

*Timken U.S. Corp. v. United States*, 421 F.3d 1350 (Fed. Cir. 2005) .......................32-33

*U.S. Steel Grp. V. United States*, 96 F.3d 1352 (Fed.Cir.1996)....................................................33

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...............................................................9

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370
(Fed. Cir. 2013)..................................................................................................................13

Administrative Determinations

*Barium Chloride from India*, Inv. No. 701-TA-678 (Final), USITC Pub.
5406 (Feb. 2023)................................................................................................................35

*Certain Oil Country Tubular Goods from India, Korea, the Philippines,
Taiwan, Thailand, Turkey, Ukraine, and Vietnam,* Inv. Nos. 701-TA-
499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub.
4489 (Sept. 2014)..............................................................................................................11

*Certain Preserved Mushrooms from China, India, and Indonesia,* Inv.
Nos. 731-TA-777-779 (Final), USITC Pub. 3159 (Feb. 1999) ......................................17

*Magnesium from Israel*, Inv. Nos. 701-TA-614 and 731-TA-1431
(Final), USITC Pub. 5009 (Jan. 2020)............................................................................40

*Multilayered Wood Flooring from China*, Inv. Nos. 701-TA-476 and
731-TA-1179 (Final), USITC Pub. 4278 (Nov. 2011) ...................................................35

*Oil Country Tubular Goods from Argentina, Austria, Italy, Japan,
Korea, Mexico, and Spain*, Inv. Nos. 701-TA-363-364 and 731-TA-711-
717 (Final), USITC Pub. 2911 (Aug. 1995) ............................................................. 10-11

*Oil Country Tubular Goods from Argentina, Italy, Japan, Korea,
Mexico*, Inv. Nos. 701-TA-364 and 731-TA-711 and 713-716 (Review),
USITC Pub. 3434 (June 2001)..........................................................................................11

*Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and
Mexico*, Inv. Nos. 731-TA-711 and 713-716 (Second Review), USITC
Pub. 3923 at 34 (June 2007) ............................................................................................39

*Oil Country Tubular Goods From Argentina, Mexico, Russia, and South
Korea*, 87 Fed. Reg. 69,331 (Nov. 18, 2022)....................................................................2

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South
Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final),
USITC Pub. 5381 (Nov. 2022) ..........................................................................................2

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South
Korea,* Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573
(Preliminary), USITC Pub. 5248 (Nov. 2021)..................................................................12

*Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020)....................................................11

*Raw In-Shell Pistachios from Iran,* Inv. No. 731-TA-287 (Second Review), USITC Pub. 4701 (Jun. 2017) .........................................................20

*Silicomanganese from Australia*, Inv. No. 731-TA-1269 (Final), USITC Pub. 4600 (Apr. 2016) ...................................................................................46

*Sodium Nitrite from Russia*, Inv. No. 701-TA-680 (Final), USITC Pub. 5342 (Aug. 2022)........................................................................................35

*Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan*, Inv. Nos. 701-TA-379 and 731-TA-788, 790- 793 (Second Review), USITC Pub. 4248 (Aug. 2011) .....................................................40

*Tomatoes From Canada*, Inv. No. 731-TA-925 (Final), Pub. 3499 (Apr. 2002) .................................................................................................... 46-47

*Urea Ammonium Nitrate Solutions from Russia and Trinidad and Tobago*, Inv. Nos. 701-TA-668-669 and 731-TA-1565-1566 (Final), USITC Pub. 5338 at 27-32 (Aug. 2022)................................................................36

Other Legislative Materials

H. Conf. Rep. 100-576 (1988) ....................................................................25

*Omnibus Trade and Competitiveness Act of 1988*, Pub.L. 100-418, § 1328(2)(C) (1988)........................................................................................25

S. Rep. No. 96-249 (1979) .........................................................................25

S. Rep. 100-71 (1987) .................................................................................25

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ....................................10

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| TENARIS BAY CITY, INC., MAVERICK TUBE CORP., IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., AND SIDERCA S.A.I.C., <br><br> Plaintiffs, <br> and <br><br> TMK GROUP, AND TUBOS DE ACERO DE MEXICO, S.A., <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br> and <br><br> UNITED STATES STEEL CORP., BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC., <br><br> Defendant-Intervenors. | Consol. Court No. 22-00344 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> Business Proprietary Information Removed from Brackets on Pages 2-3, 5-6, 8, 13-16, 18, 23, 27, 29-30, 32, 36, and 38-44. |

## DEFENDANT-INTERVENORS' RULE 56.2 RESPONSE BRIEF

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, United States

Steel Corporation, Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United

Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc. (together collectively

"Defendant-Intervenors" or "Petitioners") respectfully submit this response to the motions for

judgment on the agency record filed by Tenaris Bay City, Inc., Maverick Tube Corp., IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (together collectively, "Tenaris") (ECF Doc. 45), and TMK Group (ECF Doc. 41) (together with Tenaris, "Plaintiffs").

**RULE 56.2 STATEMENT**

### I.   Administrative Determination

This action concerns the U.S. International Trade Commission's (the "Commission") affirmative finding that "an industry in the United States is materially injured by reason of oil country tubular goods ("OCTG") from" Argentina, Mexico, South Korea, and Russia, *Oil Country Tubular Goods From Argentina, Mexico, Russia, and South Korea*, 87 Fed. Reg. 69,331 (Nov. 18, 2022), and the accompanying "Views of the Commission," *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022) (C.R.439, P.R.165) (hereinafter "Views").[1]

### II.   Issues Presented

A.   Whether substantial evidence supports the Commission's finding of a "reasonable overlap of competition" among subject and domestic OCTG, consistent with four prior Commission OCTG determinations.

B.   Whether Russian OCTG, which was imported throughout the period of investigation ("POI"), competed with other subject sources notwithstanding sanctions imposed on Russia late in the POI.

C.   Whether substantial evidence supports the Commission's finding that increases in both subject import volume ([      ] percent) and market share ([      ] percentage points) were significant.

D.   Whether statutory discretion to accord less weight to "the data" affected by "any change in volume" encompasses post-petition market share data.

---

[1] All citations herein refer to the confidential version (C.R.439).

E.   Whether substantial evidence supports the Commission's finding that subject imports "significantly undersold the domestic like product," notwithstanding Tenaris' request to restate all pricing data to account for Tenaris' own imprecisely defined contracting practices.

F.   Whether undisputed purchaser responses and evidence of sales lost [                    ] OCTG constitute "some evidence" of sales lost to subject imports.

G.   Whether the Commission lawfully found significant adverse price effects based on underselling without finding significant price suppression, consistent with other Commission determinations.

H.   Whether the Commission's finding that the domestic industry's 8.2 percentage point market share loss [                    ] and declining performance indicators were caused by subject imports was supported by substantial evidence, where the Commission treated Tenaris as part of the domestic industry, as Tenaris requested.

### III.  Statement of Facts

In response to Petitioners' request, the Commission investigated whether the domestic OCTG industry was injured by reason of OCTG imports from Argentina, Mexico, Russia, and South Korea.  The Commission considered data and evidence from 2019 through the first half of 2022 (the "POI") and concluded that significant volumes of low-priced subject imports had materially injured the domestic industry.  *See* Views at 1.  Specifically, subject import volumes increased by [      ] percent and captured [      ] percentage points of U.S. market share from 2019-2021.  *Id.* at 42.  Throughout the POI, subject import prices undersold the domestic industry in [      ] out of 170 quarterly comparisons, accounting for [      ] percent of commercial sales volume.  *Id.* at 47.  Consequently, the domestic industry lost 8.2 percentage points of market share [                    ] while suffering significant declines in production, capacity utilization, employment, financial performance, among other indicators.  *See id.* at 52-55.

Plaintiffs now challenge aspects of the Commission's decision to cumulate subject imports and its material injury analysis.

A.      **Cumulation**

Applying its usual four-factor analysis, the Commission found that all factors indicated a reasonable overlap of competition among subject imports and domestically produced OCTG—consistent with final determinations concerning OCTG from 1995, 2001, 2014, and 2020—and thus cumulated subject imports for purposes of its material injury analysis. *See id.* at 24-30. In so doing, the Commission rejected TMK's request to decumulate Russia based on sanctions imposed in response to Russia's invasion of Ukraine. *See id.* at 29-30. The Commission observed that the sanctions highlighted by TMK arose only during the final months of the POI and that TMK imported significant volumes even during this period. *See id.* at 23-25, 29-30.

No party disputed that seamless and welded OCTG constitute a single like product. *See id.* at 10. And, consistent with a long line of administrative precedent, the Commission rejected Tenaris' request to decumulate based on alleged fungibility issues between seamless OCTG (a greater proportion of Argentinian and Mexican imports) and welded OCTG (a greater proportion of Russian and South Korean imports). In its reasoning, the Commission observed that all subject countries exported seamless OCTG to the United States throughout the POI, while acknowledging significant variation in each country's proportion. *Id.* at 25-26. The Commission also found, as it has in the past, that most downhole applications could employ either seamless or welded OCTG. *Id.* at 8, 26. Finally, the Commission acknowledged differences in the AUVs of majority-seamless and majority-welded countries, but noted a decreasing gap during the POI and found no further evidence to challenge the longstanding fungibility consensus. *See id.* at 10 n.32, 27.

The Commission also rejected Tenaris' appeal to decumulate its affiliates in Argentina and Mexico based on Tenaris' rebranding of its distribution services as "Rig Direct®," finding that distribution channels (like the three other cumulation factors) indicate a reasonable overlap

of competition, with OCTG from all sources sold through distributors.  *Id.* at 28.  Moreover, the

Commission rejected Tenaris' argument that services offered to end users somehow

distinguished its OCTG supply from that of other domestic producers and distributors.  *Id.* at 61.

      **B.**    **Material Injury**

      As the statute requires, the Commission assessed material injury by reference to subject

imports' volume, price effects, and impact on domestic producers.  The Commission found the

volume of subject imports to be significant, based on an analysis of both absolute volume (which

increased [     ] percent) and volume relative to U.S. demand, *i.e.*, market share (which

increased [     ] percentage points).  *Id.* at 42.  While subject imports gained market share

over the POI, the Commission noted that this trend reversed after the October 2021 filing of the

petition.  Recognizing this, the Commission invoked 19 U.S.C. § 1677(7)(I) and opted to

discount post-petition market-share data.  *See id.* at 43 n.184.  Because subject imports' absolute

volume continued to rise in the interim period (consistent with demand), the Commission

deemed it unnecessary to discount that data.  *See id.* at 43.

      The Commission's price analysis considered the existence of significant underselling and

significant price suppression.  *Id.* at 44-51.  The Commission rejected Tenaris' suggestion to

modify all pricing data due to Tenaris-specific contracting practices.  *See id.* at 45-47.  As the

Commission found, Tenaris failed to establish what proportion of its subject imports (much less

all subject imports) was affected by such contract practices.  *Id.* at 46 & n.193.  Moreover, a

[    ] proportion of domestic sales involved similar contract practices, which would have an

offsetting effect.  *Id.* at 46.  The Commission also supported its underselling analysis by

reference to "some evidence" of lost sales, primarily purchaser questionnaire responses

indicating that subject imports were purchased in lieu of domestic OCTG due to price

considerations.  *See id.* at 48-49.  Owing to strong evidence of underselling, the Commission

determined that significant price effects had occurred, obviating the need to make a finding about the significance of price suppression.  *Id*. at 51.

Given a broad decline in domestic industry performance—[

]—which coincided with increasing subject import market share and significant underselling, the Commission concluded that the domestic industry had been negatively impacted by subject imports.  *Id.* at 63.  The Commission undertook this analysis "within the context of" conditions of competition identified by interested parties.  The Commission acknowledged substantial demand decreases coinciding with the COVID-19 pandemic early in the POI.  *E.g.*, *id.* at 52-53.  It furthermore evaluated the extent to which Tenaris' in-house distribution affected the competitive landscape, finding that U.S. purchasers generally saw little difference in availability and technical support as between subject OCTG and domestically produced OCTG, while acknowledging a minority view to the contrary.  *Id.* at 61.

The Commission also considered Tenaris' allegations that hiring constraints delayed a resumption of domestic production as demand rebounded but found contrary testimony from several other domestic producers.  *Id.* at 62 & n.265.  The Commission rejected Tenaris' assertion that the need to draw down post-COVID OCTG inventories hampered the domestic industry, reasoning that any inventory overhang was resolved before the domestic industry lost market share to subject imports and that any overhang would affect subject imports as well.  *Id.* at 60-61.  Finally, cognizant of the significant increase in hot-rolled steel coil prices during the POI, which increased the cost of welded OCTG production, the Commission observed that unused capacity at domestic producers of seamless OCTG could have nevertheless satisfied U.S. demand.  *See id.* at 62.  Having rejected Tenaris' alternative purported causes of injury, the

Commission concluded that the domestic industry was materially injured by significant volumes of low-priced subject imports.

Tenaris and TMK subsequently launched this appeal.

## SUMMARY OF ARGUMENT

The Commission's injury determination in this investigation is firmly supported by the administrative record and consistent with the Commission's numerous prior affirmative injury determinations concerning OCTG.  Extensive evidence confirmed that subject imports materially injured the domestic industry—growing volumes, lost market share, predominant underselling, and declining domestic industry performance.  After weighing the evidence, the Commission declined to adopt Tenaris' request that it upend its usual analysis, espousing a lawful injury finding that is supported by substantial evidence.  Tenaris' only hope on appeal is for the Court to reweigh the evidence—an outcome precluded by the statutory standard of review.

The Commission found all four of its usual factors favored cumulation.  TMK disputes Russia's inclusion, based on sanctions imposed in response to Russia's invasion of Ukraine, which arose during the final months of the POI, and after which TMK continued to ship substantial volumes to the United States.  As this affected, at most, a sliver of POI data, the Commission lawfully cumulated Russia.

Tenaris' contention that seamless and welded OCTG are non-fungible contradicts administrative precedent and Tenaris's own concessions that seamless and welded OCTG are largely interchangeable.  Similarly, Tenaris' argument for decumulation based on channels of distribution failed because Tenaris' "Rig Direct®" service is merely a rebranding of services already offered by U.S. mills and distributors.  The Commission considered Tenaris' evidence on these points but found the record as a whole favored cumulation.

The Commission found material injury during the POI based on subject imports'

significant volume *and* price effects *and* impact.  Subject imports' absolute volume and market share both increased significantly, until the petition restrained subject imports' market share. Giving less weight to the post-petition data was well within the Commission's statutory authority.

The Commission's price effects finding was based on the predominance of underselling by number of quarters ([          ]) and volume ([          ]), at a 10.8% average underselling margin.  The Commission reasonably declined Tenaris' request to alter these price comparisons based on Tenaris contracting arrangements that were neither unique, nor adequately demonstrated, nor supported by record data.  The Commission's underselling assessment was further supported with purchaser questionnaires and evidence of sales lost to [                    ] imports, none of which Tenaris challenges.  Given this evidence, there was neither a legal nor a practical need for the Commission to make a finding of price suppression to further demonstrate adverse price effects, and its rationale is otherwise "reasonably discernable."

The Commission's impact analysis noted the domestic industry's 8.2 percentage point loss of market share [                    ], and its large decreases in production, capacity utilization, and employment, among other negative indicators.  Tenaris' challenges to this assessment are largely predicated on the notion that producing both domestic and subject OCTG entitled it to be included within the domestic industry, while treating Tenaris' U.S. operations data differently.  The Commission reasonably considered Tenaris' arguments, weighed the material record evidence, and declined to deviate from its usual analytical approach.  Tenaris has identified no error of law or lack of substantial evidence in the Commission's determination. Therefore, the Commission's determination should be sustained.

## ARGUMENT

I. **Standard of Review**

This Court will "hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

To determine whether the Commission's interpretation of a statue is "in accordance with law," the court applies the two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). First, a reviewing court must examine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. To discern Congressional intent, the court must exhaust "all the traditional tools of construction," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019), including the "authoritative" Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), *see* 19 U.S.C. § 3512(d). If "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

Substantial evidence review examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). "{T}he Commission's discussion in the Views of the Commission need not be of some talismanic length or in some preordained place." *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1350 (Ct. Int'l Trade 2014), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015). Even "{w}here an agency has not made a particular determination explicitly, the agency's ruling nonetheless may be sustained as long as 'the path of the agency may be reasonably discerned.'" *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005).

## II.   The Commission Supported with Substantial Evidence Its Finding of a "Reasonable Overlap of Competition" Among Imported and Domestically-Produced OCTG and Lawfully Cumulated Subject Imports

Tenaris and TMK challenge the Commission's decision to cumulate subject imports.  *See*

Tenaris Br. at 18-23; TMK Br. at 6-30.  The statute permits the Commission to "cumulatively

assess the volume and effect of imports of the subject merchandise" where "such imports

compete with each other and with domestic like products in the United States market."[2] 19

U.S.C. § 1677(7)(G)(i).  The SAA requires only "a reasonable overlap of competition, based on

consideration of relevant factors."  SAA, H.R. Doc 103-316, Vol. 1 (1994) at 848 (citing

*Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898, 902 (Ct. Int'l Trade), *aff'd*, 859 F.2d 915

(Fed. Cir. 1988)); *see also* Views at 22 & n.82 (citing same).  Neither the statute nor the SAA

requires a particular analysis but, consistent with *Fundicao Tupy*, the Commission generally

considers four factors: the degree of fungibility, geographic overlap in "sales or offers to sell,"

"common or similar" channels of distribution, and simultaneous presence in the market.  Views

at 22.  This is merely a "guiding framework," and "no single indicator for weighing competitive

overlap is dispositive."  *Goss Graphics Sys., Inc. v. United States*, 216 F.3d 1357, 1362 (Fed. Cir.

2000).

Here, the Commission evaluated the evidence and concluded that all four factors show "a

reasonable overlap of competition between and among domestically produced OCTG and

imports from each subject country."  Views at 30.  This conclusion is consistent with numerous

past OCTG determinations, in which the Commission has consistently found a "reasonable"

overlap of competition.  *See, e.g.*, *Oil Country Tubular Goods from Argentina, Austria, Italy,*

*Japan, Korea, Mexico, and Spain*, Inv. Nos. 701-TA-363-364 and 731-TA-711-717 (Final),

---

[2] Tenaris does not contest the remaining prerequisites.  *See* 19 U.S.C. § 1677(7)(G)(i).

USITC Pub. 2911 (Aug. 1995) at I-24; *Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, Mexico*, Inv. Nos. 701-TA-364 and 731-TA-711 and 713-716 (Review), USITC Pub. 3434 (June 2001) at 14; *Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (Sept. 2014) at 23; *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020) at 18.  Indeed, Tenaris itself has taken a position supporting such cumulation findings in the past.  *See* Tenaris Prehearing Br. at Ex. 14 at I-8-I-11 (C.R.405, P.R.128) (posthearing brief for 2020 five-year review).  Without acknowledging this, Tenaris now takes issue with the Commission's findings concerning two factors: the "degree of fungibility" and "common or similar" channels of distribution, while apparently conceding the other two factors (*i.e.*, geographic overlap and simultaneous market presence).  *See* Tenaris Br. at 18-23.  Separately, TMK argues that Russia's invasion of Ukraine should be rewarded with special decumulation treatment for Russian imports.  *See* TMK Br. at 6-25.

### A.   Tenaris Asks the Court to Re-Weigh Evidence Concerning Fungibility and Channels of Distribution

Tenaris first challenges the Commission's conclusion that seamless and welded OCTG are fungible, arguing that (1) a limited minority of applications require seamless OCTG and (2) seamless OCTG from Argentina and Mexico reported higher average unit values ("AUVs") than welded OCTG from South Korea and Russia.  *See* Tenaris Br. at 18-21.  But Tenaris failed to exhaust its administrative opportunity to contend that seamless and welded OCTG were not alike, and the Commission otherwise reasonably addressed Tenaris' contentions.

1.     **Fungibility**

i.     *Administrative Exhaustion*

Tenaris' fungibility challenge hinges upon Tenaris' presumption that seamless and welded OCTG are different products.  Yet, in defining the domestic like product, the Commission preliminarily concluded that "seamless and welded OCTG share basic physical characteristics…and are both used in oil and gas wells," and that although "there are certain more demanding applications in which only seamless and not welded OCTG can be used, the two products are nonetheless largely interchangeable," as reflected by producer and consumer perceptions.  *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Preliminary), USITC Pub. 5248 (Nov. 2021) at 11-13 (C.R.222, P.R.74) ("Preliminary Views").[3]  In reaching this conclusion, the Commission specifically cited Tenaris' lack of "dispute that welded OCTG is interchangeable with seamless OCTG in less-demanding applications, or that seamless OCTG is interchangeable with welded OCTG in all applications."  *Id.* at 13 & n.49.  *No party challenged the foregoing analysis in the final phase of the investigation*, and the Commission continued to find seamless and welded OCTG have a "preponderance of similarities" and are "interchangeable in a large number of applications."  *See* Views at 10 & n.32.

Through its silence, Tenaris conceded the interchangeability of seamless and welded products in the Commission's domestic like product analysis.  Now Tenaris seeks remand because the Commission's fungibility analysis relied upon the same basic factual proposition.  *See id.* at 24-28 (discussing, *e.g.*, interchangeability and comparability); Tenaris Br. at 18-21.  To the extent these analyses overlap, Tenaris cannot have it both ways.  This Court's governing

---

[3] All citations refer to the proprietary version (C.R.222).

statute mandates that plaintiffs exhaust administrative remedies where appropriate.  *See* 28 U.S.C. § 2637(d).  The court "generally takes a 'strict view' of th{is} requirement," *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013),[4] and should therefore reject Tenaris' bid to disturb factual findings that Tenaris conceded administratively.

    ii.   *Substantively, the Commission Provided a Reasoned Determination*

Tenaris' assertion that the Commission "fail{ed} to account for {Tenaris'} evidence," *id.* at 19, is simply incorrect.  The Commission fully considered—and rejected—Tenaris' cumulation arguments.  Tenaris specifically references (1) the proportion of welded versus seamless OCTG shipped by Argentina, Mexico, and South Korea (but not Russia); (2) hearing testimony and [                                                        ] indicating that certain applications require seamless OCTG; and (3) the [                                        ] AUVs for Argentinian and Mexican OCTG versus South Korean and Russian OCTG in [                    ] of the POI.  *See* Tenaris Br. at 19-20.  The Commission considered each of these in its analysis.

*First*, the Commission acknowledged that Argentinian and Mexican OCTG "*primarily or exclusively* consist of seamless OCTG" while South Korean OCTG "primarily consist of welded OCTG," Views at 26 (emphasis supplied), citing the same evidence as Tenaris in its brief. *Compare* Staff Report, Memorandum INV-UU-100 (Oct. 14, 2022) (C.R.431, P.R.161) at Tables IV-5 (seamless OCTG quantities for all subject countries and periods), IV-6 (welded OCTG quantities for all subject countries and periods), and IV-13 (2021 figures), *with* Tenaris Br. at 19 (seamless and welded OCTG quantities expressed as percentages).  The Commission also found that "there were imports of seamless OCTG from each subject source throughout the POI, and

---

[4] None of the limited exceptions could apply here.  *See, e.g.*, *SeAH Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335, 1351 n.7 (Ct. Int'l Trade 2017) (summarizing exceptions).

that the domestic industry produced seamless OCTG throughout this period," Views at 25, findings corroborated by Tenaris' own table, *see* Tenaris Br. at 19.  The Commission's fungibility analysis therefore sufficiently considered the evidence Tenaris cites, and reasonably concluded that this evidence did not compel decumulating imports from subject countries.

*Second*, the Commission acknowledged that "seamless OCTG is generally required for use in high-pressure or sour service environments," Views at 8 & n.26; *see also id.* at 23 n.84 (acknowledging Tenaris' related argument), carrying forward its unchallenged preliminary finding that "seamless OCTG may be required for certain more demanding applications," *id.* at 10 n.32.  However, the Commission concluded that "welded and seamless OCTG can be used interchangeably in most if not all other applications."  *Id.* at 26.  The Commission reasoned that both seamless and welded OCTG "can meet the specifications for the majority of API grades, suggesting that either form can be used in the majority of applications." *Id.* at 26; *see also id.* at 25 & n.94.  Respondent testimony and prior USITC determinations buttressed the Commission's conclusions, acknowledging overlap "for most applications.".  *Id.* at 27 & n.104.  Finally, the Commission observed that "{m}ajorities of responding domestic producers, importers, *and purchasers*" reported that OCTG from all sources are "always or frequently interchangeable." *Id.* at 24 (emphasis supplied).[5]  Tenaris' brief makes no effort to establish how its citations undermine the Commission's conclusions,[6] and "the fact that certain information is not discussed

---

[5] The Commission's preliminary determination addressed the precise exhibit Tenaris relies upon, concluding that it "does not argue or suggest that these customer testimony and reporting establish that welded and seamless OCTG cannot be used interchangeably in other applications." Preliminary Views at 13 n.49; *see also* Tenaris Br. at 20 (citing Exhibit 11 of its Post-Conference Brief).

[6] Many of Tenaris' citations do not address fungibility, but rather [                    ] or the overall proportion of seamless versus welded OCTG consumption.  *See* Tenaris Br. at 20 (citing Table V-19 of the Staff Report and Exhibit 23 of Tenaris' Posthearing Brief).

in {a Commission} determination does not establish that the {Commission} failed to consider that information because there is no statutory requirement that the {Commission} respond to each piece of evidence presented by the parties." *Nucor Corp. v. United States*, 28 C.I.T. 188, 262 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005) (quoting *Granges Metallverken AB v. United States*, 716 F. Supp. 17, 24 (Ct. Int'l Trade 1989)). The Commission reached an evidence-based conclusion that both welded and seamless OCTG can be used in most downhole applications.

*Finally*, turning to AUV differences, the Commission acknowledged that Argentinian and Mexican OCTG imports reflected higher AUVs "relative to other subject imports." Views at 23. Elsewhere, it carried forward its unchallenged preliminary analysis that "while seamless OCTG is generally more expensive than welded OCTG, this price premium diminished over the preliminary phase period of investigation," *id.* at 10 n.32, and found "no new information or party argument" to warrant reconsideration, *id.* at 10. Ultimately, the Commission "acknowledge{d}" a price gap, but found it insufficient, on its own, to defeat the other record evidence of fungibility. *See id.* at 27. This is not a "failure to consider" relevant evidence as Tenaris suggests, but rather an acknowledgment of the record evidence and a reasonable weighing of the totality of evidence concerning fungibility.

## 2. Distribution Channels

Tenaris also asserts that that the Commission's channels of distribution analysis failed to consider "representative data" and "evidence that Tenaris sold subject imports from Argentina and Mexico and its U.S.-produced OCTG to its U.S. customers mainly using its unique Rig Direct® program." Tenaris Br. at 21. Tenaris also claims the Commission's analysis is inconsistent with *Preserved Mushrooms*. *Id.* at 23.

Regarding the data, Tenaris asserts that, for most (but not all) of the POI, [          ] of Argentine and Mexican OCTG imports were sold to [              ], while [          ] of South

15

Korean OCTG imports were sold to [                    ].  *See id.* at 21.  Tenaris further asserts

that the Commission only considered 2021 data, "rather than the POI overall," thereby

"overstat{ing} the overlap."  *See id.* at 22.  Tenaris misstates what the Commission did and, in

any event, identifies no deviation from statutory requirements.

 The Commission expressly acknowledged that Argentina and Mexico "primarily sold

OCTG to [              ] while also selling a smaller amount to [          ]" over the POI, [

                    ].  Views at 28 & n.107 (citing Staff Report

table reporting such information for all periods of the POI).  Specifically rejecting Tenaris'

contention that distribution channels could not support a "reasonable overlap," the Commission

observed that over [      ] of Mexican OCTG imports and over [      ] of Argentinian OCTG

imports were sold to distributors in 2021.  *Id.* at 28 n.108.  Tenaris' evident preference for a

higher threshold notwithstanding, the Commission considered these data evidencing OCTG sales

from subject countries through overlapping channels of distribution.

 Tenaris next claims the Commission should have differently weighed Tenaris' relabeling

of standard distribution services performed by affiliated entities as "Rig Direct®."  *See* Tenaris

Br. at 22-23.  But Tenaris conflates promotional branding with meaningful operational

distinctions.  As Tenaris recognizes, "Rig Direct" is simply brand-name shorthand for direct-to-

end-user sales, *i.e.*, "do{ing}…together" what is already done by "mills, processors, and

distributors." *Id.*  Tenaris is merely repackaging its first critique.  The Commission recognized as

much, noting "Petitioners{'}…signed declarations and supporting documentation corroborating

that domestic producers in combination with their distributors provide the same services as Rig

Direct,"  Views at 61, and thus confirming that subject imports and the domestic like product are

sold through similar channels of distribution.

Finally, Tenaris proffers *Preserved Mushrooms* as an example of the Commission refusing to cumulate where sales were made "overwhelmingly" through different channels of distribution.  Tenaris Br. at 23 (citing *Certain Preserved Mushrooms from China, India, and Indonesia*, Inv. Nos. 731-TA-777-779 (Final), USITC Pub. 3159 (Feb. 1999) at 8-9).  Evidently, Tenaris misread *Preserved Mushrooms*.  The Commission decumulated Chilean mushrooms from Indonesian mushrooms, but cumulated both with China and India.  *See Preserved Mushrooms* at 10.  Of the three channels of distribution at issue, the Commission found "only a minimal overlap…and *no common purchasers* of subject imports" between Chile and Indonesia. *Id.* at 9 n.45 (specific Chilean percentages are proprietary) (emphasis supplied).  Quite unlike this investigation, different distribution channels involved different packaging, *see id.*, and purchaser responses indicated low interchangeability for Chilean and Indonesian mushrooms, *compare id.* at 7 (one purchaser reporting "moderate substitute{ability}," another characterizing them as "not substitutable"); *with* Views at 24 (majorities of all categories of respondents reported all subject countries' OCTG as always or frequently interchangeable).  *Preserved Mushrooms* concerned a weak record vis-à-vis channels of distribution and significant fungibility flaws as well.  Here, the Commission reasonably weighed the record evidence in finding a reasonable overlap in competition between subject imports from Argentina and Mexico and other subject imports.

### B.    The Commission's Decision to Cumulate Russia Is Lawful and Reasonable

TMK and Tenaris assert that cumulation of Russian OCTG was unsupported by substantial evidence, arguing that responses to Russia's unprovoked invasion of Ukraine stymied TMK's U.S.-bound shipments at the tail end of the POI, which warranted special treatment for

17

TMK.  *See* Tenaris Br. at 24-25; TMK Br. at 6-25.[7]  There is no basis for remand on this issue. The Commission's analysis is reasonable, evidence-based, and lawful.

The Commission rejected TMK's assertions that Russian OCTG did not exhibit a "reasonable overlap" of competition during the POI, reasoning that (1) the sanctions "arose only late in the POI—*i.e.*, subsequent to Russia's February 2022 invasion of Ukraine," *see* Views at 23 n.86; (2) "significant volumes of OCTG from Russia {continued to} enter{} in two out of the four post-invasion months of the POI (March and May of 2022)," *id.* at 29, with H1 2022 totaling a greater volume than H1 2021, *id.* at 29 n.114; (3) sanctions did not outright "prohibit the entry or sale of Russian OCTG," *id.* at 29; and (4) "the market impact of [

                                                   ] is not yet clear," *id.* at 30, but Russian producers could, in any case, sell [                              ] after further processing in the United States, *id.* at 30 n.116. Any one of these reasons would be a valid basis for rejecting Plaintiffs' argument and affirming the Commission's determination.

Plaintiffs take great pains to avoid confronting the Commission's first rationale.  The Commission found present material injury based on what occurred during the complete 42-month POI.  Sanctions and licensing penalties in response to Russia's invasion were not even introduced until March and April 2022—*i.e.*, the last four months.  *See* Views at 23-24. Moreover, the Commission discounted H1 2022 market share data due to post-petition effects, *see id.* at 43 n.184;[8] 19 U.S.C. § 1677(7)(I), and neither TMK nor Tenaris argue that H1 2022

---

[7] By focusing on post-invasion developments, TMK implicitly concedes that Section 232 tariffs alone, imposed in 2018, would not warrant Russia's decumulation.  *See* TMK Br. at 14.

[8] The decision to discount post-petition data is based on consideration of "the industry as a whole."  *CP Kelco*, 24 F. Supp. 3d at 1352.

Russian pricing data were distinct, *see* Tenaris Br. at 24-25; TMK Br. at 6-25.  This timing issue

defeats Plaintiffs' arguments.

The cumulation provision cross-references the present material injury subsections and

requires that "*such imports* compete with each other." *See* 19 U.S.C. § 1677(7)(G)(i) (emphasis

supplied).  The period in which competition must "reasonably overlap" is the POI.  *See id*; *AWP

Indus., Inc. v. United States*, 35 C.I.T. 774, 790 (2011) ("there is no requirement to include such

post-POI data, as the POI is the centerpiece of the investigation's time frame").  TMK's *future*

plans, or lack thereof, *see* Tenaris Br. at 25; TMK Br. at 14, are irrelevant to whether OCTG

imports from Russia competed with OCTG from other sources during the POI.  Plaintiffs'

suggestion that the Commission decumulate subject imports from Russia due to developments

affecting, at most, the last few months of a 42-month POI is unreasonable and not compelled by

record evidence.  The Commission rightfully "disagree{d} with TMK that we should focus our

assessment of whether there is a reasonable overlap of competition from February 2022 onward

and disregard data covering the majority of the POI."  Views at 23 n.86.  The Commission

otherwise addressed TMK's arguments, *see id.* at 25 n.95, 29-30, and nothing in Tenaris' or

TMK's briefs overcomes the fundamental flaw in TMK's bid for special treatment.

In addition, the Commission's second rationale, the presence of significant post-sanction

imports, moots TMK's theoretical arguments, even for the short period affected.  Regardless of

rationale for continued post-sanctions imports of Russian OCTG, s*ee* TMK Br. at 21, the

Commission reasonably found that OCTG imports totaling 47,373 short tons after the imposition

of sanctions further confirmed Russian OCTG's competition with OCTG from other sources

during even the POI's last few months.  Views at 29 (citing Staff Report at Table IV-18).

Tenaris and TMK's arguments about the Commission's citation to *Raw Pistachios* are also misplaced. *See id.* at 30 n.115 (citing *Raw In-Shell Pistachios from Iran*, Inv. No. 731-TA-287 (Second Review), USITC Pub. 4701 (Jun. 2017) at 19). *Raw Pistachios* found, despite sanctions, subject imports can adversely impact the domestic industry, *see Raw Pistachios* at 1, 19. Here, unlike the *Raw Pistachios* five-year review, no guesswork was involved. This investigation concerned the existence of material injury during the POI, *see* Views at 1, so the Commission cited *Raw Pistachios* as support for not dismissing Russian data. Notably, respondents identify no contrary precedent.

Nor do Plaintiffs explain why it matters whether a proffered market restriction is labeled a "sanction" or some "other measure." In any event, Plaintiffs are wrong that *Raw Pistachios* considered only "sanctions." The cited portion of *Raw Pistachios* discusses "stricter {food} standards in OECD countries," "U.S. sanitary/phytosanitary requirements with respect to aflatoxin contamination," and "financial sanctions." *Raw Pistachios* at 18-19; *see also* Views at 30. By Plaintiffs' own rationale, this multifaceted situation underscores the reasonableness of the Commission's reference to *Raw Pistachios*.

In sum, Plaintiffs offer nothing to warrant remanding the Commission's decision to cumulate Russian imports.

### C.   The Preexisting Antidumping Order on South Korean OCTG Does Not Undermine the Cumulation Determination

Tenaris and TMK claim the Commission was required to "consider" the preexisting antidumping order on South Korean OCTG as part of its "reasonable overlap of competition" analysis—a requirement found nowhere in the statute or SAA. *See* Tenaris Br. at 23-24; TMK Br. at 26-30. But Plaintiffs provided the Commission nothing to "consider" in the final phase of this investigation, and thus failed to exhaust administrative remedies. As Tenaris acknowledged

administratively, the Commission rejected the relevance of the Korean antidumping order in its
preliminary phase determination.  *See* Tenaris Final Comments at 9 n.46 (C.R.437, P.R.164);
Preliminary Views at 31-32 (C.R.222).  Plaintiffs' sole mention of the Korean antidumping order
in final phase briefing was the following sentence from Tenaris' Final Comments: "Cumulating
imports from Korea was always questionable given they are subject to an injury finding that
resulted in an antidumping dumping duty ("AD") order."  Tenaris Final Comments at 9
(C.R.437).  TMK's final phase briefs omitted this issue completely.

While the Commission's final determination acknowledged the antidumping order,
Views at 41 n.176, Tenaris failed to explain how the antidumping order precluded a "reasonable
overlap of competition" in terms of an argument to which the Commission might have
responded.  *See id.*  Moreover, Tenaris' vague "questionability" assertion bears no resemblance
to TMK's four pages of argument before this court.  *Compare id.*, *with* TMK Br. at 26-30.
Plaintiffs simply failed to exhaust their administrative remedies.  *See, e.g.*, *Diamond Sawblades
Mfrs. Coal. v. United States*, 612 F.3d 1348, 1362 (Fed. Cir. 2010) ("isolated statements" in pre-
and post-hearing briefs did not "effectively present{} issue to the Commission."); *Guangzhou
Jangho Curtain Wall Sys. Eng'g Co. v. United States*, 181 F. Supp. 3d 1265, 1283 (Ct. Int'l
Trade 2016) ("the onus was on the Plaintiff to develop that argument and direct Commerce to the
pertinent facts. It did not, and, as such, it failed to exhaust its administrative remedies").

Separately, Tenaris and TMK purport that three tables cited in the Commission's
cumulation analysis contain nonsubject data from Hyundai Steel Company ("Hyundai").[9]  *See*
Tenaris Br. at 23; TMK Br. at 25 (both citing Tables II-16, II-19, and IV-17 of the Staff Report).

---

[9] Because Commerce concluded that Hyundai received subsidies below *de minimis*, Hyundai's
products were nonsubject OCTG for purposes of the challenged Commission determination.

But Plaintiffs have failed to allege "that {they} suffered harm as a result of the purported error." *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1359 (Fed. Cir. 2020) (declining to reach issue without impact on dumping margin). Plaintiffs rely on a single CIT case where the plaintiff had specifically argued that exclusion of nonsubject data would show subject imports had replaced nonsubject imports and undermine the Commission's volume analysis. *See Celanese Chemicals, Ltd. v. United States*, 31 C.I.T. 279, 293 (2007). Here, by contrast, neither plaintiff explained *how* Hyundai data affected the Commission's analysis, much less how its exclusion would have changed the cumulation determination. *See* Tenaris Br. at 23-24; TMK Br. at 25-26. Nor did Plaintiffs request that the Commission gather producer-specific (rather than countrywide) responses, leaving the Commission no practical opportunity to obtain responses that specifically omitted Hyundai. *See* Section III.C.3 (detailing timeline).

Table II-16 tallies importer responses concerning product interchangeability on a country-wide basis. Table II-19 tallies importer responses concerning the significance of product differences, also on a country-wide basis. The Commission cited these and other unaffected tables reflecting similar responses from U.S. producers and purchasers, at footnotes 90-91 and 97-98 for the perspectives of market participants on product interchangeability. *See* Views at 24-26. Neither Tenaris nor TMK asserts (or could assert) that any particular response in relation to Korean OCTG was specifically driven by Hyundai-produced OCTG, or that excising responses that considered Hyundai's OCTG would affect the countrywide conclusions.

Table IV-17, as the respondents concede, acknowledges the inclusion of nonsubject products from Hyundai Steel. *See* Staff Report at IV-34; Tenaris Br. at 23; TMK Br. at 26. The Commission cited this table at footnote 111 for a broad proposition relevant to the geographic overlap factor, *viz.*, that "nearly all subject imports from all four sources entered the United

States through the Southern border." *Id.* at 28-29.  Logically, as this is true of the combined

data, *i.e.*, including Hyundai's nonsubject OCTG, removing Hyundai's data would change

nothing.  Neither plaintiff challenges the Commission's finding on geographic overlap or

explains how removing Hyundai's data could change the Commission's conclusion.  Even if

there were an error, it would plainly be harmless.  *See Intercargo Ins. Co. v. United States*, 83

F.3d 391, 394 (Fed. Cir. 1996) ("It is well settled that principles of harmless error apply to the

review of agency proceedings.").

### III. <u>The Commission's Determination That Significant Volumes of Low-Priced Subject Imports Materially Injured the Domestic Industry Was Lawful and Supported by Substantial Evidence</u>

By statute, the Commission's material injury determination considers subject imports' (1)

volume, (2) effect on prices for the domestic like products, and (3) impact on domestic

producers.  *See* 19 U.S.C. §§ 1677(7)(A), (B)(i).  Here, the Commission's material injury

determination was based on significant subject import volumes, significant adverse price effects,

and an adverse impact to the domestic industry.  Contrary to Tenaris' claims, this analysis was

lawful and supported by substantial evidence.

### A. Substantial Evidence Demonstrates that Subject Import Volumes Were Significant

The statute directs the Commission to "consider…the volume of imports of the subject

merchandise," including "consider{ation of} whether the volume…or any increase…, either in

absolute terms or relative to production or consumption in the United States, is significant."  19

U.S.C. §§ 1677(7)(B)(i)(I), (7)(C)(i).  Here, the Commission found material increases in

cumulated subject imports' volume (by [     ] percent) and market share (by [     ] percentage

points) from 2019 to 2021, concluding that "the volume of cumulated subject imports, and the

increase in that volume, are significant in absolute terms and relative to consumption in the

United States."  Views at 42-43.  Tenaris' objections to the Commission's analysis misstate the law and overlook the Commission's review of record evidence.

       **1.**       **Tenaris Misunderstands the Statute; The Commission Lawfully Assessed the Significance of Subject Import Market Share Gains and Found No Evidence of Domestic Supply Constraints**

Tenaris first incorrectly asserts that the Commission's volume analysis "must consider conditions of competition."  Tenaris Br. at 25.  Substantively, Tenaris asserts that "following the historic demand collapse, U.S. producers could not supply the surging demand in 2021 and imports were needed," *id.* at 26, but fails to tie this factual assertion to any fault in the Commission's analysis.  The Commission lawfully considered Tenaris' theory and cited substantial evidence in rejecting Tenaris' assertion.

Tenaris' own chosen authority recognizes that the statute mandates consideration of conditions of competition only in relation to the Commission's *impact* analysis.  *See Nevinnomysskiy Azot v. United States*, 32 C.I.T. 642, 660 (2008); *see also* Tenaris Br. at 10.  As the Commission recognized here, consideration of "conditions of competition" in a material injury investigation is required by 19 U.S.C. § 1677(7)(C)(iii).  Views at 31 & n.122.  Section 1677(7)(C)(iii) elucidates the economic factors pertaining to the Commission's assessment of the impact on the affected domestic industry and mandates consideration of "conditions of competition" for economic factors within "this clause" (*i.e.*, 1677(7)(C)(iii)), as opposed to "this subparagraph" (*i.e.*, 1677(7)(C)).  This provision was added by the *Omnibus Trade and Competitiveness Act of 1988*, Pub.L. 100-418, § 1328(2)(C) (1988), and like the statute itself, the conference report makes clear that the "conditions of competition" mandate applied only to the Commission's evaluation of impact.  *See* H. Conf. Rep. 100-576 (1988) at 617 (subsection c); *see also* S. Rep. 100-71 (1987) at 117 (describing the "third change" as relating to "examin{ation of} the impact of imports on domestic producers").

Tenaris characterizes *Altx* (quoting *Nippon*) as imposing a similar "conditions of competition" requirement with respect to volume. *See* Tenaris Br. at 25 (citing *Altx, Inc. v. United States*, 26 C.I.T. 709, 719 (2002); *Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330, 1335 (Ct. Int'l Trade 2001)).[10] However, *Altx* mistakenly cites Section 1677(7)(C), *see Altx*, 26 C.I.T. at 719, despite the Public Law making it clear that the "conditions of competition" phrase appears only in Section 1677(7)(C)(iii), *see* Pub.L. 100-418, § 1328(2)(C). More broadly, neither *Altx* nor *Nippon Steel* address the statutory distinction and reinforcing legislative history discussed above. Considering volume data "in the context of conditions of competition," *Nippon Steel*, 182 F. Supp. 2d at 1335, can be *one reasonable way* to assess whether subject import volumes, are "significant," but it is a matter of discretion. Here, the Commission lawfully considered domestic supply and demand issues when analyzing subject import volumes.

As an initial matter, the ITC sets forth a detailed discussion of conditions of competition immediately before its volume analysis, *see* Views at 35-42, so Tenaris' baseline assertion that such issues were "ignored" rings hollow, *see* Tenaris Br. at 25. Moreover, the Commission's analysis of volume "*relative to consumption* in the United States" inherently accounts for demand shifts during the POI. *See* Views at 42-43 (emphasis supplied). Concerning supply, the Commission found no indication "that the domestic industry's supply constraints…could account for the industry's market share loss and consequent injury," observing, *e.g.*, the domestic industry's substantial unused capacity and positive purchaser ratings for availability. *Id.* at 59. While the latter passage is under the "Impact" subheading, this comports with the statutory

---

[10] Tenaris' remaining citations ultimately rely on S. Rep. No. 96-249 (1979) at 88, which discusses the Commission's discretion to consider "any other factor it deems relevant," *e.g.*, conditions of competition, in evaluating whether subject import volumes are significant. *See* Tenaris Br. at 25-26.

scheme outlined above and addresses the substance of Tenaris's argument by reference to record evidence.

> ## 2.   The Commission Lawfully Accorded Less Weight to Post-Petition Market Share Data

The statute requires the Commission to "consider whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation…is related to the pendency of the investigation." 19 U.S.C. § 1677(7)(I).  If that is so, the Commission may "reduce the weight accorded to the data for the period after the filing of the petition" in making its material injury determination.  *Id.*  The SAA explains that this mechanism was intended to address concerns "that the initiation of antidumping and countervailing duty proceedings can create an *artificially low demand* for subject imports, thereby distorting post-petition data compiled by the Commission," and is furthermore:

> intended to make clear that, when the Commission finds evidence on the record *of a significant change in data concerning the imports* or their effects subsequent to the filing of the petition or the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation.

SAA at 854 (emphases supplied).  Here, the Commission "f{ound} that the decline in subject import market share in interim 2022 relative to interim 2021 was related to the pendency of the investigations and place{d} less weight on interim 2022 market share data in determining that that the volume of subject imports is significant."  Views at 43 n.184.

Tenaris criticizes this determination as unlawful, arguing that the statute limited the Commission to considering *absolute* volume, such that the Commission erred in considering volume *relative to consumption* (*i.e.*, market share).  *See* Tenaris Br. at 26-27.  Tenaris' nonsensical reading of the law would create a half dozen internal conflicts regarding the meaning of "volume" within Section 1677(7) and contravenes the clear intent expressed in the SAA. Section 1677(7)(I) was created to address "significant change{s} in data concerning the imports"

and avoid distortions caused by "artificially low demand" following an antidumping petition.

SAA at 854.  To prevent distortion in the Commission's material injury analysis—as Congress

intended—the term "volume" in Section 1677(7)(I) must logically be coextensive with the term

"volume" in Section 1677(7)(B)(i)(I).  *See Ratzlaf v. United States*, 510 U.S. 135, 143 (1994)

("A term appearing in several places in a statutory text is generally read the same way each time

it appears.").  The latter is defined by Section 1677(7)(C)(i) to encompass volume "in absolute

terms or relative to production or consumption in the United States."  And, of course, "market

share" is merely volume relative to consumption.  Thus, the Commission's consideration of

whether post-petition effects distorted volume "relative to production or consumption in the

United States" is consistent with Section 1677(7)(I).

Separately, Tenaris contends that the Commission erred in "not considering volume,"

Tenaris Br. at 28-30, evidencing a fundamental failure to grasp the purpose of Section

1677(7)(I).  As explained, that provision creates an "if, then" situation: <u>if</u> the Commission

observes "any {post-petition} change" in the "volume, price effects, or impact" data, <u>then</u> it may,

in its discretion, presume this is due to the pendency of the investigation and afford less weight

to the affected data point(s).  *See* 19 U.S.C. 1677(7)(I).  As the statutory phrase "any change"

and discretionary "may" each individually indicate, *id.*, it is not an all-or-nothing proposition,

*see, e.g.*, *LG Elecs., Inc. v. USITC*, 26 F. Supp. 3d 1338, 1354-55 (Ct. Int'l Trade 2014)

(rejecting argument that the Commission "improperly ignored post-petition data for some

analyses but included it for others").  The Commission pointedly *did not* discount the post-

petition absolute volume data, observing that "cumulated subject import volume was [        ]

percent greater in interim 2022, at [          ] short tons, than in interim 2021, at [          ]

short tons" (unsurprising given the substantial demand increase in interim 2022).  Views at 36,

42. And the Commission's decision to accord less weight to post-petition market share data, which contrasted with volume and market share trends for the rest of the POI, see *id.* at 43 n.184, was reasonable and comports with 19 U.S.C. § 1677(7)(C)(i) and the discretion afforded by 19 U.S.C. § 1677(7)(I).

### B.     The Commission's Finding of Significant Adverse Price Effects Was Based on Substantial Evidence and in Accordance with Law

The statute instructs the Commission to consider the effect of subject imports "on prices in the United States."  19 U.S.C. § 1677(7)(B)(i)(II).  This reference to "prices" is clarified as requiring the Commission to "*consider* whether" there was "significant price underselling," or significant price suppression or depression.  *Id.* § 1677(7)(C)(ii) (price suppression is defined as "prevent{ion of} price increases, which otherwise would have occurred") (emphasis supplied). The Commission found that "subject imports significantly undersold the domestic like product" and thus concluded that "subject imports had significant adverse price effects."  Views at 51. The Commission "d{id} not reach a conclusion" about price suppression, *id.*, but considered the relevant arguments, *see id.* at 50-51 & n.215 (summarizing strengths and weaknesses).  In effect, the Commission concluded that significant price effects occurred based on underselling, even absent a specific finding of price suppression (or depression).  Tenaris argues that (1) the Commission's underselling analysis failed to adequately account for Tenaris' proffered alternative pricing data, Tenaris Br. at 35-37 (V.D.3); (2) the analysis relied on flawed evidence of lost sales and revenues, *id*. at 32-35 (V.D.2); and (3) the lack of a price suppression conclusion is unlawful and requires remand, *id.* at 30-32 (V.D.1).  These arguments are meritless.

1.    **The Commission's Underselling Analysis Adequately Addressed Tenaris' Alternative Pricing Data**

As is the Commission's standard practice, it assessed underselling by comparing prices for cumulated subject merchandise with domestic prices within a given quarter (*e.g.*, domestic Q3 vs. subject Q3), finding that subject imports undersold the domestic like product in [      ] out of 170 quarterly comparisons (totaling [          ]% of commercial shipment volume) at a 10.8 percent average underselling margin. *See* Views at 47 & n.200.  Tenaris concocted an alternative—the "Tenaris exception" to Commission practice—whereby the Commission would lag the comparison by one quarter (*e.g.*, domestic Q3 vs. subject Q2) and/or exclude Tenaris' U.S. production from the domestic industry.  Although Tenaris identified zero precedent for its Tenaris-centric proposal, the Commission nevertheless considered Tenaris' request before rejecting it. *See* Views at 45-47.

The Commission reasonably described the flaws in Tenaris' proposal to mismatch pricing data by one quarter.  *First*, Tenaris made no attempt to justify the mismatching in terms of the pricing practices for *cumulated* subject imports.  Views at 46.  Tenaris argued solely based on its pricing practices vis-à-vis the commercial shipments of subject OCTG from Argentina and Mexico ([          ] of subject commercial shipment volumes ), without reference to subject OCTG from Russia or Korea ([          ] of subject commercial shipment volumes).  *See id.* at 45-46; Staff Report at Table V-17 (volume data) (C.R.431).

*Second*, Tenaris' proposal lacked any precision, offering a single adjustment to the entirety of Tenaris' pricing data, notwithstanding the varied selling practices reflected in the pricing data utilized by the Commission in its underselling analysis.  For example, Tenaris failed to identify what proportion of Tenaris' imported OCTG is subject to contracts with a one-quarter price lag.  Views at 46 & n.193.  As the Commission recognized, the paid-for "expert" report on

which Tenaris' price lag argument is predicated states that Tenaris' contract sales only

"typically" have one-quarter price adjustments, and that "25 percent" of Tenaris' sales were *not*

by contract at all.  *See id.*; Tenaris Prehearing Br. at Ex. 63 ([


]) (C.R.405).  Tenaris' posthearing brief further

muddied the waters, conceding that some indeterminate proportion of Tenaris' contracts lag "by

even longer (*e.g.*, 6 months)."  Tenaris Posthearing Br. at Ex. 1, p.38 (C.R.418, P.R.144).  And

Tenaris admitted that its [                                                      ].  *See* Views

at 46 n.193.  The administrative record simply does not support Tenaris' assertion before this

court that [      ] of its subject imports were [                              ].  *See* Tenaris Br.

at 35.

    *Third*, the Commission identified record evidence demonstrating that [      ] of

domestic OCTG shipments were likewise made pursuant to contracts, including contracts with a

similar "lagging" price mechanism.  Views at 46.  Tenaris claims that the Commission should

have disregarded Tenaris' U.S. data [

].  *See* Tenaris Br. at 35-36.  This is an odd contrast to Tenaris'

trumpeting of its status as "the largest U.S. OCTG producer," *id.* at 16, and its position before the

Commission that Tenaris "*should not be excluded from the domestic industry*," Tenaris

Posthearing Br. at Ex. 1 p.7 (C.R.418) (emphasis supplied); *see also* Views at 21 (including

Tenaris in domestic industry).  Tenaris cites no precedent or persuasive rationale for the

Commission including a company in the domestic industry, only to disregard that company's

pricing data.  *See* Tenaris Br. at 35-37.  It would be inconsistent with the statute, which instructs

the Commission to consider subject imports' effect on "prices in the United States for domestic

like products," 19 U.S.C. § 1677(7)(B)(i)(II), and in turn defines the domestic industry as

"producers as a whole of a domestic like product," *id.* § 1677(4)(A).  It also demonstrates

Tenaris' propensity to argue issues inconsistently where Tenaris' perceives some benefit to its

litigating position.

     *Finally*, Tenaris' theory did not hold up against the data.  If subject import pricing ***lags***,

then ***over***selling should be exaggerated when market prices ***fall*** (as occurred early in the POI)

while ***under***selling should be exaggerated when market prices ***rise*** (as occurred later in the POI).

Neither occurred.  Instead, as the Commission observed, the record showed "fairly consistent"

underselling from 2019 (55.9%) to 2020 (57.1%) to 2021 (60.4%).  *See id.* at 46-47.

     In sum, the Commission cited ample evidence to reasonably reject Tenaris' proposal to

tailor its comparison of cumulated subject import pricing and domestic like product pricing to

Tenaris' business model.

### 2.    The Commission's Price Effects Analysis Adequately Addressed Evidence of Lost Sales

     Although the statute does not specifically mention consideration of lost sales due to price,

*see* 19 U.S.C. § 1677(7)(B)-(C), in practice the Commission's price effects analysis considers

this factor, *see, e.g.*, Views at 44-49.  Here, the Commission observed "some evidence that

domestic producers lost sales to subject imports on the basis of price," *id.* at 48.  Contrary to

Tenaris' incomplete presentation, *see* Tenaris Br. at 32, the Commission did not rely solely (or

even primarily) on a market share table and domestic producers' lost sales communications.

Rather, the Commission *first* supported its lost sales observation using purchaser questionnaire

responses, finding eight (out of twenty-eight) purchasers reported purchasing subject imports

instead of domestic OCTG *and* that "subject imports were priced lower than the domestic like

product."  Views at 48.  Of these eight, five expressly reported "that price was a primary reason

for purchasing [            ] short tons of subject OCTG over the domestic like product." *Id.*

The Commission even addressed Tenaris' counterarguments concerning the reliability of these

purchaser questionnaire responses, *id.* at 48 n.203, which Tenaris does not contest, *see* Tenaris

Br. at 32-35.  Given the foregoing, substantial evidence supports the Commission's finding of

"some evidence that domestic producers lost sales to subject imports on the basis of price." *Id.*

Moreover, the Commission noted that Petitioners' "communications indicating that

domestic producers (and their distributors) have lost sales to subject imports on the basis of

price" were "{c}onsistent with" the unchallenged purchaser questionnaire responses.  *Id.* at 49.

Importantly, the Commission specifically highlighted examples of communications concerning

[                                                    ].  *See id.* at 49 n.205.  Tenaris

nevertheless claims that the Commission erred in relying on Petitioners' evidence of sales lost

[                              ] because it inadequately discussed Tenaris' correspondence

concerning [                                           ].  *See* Tenaris Br. at 33-

34 (discussing Tenaris-related evidence).  The disconnect is obvious.  The Commission

specifically referenced communications that are not implicated by Tenaris' evidence, leaving no

need for it to discuss Tenaris' evidence.  *See, e.g.*, *Timken U.S. Corp. v. United States*, 421 F.3d

1350, 1355–56 (Fed. Cir. 2005) ("{T}hat certain information is not discussed in a Commission

determination does not establish that the Commission failed to consider that information.

Rather, the Commission need only discuss material issues of law or fact.").  The Commission's

finding that "some evidence" indicated sales lost due to price was supported by substantial

evidence.

Tenaris also briefly attacks the Commission's discussion of Table V-18, which generally

corroborated other evidence that purchasers shifted from domestically produced OCTG to

subject imports.  *See* Views at 48 n.204.  This was not central to the Commission's analysis and, as Tenaris concedes, the Commission acknowledged potential concerns with double-counting purchases (*e.g.*, counting a distributor's purchases as well as an end user's purchases).  *See* Staff Report at V-40 (C.R.431); *cf. also Nucor Fastener Div. v. United States*, 37 C.I.T. 749, 757 (2013) ("the ITC admitted that it never obtains perfect data on imports, foreign producers, or the domestic industry in any investigation, given the constraints of the statute…").  Finally, Tenaris identifies no alternative which the Commission should have considered.  *See* Tenaris Br. at 32. There is no basis to remand the Commission's consideration of lost sales due to a transparently acknowledged potential data issue affecting an ancillary observation. If there were any error, it was harmless, given the Commission's reliance upon other corroborating evidence.  *See U.S. Steel Grp. V. United States*, 96 F.3d 1352, 1367 (Fed.Cir.1996) (erroneous reliance on certain record evidence would be harmless because the Commission's determination was supported by substantial other record evidence).

3.  **The Commission's Treatment of Price Suppression Comports with the Statute**

The Commission's price effects analysis was lawful, and none of the authorities on which Tenaris relies suggest otherwise.  The statute instructs the Commission to consider subject imports' effects on U.S. prices as part of its present material injury analysis.  19 U.S.C. § 1677(7)(B)(i)(II).  In particular, the Commission "*consider{s}*" three aspects, one of which is price suppression, "{i}n evaluating the effect of imports…on prices."  *Id.* § 1677(7)(C)(ii) (emphasis supplied).  Tenaris faults the Commission for making no price suppression *finding*, but nothing in the statute requires the Commission to do so.  *See CP Kelco*, 24 F. Supp. 3d at 1350 ("some discussion of post-petition effects,…was all that {the} statutory{y term 'consider'} required {the Commission} to do.").  Plainly, the Commission *considered* price suppression.  It

expressly said as much and otherwise summarized record evidence relevant to price suppression. *See* Views at 50-51 & n.215.

The Federal Circuit has already held that no legal error exists in such situations. In an appeal of a negative injury determination, the plaintiff argued that remand was mandatory because although the Commission expressly found no price suppression, it never determined whether underselling was significant. *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005). The Federal Circuit found no error, reasoning:

> It is true . . . that the Commission did not state in so many words that the volume of underselling was an insignificant factor . . . Nonetheless, the trial court found that to be the plain import of the Commission's analysis, and we agree. Where an agency has not made a particular determination explicitly, the agency's ruling nonetheless may be sustained as long as "the path of the agency may be reasonably discerned."

*Id.* (quoting *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987)). Here, likewise, the path of the Commission's price effects rationale was clear, even absent a specific price suppression finding. The Commission stated: "{W}e find that cumulated subject imports significantly undersold the domestic like product. The underselling by subject imports led the domestic industry to lose market share to subject imports. We therefore find that cumulated subject imports had significant adverse price effects on the domestic industry." Views at 51. Because the Commission found significant adverse price effects based on predominant underselling, it was unnecessary for it to reach a conclusion as to whether price suppression was also significant. The Commission has likewise found significant adverse price effects based on underselling alone during periods of investigation wherein market prices have increased. *See, e.g.*, *Barium Chloride from India*, Inv. No. 701-TA-678 (Final), USITC Pub. 5406 (Feb. 2023) at 25-27; *Sodium Nitrite from Russia*, Inv. No. 701-TA-680 (Final), USITC Pub. 5342 (Aug. 2022) at 33-34.

Tenaris' authorities are consistent with this assessment. *See* Tenaris Br. at 31. *Octal* stated that the Commission is "required…to *consider* both underselling, and price suppression…," and *affirmed* a "finding of significant adverse price effects due to underselling, without a finding that there was significant price depression or suppression." *See Octal Inc. v. United States*, 539 F. Supp. 3d 1291, 1303, 1316 (Ct. Int'l Trade 2021). The Court reasoned that by surveying "the domestic industry's ratio of cost of goods sold to net sales…the Commission considered price depression and suppression in its price effects analysis in the instant case." *Id.* at 1308. So too here. *See* Views at 50 (discussing trends in COGS-to-net sales, unit COGS, and net sales AUVs).

*Swiff-Train* and *UAN Solutions* are distinguishable. *Swiff-Train* reviewed a split decision wherein the majority "f{ou}nd evidence" that subject imports "depressed prices" in the U.S., but never clarified whether such price depression or suppression was significant, insignificant, or (like here) unnecessary to find significant adverse price effects. *See Multilayered Wood Flooring from China*, Inv. Nos. 701-TA-476 and 731-TA-1179 (Final), USITC Pub. 4278 (Nov. 2011) at 30-31. The court could not discern whether the Commission relied solely on significant underselling to find adverse price effects and remanded for the Commission to address substantive issues with its price depression and suppression analysis. *See Swiff-Train Co. v. United States*, 904 F. Supp. 2d 1336, 1343-44 (Ct. Int'l Trade 2013). Here, by contrast, the Commission explicitly found subject import underselling and the impact of low-priced imports on domestic industry market share to evidence "significant adverse price effects." As for *UAN Solutions*, the Commission found *no* significant underselling, *no* price depression, and *no* price suppression. *See Urea Ammonium Nitrate Solutions from Russia and Trinidad and Tobago*, Inv. Nos. 701-TA-668-669 and 731-TA-1565-1566 (Final), USITC Pub. 5338 at 27-32 (Aug. 2022).

Whether the AUV and COGS-to-net-sales trends led to a negative price suppression finding in that case is irrelevant, because the Commission did not rely on price suppression to find adverse price effects here.  *See* Views at 51.

> **C.**  **Substantial Evidence Supported the Commission's Lawful Finding that Subject Imports Adversely Impacted the Domestic Industry**

The Commission found that subject imports significantly and negatively impacted the domestic industry, as evidenced by, among other indicators, the domestic industry's 8.2 percentage point loss of market share [                    ] between 2019 and 2021, and its 39.7 percent decrease in production, 17.0 percentage point decrease in capacity utilization, 44.3 percent decline in employment, and deepening operating losses over the same period.  *See* Views at 52-63.  Contrary to this court's standard of review, Tenaris fails to explain how the Commission's determination fell short of the substantial evidence standard and simply asks the court to reweigh the evidence.  *See* Tenaris Br. at 37-47.  That is not this Court's role.  "It is up to the ITC to weigh evidence."  *Nucor Corp.*, 28 C.I.T. at 232.

> **1.**  **The Commission Lawfully Considered Conditions of Competition in Assessing Subject Imports' Impact and its Conclusions Were Supported by Substantial Evidence**

The statute instructs the Commission to evaluate certain enumerated economic factors related to subject imports' impact on the domestic industry "within the context of the…conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii).  Tenaris argues that the Commission failed to do so, specifically identifying (1) a "Russia/Saudi oil supply war" and the COVID-19 pandemic's impact on demand; (2) intra-industry competition; and (3) three supply constraints that Tenaris claims "necessitated imports": inventory overhangs, high hot-rolled steel coil ("HRC") prices, and labor shortages.  *See* Tenaris

Br. at 38-44.  In fact, the Commission's Views reasonably addressed—and rejected—all three arguments.

        i.    *Demand*

By presenting the issue as the "Russia/Saudi oil supply war" and "COVID-19 pandemic," Tenaris attempts to elevate labels over the actual *condition* that the Commission was instructed to consider.  *See* Tenaris Br. at 38.  As Tenaris acknowledges, these events overlapped and the relevant *condition* created was an oil demand collapse, precipitating a decrease in the rig count, and consequently, OCTG demand.  *See id.* at 11.  The Commission recognized as much, *see* Views at 35 & n.140, 52, 53 n.219, 57 n.243, 60 n.256, and its failure to name-check each factor contributing to decreasing demand has no effect on the completeness of its analysis. Affirmatively saying "Russia/Saudi oil supply war" would have no effect on the U.S. demand trends.  *See* Staff Report at C-3 (C.R.431).  The statute requires the Commission to consider "conditions of competition," not to exhaustively "identify and name each cause" of those conditions.  19 U.S.C. § 1677(7)(C)(iii).

Tenaris claims that the Commission recognized COVID-19 as a "key condition of competition in contemporaneous cases," citing two non-OCTG decisions, but fails to explain why the Commission's assessment of the steel nails and rubber industries should control its assessment of the OCTG industry.  *See* Tenaris Br. at 38.  Here, the Commission recognized declining demand "from January 2019 to a historic low in August 2020" as a condition of competition, Views at 35, which covers the period of both the "Russia/Saudi oil supply war" and the COVID-19 pandemic, *see* Tenaris Br. at 11.  The Commission later recognized that this decrease in consumption was consistent with the domestic industry's poor performance through 2020, though it could not explain continued poor performance in 2021 when demand rebounded sharply.  *See* Views at 52-53.  While Tenaris criticizes the Commission's level of emphasis, *see*

Tenaris Br. at 38, "{t}he {Commission} weighs the evidence as the trier of fact…" *Nitrogen Sols. Fair Trade Comm. v. United States*, 29 C.I.T. 86, 89 (2005).

      ii.  *Intra-Industry Competition*

Contrary to Tenaris' assertion that the Commission "did not address *any* record evidence when discussing intra-industry competition," Tenaris Br. at 43, the Commission devoted substantial analysis to this condition, *see* Views at 39 & n.165, 49 n.206, 61-62, 61 n.258 (discussing "Rig Direct" and Tenaris' claims of competitive superiority).  To the extent Tenaris implies that "intra-industry competition" is somehow distinct from Tenaris' "Rig Direct"-related arguments, it fails to articulate *how* they differ, and identifies no specific "intra-industry competition" evidence that the Commission overlooked.  *See* Tenaris Br. at 43-44.

As concerns Tenaris' "Rig Direct" branding, Tenaris alleges that one piece of evidence was "ignore{d}", *viz.*, "statements from [          ] customers" [

        ].  Tenaris Br. at 43.[11]  But the Commission did consider evidence of customer (*i.e.*, purchaser) perceptions, finding that "large majorities of purchasers rated domestically produced OCTG as superior or comparable to subject imports with respect to both availability and technical support/service."  Views at 61.  Insofar as subject imports from Argentina and Mexico would nearly all be part of Tenaris' "Rig Direct" program, purchasers' perception of their availability and service as comparable to domestic OCTG in general (*i.e.*, including non-Tenaris producers) directly addresses Tenaris' argument.

---

[11] Separately, Tenaris claims the Commission "disregarded" Tenaris' supply chain, its "complement{ary}" subject OCTG imports, and "one price" structure in favor of Petitioners' assessment of Tenaris' business model, without claiming these were unaddressed.  *See* Tenaris Br. at 43.  To be sure, the Commission reasonably weighed record evidence concerning these issues.  *See* Views at 39 n.165, 61-62 (discussing Tenaris' supply chain); *id.* at 49 n.206 (acknowledging "one price" in price effects analysis).

Tenaris' one additional customer statement, *see* Tenaris Br. at 43, is merely cumulative.  The tables on which the Commission relied *already* indicate the existence of a minority of purchasers who found domestic OCTG availability and service "inferior" to that of the Rig Direct source countries.  *See* Views at 61 n.260; Staff Report at II-32 (Table II-14) (C.R.431).  [

] that Tenaris claims was "ignore{d}."  The Commission's reference to "large majorities," rather than "all," confirms its awareness of the minority view.  *See id.*

Tenaris' passing references to precedent fare no better.  *First*, the Commission's forward-looking "belief" in 2007 that Tenaris' interests "would not be served" by dumping OCTG from its foreign export platforms, *see* Tenaris Br. at 42 (quoting *Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico*, Inv. Nos. 731-TA-711 and 713-716 (Second Review), USITC Pub. 3923 at 34 (June 2007)), carries no weight in the face of actual record evidence that Tenaris later did exactly that during the 2019-H1 2022 POI, *see* Staff Report at I-9 (dumping margins of 78.30% (Argentina) and 44.93% (Mexico)) (C.R.431).  Similarly, Tenaris' statements about "complement{ing} U.S. production," *see* Tenaris Br. at 42, are both non-specific and cannot outweigh the domestic industry-wide performance data (which included Tenaris' own [          ] performance) over the POI.

Tenaris analogizes another forward-looking statement from the *Stainless Steel Plate* five-year review.  *See* Tenaris Br. at 42-43.  Tenaris did not cite this decision administratively.  There, the Commission cited two pieces of evidence to conclude that it was unlikely ThyssenKrupp would cause future material injury via Italian imports: (a) ThyssenKrupp's U.S. investments *after* an antidumping order and (b) its yearslong decline in German imports *not* subject to any antidumping order.  *See Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and*

*Taiwan*, Inv. Nos. 701-TA-379 and 731-TA-788, 790- 793 (Second Review), USITC Pub. 4248 at 17-18, 37 (Aug. 2011).  That is quite unlike Tenaris' present bid to be absolved of having injured the domestic industry because Tenaris invested in U.S. facilities long before its imports, cumulated with other OCTG imports, caused injury.  *See* Tenaris Br. at 42-43.

Finally, Tenaris invokes *Magnesium from Israel*.  Tenaris Br. at 44.  There, the Commission observed intra-industry competition from U.S. secondary magnesium producers with "access to those low-cost imports of magnesium scrap *from nonsubject sources*."  *Magnesium from Israel*, Inv. Nos. 701-TA-614 and 731-TA-1431 (Final), USITC Pub. 5009 (Jan. 2020) at 37 (emphasis supplied).  This is not the same as overlooking injurious *subject imports* merely because one member of the domestic industry imported them.  The Commission could not lawfully do so.

Fundamentally, Tenaris' willingness to favor its Argentine and Mexican facilities and injure its U.S. assets as part of its global profit-making strategy did not extinguish the material injury experienced by the domestic industry as a whole.  Tenaris [

].  Views at 19-20.  And the Commission found material injury based on domestic industry data that *included Tenaris' U.S. operations*, whose [                                                                                      ].  *See* Views at 19-21, 49 n.206.  Tenaris identified no precedent wherein the Commission found no present material injury in like circumstances.

iii.   *Supply Constraints*

The Commission correctly rejected Tenaris' arguments regarding labor shortages, HRC prices, and inventory overhang.  *See* Views at 36-37, 36 n.145, 40-41, 54 & nn.225-226, 55, 59-62.  In weighing the evidence, the Commission concluded that none of these factors severed the causal link between subject imports and injury to the domestic industry.  *See id.* at 59-62.

Concerning labor shortages, Tenaris faults the Commission for finding Petitioners' evidence more compelling than what Tenaris proffered. *See* Tenaris Br. at 41. But what Tenaris derides as "Petitioner's {sic} self-serving statements," *see id.*, is in fact sworn hearing testimony, *see* Hearing Transcript at 7 (swearing in) (P.R.136), and certified questionnaire responses, *see* Staff Report at II-13, Table III-5 (C.R.431); U.S. Producer's Questionnaire at 1 ("Certification" block) (P.R.92). Views at 62 n.265 (citing the foregoing); *see also id.* at 54 (summarizing employment trends). The Commission did "take into account" Tenaris' alternative viewpoint but found it less compelling. *See id.* at 62 & n.262. And the Commission is best positioned to judge the credibility of witnesses appearing before it.

Regarding HRC prices, Tenaris cannot fault the Commission for reasoning that domestic seamless OCTG producers, unaffected by rising HRC prices, "were fully capable of serving the increase in OCTG demand…in light of their low rate of capacity utilization," *id.* at 62, given that the Commission specifically recognized Tenaris' lack of "dispute that…seamless OCTG is interchangeable with welded OCTG in all applications," Preliminary Views at 13 & n.49 (C.R.222); *see also* Views at 23 n.84, 25-26 (same argument). *See* Tenaris Br. at 40-41. Tenaris frames high HRC prices as a "supply constraint," Tenaris Br. at 39, so the Commission's rationale that *seamless* producers—by themselves—could have supplied OCTG demand necessarily accounted for any "severe effect…on welded producers," *see* Views at 62. Under the Commission's rationale, even if high HRC prices eliminated U.S. welded OCTG producers from the market *completely*, U.S. producers of seamless OCTG could still meet demand. *See id.* This is not "speculation," insofar as it is grounded in objective data comparing U.S. seamless producers' unused capacity ([            ]) and U.S. demand (3,504,858 ST), *see* Staff Report at Table III-8, C-3, and evidence of seamless and welded OCTG's interchangeability.

Tenaris' inventory arguments were likewise reasonably addressed. Tenaris suggests the Commission erred in considering inventory questions "alone," and should have "combin{ed}" this with labor shortages and HRC prices, *see* Tenaris Br. at 39, but given that the Commission concluded the latter two were non-issues, as discussed above, it makes no practical difference whether the Commission "combined" them with inventory. Tenaris does not identify *any* particular interaction between inventory and the other two factors, much less an interaction necessitating separate consideration that the Commission failed to address. *See id.* at 39-40.

Tenaris also claims the Commission's inventory analysis did not "address{}" "significant arguments" concerning Tenaris' alleged ability to maintain lean inventory, and certain U.S. distributors' need to draw down existing inventory before placing new orders from mills. *See* Tenaris Br. at 39-40. But the Commission explicitly addressed both points. The Commission reasoned that Tenaris' asserted ability to "run with a lean inventory volume" did not affect the Commission's analysis of the impact of cumulated subject imports because "any inventory overhang held by distributors would have included subject imports from Russia and South Korea and impacted them in the same manner as domestic producers." Views at 61 n.258. In other words, even if increased inventories temporarily caused distributors to reduce orders, such reduction would have similarly impacted domestic OCTG producers and subject imports. *See id.* at C-3 (reporting import volumes from subject South Korean and Russian OCTG [

]). In fact, however, the data demonstrated imports from *all* subject countries were unaffected by the supposed "inventory-induced" effect on orders, *see id.* at 60-61, a reflection of subject imports' underselling.

The Commission's remaining analysis focused extensively on U.S. distributors' supposed need to draw down inventory before making U.S. purchases. *See id.* at 59. The Commission reasoned that Tenaris' preferred data demonstrated "any alleged inventory 'bulge' was largely worked down by the end of 2020, prior to the domestic industry's loss of market share to subject imports in 2021;" that the availability of domestically produced OCTG in inventory would not explain why increased consumption unmet by such inventory was "satisfied by increased subject imports rather than domestic producers;" and that data derived from [                    ] indicated "relatively constant" inventory levels "between January 2019 and March 2021" suggesting no "'massive' draw down of inventories in 2020." *Id.* at 60. Thus, the Commission reasoned, subject import volumes and underselling were a more convincing explanation for the injury endured by the domestic industry. *See id.* at 61.

Finally, Tenaris claims the Commission's reliance on data from an [

        ] was tainted by unspecified "[                    ]." *See* Tenaris Br. at 40. But the Commission explicitly recognized this shortcoming, and observed that Tenaris' preferred data source exhibited the same "[                    ]." *See* Views at 60 n.255. Moreover, as described above, the Commission did not rely solely on the [                    ] data, but also analyzed Tenaris' preferred data and found that it also supported the Commission's conclusions. *See id.* at 60. In short, Tenaris has identified no basis for remand. The Commission's findings were supported by substantial evidence, and reasonably considered Tenaris' supposedly contrary evidence.

### 2.     The Commission's Treatment of Post-Petition Impact Data Was Lawful

Tenaris appears confused about the Commission's analysis of post-petition impact data. Tenaris asserts that the Commission "should have given full weight to the evidence of the

domestic industry's recovery."  Tenaris Br. at 44; *see also id.* at 37 (arguing same).  The

Commission expressly did so.  Specifically, the Commission "f{ou}nd it instructive that the

domestic industry was able to improve its performance markedly in interim 2022 compared to

interim 2021 after the filing of the petitions in October 2021" when subject imports became less

intense.  Views at 57.  As a consequence of subject imports "losing [      ] percentage points of

market share as the domestic industry gained 0.6 percentage points of market share in interim

2022 compared to interim 2021," the Commission concluded, "the domestic industry was able to

more fully capitalize on the 70.6 percent increase in apparent U.S. consumption in interim 2022

compared to interim 2021 and improved its performance by nearly every measure between the

interim periods."  *Id.* at 57-58.[12]  The Commission's decision is therefore consistent with

*Hardwood Plywood* and *Steel Wire Rod* insofar as Tenaris cites these as examples of the

"Commission…ha{ving} given full weight to such trends."  *See* Tenaris Br. at 46-47.

Evidently, Tenaris wishes the Commission had inferred from the overlapping decline in

subject imports' market share and improvement of "nearly every measure" of the domestic

industry's health in interim 2022 that the domestic industry was never injured—in other words,

giving the data full weight (as the Commission did), but drawing the opposite conclusion.  *See*

Tenaris Br. at 44-47.  But the Commission's reading of the evidence was logical.  It stands to

---

[12] The majority distinguished its position from that of Commissioner Schmidtlein, who "agree{d} that the filing of the petitions and the pendency of the investigations had an effect on the data (and thus she accords less weight to the interim data), {but} does not find the effect on the data to be evidence of present material injury."  *Id.* at 58 n.245.  Commissioner Schmidtlein's position is consistent with 19 U.S.C. § 1677(7)(I), but insofar as that subsection merely permits the Commission ("may") to reduce the weight accorded to post-petition impact data, the Commission majority was not required to do so.  Notwithstanding this technical distinction, insofar as the ultimate aim of Section 1677(7)(I) is to avoid distortion in the Commission's analysis, *see* Section III.A.2, *supra* (discussing SAA and legislative history), both the majority's and Commissioner Schmidtlein's reasoning are logical, lawful, and yielded the same result.

reason that the correlation of a drop in subject imports' market share and an across-the-board rise in the domestic industry's performance metrics demonstrates subject imports had heretofore held back (*i.e.*, injured) domestic industry performance.  There is rarely only one way to read the evidence, but Tenaris' preference for a different reading is no basis for remand.

Tenaris argues, relying on a selective survey of 2020-2021 trends, that the Commission overlooked that the domestic industry's recovery began prior to the filing of the petition in October 2021.  *See* Tenaris Br. at 44-46.  But Tenaris omits that the Commission *did* consider 2021 trends and observed that "the industry's production, employment, and financial performance remained weaker in 2021 than would have been expected in light of the strong increase in demand."  Views at 57.  The Commission provided further detail:

> in certain respects, the industry's performance in 2021 remained similar to its performance in 2020, when the industry was experiencing a demand collapse due to the COVID-19 pandemic. For example, U.S. mills' capacity and capacity utilization were only 1.3 percent and 3.7 percentage points greater, respectively, in 2021 than in 2020, and U.S. producers' employment and hours worked were only 1.1 percent and 2.2 percent greater, respectively, in 2021 than in 2020. CR/PR at Table C-1. Moreover, the industry's capital expenditures and R&D expenses were each lower in 2021 than in 2020.

*Id.* at 57 n.243.  Notably, Tenaris' analysis of the 2020-2021 data—itself incomplete by omission of the first year of the POI—completely ignores the specific points highlighted by the Commission.  *See* Tenaris Br. at 44-46 (omitting discussion of the 2020-2021 trends for U.S. mills' capacity, capacity utilization, employment (*i.e.*, PRWs and wages), hours worked, and capital expenditures, and broadly asserting that R&D trends were "not consistent" during the POI).  Tenaris also fails to account for the over 850,000 short ton upswing in demand from 2020-2021, *see* Staff Report at C-3 (C.R.431), which *should have* presaged significant improvement in domestic industry performance, but for the injurious impact of subject imports.  Yet again, Tenaris' complaints reflect a difference in how Tenaris and the Commission weighed the record

45

data, but the quoted passages above reflect the Commission's reasoned consideration of whether the industry's condition as a whole had improved before 2022.  The Commission need not robotically name-check every data point.  *See, e.g.*, *Nucor Corp.*, 28 C.I.T. at 262.  Moreover, the Commission's reference to "certain respects" implies its awareness of other metrics.  *See* Views at 57 n.243.  A mere difference of opinion is no basis for remand under this court's standard of review.

Tenaris pivots to claim that the Commission's analysis of interim 2022 data was inconsistent with *Silicomanganese from Australia* and *Tomatoes from Canada*, but does not assert that the Commission had a practice of always treating interim period improvements as evidence of no adverse impact.  *See* Tenaris Br. at 47; Tenaris Posthearing Br. at 11 & n.58 (C.R.418).  *Silicomanganese* and *Tomatoes* are readily distinguishable.  The Commission's causation analysis in *Silicomanganese* was driven primarily by the lack of any significant subject import price effects.  *See Silicomanganese from Australia*, Inv. No. 731-TA-1269 (Final), USITC Pub. 4600 (Apr. 2016) at 25.  And, in stark contrast to this proceeding, where interim 2022 saw a *decline* in subject imports' market share, *Silicomanganese* explained that subject imports "increase{d their} market presence" in the interim period when domestic performance was improving, *id.* at 26, a nearly opposite scenario.

Similarly, *Tomatoes* reflected *no* significant volume effects, *no* significant price effects, and observed with respect to causation that "the {tomato} industry {as a whole} was producing and shipping higher volumes in 2001 than in 1998" and "held a marginally higher market share in 2001 than in 1998, *despite consistent increases in the volume of subject imports*."  *Tomatoes From Canada*, Inv. No. 731-TA-925 (Final), Pub. 3499 (Apr. 2002) at 20, 23-24 (emphasis supplied).  The Commission then assessed greenhouse growers, where it "expect{ed} any

adverse impact by subject imports would be most apparent." *Id.* at 25.  Despite depressed

operating results in the middle of the POI, the Commission found "subject imports…not

responsible for falling prices," attributed the poor financial results to high operating expenses,

and was unpersuaded by domestic industry bankruptcies "{a}bsent significant volume or price

effects by subject imports."  *Id.* at 26-27.  The Commission did not rely on a late POI upswing,

but instead found alternate explanations for early POI downswings.

      The record of each proceeding is distinct, and the Commission considered the record and

espoused conclusions supported by substantial evidence.  There is no basis for remanding the

Commission's analysis.

### 3.     The Commission's Analysis of Purchaser Responses Was Supported by Substantial Evidence

      Tenaris claims that remand is mandated because the Commission cited tables

summarizing purchaser responses, and those purchaser responses were provided on a country-

wide basis, without distinguishing between subject and nonsubject South Korean OCTG.  *See*

Tenaris Br. at 47-48.  Tenaris offers no alternative analysis of the purchaser responses, nor does

it explain how parsing out nonsubject South Korean OCTG could have materially undermined

the Commission's finding that "large majorities of purchasers rated the availability of

domestically produced OCTG as superior or comparable to that of subject imports from each

source."  *Id.*; *see also* Views at 59 n.250.

      As a practical matter, the Commission had no opportunity to gather purchaser responses

which isolated producers' impressions of nonsubject (Hyundai) OCTG from their impressions of

subject South Korean OCTG.  The purchaser questionnaires were issued in June 2022 and

returned the following month.  *See* U.S. Purchaser's Questionnaire (P.R.92).  The final

determination in the U.S. Commerce Department's countervailing duty investigation first put

interested parties on notice that Hyundai's OCTG would be considered nonsubject, *see Oil Country Tubular Goods from the Republic of Korea*, 87 Fed. Reg. 59,056 (Sept. 29, 2022), but was not published until one week *after* the Commission held its hearing.  Substantial evidence review does not require clairvoyance on the Commission's part.  Notably, despite Tenaris having an opportunity to comment on the draft purchaser questionnaires, it made no suggestion that responses should be producer-specific.  *See* Letter from Tenaris, "Comments on Draft Questionnaires" (Feb. 15, 2022) at 4-6 (C.R.225, P.R.85).

Imperfect data are not the same as a lack of substantial evidence.  Virtually no administrative record is perfect.  Tenaris did not foresee the problem of which it now complains and offers no explanation of what the Commission should (or could) have done differently with the record before it.  Moreover, the responses at issue were not "close calls."  Sixteen out of nineteen purchasers rated U.S. OCTG's availability as "superior" or "comparable" to South Korean OCTG.  Staff Report at Table II-14 (C.R.431).  Tenaris identifies no basis in the record for expecting that merely removing Hyundai from the equation would materially change those results.

## CONCLUSION

Plaintiffs merely ask the Court to reweigh the evidence and have identified no ground for remand.  This court should therefore sustain the Commission's Views in all challenged respects.

*         *         *

NON-CONFIDENTIAL VERSION

Respectfully submitted,

/s/ Thomas M. Beline

Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301

*Counsel to United States Steel Corporation*

/s/ Roger B. Schagrin

Roger B. Schagrin
Jeffrey D. Gerrish
Luke A. Meisner

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
Phone: (202) 223-1700
Fax: (202) 429-2522

*Counsel to Borusan Mannesmann Pipe U.S.
Inc., PTC Liberty Tubulars LLC, United
Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial
and Service Workers International Union,
AFL-CIO, CLC, and Welded Tube USA Inc.*

NON-CONFIDENTIAL VERSION

**<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>**

  The undersigned hereby certifies that the foregoing brief contains 13,985 words, exclusive of the caption block, table of contents, table of authorities, signature block, braces, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

        By: <u>/s/ Thomas M. Beline </u>
           Thomas M. Beline