**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C., | |
| Plaintiffs, | |
| and | |
| TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A., | |
| Consolidated Plaintiffs, | |
| and | |
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; AND IPSCO TUBULARS INC., | Consol. Court No. 22-00344 |
| Plaintiff-Intervenors, | **NON-CONFIDENTIAL** |
| v. | |
| UNITED STATES, | **Business Proprietary Information has been deleted from Pages 4, 7-9, 11-13, 17, 19-21.** |
| Defendant, | |
| and | |
| UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE USA INC., | |
| Defendant-Intervenors. | |

**REPLY IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

October 12, 2023

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ..............................................................................................1

II. ARGUMENT ....................................................................................................3

    A.    Cumulation..................................................................................................... 3

           1.    A separate like product finding is not necessary to determine that imports of seamless OCTG (Argentina and Mexico) and welded OCTG (South Korea) are not fungible.....................................................3

           2.    The Commission's cumulation analysis does not consider Tenaris' Rig Direct® program in comparing channels of distribution.............................3

    B.    Volume.......................................................................................................... 4

           1.    The Commission failed to analyze conditions of competition in finding subject imports were "significant"....................................................................5

           2.    Record evidence demonstrates that imports were "needed" after demand collapsed and supply constraints impeded the domestic industry's ability to supply the market........................................................6

    C.    Price ............................................................................................................. 8

           1.    The record does not support a significant adverse price effects finding......8

           2.    A remand is required for the Commission to reach a conclusion regarding price suppression ........................................................................9

           3.    The Commission's failure to consider lost sales arguments and evidence cannot be cured with *post hoc* rationalizations............................11

    D.    Impact ........................................................................................................ 13

           1.    The Commission's flawed causation analysis failed to evaluate the record evidence in the context of market conditions distinctive to the domestic industry, which demonstrated that subject imports did not cause injury ......................................................................................13

           2.    The Commission failed to justify discounting the detracting record evidence of the historic demand collapse and supply constraints that impeded the ability of U.S. producers to meet the increasing demand......15

                 a)    OCTG demand collapsed and then surged.....................................15

                 b)    High OCTG inventory levels of U.S. distributors delayed ramp up......................................................................................................17

                 c)    High HRC prices reduced welded OCTG production ...................18

                 d)    Labor shortages impeded ramp up.................................................19

   e) The Commission failed to address Tenaris' $10 billion investment in U.S. OCTG production in its impact analysis.........20

  3. Interim 2022 data confirm the lack of causation ......................................21

   a) The Commission changed its legal rationale for interim 2022 when subject import volumes continued to increase as the domestic industry's condition dramatically improved..................21

   b) The Commission failed to rebut controlling legal precedent........22

   c) The Commission failed to explain its departure from its practice where import volume increases and the domestic industry's conditions improve.........................................................23

III. CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Altx, Inc. v. United States,*
167 F. Supp. 2d 1353 (CIT 2001) .................................................................. passim

*Altx, Inc. v. United States,*
26 C.I.T. 709 (2002) ...................................................................................5

*Altx, Inc. v. United States,*
370 F.3d 1108 (Fed. Cir. 2004)................................................................5, 10

*Angus Chemical Co. v. United States,*
20 C.I.T. 1255, 944 F. Supp 943 (1996) ...................................................6

*Arlanxeo USA LLC v. United States,*
389 F. Supp. 3d 1330 (CIT 2019) ............................................................6

*Chemours Co. FC, LLC v. United States,*
443 F. Supp. 3d 1315 (CIT 2020) ...........................................................23

*CP Kelco US, Inc. v. United States,*
38 C.I.T. 1511 (2014) ..............................................................................22

*Dak Ams. LLC v. United States,*
456 F. Supp. 3d 1340 (CIT 2020) ............................................................4

*General Motors Corp. v. United States,*
17 C.I.T. 697 (1993),
*aff'd,* 140 F.3d 1478 (Fed. Cir. 1998)......................................................6

*Huaiyin Foreign Trade Corp. v. United States,*
322 F.3d 1369 (Fed. Cir. 2003)..........................................................12, 13

*Hynix Semiconductor, Inc. v. United States,*
431 F. Supp. 2d 1302 (CIT 2006)............................................................17

*Metallverken Nederland B.V. v. United States,*
744 F. Supp. 281 (CIT 1990)...................................................................22

*Nippon Steel Corp. v. United States,*
25 C.I.T. 1415 (2001) ..............................................................................6

*Nucor Corp. v. United States,*
414 F.3d. 1331 (Fed. Cir. 2005)..............................................................10

*OCP S.A. v. United States,*
    Consol. Court No. 21-00219, Slip Op. 23-136 (CIT Sept. 19, 2023) ............................ passim

*OCTAL Inc. v. United States,*
    539 F. Supp. 3d 1291 (CIT 2021) .................................................................................6, 10

*Rhone Poulenc S.A. v. United States,*
    592 F. Supp. 1318 (CIT 1984) ...........................................................................................10

*Swiff-Train Co. v. United States,*
    904 F. Supp. 2d 1336 (CIT 2013) .....................................................................................9, 10

*Usinor v. United States,*
    26 C.I.T. 767 (2002) .......................................................................................................4, 14

## STATUTES AND REGULATIONS

19 U.S.C. § 1677(7)(I) ...............................................................................................................22

19 U.S.C. § 1677(7)(C)(i) .............................................................................................................5

19 U.S.C. § 1677(7)(F)(i)(III) ....................................................................................................22

## LEGISLATIVE MATERIALS

Statement of Administrative Action to the Uruguay Round Agreements Act,
    H.R. Rep. No. 103-316, vol. 1 (1994) ................................................................................17

## ADMINISTRATIVE DETERMINATIONS

*Certain Aluminum Plate From South Africa,*
    Inv. No. 731-TA-1056 (Final),
    USITC Pub. 3734 (Nov. 2004) ..........................................................................................24

*Certain Steel Wheels from China,*
    Inv. Nos. 701-TA-478 and 731-TA-1182 (Final),
    USITC Pub. 4319 (May 2012) ...........................................................................................23

*Certain Steel Wire Rod From Canada, Germany, Trinidad & Tobago, and Venezuela,*
    Inv. Nos. 731-TA-763-766 (Final),
    USITC Pub. 3087 (March 1998) .........................................................................................24

*Emulsion Styrene-Butadiene Rubber from Czechia and Russia,*
    Inv. Nos. 731-TA-1575 and 731-TA-1577 (Final),
    USITC Pub. 5392 (Jan. 2023) ............................................................................................16

*Grain-Oriented Silicon Electrical Steel from Italy and Japan,*
    Invs. Nos. 701-TA-355 and 731-TA-660 (Final),
    USITC Pub. 2778 (May 1994) .............................................................................................3

*Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico,*
    Inv. Nos. 731-TA-711 and 713-716 (Second Review),
    USITC Pub. 3923 (June 2007)................................................................................20

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea,*
    Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final),
    USITC Pub. 5381 (Nov. 2022) ...............................................................................4

*Steel Nails from India, Oman, Sri Lanka, and Turkey,*
    Inv. Nos. 701-TA-673-675 and 677 (Final),
    USITC Pub. 5370 (Oct. 2022) ...............................................................................16

*Urea Ammonium Nitrate Solutions from Russia and Trinidad and Tobago,*
    Inv. Nos. 701-TA-668-669 and 731-TA-1565-1566 (Final),
    USITC Pub. 5338 (Aug. 2022) ...............................................................................11

NON-CONFIDENTIAL VERSION

## I.    INTRODUCTION

The Commission declares in its response brief:

Declining demand earlier in the POI obviously could not explain injury later in the
POI, which occurred as demand *increased*.  Indeed, as discussed, the very nature
of this injury was that the industry's performance was weaker than would have been
expected in light of the strong increase in demand.

Defendant's Brief at 40("ITCBr")(ECF51-52).  In fact, the record demonstrates that the historic

demand collapse early in the period of investigation ("POI") combined with severe market supply

constraints prevented the domestic industry from responding to rising demand later in the period.

That the Commission considered the record before it "obviously could not explain" the domestic

industry's condition "later in the POI" perfectly summarizes its determination:  a conclusory

analysis, a presumption of causation, and a failure to address the detracting record evidence.

The Commission and Defendant-Intervenors criticize Tenaris for arguing that imports were

"needed" to supply the market to meet the rising demand that followed the historic demand

collapse.  The need for imports was clear from the record of oil country tubular goods ("OCTG")

shortages confirmed by end users.  This Court recently confirmed that assessing whether imports

are needed is fundamental to the Commission's statutory obligation to assess if the subject import

volume is "significant," and to ensure that other factors are not misattributed to imports in the

causation analysis.  *OCP S.A. v. United States,* No. 21-00219, slip op. at 37, 46 (CIT Sept. 19,

2023).

The Commission's failure to assess volume in the context of market conditions then tainted

the Commission's price effects analysis, as the Commission relied on price comparison data to

find that subject imports "significantly undersold" the domestic like product and speculated that

this "led the domestic industry to lose market share to subject imports."   The evidence

demonstrates that subject imports were required to fulfill demand that the U.S. industry could not supply, and this explained why the domestic industry lost market share.

When the evidence confirmed that the domestic industry's condition improved despite rising subject import volumes in interim 2022, the Commission had to switch theories. The Commission ignored this volume increase. Instead, it focused on the subject imports' falling market share, attributed it solely to imports competing "less aggressively" in the post-petition period, and ascribed the domestic industry's significant improvement to the effect of the petitions. The Commission "must draw all those inferences that the evidence fairly demands" and the Commission cannot simply switch theories when "the same rationale applied to {the} data" would compel a different conclusion (*i.e.,* here that any harm to the domestic industry was not caused by subject imports). *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1363 (CIT 2001). This switch also ignored that the Commission routinely considers (1) improvements that began before the petition was filed as a basis to give full weight to post-petition data, such as the interim 2022 data in this case, and (2) improvements to the domestic industry's condition during the interim period at a time of increasing import volume and rising prices, here, as a basis to find no adverse impact.

The Commission's failure to make determinations in the context of market conditions, as required by statute, its failure to address detracting evidence, its use of inconsistent rationale, and its arbitrary departure from established practice is contrary to law, unsupported by substantial evidence, and requires a remand.

## II.     ARGUMENT

### A.     Cumulation

#### 1.     A separate like product finding is not necessary to determine that imports of seamless OCTG (Argentina and Mexico) and welded OCTG (South Korea) are not fungible

The Commission and Defendant-Intervenors are wrong that Tenaris is precluded from arguing that subject imports from Argentina and Mexico are not fungible with subject imports from South Korea because Tenaris did not argue seamless and welded OCTG are separate like products.[1]  *See* ITCBr18n.5; Defendant-Intervenors' Brief at 12("Def-IntBr")(ECF49-50).  The Commission previously has found both a single like product ***and*** that subject imports are not fungible.  *See, e.g., Grain-Oriented Silicon Electrical Steel from Italy and Japan*, Inv. Nos. 701-TA-355 and 731-TA-660(Final), USITC Pub. 2778 at I-8, I-13 (May 1994).

Similarly unavailing are arguments that past OCTG fungibility decisions are dispositive here.  *See* ITCBr15-16; Def-IntBr10-11.   The Commission acknowledged in a different context that "each Commission investigation is *sui generis*" and "prior determinations are not 'legally binding' on later determinations." *See* ITCBr20.  Accordingly, the Commission must consider the evidence of differences regarding fungibility on ***this*** record between subject imports from Argentina and Mexico and subject imports from South Korea, and the record here justifies a decision not to cumulate.  Tenaris' Rule 56.2 Brief at 18-21("TenarisBr")(ECF45-46).

#### 2.     The Commission's cumulation analysis does not consider Tenaris' Rig Direct® program in comparing channels of distribution

The record contradicts the Commission's claim that it "did not ignore that Tenaris sold OCTG using its 'Rig Direct' program." ITCBr20.  The Commission did not mention Rig Direct®

---

[1] Evidence shows subject imports from Russia competed differently in the market due to restrictions.  TenarisBr24.

NON-CONFIDENTIAL VERSION

in its cumulation analysis. *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573(Final), USITC Pub. 5381 at 16-23 (Nov. 2022)(P.R.165); *see also* confidential Views of the Commission at 21-30("Views")(C.R.439).[2] The Commission now dismisses Rig Direct® as "Tenaris's name for its sales of OCTG to end users (*e.g.*, rigs)." *See* ITCBr20; *see also* Def-IntBr4(dismissing Rig Direct® as a "rebranding of its distribution services").

The record demonstrates that the "distributor" model for sales of subject imports from South Korea using unaffiliated producers, processors, and distributors is not the same as Tenaris' Rig Direct® model for sales of Tenaris' domestic and imported OCTG using affiliated parties to provide OCTG and services on a "fully integrated" basis. *See, e.g.*, Hearing Transcript at 285-86(Zanotti)("Tr")(P.R.149); Tenaris' Posthearing Brief at Ex19("TenPosthrgBr") (C.R.418;P.R.144)(Tenaris' customer [

]. The Commission disregarded this detracting evidence in finding channels of distribution were the same. *See Dak Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1357–58 (CIT 2020); *Usinor v. United States*, 26 C.I.T. 767, 773 (2002).

**B.    Volume**

The Commission determined subject import volume was "significant" without addressing the conditions of competition underlying subject imports' market presence and evidence of demand and supply factors distinctive to the domestic industry. That failure warrants remand. As

---

[2] Citations to administrative record indicate public and confidential record document numbers ("P.R." and "C.R.").

addressed in Section D, the Commission also employed inconsistent rationales in evaluating data in assessing the causal link between subject import volumes and injury.

> **1.      The Commission failed to analyze conditions of competition in finding subject imports were "significant"**

The Commission and Defendant-Intervenors incorrectly assert that a finding of whether subject import volumes are "significant" does not require consideration of the conditions of competition distinctive to the affected industry.   *See* ITCBr27; Def-IntBr24-25.   "'***For the Commission's findings under 1677(7)(C)(i) to be supported by substantial evidence … the Commission must analyze the volume and market share data in the context of the conditions of competition'*** *to determine if subject import volume is significant.*"   *Altx, Inc. v. United States*, 26 C.I.T. 709, 719 (2002)(emphasis added)(citations omitted); *see also* TenarisBr25-56.

Defendant-Intervenors claim that this Court in *Altx* "mistakenly cites Section 1677(7)(C)." Def-IntBr25.   But this Court explicitly referred to 19 U.S.C. § 1677(7)(C)(i), the volume provision. *Altx*, 26 C.I.T. at 719.   The Commission's brief avoids this Court's *Altx* holding, and instead argues that the analysis only concerns volume and that Tenaris is "ask{ing} more of the Commission than required by the statute," referring to the CAFC's decision.   ITCBr27(quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1123 (Fed. Cir. 2004)).   The CAFC language quoted addresses a different issue – whether the dumping margin must be considered in the impact assessment.

This Court in *OCP* confirmed "***the Commission must apply its findings regarding the conditions of competition to its analysis of the three statutory factors***," ***including whether import volumes are*** "***significant***":

> The touchstone of the inquiry is "significance." "Congress, this court, and ITC itself have repeatedly recognized that it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)." *USX Corp. v. United States*, 11 CIT 82, 85 (1987) (emphasis in original). To determine if a volume of imports is significant, the Commission "must analyze the

volume and market share data in the context of the conditions of competition." *Nippon Steel {Corp. v. United States}*, 25 CIT {1415,} 1420; *see also Angus Chemical Co. v. United States*, 20 CIT 1255, 1266 (1996) ("The Commission evaluates import volume 'in light of the conditions of trade, competition, and development regarding the industry concerned.'") (quoting *General Motors Corp. v. United States*, 17 CIT 697, 711 (1993), *aff'd*, 140 F.3d 1478 (Fed. Cir. 1998)).

*OCP* at 39-40.

The Commission fails to acknowledge two cases supporting Tenaris' position.  *See* TenarisBr25-26(citing *Angus Chem. Co. v. United States*, 944 F. Supp. 943, 952 (CIT 1996) and *Arlanxeo USA LLC v. United States*, 389 F. Supp. 3d 1330, 1338 (CIT 2019)).  Also misplaced is the Commission's reliance on *OCTAL*, which confirms the analysis must address the conditions relevant to the industry: "the Commission must evaluate what is 'significant' in a volume determination on a case-by-case basis. Whether a particular volume of imports is 'significant' varies across industries and circumstances." *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1298 (CIT 2021).

> **2.  Record evidence demonstrates that imports were "needed" after demand collapsed and supply constraints impeded the domestic industry's ability to supply the market**

The Commission asserts that "Tenaris wrongly argues that the Commission was required to consider whether subject imports were 'needed' in order to determine if the volume of these imports was significant."  ITCBr27.  This Court recently confirmed that whether "imports were needed" to supply the market is essential to assessing whether import volumes are "significant." *See OCP* at 37 ("the existence of uncontroverted record evidence that additional imports were needed in 2019 to supply regions unaffected by bad weather undermines the Commission's oversupply analysis"), at 46 ("the Court has found that respondents offered an explanation for why additional imports were needed in early 2019"), and at 47 ("the record shows that domestic product could not effectively fill all U.S. demand").

NON-CONFIDENTIAL VERSION

The Commission and Defendant-Intervenors confuse the separate statutory inquiries of whether subject import volume is "significant" with the impact analysis. *See, e.g.*, ITCBr27; Def-IntBr25. The Commission also argues it can undertake a "quantitative analysis" and can find subject imports to be significant in absolute terms. ITCBr27. These arguments all miss the point that assessing whether volume is "*significant*" requires consideration of the market conditions context.

The record before the Commission was clear that when demand began to increase, customers could not obtain sufficient OCTG. A large majority of U.S. purchasers reported that firms "had refused, declined, or been unable to supply" OCTG between January 1, 2019 and October 5, 2021 (*i.e.*, the petitions filing date). Staff Report at II-14("CSR"/"PSR" for confidential/public versions)(C.R.431;P.R.161). Purchasers explained that U.S. mills reduced their capacity in 2020 and had difficulty restoring it due to labor shortages and raw material shortages. *Id.* at II-14-15. After the petitions were filed, 26 out of 27 purchasers observed similar trends they attributed in part to "preexisting supply tightness." *Id.* at II-14-15; U.S. Purchasers' Questionnaire Responses at Question III-13(a) ([


]; ([

]; ([

].

A Texas Alliance of Energy Producers survey confirmed a lack of OCTG availability continuing in 2022, with 87.5% of end users noting that not having OCTG "ma{de} it difficult to ramp up drilling activities and production of crude oil and/or natural gas{,}" and 77.5% calling supply constraints "highly significant." Tenaris' Prehearing Brief at Ex44(Question#1-

NON-CONFIDENTIAL VERSION

2)("TenPrehrgBr")(C.R.405;P.R.128).   The Dallas Federal Reserve Energy Survey documented 89 oil and gas executives reporting a "shortage" or "significant shortage" of steel tubular goods in June 2022.   *See* TenPrehrgBr31-32Ex54.   Finally, the Commission cited U.S. plant closings, shutdowns, and curtailments during the POI, and noted the majority of U.S. producers reported supply constraints since 2019.   Views36.

This record confirms a case where "volumes may not be significant" because "the imported quantities fill demand that the domestic industry is unable to meet."   *OCP* at 41.   This Court recognized "***the principle that imported volumes may not be significant if the imported quantities fill demand that the domestic industry is unable to meet 'either because of incapability or lack of viability.'***"   *Id.* (emphasis added)(citation omitted).

**C.      Price**

**1.      The record does not support a significant adverse price effects finding**

The Commission relied on price comparison data to find that subject imports "significantly undersold"[3] the domestic like product and speculated that this "led the domestic industry to lose market share to subject imports."   Views51.   A Commission finding is legally deficient if it relies on "industry conditions that are hypothetical, theoretical, or speculative."   *OCP* at 28.   The evidence demonstrates that subject imports were required to fulfill demand that the U.S. industry could not supply, and this was the reason the domestic industry lost market share.   *See* TenarisBr9-17,25-26; *see also OCP* at 44 (remanding because "the Commission's pricing analysis depended

---

[3] Tenaris explained that the price comparison data used to find underselling reflected certain limitations and described the [                                                                                                    ].
*Compare* TenarisBr36-37 *with* ITCBr34 and Def-IntBr30.   Even if price comparisons are relied on without any changes, underselling/overselling can at best be characterized as [
                              ] of price comparisons reflecting underselling.   Views47; CSR V-35.

in part on a purported fact about the fertilizer market for which no evidence existed").

The Commission speculated that the U.S. producers lost market share due to underselling and ignored evidence of high U.S. demand and constrained domestic supply reflected in rising OCTG prices for both imported and domestic products during the POI.  OCTG prices increased for twenty-four consecutive months (including for more than a year before the petitions).  TenarisBr10.  Prices increased from 2019-2022 for all nine Commission pricing products for U.S. **_and_** subject imports.  PSR V-33.  Moreover, AUVs of subject imports increased by [     ]%, and AUVs of domestic net sales increased [                              ], by 12.5%, during the POI.  *See* CSR IV-4, Table VI-2 at VI-5.  The Commission's finding of price effects based on underselling is unsupported by substantial evidence, not in accordance with law, and should be remanded.  *See OCP* at 44, 49.

### 2.    A remand is required for the Commission to reach a conclusion regarding price suppression

The Commission compounded the deficiencies of its price effects analysis that relies upon a speculative link between underselling and lost market share by refusing to make **_any_** finding – affirmative or negative – regarding price suppression:  "Given the significant underselling and the market share shift, **_we do not reach a conclusion_** as to whether the domestic producers would have been able to further increase prices to a significant degree than they did but for subject imports."  Views51(emphasis added).  This refusal is contrary to this Court's precedent.

The Commission objects to *Swiff-Train* as "wrongly cited by Tenaris," claiming that the "Court did not remand on the basis that the statute requires the Commission to make a price suppression finding," but rather "because the Commission's price suppression finding was 'not supported by substantial evidence.'"  ITCBr36n.18.  The Court was clear that the Commission must make an "explicit finding" regarding price suppression.  *See Swiff-Train Co. v. United States,*

904 F. Supp. 2d 1336, 1344, 1348 (CIT 2013) ("{I}t is hereby … ORDERED that the Commission shall make specific findings on the effect of the subject imports on the statutory price suppression and depression factors"). Arguments that the Commission need only "consider" price suppression (and that this was done by referencing the industry's COGS-to-net-sales ratio) thus also fail. ITCBr35-36; Def-IntBr33-36. The other cited cases do not upset *Swiff-Train's* holding.

The Commission's reliance on *Altx* is misplaced. The Court there addressed a different issue – the Commission's consideration of Commerce's dumping margin in its impact analysis – and the Commission had found "no price suppression or depression." *See Altx*, 370 F.3d at 1114, 1123. Similarly misplaced is reliance on *Rhone Poulenc* from 1984, in which this Court was "reluctant to require the ITC to state its position with technical exactitude in this developing area of the law." *Rhone Poulenc S.A. v. United States*, 592 F. Supp. 1318, 1326 (CIT 1984); *see also* ITCBr36. Nearly 40 years later, the Commission's price effects analysis can no longer be considered "developing," and *Swiff-Train* confirms a specific finding regarding price suppression is now required.

The claim that *OCTAL* and *Nucor* only require the Commission to "consider" price suppression also are inapposite. ITCBr36; *see also* Def-IntBr34-35. *OCTAL* merely recognizes the statute does not require the Commission to make **_affirmative_** findings of both price underselling **_and_** price depression or price suppression in order to find adverse price effects. The Commission does not address whether "specific findings" are required because the Commission had made specific negative findings of price depression and suppression. *See OCTAL*, 539 F. Supp. 3d. at 1308. In *Nucor*, the CAFC agreed that "although the Commission did not state in so many words that the volume of underselling was an insignificant factor in evaluating {price effects}, "the trial court found that to be the plain import of the Commission's analysis." *Nucor*

*Corp. v. United States*, 414 F.3d. 1331, 1339 (Fed. Cir. 2005). Here, there is no such "plain import"; the Commission expressly did "not reach a conclusion."

The evidence demonstrates no price suppression. OCTG prices and AUVs for U.S. and subject OCTG increased during the POI. TenarisBr10; PSR V-33; CSR IV-4, Table VI-2 at VI-5. Despite an increase in the COGS-to-net sales ratio from 96.8% in 2019 to 117.2% in 2020, the ratio declined to 109.2% during interim 2021 and to 98.0% for full year 2021, before reaching a low of 77.4% in interim 2022. *See* PSR Table VI-1 at VI-3; *see also, e.g.*, *Urea Ammonium Nitrate Solutions from Russia and Trinidad and Tobago*, Inv. Nos. 701-TA-668-669 and 731-TA-1565-1566(Final), USITC Pub. 5338 at 28-33 (Aug. 2022) (finding no significant price effects based on increasing prices and decreasing COGS-to-net sales ratio toward end of POI despite opposite trends earlier in POI).

### 3. The Commission's failure to consider lost sales arguments and evidence cannot be cured with *post hoc* rationalizations

To support its finding of "significant adverse price effects," the Commission cites "some evidence that domestic producers lost sales to subject imports on the basis of price." Views48,51. The Commission now argues that it "grounded its lost sales finding … on CR Table V-19" and therefore did not "ignore contrary record evidence" that Tenaris provided. ITCBr33-35. It also claims to have merely "referenced" Table V-18, but its cite to that table suggests it relied on it to support its lost sales finding. ITCBr35; Views48n.204. The Commission's *post hoc* rationalizations merely confirm its price effects conclusion must be remanded because its lost sales finding was unsupported by substantial evidence and relied on flawed information.

The Commission **_now_** claims its lost sales finding relied only on Table V-19 and "certain emails" provided by Petitioners that it found "corroborative" of Table V-19. *See* ITCBr34n.16 (citing Views49n.205); *see also* Def-IntBr32(acknowledging that the Commission [

NON-CONFIDENTIAL VERSION

]

… leaving no need for it to discuss Tenaris' evidence").   The claim that the Commission [

] confirms its failure to consider the record as a whole.  Tenaris provided rebuttal evidence demonstrating that domestic producers were not losing sales to Tenaris on the basis of price.   *See*, *e.g.*, Tr284(Moreno);  TenPosthrgBrEx1(Question#15),Ex19-20;  Tenaris' Final Comments at 4-5(C.R.437;P.R.164).  A remand is required because this evidence contradicts the Commission's finding that U.S. products lost market share to low-priced subject imports.   The Commission's determination is unsupported by substantial evidence because it failed to "consider{} the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003)(citation omitted).

In any event, Table V-19 is an insufficient basis for a finding of lost sales.  According to the Commission, Table V-19 "showed that five purchasers had *confirmed* buying [        ] short tons of subject OCTG over the domestic like product based on their lower prices." ITCBr35(citing Views48).  The total amount represents [         ] percent of the "nearly 11 million short tons of OCTG {purchased} during January 2019-June 2022."  *See* PSR V-38.  Nor can only five of twenty purchasers be considered significant.  Moreover, Tenaris challenged reliance on this chart due to inconsistencies in the questionnaire responses for two of the purchasers (*i.e.*, [

]) before the Commission.  *See* Views48n.203 (noting Tenaris argued "two of the five purchasers reporting that they purchased subject imports … due to price … contradicted this reporting elsewhere").  The Commission rejected Tenaris' specific rebuttal and relied on [

12

NON-CONFIDENTIAL VERSION

].  *Id.*  The [

], also [

].   U.S. Purchasers' Questionnaires of [

].

Finally, the Commission **_now_** denies it relied on the flawed Table V-18, which contained a warning note by Commission Staff.  *See* ITCBr35("the Commission focused on the data in *Table V-19* to which no equivalent note was attached").  The Commission's Staff note warned that Table V-18 it may reflect double counting: "Because some of these purchasers are end users and some are distributors, some data in the table may represent shipments of the same OCTG."  PSR, note to Table V-18 at V-40.   In fact, the Commission cited to **_both_** Table V-19 and Table V-18 to support the sentence the Commission points to for its lost sales conclusion.   Views48nn.203&204. The Commission offers an alternative argument regarding Table V-18 that, even if its lost sales analysis was "partially based on a table potentially containing double counting," its analysis was "tempered appropriately" because it only found "*some*" evidence of lost sales.  ITCBr35.  This argument undermines the claim it relied only on Table V-19 and acknowledges that the lost sales finding is weak and based on merely "some" alleged evidence of lost sales.   The Commission's reliance on Table V-18 is certainly not "harmless" error.  Def-IntBr33.

The Commission's price effects finding, including its lost sales finding, should be remanded.

    **D.**    **Impact**

        **1.**    **The Commission's flawed causation analysis failed to evaluate the record evidence in the context of market conditions distinctive to the domestic industry, which demonstrated that subject imports did not cause injury**

The Commission argues it found a "causal nexus between cumulated subject imports and

the industry's weak performance relative to the strong growth in demand from 2020 to 2021" and "further confirming this causal nexus, the industry's performance significantly improved in interim 2022 (January-June 2022) relative to interim 2021 (January-June 2021), as subject imports competed less aggressively and lost market share." ITCBr5(citing Views57-58; CSR Table C-1). The factual record does not support a causal nexus between subject imports and the domestic industry's performance during 2020-2021 or during the interim 2022 period, when subject import volume continued to increase and the domestic industry's condition dramatically improved. *See* TenarisBr30-47

Following the collapse of OCTG demand in 2020, market supply constraints – not subject imports – prevented domestic production from meeting rising demand after the collapse. Coinciding with easing of market supply constraints at the end of 2021, and in interim 2022, the U.S. industry's financial condition improved dramatically, as subject import volume increased and market share declined, thus confirming that subject imports were not the cause of any harm to the domestic industry.

The Commission's contention that it "comprehensively addressed the effects of *all* factors" is belied by its declaration that "{d}eclining demand earlier in the POI obviously could not explain injury later in the POI, which occurred as demand increased" and "the very nature of this injury was that the industry's performance was weaker than would have been expected in light of the strong increase in demand." ITCBr39-40. These statements reveal a failure to consider the whole record, which supported the exact condition the Commission considered it "obviously could not." ITCBr40. The Commission has "responsibility to explain or counter salient evidence that militates against its conclusions" and generic references to data cannot act "as a shield against examination of the Commission's failure to present required analysis of the record evidence." *Usinor*, 26 C.I.T.

at 783.  The evidence of supply constraints impeding the ability of U.S. producers to meet the

increasing demand "militates against" the Commission's conclusions that "{d}eclining demand

earlier in the POI obviously could not explain injury later in the POI, which occurred as demand

*increased*."  ITCBr40.

The Commission argues it "set out the background conditions of competition at the start of

its injury analysis" and "further analyzed" relevant conditions in its impact analysis.  ITCBr6.

Defendant-Intervenors claim the Commission need not "exhaustively 'identify and name each

cause' of those conditions."  Def-IntBr37.  These arguments fail:

> **The Commission "does not comply with its statutory mandate by simply describing various conditions of competition in isolation," but rather the Commission must apply its findings regarding the conditions of competition to its analysis of the three statutory factors: subject import volume, price effects, and impact on the domestic industry**.

*OCP* at 26(citations omitted)(emphasis added).

**2.      The Commission failed to justify discounting the detracting record evidence of the historic demand collapse and supply constraints that impeded the ability of U.S. producers to meet the increasing demand**

**a)      OCTG demand collapsed and then surged**

The remarkable demand conditions during the POI, from historic low demand due to the

Russia-Saudi oil price war and COVID-19 to surging demand that domestic producers could not

supply, are critical to analyzing the source of any harm to the U.S. industry.

Defendant-Intervenors characterize the Commission's failure to analyze market

conditions, including the Russia-Saudi oil price war, as a "failure to name-check" that had no effect

on the completeness of its analysis.  Def-IntBr37.  Omission of the Russia/Saudi oil price war is

striking given it contributed to oil prices being "well below $40 per barrel" and "negative for a

period of time."  *See* TenPrehrgBrEx50.3-4.  The Commission's failure to engage with evidence

of oil trading below zero $USD/barrel is confirmed by remarkable understatement: "U.S. oil and gas prices fell irregularly from January 2019 to mid-2020, and then increased irregularly through the end of the POI."  Views35.  The Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions{.}"  *Altx*, 167 F. Supp. 2d. at 1374.  The Commission argues that references to apparent U.S. consumption, the active U.S. rig count, and U.S. oil and gas prices is tantamount to addressing "the effects of *all* factors."  ITCBr39. This argument fails.  Where a "Final Determination merely cites to record evidence containing data on subject import indicators throughout the POI" the "reference to annual data cannot, by itself, constitute an acknowledgment of Plaintiffs' arguments, much less a reasoned explanation for discounting them, as the statute requires."  *Altx*, 167 F. Supp. 2d at 1359.

The Commission also failed to explain the different treatment of COVID-19 demand shocks here versus in contemporaneous cases.  *See, e.g.*, *Steel Nails from India, Oman, Sri Lanka, and Turkey*, Inv. Nos. 701-TA-673-675 and 677(Final), USITC Pub. 5370 at 32,34,36-37,40-41,57n.225 (Oct. 2022) (negative determination noting "changes in supply and demand as affected by the COVID-19 pandemic"); *Emulsion Styrene-Butadiene Rubber from Czechia and Russia*, Inv. Nos. 731-TA-1575 and 731-TA-1577(Final), USITC Pub. 5392 at 33,43 (Jan. 2023).

Although the Commission recognized that demand subsequently increased, it did not consider the implications of this sudden, significant increase.  Rather, it merely speculated that the domestic industry should have done better given the demand increase.  The Commission asserts that the domestic industry's "capacity, capacity utilization, employment, and hours worked all remained nearly identical in 2021, when demand significantly improved, as in 2020, when demand had collapsed{.}"  ITCBr38(citing Views57n.243).  The evidence demonstrates that market conditions – not subject imports – explain these data points.  *See* above Section II.B.2.  The

NON-CONFIDENTIAL VERSION

Commission must not attribute to subject imports injury caused by other factors. *See* Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. REP. NO. 103-316, vol. 1 at 851-52(1994)("SAA").  Additionally, the Commission must "analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports in causing that injury." *Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1317 (CIT 2006).

            **b)**      **High OCTG inventory levels of U.S. distributors delayed ramp up**

The first critical supply factor is significant inventory held by distributors before the demand surged, which delayed ramp up of U.S. production.  The Commission dismisses "any alleged inventory 'bulge'" as "largely worked down before 2021."  ITCBr41.  The Commission Staff reported that months-on-hand inventory rose from [    ] months in January 2019 to [    ] months in August 2020.  *See* CSR II-16n.18.  Although this is a [    ] percent increase in the months of supply of inventory, the Commission downplayed this buildup: "{i}nventories may have had some effect on delaying domestic producers' resumption of production and shipments." Views60-61.  The [                         ] caused OCTG inventories to [           ] in September 2020 to [         ] in September 2021, [                                          ].  TenPrehrgBr27-28,Ex28.  The Commission found that "inventories, or inventories alone, cannot explain why additional demand in 2021 was satisfied by increased subject imports, rather than domestic producers and nonsubject imports."  Views61.  Tenaris has emphasized that no single factor, but rather a combination of three factors – inventories, HRC prices, and labor shortages – constrained domestic OCTG supply.  Indeed, additional supply constraints – the meteoric price rise of the key input for welded OCTG and worker shortages – emerged as inventory levels decreased relative to surging demand.  TenPrehrgBrEx45.  The Commission's determination shows no attempt to evaluate the impact of these supply constraints.

### c)    High HRC prices reduced welded OCTG production

The second critical supply factor is high HRC prices.  From August 2020 through August 2021, the price of HRC rose dramatically, sometimes even eclipsing the price of welded OCTG, and remained elevated throughout the POI.  TenPrehrgBr24-25; TenPosthrgBrEx5; CSR Table V-1 at V-4.  The Commission failed to address the implications of the high HRC prices that constrained welded OCTG production.

The Commission argues that "even if rising HRC prices did reduce the supply of domestically produced welded OCTG in 2021, domestic seamless producers were fully capable of compensating for any constraint in the supply of domestic welded OCTG."  ITCBr41.  This position ignores the impact of HRC prices on the condition of welded OCTG producers and their operations, and is speculation regarding seamless OCTG producers.

The evidence confirms the production constraints on welded OCTG producers from high HRC costs.  Welded petitioners conceded they could not pass on increasing HRC costs to their OCTG customers.  Tr27(Mandel), 32(Hart) ("being unable to pass along our cost increases, we decided not to produce more tons and sell them at prices that end up losing money on every sale").  This Court recognized that "{a} practice that is uneconomical will not be adopted by an industry as part of its conditions of competition."  *OCP* at 35.  The evidence shows several welded OCTG producers halted production.  TenPrehrgBr26n.74.

The Commission speculates that "domestic seamless producers were fully capable of compensating for any constraint in the supply of domestic welded OCTG."  ITCBr41.  This speculation conflicts with evidence of supply constraints, such as ramp up delays and worker shortages affecting U.S. welded *and* seamless mills.  TenarisBr9-17; CSR/PSR II-13-14.  This Court stated that "*{i}ndustry conditions that are hypothetical, theoretical, or speculative are not*

18

*part of the conditions of competition distinctive to the affected industry; and Commission findings that have been premised on such conjectures are legally deficient."* OCP at 28(emphasis added). The Commission then attempts to support its conjecture by arguing "that seamless OCTG's share of total domestic production went up significantly from 2020 to 2021, from [    ] to [    ] percent." ITCBr42(citing CRS Table III-8). Pointing to a percentage increase alone says nothing about the seamless producers' ability to "fully" "compensate" the loss of welded production. This *post hoc* rationalization is not reflected in the Commission's analysis, where the Commission again relied on conjecture that domestic seamless producers could have supplied the market based solely on a self-reported "low rate of capacity utilization" and the "interchangeability" of seamless and welded OCTG. Views62.

### d) Labor shortages impeded ramp up

The third critical supply factor preventing U.S. producers from supplying increased demand is labor shortages. Tenaris does not ask the Court to reweigh evidence related to labor shortages. *See* ITCBr43; Def-IntBr7,36,48. However, the Commission improperly relied solely on unsubstantiated information to find no labor constraints and ignored contemporaneously corroborated contradictory evidence. Views62&n.265. The Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions{.}" *Altx,* 167 F. Supp. 2d at 1374.

U.S. OCTG producers idled operations and laid off workers in 2020 due to the demand collapse. *See* CSR Table III-6 at III-9-11. When demand increased in 2021, U.S. market participants confirmed the difficulties U.S. producers faced fulfilling orders because of the challenge of hiring OCTG workers. CSR/PSR II-13-14. The largest OCTG producer Tenaris suspended certain operations and reduced employees when demand fell, but as market conditions

improved "{Tenaris'} challenge {was} hiring enough qualified workers to ramp up U.S. production quickly enough to meet the increased demand for OCTG of {its} U.S. customers." Tr177(Schnurbusch); *see also* TenPosthrgBrEx1.21-22,28-29(Questions#4-5),Ex8-9.   Tenaris documented its hiring challenges, including the [      ] in [

]. TenPosthrgBrEx1.21-22(Question#4).

The Commission instead relied on unsubstantiated assertions about Petitioners' ability to hire employees. *See* Views62&n.265(citing CSR/PSR II-13, Table III-5; Tr67(Beltz), 68(Dorn)). "Commission findings that have been premised on such conjectures are legally deficient." *OCP* at 28.   The Commission failure to engage with detracting evidence of reduced capacity and labor shortages that prevented U.S. mills from restoring their capacity "seriously undermines its reasoning and conclusions." *Altx,* 167 F. Supp. 2d at 1374.   This Court has explained that when "considered individually every discrepancy discussed here might not rise to the level of requiring reconsideration of the overall disposition, but taken as a whole" may compel a finding that "the ITC decision is not substantially supported and explained." *Id.*

### e) The Commission failed to address Tenaris' $10 billion investment in U.S. OCTG production in its impact analysis

That the Commission referenced Tenaris' investments in U.S. OCTG production only in its related party analysis, ITCBr43, starkly contrasts with the Commission's view in 2007 that Tenaris would not harm what it *then called* a "substantial investment" in U.S. production assets after Tenaris' purchase of Maverick. *Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico*, Inv. Nos. 731-TA-711 and 713-716(Second Review), USITC Pub. 3923 at 34 (June 2007).   Since then, Tenaris' investment in U.S. OCTG production of more than $10 billion (including the POI acquisition of IPSCO) – far exceeds what the Commission considered a

"substantial investment" in 2007.  The Commission declined to consider Tenaris' investment to become the largest U.S. OCTG producer and failed to provide a reasoned explanation for not addressing this evidence in its impact analysis.

### 3.   Interim 2022 data confirm the lack of causation

The Commission argues that "Tenaris does not challenge the Commission's factual finding that the decline in subject import market share in interim 2022 relative to interim 2021 was related to the pendency of the investigations." ITCBr27.  This is baseless.  Tenaris challenged the factual bases for, and the Commission's conclusion regarding, the purported causal nexus of subject import volume, market share, and post-petition effects. *See e.g.,* Complaint¶42(ECF15); TenarisBr30,44-47.

### a)   The Commission changed its legal rationale for interim 2022 when subject import volumes continued to increase as the domestic industry's condition dramatically improved

The Commission concedes that "the domestic industry was able to markedly improve its performance in interim 2022 relative to interim 2021{.}" ITCBr38.  Subject import volume increased by [    ] percent from interim 2021 to 2022.  Views42.  The Commission switched theories, however, when it considered this increasing subject import volume (and increasing market share gains) during 2020-2021 to confirm a causal link between subject imports and injury, but then declined to find a lack of causal nexus in interim 2022 when subject import volume also increased (but market share declined) as the condition of the domestic industry also dramatically improved.  Despite this increase, the Commission concludes the data "confirm{s} the causal nexus between subject imports and injury" because they "competed less aggressively and lost market share." ITCBr38-39.

NON-CONFIDENTIAL VERSION

The Commission switched its rationale to reach this conclusion. *"Having employed a rationale to interpret data from {one} … part of the POI in such a manner as to support its conclusion, the Commission may not ignore the fact that the same rationale applied to data from {another}… part of the POI weakens its conclusion."* *Altx,* 167 F. Supp. 2d at 1363(emphasis added). This arbitrary switch is unsupported by evidence and inconsistent with Court precedent.

  b)  **The Commission failed to rebut controlling legal precedent**

The Commission contends that Tenaris' argument "is inconsistent with the statute's text, history, and purpose." ITCBr4. Section 1677(7)(I) refers to "volume," not market share. The Commission characterizes the SAA as the "authoritative expression on the interpretation and application of 19 U.S.C. § 1677(7)(I)," but the SAA does not mention market share. *See* ITCBr28; SAA at 854-855. The Commission also relies on *Metallverken Nederland B.V. v. United States,* 744 F. Supp. 281 (CIT 1990). ITCBr28. That case is inapplicable because it involved a threat determination, and the statute requires the Commission to consider "market penetration of imports" in a threat analysis. *See* 19 U.S.C. § 1677(7)(F)(i)(III).

The Commission failed to address *CP Kelco*, where the Court has noted that the Commission's "hallmark vectors for evaluating … post-petition effect {are} volume and price," and volume in particular. *CP Kelco US, Inc. v. United States*, 38 C.I.T. 1511, 1529 (2014). Defendant-Intervenors refer to *CP Kelco* in the context of post-petition effects for the proposition that "{t}he decision to discount post-petition data is based on consideration of 'the industry as a whole.'" Def-IntBr18n.8. The domestic industry's dramatic improvement "as a whole" during interim 2022 while imports increased confirms no causal nexus.

NON-CONFIDENTIAL VERSION

The Commission dismisses *Chemours* as "irrelevant to the volume-specific arguments" because it "concerned the Commission's assessment of whether a post-petition change in price, not volume, was related to the pendency of the investigation." ITCBr30-31n.14. That difference does not undermine the applicability of *Chemours*, which held that the Commission must consider "all of the evidence on the record" in considering post-petition effects. *Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1329 (CIT 2020). Here, without explanation, the Commission failed to consider contrary evidence of increasing subject import volume in the interim period and the easing of supply constraint conditions, as the industry's condition dramatically improved, and therefore failed to adequately support its decision to discount post-petition data. The evidence demonstrated no causal link between imports and injury to the domestic industry and the Commission failed to explain how its determination considered the evidence that undermines its conclusion.

<p style="padding-left: 2em;"><strong>c)</strong>     <strong>The Commission failed to explain its departure from its practice where import volume increases and the domestic industry's conditions improve</strong></p>

Tenaris explained that "in past cases, the Commission has declined to discount post-petition data if the volume of subject imports is higher relative to the year prior, remains unchanged, 'was declining prior to the filing of the petition,' or only 'declined slightly.'" TenarisBr29(citing past determinations). The Commission merely claims that none of these cases have the same fact pattern of increasing import volume and decreasing market share and further remarks that "prior determinations are not controlling." ITCBr30. However, there are such examples. *See, e.g., Certain Steel Wheels from China*, Inv. Nos. 701-TA-478 and 731-TA-1182(Final), USITC Pub. 4319 (May 2012) ((1) subject imports increased in the interim period;

(2) market share decreased (albeit "marginally"); and (3) the Commission did not reduce the weight given to post-petition information).

The Commission said it did not "discount this improved performance" of the domestic industry, but "{t}o the contrary, it found it instructive." ITCBr44. Here, the domestic industry's improved performance – driven by 24 months of increasing prices – occurred despite an increase in the volume of subject imports. The Commission previously has relied on such trends to give full weight to post-petition data and not attribute recovery to the petition. *See* TenarisBr46-47; *Certain Aluminum Plate From South Africa*, Inv. No. 731-TA-1056(Final), USITC Pub. 3734 at 27-28 (Nov. 2004) (domestic industry's price increases and accompanying recovery are not "attributable to any significant degree to the filing of the petition" if such changes "were part of a general increase in prices … as demand rose sharply"); *Certain Steel Wire Rod From Canada, Germany, Trinidad & Tobago, and Venezuela*, Inv. Nos. 731-TA-763-766(Final), USITC Pub. 3087 at 15n.69, 21n.101 (March 1998) ("Because the rising price trend and accompanying financial recovery of the domestic industry began … more than half a year before the petitions in these investigations were filed … we conclude that these trends are not related to the pendency of the investigation"). Consistent with this practice, the increasing subject import volume breaks the causal link between subject imports and the domestic industry's performance. The Commission's departure from its practice on this record reflects a *presumption of causation* by the Commission, which is contrary to law and unsupported by substantial evidence.

**NON-CONFIDENTIAL VERSION**

## III.   CONCLUSION

For the reasons set forth above and in Tenaris' Rule 56.2 Brief, Tenaris respectfully requests that the Court grant Tenaris' Rule 56.2 motion for judgment on the agency record.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A.*

October 12, 2023

### CERTIFICATE OF COMPLIANCE

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for the Reply Brief of Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A., as computed by the White & Case word processing system (Microsoft Word 2016), is 6,987.


    /s/Gregory J. Spak
Gregory J. Spak