UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES

|  |  |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C.,<br><br>      Plaintiff,<br><br>      and<br><br>TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A.,<br><br>      Consolidated Plaintiffs,<br><br>      and<br><br>TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; AND IPSCO TUBULARS INC.,<br>      v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>      and<br><br>UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE USA INC.<br><br>      Defendant-Intervenors. | Court No. 22-00344 |

REPLY BRIEF OF TMK GROUP

CONTAINS NO PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for TMK Group

October 12, 2023

## Table of Contents

Page

ARGUMENT ................................................................................................................. 2

    A.   Cumulation of Russian Subject Imports with Subject Imports from
        Argentina, Mexico, and South Korea .................................................................. 2

        1.   There Was No Reasonable Overlap of Competition Between
             Russian Subject Merchandise and Subject Merchandise from
             Argentina, Mexico, South Korea, or U.S. Domestic Producers at
             the Time of the Commission's Final Vote .................................................... 4

        2.   Russian Imports of Subject Merchandise into The United States
             After February 2022 Do Not Suggest the Existence of a
             Reasonable Competitive Overlap with Imports from the Other
             Subject Countries at the End of the Investigation Period ............................ 9

    B.   Cumulation of South Korean Subject Imports with Subject Imports
        from Argentina, Mexico, and Russia .................................................................. 12

CONCLUSION ............................................................................................................. 16

Table of Authorities

Page

C<small>ASES</small>

*Chaparral Steel Co. v. United States*,
901 F.2d 1097 (Fed. Cir. 1990) .................................................................. 8

*Juancheng Kangtai Chem. Co. v. United States*,
37 ITRD 2011 (Ct. Int'l Trade 2015) .......................................................... 16

*Juancheng Kangtai Chem. Co. v. United States*,
37 ITRD 2011 (Ct. Int'l Trade 2015). .......................................................... 16

*Solvay Solexis SpA. v. United States*,
637 F.Supp.2d 1306 (Ct. Int'l Trade 2009) ................................................ 16

*Trust Chem Co. Ltd. v. United States*,
791 F.Supp.2d 1257 (Ct. Int'l Trade 2011) ................................................ 16

S<small>TATUTES</small>

19 U.S.C. § 1677 .......................................................................................... 2, 7, 9

O<small>THER</small> A<small>UTHORITIES</small>

*Pads For Woodwind Instrument Keys from Italy*,
USITC Publication 1566 (Aug. 1984) .......................................................... 14

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Czech
Republic (Czechia)*,
Inv. No. 731-TA-1529 (Final), USITC Pub. No. 5183 (April 2021) ............................. 6

TENARIS BAY CITY, INC.; MAVERICK
TUBE CORPORATION; IPSCO TUBULARS
INC.; TENARIS GLOBAL SERVICES
(U.S.A.) CORPORATION; AND SIDERCA
S.A.I.C.,

          Plaintiff,

          and

TMK GROUP AND TUBOS DE ACERO DE
MEXICO, S.A.,

          Consolidated Plaintiffs,

          and

TENARIS BAY CITY, INC.; MAVERICK
TUBE CORPORATION; AND IPSCO
TUBULARS INC.,

          v.

UNITED STATES,

          Defendant,

          and

UNITED STATES STEEL CORPORATION;
BORUSAN MANNESMANN PIPE U.S. INC.;
PTC LIBERTY TUBULARS LLC; UNITED
STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO, CLC;
AND WELDED TUBE USA INC.

          Defendant-Intervenors.

Court No. 22-00344

This brief is submitted on behalf of Plaintiff TMK Group ("TMK") in reply to the Response Briefs submitted by the Government (ECF51) and by United States Steel Corp., Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc. (collectively, "Defendant-Intervenors" or "Petitioners") (ECF 49).

## ARGUMENT

### A. *Cumulation of Russian Subject Imports with Subject Imports from Argentina, Mexico, and South Korea*

In its Final Determination in the investigation of Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea, the Commission cumulated imports of subject merchandise from Russia with imports of subject merchandise from Argentina, Brazil, and Mexico for the purpose of evaluating whether the domestic industry suffered material injury by reason of imports of subject merchandise. To support such a determination, the statute requires the Commission to determine that imports from all cumulated countries "compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i). *See also* Final Determination, at 16-17. In its Final Determination, the Commission based its decision to cumulate Russian imports with imports from other subject countries primarily on competitive conditions that prevailed during the initial portion of the period of investigation., even though those conditions no longer existed at the time of the Commission's final vote.[1]

---

[1] The period of investigation in this case covered the period from January 2019 to June 2022.

As explained in TMK's brief in support of its Rule 56.2 motion (hereinafter "TMK's Initial Brief")(ECF 41), the Commission's decision to cumulate Russian imports of subject merchandise was not supported by substantial evidence. In this regard, record evidence demonstrates that access to the U.S. marketplace for Russian subject merchandise progressively and profoundly closed after February 2022, such that Russian imports were effectively excluded from the U.S. marketplace and, as a result, had no competitive overlap with subject imports from Argentina, Brazil, Mexico, or domestic producers of subject merchandise prior to the Commission's decision to cumulate imports in this investigation. TMK Initial Brief, at 8-15. Key elements of this closure included: (1) the revocation of Russian producers' ability to API-certify its products on March 17, 2022, (2) the withdrawal of most-favored-nation ("MFN") status for Russia by the United States on April 18, 2022, (3) the prohibition of Russia-affiliated vessels from entering U.S. ports on April 21, 2022, and (4) the imposition of an across-the-board increase in tariffs applicable to Russian merchandise imported into the United Stated to 35 percent on June 27, 2022. *Id*. TMK's Initial Brief demonstrated that these obstacles, combined with private sector shipping boycotts and significant banking sanctions, rendered Russian subject merchandise unable to meaningfully compete in the U.S. marketplace by the end of the period of investigation. TMK Initial Brief, at Id. Moreover, TMK's Initial Brief demonstrated that substantial evidence collected by the Commission established that the statutory requirements for cumulating Russian imports of subject merchandise with imports from the other accused countries were not met at the time of the Commission's final determination. *Id*., at 15-16.

Considering these circumstances, the Commission's decision in its Final Determination to cumulate Russian imports of subject merchandise with imports from

Argentina, Brazil, and Mexico in assessing whether the domestic industry was materially injured by reason of imports of subject merchandise was not supported by substantial evidence and should be remanded for reconsideration consistent with the evidence in this case.

In response to these arguments, the Government and Defendant-Intervenors (collectively, "Defendants") contend that the Commission's decision to cumulate Russian subject imports with subject imports from other subject countries was lawful and reasonable because (1) the sanctions at issue only arose during the final months of the period of investigation and were not in effect for most of the period considered by the Commission in its material injury analysis, and (2) reported importations of subject merchandise from Russia after February 2022 negates the claim that Russian subject merchandise were largely excluded from the U.S. marketplace as a result of the post-February 2022 sanctions and other trade barriers. Government Response Brief, at 24-25. Defendant-Intervenor Response Brief, at 17-20. As explained below, Defendants' arguments are without merit.

> 1. *There Was No Reasonable Overlap of Competition Between Russian Subject Merchandise and Subject Merchandise from Argentina, Mexico, South Korea, or U.S. Domestic Producers at the Time of the Commission's Final Vote*

The period of investigation at issue in this proceeding comprised two distinct and disparate competitive environments for Russian imports of subject merchandise in the United States.

The <u>First Competitive Environment</u> was the environment that existed at the time that the petition in this proceeding was filed and persisted for most of the period of investigation. This competitive environment included elements such as

(1) API-certification for Russian OCTG products, (2) MFN status for Russian imports of subject merchandise into the United States, (3) access to U.S. ports for Russian ships, and (4) the absence of boycotts and sanctions intended to prevent the importation of Russian products from being sold in the U.S. marketplace.

The <u>Second Competitive Environment</u> began to emerge in February 2022 and persisted until the end of the period of investigation and to the time of the Commission's decision to cumulate Russian imports with the imports of other subject countries. The Second Competitive Environment grew progressively more hostile to imports of Russian subject merchandise into the United States – culminating in the effective exclusion of such imports from the U.S. marketplace prior to the end of the period of investigation (and the Commission's "vote day" in this proceeding).

Key milestones in the development of the Second Competitive Environment included: (1) the revocation of Russian producers' ability to API-certify its products on March 17, 2022, (2) the withdrawal of most-favored-nation ("MFN") status for Russia by the United States on April 18, 2022, (3) the prohibition of Russia-affiliated vessels from entering U.S. ports on April 21, 2022, (4) the imposition of an across-the-board increase in tariffs applicable to Russian merchandise imported into the United States to 35 percent on June 27,2022, and (5) the imposition of private sector shipping boycotts and significant banking sanctions. *See* TMK Initial Brief, at 9-14.

As a result of these actions, imports of Russian subject merchandise into the United Stated were effectively blocked by the end of the period of investigation, and there was no meaningful competitive overlap in the U.S. marketplace between Russian subject merchandise and subject merchandise produced in Argentina, Brazil, and Mexico. In fact, as explained in TMK's Initial Brief, by the end of the period of investigation, imports of

subject merchandise from Russia failed to satisfy <u>any</u> of the four factors (namely,
(1) fungibility, (2) geographic overlap, (3) common distribution channels, and
(4) simultaneous presence in market) normally considered by the Commission in the
assessment of whether cumulation of imports from different subject countries is
appropriate for the purpose of assessing material injury. *Id.*, at 15-16

As noted above, to support decision to cumulate imports from different countries for
the purposes of assessing material injury to the U.S. industry, the statute requires the
Commission to determine that imports from all cumulated countries "compete with each
other and with domestic like products in the United States market." 19 U.S.C. §
1677(7)(G)(i). *See also* Final Determination, at 16-17. To address this requirement, the
Commission examines whether there is a "reasonable overlap" of competition between
imports from the countries to be cumulated. *See, e.g.*, *Seamless Carbon and Alloy Steel
Standard, Line, and Pressure Pipe from the Czech Republic (Czechia)*, Inv. No. 731-TA-
1529 (Final), USITC Pub. No. 5183 (April 2021) ("SLLP ITC Final") at 25-26.

Given these requirements, the fundamental issue in this proceeding concerning the
cumulation of Russian imports with imports from the other subject countries is: Which of
the two distinct Competitive Environments should be used to inform the Commission's
analysis? In its final determination, the Commission based its decision to cumulate
primarily on the evidence from the <u>First Competitive Environment</u>. According to the
Government,

> assessing cumulation data over the full 42 months of the POI
> to develop a complete picture of Russian OCTG's
> competitive relationship to other subject imports and the
> domestic like product (as the Commission did), rather than
> relying on a snapshot of data on or around the day of the
> Commission's vote (as TMK proposes), was certainly
> reasonable.

Government Response Brief, at 25. As explained below, the Commission's decision to cumulate Russian imports with imports from the other subject countries for the purposes of assessing material injury to the domestic industry is contrary to the requirements for cumulating imports from different countries for the purpose of assessing material injury and inconsistent with record evidence.

Regarding the statute, the language of 19 U.S.C. §1677(7)(G)(i) suggests (but does not require) that the assessment of competitive overlap for cumulation purposes should be made at the time of the Commission's vote rather than a historical period that no longer reflects the competitive reality of the marketplace. In this regard, the Court of Appeals for the Federal Circuit noted that

> The statute is written entirely in the present tense. It uses the words "compete" …. It does not say … "competed."

The Commission has interpreted this statutory language to call for a vote-day determination in appropriate circumstances. In *Chaparral Steel Co. v. United States*, the Federal Circuit upheld a determination by the Commission to decline to cumulate imports from various countries where the requirements for cumulation were not met on vote day, even though the conditions had been met during the period of investigation. 901 F.2d 1097, 1104-05 (Fed. Cir. 1990). In that case, the Commission did not to cumulate imports from Spain and Poland with imports from Norway for the purpose its material injury analysis where Spanish and Polish imports were initially found to be unfairly traded during the period of investigation but ceased to be "subject to investigation" (a requirement for cumulation) at the Commission's vote day due to their entry into Voluntary Restraint Agreements. *Id.* ("[T]he ITC interpreted 'subject to investigation' to include only imports

still under investigation on 'vote day' and imports which were proven 'unfair' and to have continuing impact as of vote day.").

In the present case, imports of Russian subject merchandise did not satisfy the "competitive overlap" requirement for cumulation on the Commission's vote day – even if they may have satisfied this requirement earlier in the period of investigation. Moreover, given the number of substantial obstacles facing Russian imports at the time of the vote, there was no reason to believe that Russian imports of subject merchandise would be in any position to have a continuing adverse impact on the U.S OCTG industry at the time of the Commission vote. In these circumstances, the Commission erred in cumulating imports of subject merchandise from Russia with those from Argentina, Brazil, and Mexico for the purpose of assessing material injury in its Final Determination.

In these circumstances, the data generated in the First Competitive Environment did not reflect the ability of Russian subject merchandise to compete in the U.S. marketplace at the time that the Commission's cumulation determination was made. In fact, even though the competitive environment changed relatively late in the period of investigation, the profound loss of access to the U.S. marketplace for Russian products during the Second Competitive Environment was real and transformative – and should have been the basis for the Commission's cumulation decision. Simply put, the Government suggestion that the use of POI cumulation data over the "full 42 months of the POI" would provide a more reasonable or complete picture of Russian OCTG's competitive relationship to other subject imports and the domestic like products than relying on a snapshot of data on or around the day of the Commission's vote is incorrect. Having more data does not improve analysis when the additional data that are added to the analysis are no longer relevant to the question being addressed.

In their reply brief, Defendant-Intervenors appear to justify the Commission's decision to focus its cumulation analysis on the early portion of the period of investigation by observing that "the Commission discounted H1 2022 market share data due to post-petition effects." Defendant-Intervenor's Reply Brief, at 18. This argument is misplaced, however, because the Commission's discounting of such data is authorized by the statute only where post-petition market developments are found to be "related to the pendency of the investigation." 19 U.S.C. § 1677(7)(I). In this case, Russia's loss of access to the U.S. marketplace was an exogenous shock to the industry that had nothing to do with the pendency of the investigation. Accordingly, the Commission's decision to discount post-petition data from parts of its analysis cannot be used as a justification to ignore the dramatic changes in Russia's access to the U.S. marketplace after February 2022 in the decision to cumulate.

Considering the foregoing, the Commission erred in relying on data from the full 42-month period of investigation in reaching its cumulation decision, and this case should be remanded to the Commission to re-evaluate its cumulation decision in this matter.

> 2. *Russian Imports of Subject Merchandise into The United States After February 2022 Do Not Suggest the Existence of a Reasonable Competitive Overlap with Imports from the Other Subject Countries at the End of the Investigation Period.*

In their Reply Briefs, Defendants claim evidence of imports of Russian subject merchandise after February 2022 justified cumulation of Russian imports with imports from the other subject countries because they indicated that Russian subject merchandise was not excluded from the U.S. marketplace by the post-February 2022 developments and that Russian subject merchandise remained competitive in the U.S. marketplace throughout

the period of investigation. Defendant-Intervenor's Reply Brief, at 19; Government Response Brief, at 24. These arguments are without merit for, at least, two reasons.

First, as explained in TMK's Initial Brief, the importations of Russian subject merchandise in March and May 2022 <u>do not</u> suggest that the sanctions imposed on Russian imports after February 2022 did not profoundly affect Russian producers' access to the U.S. marketplace. TMK Initial Brief, at 20-22.

Regarding the importation of Russian merchandise in March, this importation occurred *before* the United States revoked Russia's MFN status on April 18, 2022, and *before* Russian ships were barred from U.S. ports on April 22, 2022. In addition, the production of the subject merchandise that arrived in the United States in March 2022, is likely to have occurred before Russian producers lost the ability to API-certify their products on March 17, 2022. In these circumstances, it would not be reasonable to expect sufficient adverse effects on Russian imports by March 2022 to significantly impair access to the U.S. marketplace.

Regarding the May 2022 importation of Russian subject merchandise, this importation was made *after* the United States revoked Russia's MFN status but took advantage of an unintended gap in the Column 2 of the HTS tariff tables that permitted some unfinished subject merchandise to enter with a tariff rate of 1.0 percent. Id., at 21-22. This unintended gap in trade protection of Russian products was eliminated on June 27, 2022, with the President's Proclamation 10420 which raised the rates of duty on all products of the Russian Federation to 35 percent. *Id*. No additional imports of Russian subject merchandise were reported after Russian imports were subject to the 35.0 percent tariff barrier (in addition to all the other new obstacles to Russian imports of subject merchandise). Accordingly, the imports observed in May 2022 did not indicate that

Russian products could still compete in the U.S. marketplace at the time of the Commission's vote because the trade barriers facing Russian imports rose even further by the end of the period of investigation.

The second reason that reliance on the March and May 2022 importation of Russian subject merchandise to justify cumulation of imports from Russia with imports from the other subject countries is that the existence of these imports does not prove the existence of the reasonable competitive overlap between Russian products and products produced in the other subject countries that is required to justify cumulation. In this regard, one of the "important" rationales offered by the Commission and highlighted by Defendant-Intervenors to justify cumulation is that "none of the additional measures emphasized by Tenaris and TMK *prohibit the entry or sale of Russian OCTG*."  Views, at 23. Defendant-Intervenor Response Brief, at 18. However, complete exclusion from the U.S. marketplace is not required to prevent cumulation of Russian products with products from other subject countries because the statute focuses on the extent of competition in the U.S. marketplace with other subject imports *(i.e.,* "reasonable competitive overlap*)* and with domestically-produced subject merchandise. In its Final Determination, the Commission did not assess whether the conditions facing Russian producers after the imposition of all the trade barriers in the months following February 2022 allowed for a "reasonable competitive overlap" between Russian subject merchandise and subject merchandise produced in Argentina, Brazil, Mexico, and the United States. As shown in TMK's Initial Brief, record evidence indicates that no such overlap existed by the time of the Commission's vote day. TMK Initial Brief, at 15-16

In light of the foregoing, this issue should be remanded to the Commission to re-evaluate its cumulation decision to properly consider whether there was a "reasonable

competitive overlap" between Russian subject imports and subject imports from other subject countries based on the competitive environment that existed <u>at the time of the Commission vote.</u>

    B.   *Cumulation of South Korean Subject Imports with Subject Imports from Argentina, Mexico, and Russia*

In the Preliminary Determination, imports of subject merchandise from South Korea were excluded from the Commission's cumulation analysis because they had preliminarily been found to be non-subsidized (*de minimis*) by the U.S. Department of Commerce in its CVD investigation. Staff Report, at I-8 – I-10. In the Final Determination, however, South Korean subject merchandise imports were cumulated with imports from Argentina, Brazil, and Mexico because Commerce calculated a subsidy rate of 1.33 percent (*i.e.*, <u>barely</u> above *de minimis*) for one investigated Korean company – making such merchandise eligible for cumulation as long as the Commission found a "reasonable competitive overlap" between South Korean imports and imports from the other subject countries. *Id.*, at I-9

TMK's Initial Brief noted that a critical difference between South Korean imports of subject merchandise and imports from other subject countries during the review period was that South Korean imports were already subject to an antidumping order and argued that the Commission should have considered the implications of this difference in its cumulation analysis. TMK's Initial Brief, at 27. TMK's Initial Brief recognized that consideration of this difference was not included in the Commission's four-factor test but represented a sufficiently important "condition of competition" to warrant consideration in the Commission's cumulation analysis. *Id.*, at 28. In particular, it was noted that the existence of the antidumping order on South Korean products imposed a discipline on these imports that was not faced by imports from other subject nations – namely, a

discipline on pricing designed to ensure that sales of South Korean subject merchandise would not cause material injury due to dumping. Accordingly, any harm to the U.S. industry attributable to South Korean imports would have to be based solely on underselling caused by subsidies – and, as noted above, those subsidies in this investigation were found to be 1.33 percent on only a portion of South Korean imports.

Given these circumstances, the Commission should have considered in its cumulation analysis that imports from South Korea's potential for harming the U.S. industry due to unfair pricing was vanishingly small relative to the other subject countries (which had combined subsidy and antidumping rates an order of magnitude higher than South Korea). In this regard, in *Pads for Woodwind Instrument Keys from Italy* (a case in which the relevant dumping margin was 1.09 percent), the Commission noted,

> {T}here is absolutely no evidence attributing the alleged injury by reason of these imports to the fact that they have been found to be sold at less-than-fair-value. Plain common sense tells you that the amount of the dumping margin relative to the amounts by which the imports undersell {domestic} products is obviously insignificant. ... Thus, the effect of the unfair trade practice on the pricing or market behavior of imports is negligible or nil. It is certain that had the LTFV margins been zero, {the domestic industry's} performance would have been identical.

*Pads For Woodwind Instrument Keys from Italy*, USITC Publication 1566 (Aug. 1984). In short, cumulating South Korean imports distorted the Commission's cumulation analysis because these "All Volume, No Injury" imports created an illusion of much larger volume of imports that could threaten the U.S. industry than actually existed.

In responding to these arguments, Defendants do not contest the substance of these arguments. Rather, they argue that these issues were not sufficiently developed before the Commission to exhaust administrative remedies. Government Response Brief, at 21-22.

Defendant-Intervenor Response Brief, at 20-21. In addition, the Government noted that "the Commission is 'not required to explicitly address every piece of evidence presented by the parties' during an investigation." Government Response Brief, and 22, n. 9 (citations omitted). These arguments are without merit.

As an initial matter, both the Government and Defendant-Intervenor acknowledge that the issue of the implications of South Korea's antidumping order on its cumulation analysis <u>was</u> raised before the Commission during the investigation – both in the preliminary and final phases of the investigation. Government Response Brief, at 21. Defendant-Intervenor Response Brief, at 20. However, they contend that the issue was insufficiently developed to permit the Commission to have addressed this issue in its Final Determination. In this regard, the Government wrote that "Plaintiff's argument {concerning this issue in the Preliminary Investigation} did not even address the factors considered by the Commission in its cumulation analysis…" Government Response Brief, at 21. However, the Post-Conference Brief filed on behalf of TMK in the preliminary phase of the investigation argued

> the Commission must consider the fact that subject imports from South Korea have already been found to be injurious and are consequently already under an AD order as a relevant additional factor beyond its "general { }" "framework" that compels de-cumulation of South Korea from Argentina, Mexico, and Russia in this particular instance. To do otherwise would result in cumulation when not "appropriate in light of the conditions of competition" — again, South Korea already being under an AD order while the other subject countries are not….

Post Conference Brief of TMK Group, November 2, 2021, at 6-7. (Confidential Record ("CR") 139; Public Record ("PR") 39). In other words, it was recognized that the issue of the implications of South Korea's antidumping order on cumulation did not fall within the

Commission's four factor analysis for cumulation but that they should be evaluated in light of the overall <u>conditions of competition</u> between South Korea, Argentina, Brazil, and Russia that are relevant for cumulation. In its Final Comments in the final phase of the investigation, Tenaris referenced these arguments while arguing cumulation of South Korea imports with imports from the other subject countries. Tenaris Final Comments at 9, n. 46 (CR-437, PR-164).

The issue of the implications of South Korean antidumping order on the Commission's cumulation analysis was sufficiently addressed before the Commission for the issue to fall outside the doctrine of administrative exhaustion and should be considered by the Court. Moreover, even if the doctrine of exhaustion did apply, this Court has explained that "{t}he exhaustion doctrine does not prevent a plaintiff from expanding on an argument based on the final record before the court…" *See Juancheng Kangtai Chem. Co. v. United States*, 37 ITRD 2011, 42 and n. 50 (Ct. Int'l Trade 2015) (*citing Trust Chem Co. Ltd. v. United States*, 791 F.Supp.2d 1257, 1268 n. 27 (Ct. Int'l Trade 2011) and *Solvay Solexis SpA. v. United States*, 637 F.Supp.2d 1306, 1309 n. 2 (Ct. Int'l Trade 2009)). In *Juancheng Kangtai Chem. Co. v. United States*, this court noted, "{t}he exhaustion doctrine does not prevent a plaintiff from expanding on an argument based on the final record before the court, and an argument raised below does not need to be worded exactly as it is to the court." *Juancheng Kangtai Chem. Co. v. United States*, 37 ITRD 2011, 42 and n. 50 (Ct. Int'l Trade 2015).

In light of the foregoing, the Commission's failure to consider the implications of the South Korean antidumping order is properly before this Court, and the Court should remand this issue back to the Commission for reconsideration in light of the record evidence.

<u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the Court reject Defendants' arguments, grant TMK's motion for judgment on the agency record, and remand this matter to the Commission for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

<u>/s/Michael J. Chapman</u>

Michael J. Chapman
Jeffrey M. Winton
Amrietha Nellan
Vi Mai
Ruby Rodriguez
Jooyoun Jeong

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for TMK Group

October 12, 2023

## CERTIFICATE OF COMPLIANCE

I, Michael J. Chapman, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 4,127 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.

    /s/Michael J. Chapman    
Michael J. Chapman