Slip Op. 24-48

## UNITED STATES COURT OF INTERNATIONAL TRADE

TENARIS BAY CITY, INC.,
MAVERICK TUBE
CORPORATION, IPSCO
TUBULARS INC., TENARIS
GLOBAL SERVICES (U.S.A.)
CORPORATION, AND SIDERCA
S.A.I.C.,

       Plaintiffs,

and

TMK GROUP AND TUBOS DE
ACERO DE MEXICO, S.A.,

       Consolidated Plaintiffs,

and

TENARIS BAY CITY, INC.,
MAVERICK TUBE
CORPORATION, AND IPSCO
TUBULARS INC.,

       Plaintiff-Intervenors,

v.

UNITED STATES,

       Defendant,

and

Before: Jennifer Choe-Groves, Judge

Consol. Court No. 22-00344

> **UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC.,**
>
> **Defendant-Intervenors.**

## OPINION AND ORDER

[Remanding the U.S. International Trade Commission's affirmative material injury determination resulting from the investigations involving oil country tubular goods from Argentina, Mexico, Russia, and South Korea.]

Dated: April 19, 2024

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Matthew W. Solomon, White and Case, LLP, of Washington, D.C., for Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C., and Consolidated Plaintiff Tubos de Acero de Mexico, S.A.

Michael J. Chapman, Jeffrey M. Winton, Amrietha Nellan, Vi Mai, Ruby Rodriguez, and Jooyoun Jeong, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff TMK Group.

Andrea C. Casson, Assistant General Counsel for Litigation, and Noah A. Meyer, U.S. International Trade Commission, of Washington, D.C., argued for Defendant United States. With them on the brief were Dominic L. Bianchi, General Counsel, and Jason F. Miller, Attorney-Advisor, Office of the General Counsel.

Thomas M. Beline, Myles S. Getlan, James E. Ransdell, and Nicole Brunda,

Cassidy Levy Kent, of Washington, D.C., for Defendant-Intervenor United States
Steel Corporation.

Luke A. Meisner and Saad Y. Chalchal, Schagrin Associates, of Washington, D.C.,
argued for Defendant-Intervenors Borusan Mannesmann Pipe U.S. Inc., PTC
Liberty Tubulars LLC, United Steel, Paper, and Forestry, Rubber Manufacturing,
Energy, Allied Industrial and Service Workers International Union, AFL-CIO,
CLC, and Welded Tube USA Inc.  With them on the brief were Roger B. Schagrin
and Jeffrey D. Gerrish.

Choe-Groves, Judge:  This appeal from the final affirmative material injury

determination by the U.S. International Trade Commission ("Commission" or

"ITC") investigating oil country tubular goods ("OCTG") from Argentina, Mexico,

Russia, and South Korea includes unique issues on the impact on competitiveness

of sanctions imposed due to Russia's invasion of Ukraine.  See Oil Country

Tubular Goods from Argentina, Mexico, Russia, and South Korea, 87 Fed. Reg.

69,331 (ITC Nov. 18, 2022) ("Final Determination"), PR 169; see also Views of

the Commission, USITC Pub. 5381, Inv. Nos. 701-TA-671–72, 731-TA-1571–73

(Final) (Nov. 18, 2022), PR 165[1] ("Views"); Final Staff Report (Oct. 14, 2022), PR

161 ("Staff Report").

Consolidated Plaintiff TMK Group, Plaintiffs Tenaris Bay City, Inc.,

Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services

(U.S.A.) Corporation, and Siderca S.A.I.C., and Consolidated Plaintiff Tubos de

---

[1]  Citations to the administrative record reflect the public administrative record
("PR") document numbers.  ECF No. 59.

Acero de Mexico, S.A. (collectively, "Plaintiffs") contest certain aspects of the

final affirmative material injury determination.

Before the Court are USCIT Rule 56.2 motions for judgment on the agency

record filed by TMK Group and filed by Tenaris Bay City, Inc., Maverick Tube

Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation,

Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (collectively, "Tenaris").

Pl.'s R. 56 Mot. J. Agency R. Pursuant to USCIT R. 56.2 ("TMK Group's

Motion"), ECF No. 42; R. 56 Mot. J. Agency R. ("Tenaris' Motion"), ECF No. 46;

see also Mem. Supp. Pl.'s R. 56.2 Mot. J. Agency R. ("TMK Group's Br."), ECF

No. 42-1; Mem. Points Authorities Supp. Pls.' R. 56.2 Mot. J. Agency R.

("Tenaris' Br."), ECF No. 46.

Defendant-Intervenors Borusan Mannesmann Pipe U.S. Inc., PTC Liberty

Tubulars LLC, United States Steel Corporation, United Steel, Paper, and Forestry,

Rubber Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO, CLC, and Welded Tube USA Inc. (collectively,

"Defendant-Intervenors") filed Defendant-Intervenors' Rule 56.2 Response Brief

("Def.-Intervs.' Resp."), ECF No. 50.  Defendant ITC ("Defendant" or "the

Government") filed its Memorandum in Opposition to Plaintiff's Rule 56. 2

Motion for Judgment on the Agency Record.  Def.'s Mem. Opp'n Pl.'s R. 56.2

Mot. J. Agency R. ("Def.'s Resp."), ECF No. 52.  TMK Group and Tenaris filed

their reply briefs.  Reply Supp. Pls.' R. 56.2 Mot. J. Agency. R. ("Tenaris'

Reply"), ECF No. 56; Reply Br. TMK Group ("TMK Group's Reply"), ECF No.

57.  Oral argument was held on January 25, 2024.  Oral Arg. (Jan. 25, 2024), ECF

No. 69.

     For the following reasons, the Court remands the Commission's <u>Final</u>

<u>Determination</u>.

## BACKGROUND

     Petitions requesting investigations were filed with the U.S. Department of

Commerce ("Commerce") and the ITC on October 6, 2021 by Borusan

Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular

Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing,

Energy, Allied Industrial and Service Workers International Union, AFL-CIO,

CLC, and Welded Tube USA, Inc.  Petitions (Oct. 6, 2021), PR 1.

     The Commission initiated an investigation and determined preliminarily that

there was a reasonable indication that the domestic industry was materially injured

or threatened with material injury by reason of subject imports.  Views of the

Commission (Preliminary) (Dec. 1, 2021) ("Preliminary Views"), PR 74.

     The Parties filed their respective administrative briefs.  Tenaris' Pre-Hearing

Br. (Sept. 14, 2022), PR 128; TMK Group's Pre-Hearing Br. (Sept. 14, 2022), PR

122; TMK Group's Post-Hearing Br. (Sept. 29, 2022), PR 143; Tenaris' Post-Hearing Br. (Sept. 29, 2022), PR 144.

The Commission published its <u>Final Determination</u> on November 18, 2022, determining that an industry in the United States was materially injured by reason of imports of oil country tubular goods ("OCTG") from Argentina, Mexico, Russia, and South Korea.  See <u>Final Determination</u>, 87 Fed. Reg. at 69,331.

TMK Group and Tenaris initiated proceedings to contest various aspects of the Commission's <u>Final Determination</u>, such as the Commission's cumulation of subject imports and findings of volume, price effects, and impact.  The Court held oral argument on January 25, 2024.  Oral Arg. (Jan. 25, 2024), ECF No. 69.

## ISSUES PRESENTED

The Court reviews the following issues:

1.  Whether the Commission's cumulation of subject imports is supported by substantial evidence and in accordance with law;

2.  Whether the Commission's volume determination is supported by substantial evidence and in accordance with law;

3.  Whether the Commission's price effects determination is supported by substantial evidence and in accordance with law; and

4.  Whether the Commission's impact determination is supported by substantial evidence.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and Section

516A(a)(2)(B)(ii) of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(ii), which grant the Court authority to review actions contesting

the ITC's final injury determinations following an antidumping or countervailing

duty investigation.  The Court will uphold the ITC's determinations, findings, or

conclusions unless they are unsupported by substantial evidence on the record, or

are otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); see

also Siemens Energy, Inc. v. United States, 806 F.3d 1367, 1369 (Fed. Cir. 2015).

The possibility of drawing two inconsistent conclusions from the evidence does not

prevent the Court from holding that the Commission's determinations, findings, or

conclusions are supported by substantial evidence.  See Nippon Steel Corp. v.

United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citing Am. Silicon Techs. v.

United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001)); see also Consolo v. Fed.

Mar. Comm'n, 383 U.S. 607, 620 (1966).

## DISCUSSION

### I.     Legal Framework

To make an affirmative material injury determination, the ITC must find that

(1) material injury existed and (2) the material injury was caused by reason of the

subject imports.  See Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed.

Cir. 2015) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed.

Cir. 1997)).  Material injury is defined by statute as harm that is not

inconsequential, immaterial, or unimportant.  19 U.S.C. § 1677(7)(A).  To

determine whether a domestic industry has been materially injured or threatened

with material injury by reason of unfairly subsidized or less than fair value

imports, the Commission considers:

> (I)    the volume of imports of the subject merchandise,
>
> (II)   the effect of imports of that merchandise on prices in the United
>        States for domestic like products, and
>
> (III)  the impact of imports of such merchandise on domestic
>        producers of domestic like products, but only in the context of
>        production operations within the United States.

Id. § 1677(7)(B)(i).  The Commission may consider other economic factors that are

relevant to determining whether there is material injury by reason of

imports.  Id. § 1677(7)(B)(ii).  No single factor is dispositive and the significance

to be assigned to a particular factor is for the ITC to decide.  See S. Rep. No. 96-

249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474.  The statute neither

defines the phrase "by reason of," nor provides the ITC with guidance, on how to

determine whether the material injury is by reason of subject imports.  The Court

of Appeals for the Federal Circuit ("CAFC") has interpreted the "by reason of"

statutory language to require the Commission to consider the volume of subject

imports, their price effects, their impact on the domestic industry, and to establish whether there is a causal connection between the imported goods and the material injury to the domestic industry.  See Swiff-Train Co., 793 F.3d at 1361; see also S. Rep. No. 96-249, at 57–58, 74–75 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 443–44, 460–61.

## II.    The Commission's Cumulation of Subject Imports

The Commission cumulated subject imports from Argentina, Mexico, Russia, and South Korea because it determined that the cumulation factors of fungibility, channels of distribution, geographic overlap, and simultaneous presence in the market showed a "reasonable overlap of competition" among subject imports and the domestic like product.  Views at 16–23.

Plaintiffs contend that there was no "reasonable overlap of competition" among subject imports and the domestic like product, and that the Commission's cumulation determination was not supported by substantial evidence or in accordance with law.  See TMK Group's Br. at 15–30; Tenaris' Br. at 18–25.

### A.    Legal Standard

In evaluating material injury, the Commission must "cumulatively assess the volume and effect of imports of the subject merchandise from all countries," if such imports compete with each other and with domestic like products.  19 U.S.C. § 1677(7)(G)(i)(I), (II).  The ITC refers to this requirement as "cumulation."  The

Statement of Administrative Action to the Uruguay Round Agreements Act

("SAA") states that the statutory requirement is satisfied if there is a reasonable

overlap of competition.  See Uruguay Round Agreements Act, Statement of

Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 848 (1994), reprinted in

1994 U.S.C.C.A.N. 4040, 4190.  Because the Commission need only find that a

"reasonable overlap" of competition exists, a finding of "'complete overlap' of

competition" is not required to support a cumulation decision.  Mukand Ltd. v.

United States, 20 CIT 903, 909, 937 F. Supp. 910, 916 (1996) (quoting Wieland

Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989)); see

also Goss Graphics Sys., Inc. v. United States, 216 F.3d 1357, 1362 (Fed. Cir.

2000) (stating that the ITC's inquiry is "whether 'reasonable overlap' of

competition exists.").

To determine whether imports compete with each other and with the

domestic like product, or if there is a "reasonable overlap" of competition, the

Commission analyzes four factors:

(1)    the degree of fungibility between subject imports from different
       countries and between subject imports and the domestic like
       product, including consideration of specific customer
       requirements and other quality related questions;

(2)    the presence of sales or offers to sell in the same geographic
       markets of subject imports from different countries and the
       domestic like product;

(3)    the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and

(4)    whether the subject imports are simultaneously present in the market

Int'l Indus., Ltd. v. United States, 42 CIT __, __, 311 F. Supp. 3d 1325, 1329–30 (2018) (citation omitted).

The Commission's use of these criteria for determining whether competition exists between and among subject imports and the domestic like product have been approved by the U.S. Court of International Trade ("CIT") and the CAFC. See Goss Graphics Sys., Inc. v. United States, 22 CIT 983, 985, 33 F. Supp. 2d 1082, 1085 (1998), aff'd sub nom., 216 F.3d 1357 (Fed. Cir. 2000); see also Fundicao Tupy S.A. v. United States, 12 CIT 6, 10–11, 678 F. Supp. 898, 902 (1988) (summarizing the factors as "the fungibility and similar quality of the imports, the similar channels of distribution, the similar time period involved, and the geographic overlap of the markets"), aff'd, 859 F.2d 915 (Fed. Cir. 1988).  No one factor in the Commission's analysis is dispositive.  Noviant OY v. United States, 30 CIT 1447, 1461, 451 F. Supp. 2d 1367, 1379 (2006).

The Commission must "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry" when considering the impact of subject imports on the domestic industry.  19 U.S.C. § 1677(7)(C)(iii).  The statute does not provide

further guidance, giving the ITC discretion to assess the conditions of competition

in a particular industry.  The ITC's determinations regarding competition and

market conditions must be supported by substantial record evidence.  See 19

U.S.C. § 1615a(b)(1)(B)(i); see also Siemens Energy, Inc., 806 F.3d at 1369.

When the Commission makes a determination on volume, price, or impact that is

premised on speculation about industry conditions, that determination has not been

"evaluate[d] . . . within the context of the business cycle and the conditions

of competition that are distinctive to the affected industry."  19 U.S.C.

§ 1677(7)(C)(iii); see also Catfish Farmers of America v. United States, 37 CIT

717, 733 (2013) ("[S]peculation does not amount to reasonable inference, as it

provides no factually-grounded basis for sustaining an agency's determination.").

## B.    OCTG from Russia

The ITC stated that it was "unpersuaded by Tenaris'[] and TMK [Group]'s

argument that measures taken in response to Russia's February 2022 invasion of

Ukraine have prevented subject imports from Russia from competing in the U.S.

market such that cumulation of these imports is inappropriate."  Views at 22.

Tenaris argues that:

> Record evidence demonstrates the obvious: subject imports from
> Russia competed differently in the U.S. market than other subject
> imports and should not have been cumulated with other subject imports.
> Remarkably, the Commission was "unpersuaded by Tenaris'[] and
> TMK [Group]'s argument that measures taken in response to Russia's
> February 2022 invasion of Ukraine have prevented subject imports

        from Russia from competing in the U.S. market such that cumulation
of these imports is inappropriate."

Tenaris' Br. at 24.  Tenaris states that these measures targeting Russia

included the loss of API-certification for OCTG produced in Russia, the

revocation of permanent normal trade relations status for Russia, Section

232 duties, and sanctions imposed on Russian entities and individuals.  Id.

        Plaintiffs challenge the ITC's cumulation of subject imports from Russia,

arguing that the ITC's determination was (1) not in accordance with law because

the timing of cumulation was improper and (2) not supported by substantial

evidence because Russian steel companies did not compete in the same manner in

the U.S. market as subject merchandise from the other countries due to sanctions

imposed on Russia during the last four months of the period of investigation

(referred to as the "second competitive environment" by TMK Group) from

February 2022 to June 2022.  See TMK Group's Br. at 3–5; Tenaris' Br. at 24–25;

TMK Group's Reply at 4–5.

## 1.    Timing of Assessment

        The ITC established the period of investigation as January 2019 to June

2022.  Views at 12.  Russia invaded Ukraine in February 2022.  Sanctions were

imposed against Russian companies, which Plaintiffs argue significantly reduced

the ability of Russian OCTG to compete during the last four months of the period

of investigation.  TMK Group's Br. at 3, 9–11; Tenaris' Br. at 6.  These sanctions

included: (1) the revocation of Russian producers' ability to API-certify its

products beginning on March 17, 2022; (2) the withdrawal of most-favored-nation

status for Russia by the United States in April 2022; (3) the prohibition of Russia-

affiliated vessels from entering U.S. ports in April 2022; and (4) the imposition of

an across-the-board increase in tariffs applicable to Russian merchandise imported

into the United States to 35 percent in June 2022.  See TMK Group's Reply at 3.

       In summary, the ITC determined that the sanctions had no significant effect

on the Russian products' ability to compete over the course of the entire 42-month

period of review.  TMK Group contends that the ITC's cumulation of Russian

subject imports with other subject imports was not in accordance with law because

the ITC based its determination on competitive conditions that existed during the

initial part of the period of investigation (before the sanctions due to Russia's

invasion of Ukraine were imposed), and there was no "reasonable overlap of

competition" of these subject imports at the end of the period of investigation when

the Commission took its final vote.  Id. at 8.  TMK Group argues that Russian

subject imports were effectively excluded from competing in the market from

February 2022 to June 2022, and thus Russian imports had no competitive overlap

with subject imports from Argentina, Brazil, Mexico, or domestic producers at the

end of the period of investigation.  Id. at 3.

TMK Group asserts that the language of 19 U.S.C. § 1677(7)(G)(i),
providing for cumulation "if such imports compete with each other and with
domestic like products in the United States market," suggests that the assessment
of competitive overlap for cumulation purposes should be made at the time of the
Commission's vote. 19 U.S.C. § 1677(7)(G)(i); TMK Group's Reply at 7 (citing
Chaparral Steel Co. v. United States ("Chaparral Steel"), 901 F.2d 1097 (Fed. Cir.
1990)). "Vote day" is the day that the ITC determines whether subsidized or
dumped imports actually cause, or threaten, significant injury to the domestic
industry for the time period under investigation. Chaparral Steel, 901 F.2d at 1104
n.6.

The Government argues that it was reasonable for the Commission to assess
cumulation of the subject imports over the full 42 months of the period of
investigation to develop the competitive relationship between Russian OCTG and
other subject imports and the domestic like product, rather than relying on a
"snapshot of data on or around [vote] day." Def.'s Resp. at 25.

The Commission is required to "cumulatively assess the volume and effect
of imports of the subject merchandise from all countries" if "such imports compete
with each other and with domestic like products in the United States market." 19
U.S.C. § 1677(7)(G)(i). The CAFC has upheld the ITC's interpretation of the
clause "subject to investigation" to include only imports that are still under

investigation on "vote day" and imports that were proven "unfair" and have a

continuing impact on vote day.  Chaparral Steel, 901 F.2d at 1104.  TMK Group

argues that the conditions of competition essentially ceased to exist after the

sanctions due to the Ukraine war took effect in February 2022, the conditions

arguably did not exist during the latter part of the period of investigation on vote

day, and the ITC's determination that a reasonable overlap of competition existed

is not in accordance with law.  See TMK Group's Br. at 8–9, 22.  The CAFC stated

that, "[e]ven when the Commission makes a determination of 'threat of material

injury' it assesses the 'threat of the specific indicia of *present* material injury.'"

Chaparral Steel, 901 F.2d at 1104 (citing Rhone Poulenc, S.A. v. United States, 8

CIT 47, 50, 592 F. Supp. 1318, 1322 (1984)).

    The Court observes that the statutory language is written in the present

tense: if "such imports compete with each other and with domestic like products in

the United States market."  19 U.S.C. § 1677(7)(G)(i).  Consequently, the Court

concludes that it is reasonable to require the ITC's determination to be made in the

present tense on vote day, meaning that the conditions of competition must exist in

the present tense, not in the past tense.  It is not sufficient if the conditions of

competition leading to an unfair determination existed at some point during the

period of investigation.  The unfair condition must continue to exist on vote day.

The Court holds that it was unreasonable for the ITC to view the conditions of

competition over the 42-month period of investigation without considering the effects of competition at the end of the investigation and on vote day.  Moreover, it was unreasonable for the ITC to not address potentially contrary evidence on the record suggesting that competition was severely curtailed during the last four months of the period of investigation and that competition by Russian OCTG was effectively eliminated by vote day.  If the conditions leading to the assessment that subject imports of Russian OCTG were "unfair" or otherwise threatened material injury did not exist on the vote day of October 26, 2022, the Commission's determination to make a cumulation assessment for the full period of investigation was not in accordance with law.  Consequently, the Court remands for the Commission to reassess the timing and determine whether the imports under investigation were proven unfair and had a continuing impact during the full period of investigation, including on vote day.

### 2.    Cumulation

The ITC considered subject imports from Argentina, Mexico, Russia, and South Korea on a cumulated basis because "the statutory criteria for cumulation [were] satisfied."  Views at 19.  The ITC explained that it was "unpersuaded by Tenaris'[] and TMK [Group]'s argument that measures taken in response to Russia's February 2022 invasion of Ukraine have prevented subject imports from

Russia from competing in the U.S. market such that cumulation of these imports is inappropriate." Id. at 22.

In addition to challenging the timing as discussed above, TMK Group challenges the ITC's cumulation determination as not supported by substantial evidence. TMK Group contests the determinations of all four cumulation factors, arguing that (1) the loss of American Petroleum Institute ("API")-certification for Russian subject imports rendered subject imports not fungible with other subject imports; and (2) the sanctions imposed on Russia (aside from the loss of API-certification) and Section 232 duties affected subject Russian OCTG from sharing simultaneous presence, channels of distribution, and geographic overlap with other subject imports. See TMK Group's Br. at 6–24.

First, TMK Group contests the ITC's fungibility determination. TMK Group argues that because Russian producers lost the ability to certify their OCTG as meeting the relevant API standards required by other subject countries, Russian OCTG were not fungible with OCTG from Argentina, Mexico, and South Korea that were not subject to the API sanction. Id. at 16. TMK Group explains that the API revoked the license that permitted Russian producers of subject merchandise to certify their pipe by applying the API monogram to products. Id. at 12. TMK Group contends that the API-certification:

> is critical to most U.S. consumers of OCTG as an indication of quality
> and reliability, especially in oil and gas applications operating under

high pressure.  Consequently, the loss of Russian producers' ability to provide API[-]certification for its subject merchandise changed the conditions of competition faced by Russian producers of subject merchandise and created a substantial competitive disadvantage for Russian producers relative [to] Argentinian, Mexican, South Korean, and domestic producers of subject OCTG products.

Id.

The Commission did not focus on the impact that a loss of API-certification would have on competition, but rather determined that "all OCTG, regardless of source, is generally produced in accordance with API standards," except for "limited service" OCTG, which can still be used in certain OCTG applications even without meeting API specifications, and certain types of "green tube" OCTG that is not sold as meeting any particular API grade.  Views at 19–20; id. at 20 n.94.

The ITC acknowledged the potential effect of Russian producers' loss of API-certification on the fungibility of Russian OCTG, but continued to determine that Russian OCTG were fungible with other subject imports.  Id. at 20, 22–23. The ITC cited to the Staff Report, stating that Russian OCTG can still be manufactured with API standards because a majority of responding purchasers reported that "OCTG from Russia always or usually meets minimum quality specifications" and "rated OCTG from Russia as comparable to the domestic like product—which is generally produced to API specifications—with respect to

quality meets industry standards." Id. at 20 n.95 (citing Staff Report at Tables II-12 and II-14).

Table II-12 of the Staff Report provides a count of purchasers' responses regarding suppliers' ability to meet minimum quality specifications.  Staff Report at II-30.  Purchasers were asked how often domestically produced or imported OCTG meets minimum quality specifications for their own or customers' uses, with purchasers referring to API specifications or another quality management system as the basis for quality.  Id.  The table indicates that a majority of responding purchasers reported that Russian suppliers "always" or "usually" met minimum quality specifications.  Id.  Table II-14 shows a count of purchasers' responses comparing U.S.-produced and imported product by factor and country pair.  Id. at II-32.  Purchasers were asked to compare OCTG produced domestically and OCTG produced in subject and non-subject countries.  Id. at II-31–II-39.  This table indicates that a majority of responding purchasers reported that Russian OCTG were "comparable" to the domestic product for quality meeting or exceeding industry standards.  Id. at II-33.  While this information pertains to the quality of Russian OCTG as compared to other countries, these responses do not reflect responses for quality after the loss of API-certification for Russian subject imports, nor does this information address the competitive impact that losing API-certification would have on the subject Russian products.

In determining whether Russian subject imports should be cumulated, the ITC also seemed to make contradictory statements.  The ITC stated that the impact of loss of API-certification "is not yet clear, particularly in light of continued subject imports from Russia after March 2022," but it proceeded to predict and discuss the effect of this sanction.  Views at 23.  The ITC cited to the Responses to Commission Questions, stating that the loss of API-certification to Russian OCTG producers would not prevent Russian-produced OCTG from being sold in the U.S. market with the certification because Russian producers could still send green tubes to API-certified processors and then sell the processed tubes in the U.S. market.  Id. (citing Petitioners' Post-Hearing Br. (Sept. 29, 2022) at Ex. 1 ("Responses to Commission Questions") at II-55–II-56, PR 143)).  The Court observes that the Responses to Commission Questions was not placed in its in entirety on the record filed with the Court.  The record only includes three pages of the document, pages II-29–II-32, which do not pertain to any information about the loss of API-certification or green tubes.  The ITC cited to pages II-55–II-56 of the document, but the Court is unable to review these pages or the entire document.

In addition, the Commission failed to address potentially contrary evidence on the record cited by TMK Group as to the fungibility of Russian OCTG.  For example, TMK Group argues that the Russian products' inability to provide API-certification altered U.S. consumers' willingness to purchase Russian OCTG,

making these products no longer able to compete with other subject imports that were able to be certified. TMK Group's Br. at 12 (citing USITC Hearing Transcript (Oct. 11, 2022) at 248, PR 149, and TMK Group's Pre-Hearing Br. at Ex. 2 ("Letter from American Petroleum Institute")). The API ceased its certification services within the Russian Federation "in response to restrictions on financial and business activities imposed by the U.S. and Russian governments" on March 17, 2022. Letter from American Petroleum Institute. During the administrative hearing, a witness from API testified about the practical impact of TMK Group's inability to apply the API monogram or license number to their products. USITC Hearing Tr. at 248. The witness testified that the loss of API-certification would be a "major setback" for Russia and it would not be possible for Russia to sell its OCTG to international markets. Id. At oral argument before this Court, TMK Group explained that OCTG products without an API-certification cannot be sold, and the lack of an API-certification essentially put the Russian OCTG companies out of business. See Oral Arg. at 14:08–15:13, 24:29–24:45.

The Court holds that the ITC's determination that Russian OCTG were fungible with other subject OCTG is not supported by substantial evidence because the ITC did not consider contrary evidence on the record pertaining to effects of the sanctions on Russian OCTG, especially the loss of API-certification on Russian

OCTG, and failed to file with the Court the relevant evidence from the Responses to Commission Questions that the ITC cited.

Second, TMK Group contends that other sanctions against Russia, in addition to the loss of API-certification, effectively excluded Russian OCTG from the U.S. marketplace after February 2022.  TMK Group's Br. at 6–14.  The ITC addressed the following two sanctions: the suspension of normal trade relations in Russia that resulted in high "Column 2" duties on Russian OCTG and the prohibition of Russia-affiliated vessels from entering the United States ports on April 21, 2022 with the issuance of Presidential Proclamation 10371.  Views at 18–19; Staff Report at VII-17 n.19.  The ITC determined that the domestic like product and subject imports from all subject countries were simultaneously present throughout almost the entire period of investigation, with subject imports from Russia present in 38 of 42 months.  Views at 22.

The ITC rejected TMK Group's and Tenaris' arguments during the administrative proceedings that these measures prevented Russian OCTG from competing in the U.S. market during the period of investigation because Russian OCTG were not prohibited entry or sale in the U.S. market and significant volumes of Russian OCTG entered in two out of the four post-invasion months, March 2022 and May 2022.  Id. at 22–23 (citing Staff Report at Tables IV-18, IV-2, and G-4; Raw in-Shell Pistachios from Iran, USITC Inv. No. 731-TA-287 (June 1, 2017)

(determination that the revocation of the antidumping duty order on raw in-shell

pistachios from Iran would likely lead to continuation or recurrence of material

injury to an industry in the United States within a reasonably foreseeable time and

that the existence of financial sanctions would not prevent Iranian exporters from

supplying the U.S. market in the event of revocation)).

TMK Group also contends that the imposition of Section 232 duties on

Russian OCTG, when combined with the other sanctions, affected the Russian

subject imports' ability to compete with the other subject imports.  TMK Group's

Br. at 22–23.  The ITC determined that the Section 232 duties of 25% on Russian

OCTG did not make it uncompetitive with other subject imports, citing to Tables

IV-3 and IV-18 of the Staff Report.  Views at 22 n.113 (citing Staff Report at

Tables IV-3 and IV-18).  The ITC reasoned that the duties did not prevent subject

Russian OCTG from entering the U.S. market in significant volumes throughout

the period of investigation or from being present in the U.S. market for 38 months

of the 42 months, "even though responding domestic producers, importers, and

purchasers reported that the section 232 duties had effects in the U.S. market."  Id.

The ITC cited to Tables IV-3, IV-18, IV-2, and G-4 in the Staff Report to

show that the volume of subject imports from Russia increased in 2022 compared

to 2021 and that subject imports entered in the U.S. market during the post-

invasion months of March 2022 and May 2022.  Table IV-18 presents monthly

U.S. import data during the entire period of investigation, January 2019 through June 2022.  Staff Report at IV-34–IV-37.  This table shows OCTG from Russia were imported in February 2022, March 2022, and May 2022.  Id. at IV-35.  There is no import data for April 2022 and June 2022.  Id.  Tables IV-2 and Tables G-4 demonstrate that the volume of subject imports from Russia, as well as the U.S. shipments from these imports, were higher in interim 2022 than in 2021.  Table IV-2 provides information on the firms of responding U.S. importers of OCTG from Argentina, Mexico, Russia, South Korea, their headquarter locations, and their shares of total imports (subject and non-subject) by source in 2021.  Tables IV-1 and IV-2 show the share of total subject imports from Russia in 2021.  Id. at IV-2–IV-3.  The Court observes that these tables do not show, however, the total market share of subject imports in 2022 for a comparison of the shares in 2021 versus 2022.

Table G-4 shows the domestic shipments of imports from Russia by domestic importers, by end finish and grade, and indicates that Russian OCTG imports from January 2022 to June 2022 were higher than the amount of imports from January 2021 to June 2021.  Id. at G-12.  Table IV-3 provides data for U.S. imports of OCTG from Argentina, Mexico, Russia, South Korea, and all other sources and provides the import volume for each of the six months in 2022.  Id. at IV-4–IV-5. Table IV-3 indicates that a significant number of short tons of Russian

OCTG were entered from January 2022 to June 2022.  Table IV-18, as noted

above, indicates that OCTG from Russia were imported in February 2022, March

2022, and May 2022 and no OCTG from Russia were imported in April 2022 or

June 2022.  Id. at IV-35.

TMK Group challenges the ITC's cumulation of Russian subject imports

because the imports from March 2022 and May 2022 do not accurately reflect the

effects of the sanctions.  TMK Group asserts that: (1) virtually all of such imports

were made under another Harmonized Tariff Schedule of the United States

("HTSUS") code that is not intended for "Oil or Gas Drilling"; (2) the March 2022

importation was made before the revocation of Russia's most-favored-nation status

on April 18, 2022, the barring of Russian ships on April 2022, and the production

of subject merchandise without API-certification; and (3) the May 2022 imports

had taken advantage of an unintended gap in Column 2 of the HTSUS tariff tables

that permitted some unfinished subject merchandise to enter with a tariff rate of

1%, which no longer exists because of the President's Proclamation 10420 that

eliminated this gap by raising the rates of duty on all products of the Russian

Federation by 35%.  TMK Group's Br. at 21–22 (citing Letter from American

Petroleum Institute and TMK Group's Pre-Hearing Br. at Ex. 3 ("Suspending

Normal Trade Relations with Russia and Belarus Act" or "H.R. 7018")).  The ITC

did not address these possibilities in its cumulation analysis, which is relevant to

the effect of Russian sanctions on subject OCTG from competing fairly with other

subject imports during the post-invasion months.

 While record evidence shows the import of some Russian subject

merchandise in two post-invasion months, the ITC did not provide an adequate

explanation to account for the lag of the sanction measures taking place or the

impact of the loss of API-certification services on Russian OCTG's

competitiveness.  The ITC must address the potential contrary evidence regarding

the competitiveness of imports from Russian OCTG relative to the other subject

imports from Argentina, Mexico, and South Korea.  See 19 U.S.C. § 1677(7)(G)

(requiring the ITC to "cumulatively assess the volume and effect of imports of the

subject merchandise from all countries," if such imports *compete with each other*

and with domestic like products).

 Accordingly, the Court concludes that the ITC's determination to cumulate

subject imports from Russia is not supported by substantial evidence.  The ITC's

timing of cumulation is improper, and the ITC failed to consider potentially

contrary evidence on the record for its cumulation determination and file the

Responses to Commission Questions with the Court.  The Court remands this issue

for further explanation or reconsideration by the ITC.

### C.    OCTG from South Korea

Plaintiffs challenge the Commission's determination to cumulate OCTG from South Korea as not in accordance with law and not supported by substantial evidence.  Plaintiffs argue that the ITC's cumulation determination was not in accordance with law because the ITC included non-subject imports from South Korea.  Plaintiffs also contend that this determination was not supported by substantial evidence because the ITC included subject imports from South Korea that were under an antidumping order and not fungible with subject imports from Argentina and Mexico.

### 1.    Subject Imports from South Korea

Plaintiffs allege two arguments regarding the ITC's inclusion of subject imports from South Korea in the cumulation analysis.  First, Tenaris argues that subject imports from Argentina and Mexico are not fungible with South Korean imports.  Tenaris contends that the ITC ignored record evidence when it determined that "welded and seamless OCTG can be used interchangeably in most if not all other applications" because subject imports from Argentina and Mexico during the period of investigation were "essentially all seamless," whereas the OCTG imports from South Korea were "nearly all welded" and the average unit values ("AUVs") for seamless OCTG were consistently higher than welded OCTG.  Tenaris' Br. at 18–21.

Second, Plaintiffs contest the ITC's inclusion of subject merchandise from South Korea that had already been used to support a finding of material injury to the domestic OCTG industry in 2014 in a different proceeding and was subject to an existing antidumping order, which Plaintiffs contend artificially inflated the cumulated volume of imports while adding little or no impact to the potential harm suffered by the U.S. industry.  TMK Group's Br. at 4–5; Tenaris' Br. 23–24.

### a.    Waiver of Seamless/Welded Argument

The Court first discusses Tenaris' argument that subject imports from Argentina and Mexico were not fungible with South Korean imports.  Defendant-Intervenors assert that part of Tenaris' argument, which concerns the difference between seamless and welded subject imports, is waived because such argument rests on Tenaris' contention that seamless and welded OCTG are not alike.  Def.-Intervs.' Resp. at 12–13 (citing Preliminary Views); see also Def.'s Resp. at 18 n.5. Defendant-Intervenors reason that Tenaris, by failing to raise that seamless and welded OCTG are separate like products in the final phase of the administrative proceedings, is precluded from bringing its argument and has conceded the interchangeability of seamless and welded products.  Id.

Tenaris counters that it is not precluded from raising its argument because the Commission had in a previous investigation found that the single like product and the subject imports were not fungible.  Tenaris' Reply at 3 (citing Grain-

Oriented Silicon Electrical Steel from Italy and Japan, Inv. Nos. 701-TA-355 and

731-TA-660 (Final), USITC Pub. 2778 at I-8, I-13 (May 1994)).

In challenging final agency actions, such as the underlying material injury

determination by the ITC at issue here, litigants generally must exhaust

administrative remedies.  See 28 U.S.C. § 2637(d).  The Court "generally takes a

'strict view' of the requirement that parties exhaust their administrative remedies."

Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed.

Cir. 2013) (citations omitted).  There are limited exceptions to the exhaustion

requirement, such as futility of raising an argument at the administrative level.  See

Pakfood Pub. Co. v. United States, 34 CIT 1122, 1145–48, 724 F. Supp. 2d 1327,

1351–53 (2010); see also Holmes Prod. Corp. v. United States, 16 CIT 1101, 1104

(1992) ("[E]xhaustion may be excused if the issue was raised by another party, or

if it is clear that the agency had an opportunity to consider it.").  The CIT has

discretion as to whether exhaustion is required in its cases.  Corus Staal BV v.

United States, 502 F.3d 1370, 1381 (Fed. Cir. 2007) ("[T]he decision whether to

require exhaustion in a particular case is a matter committed to the discretion of the

trial court; in particular, we have held that applying exhaustion principles in trade

cases is subject to the discretion of the judge.").

The ITC had preliminarily determined that, "in light of the preponderance of

similarities between seamless and welded OCTG, and in the absence of any

contrary argument, we define seamless and welded OCTG as a single domestic like product."  Preliminary Views at 12.  The ITC recognized that "[a]lthough subject imports from South Korea primarily comprise welded OCTG, whereas subject imports from other countries primarily comprise seamless OCTG, the record shows that these differences do not limit the fungibility between these subject imports." Id. at 25.  The ITC also noted that "while the parties disagree on the degree, they do not dispute that welded OCTG can be substituted for seamless OCTG in many applications, or that seamless OCTG can be substituted for welded OCTG in all applications."  Id. at 26.

Tenaris raised its concerns about the interchangeability of welded and seamless OCTG in the preliminary phase of the investigation.  Specifically, the ITC recognized that, "[w]hile Tenaris disputes Petitioners' estimation of a 99-percent overlap in end-use applications, and contends that there are 'important limitations' on the interchangeability of welded and seamless OCTG, it does not dispute that welded OCTG is interchangeable with seamless OCTG in less-demanding applications, or that seamless OCTG is interchangeable with welded OCTG in all applications."  Id. at 11 n.49 (citing Tenaris' Post-Conference Br. (Nov. 1, 2021) at 11, PR 41).  The ITC noted that, "Tenaris does not argue or suggest that these customer testimony and reporting establish that welded and seamless OCTG cannot be used interchangeably in other applications."  Id.

Because Tenaris disputed the interchangeability of seamless and welded products during the preliminary phase of the administrative proceedings, Tenaris did not fail to exhaust its administrative remedies regarding this issue and is therefore not precluded from raising this argument on appeal before the Court.

**b.      Waiver of Antidumping Order Argument**

The Court now turns to Tenaris' argument that the ITC improperly included subject imports from South Korea that were previously under an antidumping order.  Defendant-Intervenors assert that Plaintiffs did not sufficiently raise this issue—specifically, the implications of the antidumping order on South Korean imports regarding the cumulation analysis—in their final phase briefing, and thus Plaintiffs failed to exhaust their administrative remedies.  Def.-Intervs.' Resp. at 20–21.

TMK Group contends that this issue was raised before the ITC during both the preliminary and final phases of the investigation.  TMK Group's Reply at 14 (citing TMK Group's Post-Conference Br. (Nov. 1, 2021) at 6–7, PR 39, and Tenaris' Final Comments (Oct. 21, 2022), PR 167).  TMK Group argues that even if the doctrine of administrative exhaustion applies, it should be allowed to expand on an argument based on the final record before the Court.  Id. at 14–15 (citing Juancheng Kangtai Chem. Co. v. United States, Slip Op. 15-93, 2015 WL 4999476

(CIT Aug. 21, 2015) (holding that the doctrine of exhaustion does not prevent a

plaintiff from expanding on an argument based on the final record before the court

and that an argument below does not need to be exactly worded to the court)).

The Court observes that both TMK Group and Tenaris raised the issue of

subject imports from South Korea affected by an antidumping order during

different phases of the investigation.

In the preliminary phase of the investigation, TMK Group discussed the

implications of the South Korean antidumping order on the cumulation analysis as

follows:

> [T]he Commission must consider the fact that subject imports from
> South Korea have already been found to be injurious and are
> consequently already under an [antidumping] order as a relevant
> additional factor beyond its "general{}" "framework" that compels de-
> cumulation of South Korea from Argentina, Mexico, and Russia in this
> particular instance.  To do otherwise would result in cumulation when
> not "appropriate in light of the conditions of competition"—again,
> South Korea already being under an [antidumping] order while the
> other subject countries are not—inconsistent with Article 3.3 of the
> [Agreement on Implementation of Article VI of the General Agreement
> on Tariffs and Trade 1994 ("AD Agreement")] and Article 15.3 of the
> [WTO Agreement on Subsidies and Countervailing Measures ("SCM
> Agreement")].

TMK Group's Post-Conference Br. at 6–7.  The Commission rejected this

argument, asserting:

> TMK [Group] does not explain how these considerations [regarding the
> antidumping duty order on OCTG from Korea] could detract from a
> finding that there is a reasonable overlap of competition between the

subject imports from South Korea and the other subject imports under
the factors considered by the Commission.

Preliminary Views at 27 n.152.

In the final phase of the investigation, Tenaris referenced this issue by

stating that, "[c]umulating imports from Korea was always questionable given they

are subject to an injury finding that resulted in an [antidumping duty order]."

Tenaris' Final Comments at 9 (citing Preliminary Views at 23–24 (noting TMK

Group's arguments that the Commission should not cumulate subject imports

because imports from Korea are subject to an antidumping duty order)).

Both TMK Group and Tenaris put forth administrative arguments regarding

the effect of the antidumping duty order on South Korean OCTG.  TMK Group

contended, for example, that the effect of the antidumping order on the impact

determination was its inconsistency with the AD Agreement and SCM Agreement.

See TMK Group's Post-Conference Br. at 6–7.  Now before the Court, TMK

Group argues that the effect of the antidumping order on South Korean imports,

which placed a "discipline" on pricing designed to ensure that the sales of South

Korea subject merchandise would not cause material injury due to dumping results,

would mean that harm to the U.S. industry attributable to South Korean imports

would have to be based solely on underselling caused by subsidies, but these

subsidies were found to be a *de minimis* amount of 1.33% on a portion of South

Korean imports.  TMK Group's Br. at 28–29; TMK Group's Reply at 12–13.

Plaintiffs' argument that the antidumping order would result in a "discipline" on

pricing is a reasonable expansion of Plaintiffs' previous administrative arguments

regarding the effects of the antidumping duty order on the South Korean imports.

The Court deems Plaintiffs' argument not waived.

### 2.    Non-Subject Imports from South Korea

In addition to challenging the inclusion of subject imports from South

Korea, Plaintiffs assert that the Commission's cumulation determination is not in

accordance with law because the ITC's inclusion of non-subject imports violated

19 U.S.C. § 1677(7)(G)(i) through its reliance on Tables II-16, II-19, and IV-7 of

the Staff Report.  See TMK Group's Br. at 25–26; Tenaris' Br. at 23–24.  Plaintiffs

request a remand to ensure that the inclusion of non-subject imports did not affect

the material injury determination, citing Celanese Chemicals Ltd. v. United States,

31 CIT 279, 293 (2007).  Id.

The Court first turns to whether the ITC violated its statutory obligations

under 19 U.S.C. § 1677(7)(G)(i) by including non-subject imports from South

Korea.

Pursuant to 19 U.S.C. § 1677(7)(G)(i), "the Commission shall cumulatively

assess the volume and effect of *imports of the subject merchandise* from all

countries . . . if *such imports* compete with each other and with domestic like

products in the United States market."  19 U.S.C. § 1677(7)(G)(i) (emphasis

added).

    Record evidence establishes that the ITC included non-subject imports of

South Korean OCTG in the Commission's cumulation determination.  For

example, Tables II-16, II-19, and IV-17 include data on non-subject South Korean

OCTG.  See TMK Group's Br. at 25–26; Tenaris' Br. at 23–24.  The ITC relied on

these tables for its fungibility and geographic overlap determinations.  See Views

at 19–22.  The Government argues that the ITC properly considered Tables II-16

and II-19 because responses from South Korean OCTG importer Hyundai Steel

USA concerned the fungibility of OCTG from whole countries, including both

subject and non-subject data, and had probative value for the ITC's fungibility

determination.  Def.'s Resp. at 22 (citing Blank U.S. Importer Questionnaire (June

14, 2022) at III-21–III-22, PR 92).  The Government also contends that the ITC

properly considered Table IV-17 in finding a geographic overlap of the subject

imports because the table reflected 99.9% of all imports from South Korea.  Id.

    The Court observes that the ITC included data that included both non-

subject and subject imports from South Korea.  See Staff Report at Tables II-16, II-

19, and IV-17.  The inclusion of non-subject imports could not be separated

because Hyundai Steel USA was asked questions about the interchangeability of

domestic OCTG and OCTG produced in other countries.  These questions did not

distinguish between subject imports or non-subject imports.  See Blank U.S.
Importer Questionnaire.  The ITC included non-subject imports due to the nature
of responses solicited from Hyundai Steel USA.  The Government emphasizes that
"given that Hyundai Steel USA's responses compiled in these tables did not tend to
support cumulation, if there was any error in considering them—which there was
not—it was in Plaintiffs' favor and was, at most, harmless."  Def.'s Resp. at 23.

Regardless of whether the ITC believes that the inclusion of non-subject
imports was harmless error, the statute is clear that only subject imports shall be
included in the cumulation analysis and does not allow for the cumulation of non-
subject imports.  The Court holds that the ITC's cumulation of non-subject South
Korean imports is a violation of 19 U.S.C. § 1677(7)(G)(i) and is not in accordance
with law.  Therefore, the Court remands the ITC's determination to cumulate non-
subject imports from South Korea for further consideration in accordance with this
Opinion.

### 3.    Cumulation

The Court now turns to the question of whether the ITC's determination to
cumulate South Korean OCTG is supported by substantial evidence.

Tenaris argues that subject imports from South Korea should not have been
cumulated because they were not fungible with subject imports from Argentina and

Mexico, which had higher AUVs than those from South Korea and Russia.

Tenaris' Br. at 18–21.

      The ITC determined that there was a sufficient degree of fungibility between the subject imports from South Korea and those from Argentina and Mexico, even though there were differences in the AUVs between these countries, based on data that showed interchangeability between all subject imports.  See Views at 27 (citing Staff Report at Tables II-15–II-17).

      In addition to looking at Tables II-16, II-19, and IV-17, the ITC cited to Tables II-1, II-15, II-18, and II-20 to support its cumulation determination.

      Tables II-15 through II-17 of the Staff Report demonstrates the interchangeability between subject imports from Argentina and Mexico and subject imports from Russia and South Korea.  Tables II-15 through II-17 provide information on the responses of U.S. producers, importers, and purchasers reporting the interchangeability between domestic OCTG and OCTG from other countries, by country pair.  Staff Report at II-40.  Table II-15 pertains to responses from U.S. producers, Table II-16 pertains to responses from producers, and Table II-17 pertains to purchasers.  See id. at II-40–II-41.  All three tables demonstrate the interchangeability between subject imports from Argentina and Mexico and subject imports from Russia and South Korea by indicating that a majority of U.S. producers, importers, and purchasers responded that OCTG from both Argentina

and Mexico are "always" or "frequently" interchangeable with subject imports from both Russia and South Korea.  See id.  Because the interchangeability between these subject imports seems to be demonstrated in the responses, the record evidence could support a "reasonable overlap" of competition between OTCG from Mexico and Argentina and OCTG from South Korea in theory, if any non-subject imports are excluded from the cumulation analysis.

The ITC rejected Tenaris' administrative argument that imports from Argentina and Mexico were not fungible with imports from Russia or South Korea and determined that there was a substantial degree of overlap between U.S. shipments of subject imports from all four subject imports in terms of end finish, grade, and product type because: (1) "majorities of responding domestic producers, importers, and purchasers reported that subject imports from both Argentina and Mexico are always or frequently interchangeable with subject imports from both Russia and South Korea,"  Views at 20; id. at 20 n.97 (citing Staff Report at Tables II-15–II-17); (2) "majorities of responding domestic producers, importers, and purchasers reported that differences other than price are only sometimes or never significant when choosing between and among subject imports from the four sources," id. at 20; id. at 20 n.98 (citing Staff Report at Tables II-18–II-20); and (3) "majorities or pluralities of responding purchasers rated subject imports from both Argentina and Mexico as comparable with subject imports from both Russia and

South Korea with respect to at least 14 of 15 purchasing factors," id. at 20; id. at 20 n.99 (citing Staff Report at Table II-14).

The ITC also determined that there was a geographic overlap of the subject imports because nearly all subject imports from all four sources entered the United States through the Southern border of entry. Views at 22 (citing Staff Report at Tables II-1, IV-17). Table IV-17 presents data on U.S. imports of OCTG by source and border of entry, based on official Commerce import statistics in 2021, indicating a geographic overlap in the Southern border of entry. Staff Report at IV-33.

Only a finding of "reasonable overlap" is required for cumulation, although record evidence shows that the ITC's determination impermissibly cumulated both subject and non-subject imports from South Korea. The Staff Report tables cited by the ITC seem to support the fungibility and geographic overlap determinations, except for the statutory problem that the ITC's cumulation determination included non-subject imports from South Korea. Three tables cited by the ITC included non-subject imports: Tables II-16 and II-19 included responses for whole countries, including both subject and non-subject data, and Table IV-17 reflected 99.9% of all imports from South Korea. The ITC cited to additional evidence that related to subject imports, such as Tables II-1, II-15, II-18, and II-20.

The Government points out that the use of this data, which included non-subject imports, was in Plaintiffs' favor. See Def.'s Resp. at 23. Plaintiffs do not contest that the result of this data was in their favor. See TMK Group's Reply; Tenaris' Reply. The fact that such data may have weighed in Plaintiffs' favor does not excuse the ITC from complying with its statutory obligation under 19 U.S.C. § 1677(7)(G)(i) that "the Commission shall cumulatively assess the volume and effect of imports of the *subject merchandise*." 19 U.S.C. § 1677(7)(G)(i) (emphasis added). It is clear to this Court that the statute does not permit non-subject merchandise to be included in the Commission's cumulation analysis.

Accordingly, the ITC's determination to cumulate both subject and non-subject South Korean imports is neither supported by substantial evidence nor in accordance with law. The Court remands the ITC's determination to cumulate South Korean OCTG because non-subject imports from South Korea may not be included in the ITC's cumulation determination. Further, the ITC did not address the possible effect resulting from the subject imports from South Korea that were under an antidumping order in its final determination.

### D.    OCTG from Argentina and Mexico

Tenaris challenges the ITC's determination to cumulate subject imports from Argentina and Mexico as unsupported by substantial evidence. Tenaris argues that OCTG from Argentina and Mexico did not sufficiently share channels of

distribution with subject imports from Russia or South Korea to warrant a

"reasonable overlap of competition."  Tenaris' Br. at 21–23.  Tenaris contends that

the Commission did not consider representative data from the period of

investigation as a whole or record evidence that Tenaris sold subject imports from

Argentina and Mexico and its U.S.-produced OCTG to its U.S. customers mainly

using its unique "Rig Direct" program.  Id.

      The ITC determined that the domestic like product and subject imports from

each country source were sold through overlapping channels of distribution during

the period of investigation because importers from Argentina and Mexico

primarily sold OCTG to customers while also selling a smaller amount to

distributors.  Views at 22; id. at 22 n.108 (citing Staff Report at Tables II-1–II-2).

The ITC also rejected Tenaris' administrative argument that subject imports from

Argentina and Mexico did not share common channels of distribution because a

substantial share of subject imports from Mexico and a lesser share of subject

imports from Argentina were sold to distributors, as were most subject imports

from both Russia and South Korea.  Id. (citing Staff Report at Table II-1).

      Tenaris first contends that the ITC relied on a "small overlap," rather than a

"reasonable overlap," and that the Commission's reliance on 2021 data overstated

the overlap.  Tenaris' Br. at 22.  The ITC cited to Tables II-1 and II-2 to support its

channels of distribution determination.  Views at 22.  Table II-1 presents data for

channels of distribution for OCTG in the U.S. market, by share and by quantity, for the entire period of investigation, showing that importers from Argentina and Mexico primarily sold OCTG to similar customers.  Staff Report at II-5–II-8. Table II-2 shows a count of U.S. producers' and U.S. importers' geographic markets, indicating that every responding producer and importer reported selling OCTG in the Central Southwest.  Id. at II-9.  Table II-1 shows that for the share of subject imports sold for 2019 through interim 2021, the typical share of subject imports from Mexico sold to end users was a fairly significant percentage and the typical share of subject imports from Argentina sold to end users was a higher percentage.  Id. at II-5–II-8.  The share of subject imports sold to end users from South Korea was a very small percentage in comparison.  Id.  Based on these two tables in the Staff Report, the ITC's determination that there was a "reasonable overlap" is supported by substantial evidence, even though there were varying degrees of shares of sales in each country.

Second, Tenaris asserts that the ITC's determination to cumulate subject imports from Argentina and Mexico is not supported by substantial evidence because the ITC did not consider Tenaris' "Rig Direct" program as the reason for the shift in market share and the increase in Tenaris' market share.  See Tenaris' Br. at 22–23.  Tenaris contends that the record demonstrates that the "distributor" model for sales of subject imports from South Korea using unaffiliated producers,

processors, and distributors is not the same as Tenaris' "Rig Direct" program for

sales of Tenaris' domestic and imported OCTG using affiliated parties to provide

OCTG and services on a "fully integrated" basis.  Tenaris' Reply at 4.

The Government and Defendant-Intervenors argue that the "Rig Direct"

program is Tenaris' rebranding of standard services performed by affiliated

entities, and the Commission should not have weighed this differently.  See Def.-

Intervs.' Resp. at 16; Def.'s Resp. at 20.

The ITC considered whether other factors may have had an adverse impact

on the domestic industry not attributable to subject imports alone.  Views at 44.

The ITC rejected Tenaris' administrative argument that the shift in market share

toward cumulated subject imports was caused by Tenaris' "Rig Direct" program,

which allegedly provided "superior availability and technical assistance."  Id. at

45–46; id. at 46 n.258 (citing Table C-1 (summary data concerning the U.S. market

for the period of investigation)).

The ITC did not view the "Rig Direct" program as a factor for the shift in

market share because: (1) "large majorities of purchasers rated domestically

produced OCTG as superior or comparable to subject imports with respect to both

availability and technical support/service"; (2) signed declarations with supporting

documentation corroborated that domestic producers in combination with their

distributors provided the same services as the "Rig Direct" program; and (3) the

domestic industry also lost market share to subject imports from Russia and South

Korea that were not sold via the "Rig Direct" program.  Id. at 46.

   The ITC cited to Table II-14 in the Staff Report and documents attached to

Petitioners' Post-Hearing Brief to show that Tenaris' "Rig Program" was not a

unique model, but other OCTG producers implemented similar strategies in selling

subject imports.  See Staff Report at Table II-14; Petitioners' Post-Hearing Br. at

Ex. 3 ("Declaration of Robert J. Beltz"), Ex. 4 ("Declaration of Brett

Mendenhall").  As noted above, Table II-14 shows the number of purchasers'

responses comparing U.S.-produced and imported product by factor and country

pair.  Staff Report at II-32.  This evidence demonstrates that for the factors of

availability and technical support/service, a majority of responding purchasers

reported that Russian OCTG merchandise were "superior" or "comparable" to the

domestic product.  Id. at II-33.  There is no record evidence demonstrating the use

of the "Rig Direct" model by Russian OCTG producers or importers.

   The Petitioners' Post-Hearing Brief included the Declaration of Robert J.

Beltz and the Declaration of Brett Mendenhall.  Both declarations indicate that the

services provided by Tenaris' "Rig Direct" program is not unique to Tenaris but is

a strategy offered by other domestic producers and manufacturers.  The

Declaration of Robert J. Beltz, who is employed as the general manager for U.S.

Steel Tubular Products ("USSTP") by United States Steel Corporation, a domestic

producer of OCTG, discussed USSTP's services and stated that Tenaris' "Rig

Direct" model only differs in its reliance on an affiliated distributor that primarily

supplies Tenaris-produced OCTG products, but does not differ in terms of the

nature of services provided to end users.  Decl. of Robert J. Beltz at 1–2.  The

Declaration of Brett Mendenhall, who is the President and CEO of P2 Energy

Services ("P2"), a domestic distributor of OCTG, stated that the services provided

by Tenaris' "Rig Direct" were not unique to Tenaris because P2 typically enters

program agreements in combination with an OCTG manufacturer, and just as in

the Tenaris "Rig Direct" model, the end user received the full range and distributor

services required under the model.  Decl. of Brett Mendenhall at 1.  He also

attached portions of a business presentation from an OCTG manufacturer that

discussed similar services to those in Tenaris' "Rig Direct" program.  Id. at 2.

The Staff Report also supported the ITC's determination that "superior

availability and service" was not exclusive to Tenaris' "Rig Direct" program and

thus could not account for the loss of market share for domestic producers.  The

ITC cited to Table IV-19 to show that the domestic industry also lost market share

to subject imports from Russia and South Korea that were not sold via the "Rig

Direct" program.  Views at 46.  Table IV-19 provides data on apparent U.S.

consumption and market shares based on quantity for OCTG, by source and

period, showing that subject imports from Russia and South Korea contributed to

the total market share of OCTG in the U.S. market.  Staff Report at IV-41.  Based on the record evidence, the ITC considered Tenaris' "Rig Direct" program in assessing possible factors that attributed to the shift in market share toward cumulated subject imports.  Therefore, the ITC's determination that the "Rig Direct" program was not a cause of the loss of domestic market share is supported by substantial evidence.  The Court holds that the ITC's determination to cumulate subject imports from Argentina and Mexico is supported by substantial evidence.

Because the Court remands the final determination to reconsider the ITC's determination to cumulate subject imports from Russia, non-subject imports from South Korea, and subject imports from South Korea under an antidumping order, as explained above, the Court defers its analysis of the challenges to the ITC's additional determinations regarding volume, price effects, and impact in the material injury determination at this time.

## CONCLUSION

For the foregoing reasons, the Court concludes that the Commission's cumulation determination is not supported by substantial evidence and not in accordance with law.  Accordingly, it is hereby

**ORDERED** that the Commission's Final Determination is remanded for reconsideration consistent with this Opinion; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

Consol. Court No. 22-00344                                                      Page 48

(1) The Commission shall file its remand redetermination on or before

August 16, 2024;

(2) The Commission shall file the administrative record on or before August

30, 2024;

(3) The Parties shall file any comments on the remand redetermination on or

before September 27, 2024;

(4) The Parties shall file replies to the comments on the remand

redetermination on or before October 25, 2024; and

(5) The joint appendix shall be filed on or before November 22, 2024.


                                                       /s/  Jennifer Choe Groves
                                                     Jennifer Choe-Groves, Judge


Dated:    April 19, 2024
          New York, New York