**Public Version**

**Views of the Commission on Remand**

By decision and order dated April 19, 2024, the U.S. Court of International Trade ("CIT") remanded the Commission's determinations regarding Argentina, Mexico, and Russia in the final oil country tubular goods ("OCTG") investigations, as set out in *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022) ("*Original Views*").[1]  Upon consideration of the remand order and based on the evidence in the record of these investigations, the Commission determines again that an industry in the United States is materially injured by reason of imports of OCTG from Argentina, Mexico, and Russia that have been found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value ("LTFV") and by reason of OCTG from Russia that have been found by Commerce to be subsidized by the government of Russia.[2]

I.    **BACKGROUND**

The petitions in the underlying investigations were filed on October 6, 2021, by Borusan Mannesmann Pipe U.S., Inc.; PTC Liberty Tubulars LLC; U.S. Steel Tubular Products, Inc.; Welded Tube USA, Inc.; and the United States Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners").[3]  The investigations were instituted and initiated on October 6, 2021 and

---

[1] *Tenaris Bay City et al v. United States*, Court No. 22-00344, Slip Op. 24-48 (Ct. Int'l Trade April 19, 2024) ("Slip Op. 24-48").

[2] As discussed below, the Commission's determinations with respect to South Korea were not appealed.

[3] Confidential Staff Report, INV-UU-100 (October 14, 2022) ("CR") at I-1.

October 26, 2021, respectively.[4]  The Commission issued affirmative preliminary determinations on November 22, 2022.[5]

On October 26, 2022, the Commission unanimously voted to find that the domestic industry producing OCTG was materially injured by reason of subject imports of OCTG from Argentina and Mexico found to have been sold in the United States at LTFV; by reason of subject imports of OCTG from Russia found to have been sold in the United States at LTFV and subsidized by the government of Russia; and by reason of subject imports of OCTG from South Korea that have been found to be subsidized by the government of South Korea.[6]  In November 2022, the Commission published its Final Views explaining its determinations.[7]

Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc. (domestic producers of OCTG), Tenaris Global Services (U.S.A.) Corporation (a U.S. importer of OCTG), Siderca S.A.I.C. (a producer of OCTG in Argentina), and Tubos de Acero de Mexico, S.A. (a producer of OCTG in Mexico) (collectively "Tenaris") and TMK Group ("TMK") (a producer of OCTG from Russia), appealed the Commission's final affirmative determinations with respect to Argentina, Mexico, and Russia on December 16, 2022.  After briefing and oral argument, the Court, on April 19, 2024, remanded the Commission's determination for further consideration of certain issues.  In particular, the Court remanded certain aspects of the Commission's assessment of whether there existed a reasonable overlap of competition between and among

---

[4] CR at I-1.
[5] CR Table I-1.
[6] *Original Views*, USITC Pub. 5381 at 3.
[7] *Original Views*, USITC Pub. 5381 at 3. The Commission transmitted its determinations to be published effective November 14, 2022.  *Oil Country Tubular Goods From Argentina, Mexico, Russia, and South Korea*, 87 Fed. Reg. 69331 (Nov. 18, 2022).

subject imports from each source and the domestic like product warranting a cumulative assessment of the effects and impact of subject imports on the domestic industry.[8]

## II.    ADOPTION OF FINDINGS FROM OUR ORIGINAL DETERMINATIONS

We have considered the record as a whole in light of the Court's remand instructions. The Commission notes that it is adopting its original findings, analysis, and conclusions in their entirety with respect to those issues that were not appealed or not addressed by the Court on appeal. Consistent with our cumulation findings on remand below, we continue to adopt our findings on the conditions of competition, volume, price effects, and impact from our original determinations. We also note that the Court has sustained certain aspects of our findings concerning cumulation[9] and causation,[10] and we again adopt the original findings that have been sustained. Regarding the findings remanded by the Court, we also incorporate our original findings, as supplemented and furthered explained in this remand determination.

## III.    CUMULATION

### A.  The Court's Instructions

The Court remanded several aspects of the Commission's determinations, all of which relate to the Commission's assessment of whether subject imports from each source and the domestic like product shared a reasonable overlap of competition so as to require cumulation.

First, addressing the timing of the Commission's assessment of a reasonable overlap of competition, the Court found that the Commission unlawfully failed to address whether subject

---

[8] *See* Slip Op. 24-48.
[9] *See* Slip Op. 24-48 at 43 (sustaining the Commission's finding that subject imports from all four countries were sold through overlapping channels of distribution as supported by substantial evidence).
[10] *See* Slip Op. 24-48 at 47 (sustaining the Commission's finding that the Rig Direct program was not the cause of the domestic industry's loss of market share as supported by substantial evidence).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

imports from Russia "were unfair and had a continuing impact during the full period of investigation, including vote day."[11]  Specifically, the Court found that the Commission erred in assessing whether a reasonable overlap of competition existed during the full 42-month period of investigation ("POI") given the measures which arose later in the POI in response to Russia's invasion of Ukraine in February 2022, including:  the suspension of Russian Producers' ability to American Petroleum Institute ("API")-certify its products as of March 17, 2022, the loss of Russia's most-favored-nation ("MFN") status in April 2022, the prohibition of Russian vessels from entering U.S. ports as of April 2022, and the imposition of tariff increases applicable to Russian merchandise from 1.0 percent to 35 percent starting in June 2022.[12]

Second, the Court held that the Commission "did not consider contrary evidence on the record pertaining to the effects of the sanctions on Russian OCTG, especially the suspension of API-certification on Russian OCTG . . . ."[13]  This potentially contrary evidence highlighted by the Court consisted of a letter from the API stating, in part, [███████████████████████ ████████████████████ ] and a piece of testimony from the President of Tenaris USA, stating that the suspension of API certification services would be a "major setback" for Russian producers of OCTG.[14]

---

[11] Slip Op. 24-48 at 17.
[12] Slip Op. 24-48 at 13–17.
[13] Slip Op. 24-48 at 22–23.
[14] Slip Op. 24-48 at 22 (citing Hearing Transcript ("Hr'g Tr.") at 248 and TMK Pre-Hearing Br. at Ex. 2 ("API Letter")).  The Court refers to testimony from "a witness from API", yet Dr. Dean Foreman, Chief Economist for API, did not opine on the potential effects of the suspension of API certifications in his testimony. Hr'g Tr. at 187–190 (Foreman).

Public Version

Third, the Court held that "cumulation of non-subject South Korean imports is a violation of 19 U.S.C. §1677(7)(G)(i) and is not in accordance with law."[15]

Fourth, the Court instructed the Commission to reconsider certain factual aspects of the Commission's cumulation analysis concerning fungibility and geographic overlap, which the Court found were unsupported by substantial evidence because the Commission did not exclude nonsubject (*i.e.*, Hyundai's) imports from South Korea from its consideration in certain aspects of its fungibility, geographic overlap, and simultaneous presence analyses.[16]

Fifth, the Court held that the Commission failed to address party arguments concerning the existing AD order on subject imports from South Korea.[17]

On May, 29, 2024, the Commission published a notice of remand proceedings, inviting interested parties to file comments on how to best comply with the Court's instructions.[18]  The Commission also issued supplemental tables, on June 7, 2024, in which it reformulated the data concerning imports from South Korea in response to the Court's remand instructions.[19]  On June 26, 2024, Petitioners – United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Borusan Mannesmann

---

[15] Slip Op. 24-48 at 37.
[16] Slip Op. 24-48 at 38–40.
[17] Slip Op. 24-48 at 41.
[18] *Oil Country Tubular Goods From Argentina, Mexico, and Russia:  Notice of Remand Proceedings*, 89 Fed. Reg. 46419 (May 29, 2024).
[19] Confidential Supplemental Memorandum, INV-WW-060 (June 7, 2024) ("Supplemental Memorandum").

Pipe USA, Inc., PTC Liberty Tubulars LLC, U. S. Steel Tubular Products, Inc., and Welded Tube

USA, Inc. – filed comments,[20] as did Respondents TMK[21] and Tenaris.[22]

### B. Timing of the Commission's Cumulation Analysis

The Court instructed the Commission to "reassess the timing {of competitive overlap

concerning imports from Russia} and determine whether the imports under investigation were

proven unfair and had a continuing impact during the full period of investigation, including on

vote day."[23]

*Petitioners' Arguments*.  Petitioners argue that vote day is not the operative

timeframe for assessing whether subject imports and the domestic like product share a

competitive overlap.[24]  Petitioners contend that the statutory language, the Statement of

Administrative Action ("SAA") to the Uruguay Round Agreements Act ("URAA"),[25] and Federal

Circuit precedent demonstrate the "Commission has broad discretion with respect to the

period of investigation that it selects for purposes of making a material injury

determination{,}" clarifies that a reasonable overlap of competition must be assessed based

on the POI, which in these investigations ran from January 2019 to June 2022.[26]  They also

---

[20] Petitioners' Confidential Remand Comments, EDIS Doc. 824503 (June 26, 2024) ("Petitioners' Comments").

[21] TMK's Public Remand Comments, EDIS Doc. 824514 (June 26, 2024) ("TMK's Comments").

[22] Tenaris's Confidential Remand Comments, EDIS Doc. 824504 (June 26, 2024) ("Tenaris's Comments").

[23] Slip Op. 24-48 at 19.

[24] Petitioners' Comments at 11–12.

[25] H.R. Doc 103-316, Vol. 1 (1994).

[26] Petitioners' Comments at 12–13, citing 19 U.S.C. § 1677(7)(G)(i); SAA at 847; and *Nucor Corp. v. United States*, 414 F.3d 1331, 1337 (Fed. Cir. 2005) (quoting *Kenda Rubber Indus. Co. v. United States*, 630 F. Supp. 354, 359 (Ct. Int'l Trade 1986)); *see also, e.g., Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1331 (Ct. Int'l Trade 2020) ("Determining the appropriate period of investigation is within the discretion of the Commission."); *Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238, 1254

**Public Version**

highlight that the CIT has held that "there is no requirement to include . . . post-POI data, as the POI is the centerpiece of the investigation's time frame."[27]  Petitioners assert that the Commission applied its "its normal practice of considering data for the three most recent calendar years plus applicable interim periods," and that no party to the proceeding proposed gathering data beyond June 2022 – the final month of the POI.[28]

Additionally, Petitioners point out that the Court's remand instruction relied on outdated and factually distinct case law.[29]  Petitioners explain that, in *Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990, the Federal Circuit there had deferred to the Commission's interpretation of the pre-URAA cumulation provision, 19 U.S.C. § 1677(7)(C)(iv) (1988).[30] Petitioners note that the provision addressed in *Chaparral Steel* was superseded in 1994 by the post-URAA cumulation provision currently in effect at 19 U.S.C. § 1677(7)(G).[31]

Regarding the provision that was applicable at the time of *Chaparral Steel*, Petitioners explain that the Commission had interpreted § 1677(7)(C)(iv) as requiring subject imports to compete with other subject imports and the domestic like product, be subject to investigation,

---

(Ct. Int'l Trade 2016) ("{T}he ITC's broad discretion in choosing the time frame for its investigation and analysis has consistently been upheld ....") (quoting *Nitrogen Solutions Fair Trade Comm. v. United States*, 358 F. Supp. 2d. 1314, 1325 (Ct. Int'l Trade 2005)) (alteration in *Mexichem*).

[27] Petitioners' Comments at 13 (*quoting AWP Indus., Inc. v. United States*, 35 C.I.T. 774, 790 (2011)).

[28] Petitioners' Comments at 13 (*quoting Swiff-Train Co. v. United States*, 999 F. Supp. 2d 1334, 1351 (Ct. Int'l Trade 2014), *aff'd*, 793 F.3d 1355 (Fed. Cir. 2015)).

[29] Petitioners' Comments at 15–19.

[30] Petitioners' Comments at 15.  19 U.S.C. § 1677(7)(C)(iv) states:
(iv) CUMULATION. — For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market.

[31] Petitioners' Comments at 17–18.

and be marketed within a reasonably coincidental period.[32]  Summarizing the various

investigations that were at issue in *Chapparal*, Petitioners note that the countervailing duty

("CVD") investigations were initiated against steel products from South Africa and Spain in

February and March 1982, respectively, and CVD orders were subsequently imposed in

September 1982 (South Africa) and January 1983 (Spain).[33]  More than a year later, AD

investigations were initiated against steel products from Spain (March 1984), Norway

(December 1984), and Poland (December 1984).[34]  Poland and Spain entered into voluntary

restraint agreements ("VRAs") in early 1985, resulting in the termination of the investigations

before Commerce rendered any final findings of dumping.[35]  The CVD order against South Africa

was revoked for lack of interest, retroactive to October 1984, but the investigation of Norway

continued.[36]  Petitioners explain that the Commission declined to cumulate dumped imports

from Poland and Spain as they were no longer "subject to . . . investigation" on vote day.[37]

Petitioners further explain that the Commission declined to cumulate subject imports from

South Africa and Spain (already subject to CVD orders due to investigations initiated in February

and March 1982, respectively) because they "did not enter the U.S. market reasonably

coincident in time with the {Norwegian} imports currently under investigation" and did not

"contemporaneously compete" with Norwegian imports.[38]  Petitioners maintain that nothing in

---

[32] Petitioners' Comments at 15–17; *see Chaparral Steel Co. v. United States*, 698 F. Supp. 254, 257 (Ct. Int'l Trade 1988), *rev'd*, 901 F.2d 1097 (Fed. Cir. 1990); *see also Carbon Steel Structural Shapes from Norway*, Inv. No. 731-TA-234 (Final), USITC Pub. 1785 (November 1985) at 7–9.

[33] Petitioners' Comments at 15.

[34] Petitioners' Comments at 15–16.

[35] Petitioners' Comments at 16.  Spain's CVD order was also revoked because of the VRA.  *Id*.

[36] Petitioners' Comments at 16.

[37] Petitioners' Comments at 16.

[38] Petitioners' Comments at 16–17 (*quoting Chaparral*, 901 F.2d at 1100–01, 1106).

**Public Version**

*Chaparral* requires the Commission to focus its assessment of an overlap of competition on vote day.[39]

Petitioners argue that the URAA amendments, contained in 19 U.S.C. § 1677(7)(G)(i, negated these *Chaparral*-type issues by tethering candidates for cumulation to the date of the filing of the petitions.[40]  Thus, Petitioners argue that the South African and Spanish imports could not have been cumulated with the imports from Norway under the current statute because those petitions were not filed on the same day as the Norway petition.[41]

Petitioners also cite to the SAA, arguing that it confirms that Congress did not intend the Commission to consider post-POI activity, regardless of when "vote day" occurs.[42] Petitioners claim that, "because the post-URAA provision limits cumulation to same-day petitions and initiations, only a staggered investigation could present the situation discussed in *Chaparral*, wherein one of the countries considered for cumulation was already subject to an AD/CVD order on 'vote day.'"[43]  They argue that the SAA's tethering of the trailing

---

[39] Petitioners' Comments at 16.

[40] Petitioners' Comments at 17–18.  The "subject to investigation" clause was replaced by 19 U.S.C. § 1677(7)(G)(i), which states:

For purposes of clauses (i) and (ii) of subparagraph (C), and subject to clause (ii), the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which—

(I) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,

(II) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or

(III) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,

if such imports compete with each other and with domestic like products in the United States market.

[41] Petitioners' Comments at 18.

[42] Petitioners' Comments at 19 (*citing* SAA, H.R. Doc 103-316, Vol. 1 (1994) at 848).

[43] Petitioners' Comments at 19.

investigation's determination to the leading investigation's record eliminates the need to adopt a "vote day" framework.[44]

Additionally, Petitioners argue that 19 U.S.C. § 1677(7)(G)(i) is written in the simple present tense and therefore does not require a vote day cumulation assessment.[45] They cite to what they believe is the better reasoning previously set out in *Steel Authority of India* ("*SAIL*").[46] In that case, the CIT deferred to the Commission's reading that the term "compete" was used in the simple present tense and therefore refers to a state rather than an ongoing action.[47]

***Respondent Tenaris's Arguments***. Tenaris argues that the Commission must reopen the record to include monthly import data from June 2022 (the end of the POI) to October 26, 2022 (the day of the Commission's final vote).[48] It claims that the Court found it was unreasonable for the Commission to "to view the conditions of competition over the 42-month period of investigation (*i.e.*, January 2019 – June 2022) without considering the effects of competition at the end of the investigation and on vote day."[49] Tenaris contends that the statute uses "compete" in the present tense and that the Commission had previously confirmed this

---

[44] Petitioners' Comments at 19.

[45] Petitioners' Comments at 14.

[46] In *Steel Authority of India*, the POI ran from January 1996 through June 1999, and the plaintiff had "voluntarily withdr{awn} from the market from July 1998 through June 1999." Petitioners' Comments at 20 (*quoting SAIL*, 146 F. Supp. 2d 900, 908 (Ct. Int'l Trade 2001)).

[47] Petitioners' Comments at 14, 19–20 (*citing SAIL*, 146 F. Supp. 2d at 907). The CIT rejected the plaintiff's "interpretation of the statute us{ing} the present continuous tense, *i.e.*, as contemplating an action that is not completed or finished at the time," which "would limit the ITC's cumulation to ongoing competition that will end in the future." Petitioners' Comments at 20 (*quoting SAIL*, 146 F. Supp. 2d at 905 n.9).

[48] Tenaris's Comments at 2, 6–9.

[49] Tenaris's Comments at 7.

interpretation in *SAIL* ("{t}he ITC determined that 'compete' {in 19 U.S.C. 1677(7)(G)(i)} was to be used in the simple present tense").[50]

**Respondent TMK's Arguments.**  TMK argues that the Commission must assess whether a reasonable overlap of competition existed between subject imports from Russia, subject imports from other sources, and the domestic product on vote day.[51]  TMK relies on the Court's opinion to support this position.

**Analysis.**  As an initial matter, we answer the fundamental first question posed by the Court:  "*whether the imports under investigation were proven unfair* and had a continuing impact during the full period of investigation."[52]  In this respect, we clarify that Commerce determined whether subject imports were unfairly traded, not the Commission.[53]  In these investigations, Commerce determined that subject imports from all four sources were unfairly traded before the time of the Commission's vote on October 26, 2022.[54]

---

[50] Tenaris's Comments at 8 (*quoting SAIL*, 146 F. Supp. 2d at 907)).  Tenaris's argument appears to be premised on "present tense" and "present perfect" tenses having the same meaning, overlooking that the CIT addressed their distinct meanings in *SAIL*:  The CIT rejected the plaintiff's "interpretation of the statute us{ing} the present continuous tense; *i.e.*, as contemplating an action that is not completed or finished at the time," which "would limit the ITC's cumulation to ongoing competition that will end in the future." *Id*.

[51] TMK's Comments at 6.

[52] Slip Op. 24-48 at 19 (emphasis added).

[53] *See* 19 U.S.C. § 1671(a)(1) (allowing Commerce to impose CVD duties *after* it determines the merchandise is unfairly subsidized); *see also* 19 U.S.C. § 1673(1) (allowing Commerce to impose AD duties *after* it determines the merchandise is dumped); *United States Steel Corp. v. United States*, 97 F.4th 1364, 1366 (Fed. Cir. 2024) ("{T}he Department of Commerce is authorized to administer the antidumping statute. . . . In administering the statute, the agency will conduct investigations and assess antidumping duties where it determines that foreign goods are being sold in the United States at less-than-fair value.") (internal citations omitted).

[54] *Oil Country Tubular Goods From the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 87 Fed. Reg. 14248 (March 14, 2022); *Oil Country Tubular Goods From the Russian Federation: Preliminary Affirmative Countervailing Duty Determination, Preliminary Negative Critical Circumstances*

Public Version

Further to the Court's inquiry, we emphasize that the Commission's approach of assessing whether imports subject to recent orders were candidates for cumulation with imports currently under investigation if they enter the market "reasonably coincident" in time, employed in *Chaparral*, was a function of the pre-URAA cumulation provision[55] – an approach that is no longer applicable as of 1994 under the amended URAA cumulation provision.

**Factual Background of Chaparral.**  In *Chaparral* the U.S. Court of Appeals for the Federal Circuit affirmed the Commission's determination to not cumulate allegedly dumped subject imports from Poland and Spain with subject imports from Norway, because the Commission concluded that the imports from Poland and Spain "were not subject to a pending investigation and thus did not fall under the {1988} cumulation provision."[56]

The Commission had based its determination not to include imports from Poland and Spain on the fact that those imports were no longer subject to investigation, as the United

---

*Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 87 Fed. Reg. 14249 (March 14, 2022); *Oil Country Tubular Goods From Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28801 (May 11, 2022); *Oil Country Tubular Goods From the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28804 (May 11, 2022); *Oil Country Tubular Goods From Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28808 (May 11, 2022).

[55] *See Chaparral*, 901 F.2d at 1099.

[56] *Chaparral*, 901 F.2d at 1099.  The cumulation provision of the statute, 19 U.S.C. § 1677(7)(C)(iv) (1988), stated at that time:

> (iv) CUMULATION. — For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products *subject to investigation* if such imports compete with each other and with like products of the domestic industry in the United States market. (emphasis added)

States had entered into VRAs with these countries – resulting in the termination of those AD

investigations.[57]  As the Federal Circuit stated:

> In this case the ITC interpreted "subject to investigation" to include
> only imports still under investigation on "vote day" and imports
> which were proven "unfair" and to have continuing impact as of
> vote day. The ITC did not cumulate imports from Poland and Spain
> because they were no longer subject to a pending investigation and
> due to the VRAs there was no possibility of being found to be
> unfairly traded. With respect to the subsidized imports from Spain
> and South Africa, the imports made before the CVD duties were
> imposed were not cumulated because they were not marketed
> reasonably coincident with the Norwegian imports.
>
> In this appeal the LTFV investigations of steel imports from Poland
> and Spain ended prior to the Norway investigation vote day. The
> ITC interprets the withdrawal of the petitions due to a VRA as
> meaning that no unfair value determination could be made for
> imports entered during the ITC investigation's time frame. Thus,
> the ITC could reasonably exclude these imports.[58]

Additionally, the Commission did not cumulate previously subsidized imports from Spain

and South Africa, which were now subject to CVD orders, with imports from Norway as they did

not enter the market "reasonably coincident" in time:[59]

> The ITC could also exclude the pre-CVD order imports from Spain
> and South Africa even though they had been found to be unfairly
> traded, because those imports did not contemporaneously
> compete with the Norwegian imports. The ITC views the imports
> from Spain and South Africa, that entered after the CVD orders, as

---

[57] *Chaparral*, 901 F.2d at 1097, 1098–99.  The VRA with Poland resulted in the withdrawal of the
petitions while the VRA with Spain occurred after Commerce's final affirmative antidumping
determinations and during the pendency of the Commission's final injury investigations.  *Id*.  Under the
current statute, 19 U.S.C. § 1677(7)(G)(i), the Commission would not even be permitted to cumulate the
imports that were subject to a prior investigation initiated on a different day, as was the case with the
imports from Spain and South Africa.

[58] *Chaparral*, 901 F.2d at 1099.

[59] *Chaparral*, 901 F.2d at 1099.

not "unfair" inasmuch as they are not marketed at unfair prices because of the imposition of duties.[60]

Thus, as the Federal Circuit found, the Commission had "construed the statutory scheme to require cumulation only of *currently* unfair imports, not those corrected by VRAs or the assessment of duties."[61]  Thus, to the extent that one aspect of *Chaparral* relied on by the Court is arguably still operative (in mandating that the Commission only cumulate subject imports that are determined to be unfairly traded on vote day), as discussed above, imports from all four sources including Russia, were in fact determined by Commerce to be "proven unfair" as of vote day.[62]

***Currently Applicable Law Post-URAA.***  In *Chaparral*, the Federal Circuit noted the Congressional silence regarding the relevant timeframe for assessing whether cumulation was appropriate, and therefore deferred to the Commission's interpretation.[63]  Congress, however, subsequently addressed this issue when it passed the URAA and amended the statute with current Section 771(7)(G)(i) to require cumulation for competing imports when petitions were filed, or the investigations initiated, on the same day.[64]  Thus, the candidates for cumulation are no longer determined based on whether they are marketed reasonably coincident in time and

---

[60] *Chaparral*, 901 F.2d at 1104–05 (internal citations omitted).

[61] *Chaparral*, 901 F.2d at 1103 (emphasis in original).

[62] *See* Slip Op. 24-48 at 17.

[63] *Chaparral*, 901 F.2d at 1104 ("Because neither the statute nor the legislative history *conclusively* establishes the time frame for cumulation, we assess the agency's interpretation of the provision to determine whether it is reasonable and in accordance with legislative purposes.") (emphasis in original); *id*. at 1105 (the ITC's interpretation not to cumulate Spanish, South African and Polish imports was "consistent with the statutory language, legislative history, and congressional purpose" and was not overturned by subsequent congressional action, although Congress was squarely presented with the opportunity to do so").  *id*. at 1106.

[64] 19 U.S.C. § 1677(7)(G)(i).  *See* SAA, H.R. Doc 103-316, Vol. 1 (1994) at 848.

are having a continuing impact on vote day but instead are based on the date the petitions are

filed.  As the SAA accompanying the URAA explains:

> In conformity with the Agreements, new section 771(7)(G)(i) provides that the Commission cumulate imports only from countries as to which investigations under sections 702 or 732 were filed or self-initiated on the same day. The requirement of simultaneous filing will promote certainty in antidumping and countervailing duty investigations by defining, at the time of filing, the countries potentially subject to cumulative analysis.[65]

The SAA further explains that staggered investigations must be based on the record

compiled in leading investigations, so the Commission no longer needs to assess whether

imports subject to the earlier investigation have any "continuing effect" on vote day:

> New section 771(7)(G)(iii) provides that the Commission will make its determination in each of the staggered investigations based upon the record compiled in the first final investigation in which it makes a determination. This eliminates the need for the Commission to consider whether imports from the first-decided investigation that are subject to antidumping or countervailing duty orders have a "continuing effect" on "vote day" of each subsequent investigation. *Compare Chaparral Steel Co. v United States*, 901 F.2d 1097 (Fed. Cir. 1990), with *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608 (Ct. Int'l Trade 1993).[66]

While the instant case does not involve staggered investigations, this passage provides

further indication that "vote day" is not the operative timeframe for assessing the cumulation

factors.  Indeed, static assessment of both cumulation and material injury on vote day (or even

at the close of the record in the trailing case) would be inconsistent with Congressional intent,

as the leading record would necessarily have closed prior to the vote, or close of the record, in

the trailing investigations.  That is, cumulation in a trailing investigation must be based strictly

---

[65] SAA, H.R. Doc 103-316, Vol. 1 (1994) at 848.
[66] SAA, H.R. Doc 103-316, Vol. 1 (1994) at 848.

**Public Version**

on facts established well before vote day because the record of the leading investigation has

already closed, and very little can be added to that record for purposes of the trailing

investigation.[67]

Furthermore, assessing competitive overlap for purpose of cumulation on vote day

would be inconsistent with the Commission's statutory obligation to provide the parties with an

opportunity for final comment on the record evidence under 19 U.S.C. § 1677m(g).  This

provision states:

> Information that is submitted on a timely basis to the administering
> authority or the Commission during the course of a proceeding
> under this subtitle shall be subject to comment by other parties to
> the proceeding within such reasonable time as the administering
> authority or the Commission shall provide. The administering
> authority and the Commission, before making a final determination
> under section 1671d, 1673d, 1675, or 1675b of this title shall cease
> collecting information and shall provide the parties with a final
> opportunity to comment on the information obtained by the
> administering authority or the Commission (as the case may be)
> upon which the parties have not previously had an opportunity to
> comment. Comments containing new factual information shall be
> disregarded.

The Commission's obligation to "cease the collection of information and . . . provide the

parties with a final opportunity to comment on the information obtained . . . " prior to making a

final determination would be rendered impossible if the Commission was required to collect

data on the competitive conditions in the U.S. market up until vote day.[68]  Had the Commission

---

[67] *See* 19 U.S.C. § 1677(7)(G)(iii) (only allowing the record of trailing investigations to be
supplemented with Commerce's final determinations and parties' comments on those determinations).

[68] Commerce's preliminary CVD determinations were rendered on March 14, 2022.  *Oil Country
Tubular Goods From the Russian Federation: Preliminary Affirmative Countervailing Duty Determination,
Preliminary Negative Critical Circumstances Determination, and Alignment of Final Determination With
Final Antidumping Duty Determination*, 87 Fed. Reg. 14249 (March 14, 2022); *Oil Country Tubular Goods
From the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of*

collected data up to and on vote day, October 26, 2022, parties to the underlying investigations would have been deprived of their reasonable opportunity to submit comments "on the information obtained" as the Commission would have never "ceas{ed} the collection of information" prior to rendering a final determination.[69]  Thus, while, as the Court found, any imports considered in the Commission's analysis must still be considered to be unfairly traded on vote day, the data upon which the Commission relies in its analyses, by nature must cover a time period prior to vote day.  Any other approach would conflict with the Commission's statutory obligation to examine the impact of subject imports on the domestic industry through an analysis of data obtained during the course of a proceeding, and with the comment requirement contained in 19 U.S.C. § 1677m(g).

---

*Final Determination With Final Antidumping Duty Determination*, 87 Fed. Reg. 14248 (March 14, 2022). In its preliminary negative CVD determination with respect to OCTG from South Korea, Commerce calculated below de minimis subsidy rates for all individually examined producers/exporters, including Hyundai Steel Corporation.  *Id.*  Commerce's preliminary AD determinations were rendered on May 11, 2022.  *Oil Country Tubular Goods From Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28801 (May 11, 2022); *Oil Country Tubular Goods From the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28804 (May 11, 2022); *Oil Country Tubular Goods From Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28808 (May 11, 2022).

[69] The notice scheduling the Commission's final-phase investigations was published on May 11, 2022. *See* CR Table I-1.  On January 10, 2022, the Commission invited interested parties to submit comments on the Commission's draft questionnaires.  On February 15, 2022, the interested parties returned comments on the draft questionnaires.  The Commission issued Questionnaires to market participants on June 12, 2022.  The Commission received responses to its questionnaires from market participants dated between June 15, 2022, and July 29, 2022.  The post-hearing Confidential Staff Report was issued on October 14, 2022.  Parties then, as required by statute, were permitted to submit their final comments on October 24, 2022, concerning the information the Commission had collected during the course of its investigations.

Public Version

### C. Addressing Contrary Evidence Regarding Sanctions on Subject Imports from Russia.

Notwithstanding our longstanding view that an assessment of the cumulation factors must take into account the behavior of subject imports during the POI as a whole,[70] we have given additional consideration to the potentially contrary evidence and arguments pertaining to the sanctions on Russian OCTG highlighted by the Court and the parties, including during the final four months of the POI.[71]

Specifically, with respect to the Commission's fungibility analysis, the Court held that:

> {T}he ITC's determination "that Russian OCTG were fungible with other subject OCTG {was} not supported by substantial evidence because the ITC did not consider contrary evidence on the record pertaining to the effects of the sanctions on Russian OCTG, especially the loss of API-certification on Russian OCTG, and failed to file with the Court the relevant evidence from the responses to Commission questions that the ITC cited."[72]

The Court highlighted that, while a majority of responding purchasers reported that Russian OCTG was "always" or "usually" comparable to the domestic like product in terms of ability to meet or exceed industry quality standards (Tables II-12 & II-14), these responses did "not reflect responses for quality after the suspension of API-certification . . . nor does this information address the competitive impact that losing API-certification would have on the subject Russian products."[73]

---

[70] *See Original Views*, USITC Pub. 5381 at 19–23; *see also Electrolytic Manganese Dioxide from Australia and China,* Inv. Nos. 731-TA-1124- 1125 (Final), USITC Pub. 4036 (September 2008) at 10 (finding that the permanent closure of the sole subject producer in Australia late in the period of investigation did not warrant departing "from our traditional practice of examining the presence of imports over the entire period of investigation.").

[71] The POI for which the Commission collected data in its questionnaires pertained to January 1, 2019, to June 30, 2022.

[72] Slip Op. 24-48 at 23.

[73] Slip Op. 24-48 at 20.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

***Petitioners' Arguments***.  Petitioners argue that the suspension of API certification did not prevent Russian imports from being fungible with other subject imports and the domestic like product, citing to data showing purchases of "green tube" from Russia in 2019, 2020, and 2021 for processing into finished OCTG.[74]  Petitioners also refute that the cited "potentially contrary evidence" regarding the suspension of API certification actually establishes that Russian OCTG was only fungible if it was API-certified.[75]  They note that the testimony in question is attributable to a representative of Respondent Tenaris USA, and not to an API witness.[76]  They also argue that the API letter cited by the Court primarily confirms what the Commission already acknowledged – [ ██████████████████████████████████ ██████████████ ].[77]  Petitioners also cite to testimonial evidence that they believe confirms that sales of non-API certified OCTG are possible and that practical solutions exist while doing nothing to undermine the feasibility of selling green tube (*i.e.*, unfinished OCTG) for further processing in the United States.[78]

Petitioners argue that the record contains no evidence that Russian OCTG imports were barred from the U.S. market, regardless of whether there was a lag in the sanctions taking effect.[79]  Specifically, they contend that the consideration whether these sanctions "effectively excluded" subject imports from Russia from the U.S. market as of vote day is an inquiry that is not required by law.[80]  To the extent that sanctions arose during the POI, however, Petitioners

---

[74] Petitioners' Comments at 21–25.

[75] Petitioners' Comments at 22–25

[76] Petitioners' Comments at 23 (*citing* Slip Op. 24-48 at 22).

[77] Petitioners' Comments at 24 (*citing* TMK Pre-Hearing Brief, Exh. 2).

[78] Petitioners' Comments at 23–24 (*citing* Hearing Transcript at 249–250 (Chapman and Lange).

[79] Petitioners' Comments at 25–30.

[80] Petitioners' Comments at 25–26.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

claim that the Commission's analysis of an overlap of competition remains valid:  significant volumes of subject imports from Russia were present in two of four of the post-invasion months of the POI, were present in [          ] the volume in interim 2022 than in interim 2021, and were not prohibited from entering into the U.S. market.[81]  Petitioners also highlight that subject imports from Russia accounted for [              ] of subject imports in interim 2022 than in interim 2021.[82]  They argue that this data reflects that subject imports from Russia were competing aggressively in the U.S. market and should not be disregarded by the Commission, especially given the lack of data pertaining to the period between the end of the POI and vote day indicating otherwise.[83]

They highlight that, even accepting the proposition that there was a lag in sanctions taking effect, the barring of Russian ships, the production of subject merchandise without API certification, and the revocation of the MFN status in April 2022 did not prevent the importation of a quantity of OCTG from Russia in May 2022, greater than the volume of subject imports from Argentina and Mexico, combined, for both May and June 2022.[84]  Petitioners contend that it would be unreasonable to assume, given the increase in import and sale quantities of Russian OCTG between interim periods, that the last remaining sanction – the elimination of a tariff gap in May 2022 – would completely change the competitive landscape.[85]

---

[81] Petitioners' Comments at 26–27.

[82] Petitioners' Comments at 28.

[83] Petitioners' Comments at 28–29.  Petitioner argues that, while TMK's Post-Hearing Brief provided import data through July 2022, this data was incomplete as data for Russia was limited to 6 HTSUS ten-digit subheadings while 51 HTSUS ten-digit subheadings were reflected in the Commission's import data.  Petitioners' Comments at 29 (*citing* TMK's Post-Hearing Brief, Exh. 2; CR at IV-7).

[84] Petitioners' Comments at 29.

[85] Petitioners' Comments at 29.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

Petitioners claim this is especially true given that all sanctions combined for Russian OCTG (*i.e.*, combining the 25 percent Section 232 tariffs, 35 percent sanction tariff, 1.59 percent highest CVD duties, and 12.84 percent highest non-AFA AD duties), was still less than the AD margin applicable to Argentinian OCTG.[86]

Finally, Petitioners note that TMK's assertions that these sanctions would prevent it from selling OCTG into the U.S. market do not reflect future plans of the entire Russian OCTG industry.[87]  They also argue that TMK's claims are incongruent with its continued efforts to overturn the AD order for access to a market into which they do not intend to sell their product.[88]

**Respondent Tenaris's Arguments**.  Tenaris argues that, given the sanctions imposed on subject imports from Russia following the February 2022 invasion of Ukraine, the Commission should not cumulate subject imports from Russia with those from Argentina and Mexico.[89] Tenaris argues that the Commission "did not consider contrary evidence on the record pertaining to effects of sanctions on Russian OCTG, especially the suspension of API certification on Russian OCTG" and must seek additional information from the parties regarding the suspension of API certification, including on vote day.[90]  Tenaris claims that the Commission's cumulation finding cannot rely on a majority of purchaser questionnaire responses reporting that subject imports from Russia always or frequently met minimum quality specifications and

---

[86] Petitioners' Comments at 29–30.  Petitioners' point appears to be that all of the sanctions, combined, did not create an insurmountable obstacle to selling in the U.S. market.

[87] Petitioners' Comments at 27 (*citing* CR at VII-7, identifying nine Russian OCTG producers and exporters and estimating that TMK accounts for [          ] percent of U.S. imports of OCTG in 2021).

[88] Petitioners' Comments at 27–28.

[89] Tenaris's Comments at 4–6.

[90] Tenaris's Comments at 9–10 (*quoting* Slip Op. 24-48 at 22–23)

is comparable to the domestic like product because these questionnaire responses pertain to

January – June 2022 and therefore "do not reflect responses for quality after the suspension of

API-certification for Russian subject imports, nor does this information address the competitive

impact that losing API certification would have on the subject Russian products."[91]  Tenaris

claims that, even after the relevant pages of Petitioners' posthearing brief are placed on the

record, Petitioners' argument that "Russian producers could still send green tubes to API-

certified processors and then sell the processed tubes in the U.S. market" is mere speculation

as there is no indication that purchasers would choose to purchase non-API certified green

tubes rather than API-certified green tubes, especially given the other sanctions in place.[92]

Tenaris points to, and discusses the "contrary evidence" that the Court faulted the

Commission for failing to consider:  (1) a letter from API indicating that API certification services

ceased effective March 17, 2022;[93] (2) an end user witness who testified that the suspension of

API certification was a "very difficult obstacle" to selling OCTG from Russia in the United

States;[94] (3) a Tenaris witness that testified "no reasonable operator or end user would ever run

the risk of running casing or tubing into their wells without an API monogram";[95] and data

indicating that 28 of 29 purchaser responses identifying "quality meets industry standards" as a

"very important" purchasing factor.[96]  With respect to the API letter, Tenaris highlights specific

language:

---

[91] Tenaris's Comments at 11 (*quoting* Slip Op. 24-48 at 21).
[92] Tenaris's Comments at 11 (*quoting* Slip Op. 24-48, at 21).
[93] Tenaris's Comments at 12 (*citing* TMK Prehearing Brief at Exhibit 2).
[94] Tenaris's Comments at 12 (*citing* Hr'g Tr. at 249 (Lange)).
[95] Tenaris's Comments at 12 (*citing* Hr'g Tr. at 248 (Zanotti)).
[96] Tenaris's Comments at 12 (*citing* CR Table II-11).

**Public Version**



The end-user witness, specifically, Adam Lange, Vice president of Drilling for Tap Rock

Operating, LLC, testified:

> {F}rom an engineering part of it, {using uncertified OCTG} would be a very difficult obstacle to overcome because it is something that we have become very comfortable with knowing, that something has an API stamp and what comes along with it. Perhaps the company that could do their own review of the internal QC and stuff and things of that nature.[98]

Finally, the Tenaris witness, Luca Zanotti, President of Respondent Tenaris USA,

testified:

> {The suspension of API certification} is a major setback for Russia because while in some domestic market, maybe in Russia, they could keep on selling the price, even without the monogram, in the rest of the world, this would not be possible. I have to assume that in the United States and in the rest of international market, no reasonable operator or end user would ever run the risk of running casing or tubing into their wells without an API monogram.[99]

---

[97] Tenaris's Comments at 12 (*citing* TMK Prehearing Brief at Exhibit 2).
[98] Hr'g Tr. at 249 (Lange)).
[99] Hr'g Tr. at 248 (Zanotti).

**Public Version**

Tenaris argues that the Commission must also address the effects of the suspension of API certification in addition to the Section 232 duties beyond stating that "{t}hese measures did not prevent such imports from entering and being sold in the United States in significant quantities from February 2022 to the end of the POI."[100]  Additionally, they imply that the Commission must address that the share of apparent U.S. consumption for subject imports from Russia was 0.7 percentage points lower in interim 2022 compared to interim 2021.[101]

Tenaris also contends that the Commission must address the argument that the post-invasion sanctions may have had a delayed effect and were therefore not reflected in the import data showing entries of Russian OCTG in March and May 2022.[102]  Similarly, it claims that the Commission must address the argument that the imports in March and May "took advantage of an anomaly in the Column 2 duty rates that imposed almost no duty," which was eliminated in June 2022 with the imposition of 35 percent duties on all products from Russia.[103]  Tenaris argues that the Commission must address the record evidence explaining that the March and May 2022 subject imports were temporary.[104]

***Respondent TMK's Arguments***.  TMK argues that the 42-month POI comprised two competitive environments – the first which existed from the time of the filing of the petitions and persisted for most of the POI and the second which began to emerge in February 2022, as

---

[100] Tenaris's Comments at 13 (*quoting* USITC Pub. 5381 at 22–23).

[101] Tenaris's Comments at 13 (*citing* CR Table C-1).  The Commission discounted volume data in interim 2022, as it found that declines in cumulated subject imports' share of apparent U.S. consumption was due to the pendency of the investigations.  *Original Views*, USITC Pub. 5381 at 32 n.184.

[102] Tenaris's Comments at 13–14

[103] Tenaris's Comments at 14.

[104] Tenaris's Comments at 14.  Tenaris provides no citation to the record for the proposition that imports in March and May 2022 were temporary.

various sanctions were imposed on Russian products.[105]  TMK claims that this second

competitive environment included:

> (1) the revocation of Russian producers' ability to API-certify its products on March 17, 2022,14 (2) the withdrawal of most-favored-nation ("MFN") status for Russia by the United States on April 18, 2022,15 (3) the prohibition by the U.S. Government of Russia-affiliated vessels from entering U.S. ports on April 21, 2022, (4) the imposition of an across-the-board increase in tariffs applicable to Russian merchandise imported into the United States to 35 percent on June 27, 2022, and (5) the imposition of private sector shipping boycotts and significant banking sanctions. It should be noted that these trade barriers were added on top of a 25 percent tariff imposed on Russia prior to the start of the investigation period that was not applicable to imports from the other subject countries.[106]

TMK contends that the suspension of API certification services on March 17, 2022, put Russian

OCTG at a substantial competitive disadvantage as supported by the testimony of the Vice

President of Tap Rock Resources, LLC:

> {F}rom an engineering part of it, {using uncertified OCTG} would be a very difficult obstacle to overcome because it is something that we have become very comfortable with knowing, that something has an API stamp and what comes along with it. Perhaps the company that could do their own review of the internal QC and stuff and things of that nature.
>
> But that is part of it is that the API does a lot of that legwork for the E&P (phonetic) industry so that smaller companies, particularly for whom it would be a larger cost, do not have to, you know, do as many inspections don't have to inspect every mill for everything. They can depend on API for that.[107]

Similarly, TMK highlights the testimony of the President of Tenaris USA:

---

[105] TMK's Comments at 6–7.  TMK seems to misapprehend that the petitions underlying these investigations were not filed at the beginning of the POI.  The petitions were filed on October 6, 2021. CR Table I-1.

[106] TMK's Comments at 7.

[107] TMK's Comments at 7 (*quoting* Hr'g Tr. at 283 (Lange)).

**Public Version**

> I would say that, with few exceptions maybe in Russia or China, I
> would not consider, based on the knowledge, that these materials
> or the Russian material without the API monogram can be a
> valuable solution for any operation. Not small, not big. Probably
> even a big operator would be even more sensible, or, say, attentive
> to the API monogram issue for the quality issue that Adam was
> mentioning.[108]

TMK claims that this evidence supports that purchaser's perceptions of and willingness to

purchase Russian OCTG was altered by the suspension of API certification services, rendering

subject imports from Russia non-fungible with other subject imports and the domestic like

product.[109] TMK contends that other record evidence demonstrates subject imports from

Russia had ceased and had no meaningful presence in the U.S. marketplace as of vote day.[110]

TMK argues that the absence of Russian OCTG from the U.S. market on vote day means that

these products do not satisfy any of the Commission's four competitive overlap factors.[111]

TMK also argues that the existence of post-February imports of Russian OCTG does not

support a finding that these imports were competing in the U.S. market on vote day.[112]  First,

TMK claims that subject imports from Russia in March 2022 occurred while only the 25 percent

Section 232 duties and private restrictions were in place and, due to the time needed to ship

merchandise from Russia to the United States, before the suspension of API certification had

---

[108] TMK Comments at 8 (*quoting* Hr'g Tr. at 283–284 (Zanotti)).

[109] TMK Comments at 8–9.

[110] TMK Comments at 9 (*citing* CR at II-12 (indicating that sanctions were imposed in 2022); CR Table VII-28 (indicating that TMK reported no arranged imports after July 2022); TMK Foreign Producer Questionnaire Table II-8 (indicating that TMK reported [ ███████████████████████████████████ ]); TMK Prehearing Br. at Exh.1 ([ ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ] ).

[111] TMK Comments at 9.  TMK did not submit or cite to any supporting documentation that showed that Russian OCTG was absent from the U.S. market in October 2022.

[112] TMK Comments at 9–14.

any effect.[113]  Second, they argue that virtually all Russian imports that entered into the United

States in March and May 2022 entered under HTSUS code 7306.29.2000, which was associated

with a 1.0 percent duty rate.[114]  Third, TMK argues that the May 2022 imports of subject

merchandise occurred after the suspension of API certification, the U.S. ban on Russian ships

entering its harbors, and the revocation of the MFN status , but that the gap in tariff code

7306.29.2000 persisted until June 27, 2022, when the gap was closed and replaced with a 35.0

percent duty rate.[115]  Thus, in effect, TMK argues that neither the March or May 2022 imports

of Russian OCTG occurred under the full effect of all sanctions – of which the last of the

specified sanctions, the replacement of the 1.0 percent tariff rate with a 35.0 percent tariff rate,

occurred on June 27, 2022.[116]

     ***Supplemental Analysis of Fungibility Given the Suspension of API Certification***.  In the

underlying investigations, U.S. purchaser questionnaire responses were issued on June 13, 2022

and were returned to the Commission by July 29, 2022, subsequent to the suspension of API-

certification on March 17, 2022, and therefore does reflect purchasers' impressions of Russian

OCTG following the revocation of API certification services.[117]  Because importers sold a

---

[113] TMK Comments at 13–14.

[114] TMK Comments at 12.  TMK does not argue that these import volumes were not appropriately considered by the Commission, but characterized this importation of subject merchandize as utilizing an unintended "gap" in the tariff schedule before the Commission.

[115] TMK Comments at 13.

[116] TMK Comments at 13.

[117] *See* Blank U.S. Purchaser Questionnaire.  U.S. Purchaser Questionnaire, question III-26 asks, "{h}ow often does OCTG from the following countries meet minimum quality specifications for your uses or your customers' uses?"  U.S. Purchaser Questionnaire, question IV-3 asks, "{f}or the factors listed below, please rate how OCTG produced in each country you identified in your response to the first question in Part IV compares with OCTG produced in each of the other countries you identified?"  *See* Blank U.S. Purchaser Questionnaire at questions III-26 and IV-3.  Thus, nothing in the relevant questions nor the timing of the responses implies that the responses on OCTG from Russia's ability to meet

majority of their subject OCTG produced-to-order and because produced-to-order subject

OCTG had lead times of 111 days, TMK argues that these responses reflected impressions of

API-certified OCTG from Russia held in inventories in the U.S. market or shipped to the U.S.

market prior to the suspension of certification services.[118]  Even *assuming arguendo* that this is

true for questionnaire coverage concerning a portion of total imports of OCTG from Russia, this

only confirms that the suspension of API certification services did not prevent these imports

from competing in the U.S. market, alongside other subject imports and the domestic product,

during the final months of the POI.

In the Commission's Original Views, the Commission noted party arguments on the

potential future effects of the suspension of API certification without adopting either parties'

position.[119]  On remand, we have given additional consideration to this argument and find that

because Russian-produced green tubes can still be sold to API-certified processors in the United

States, the suspension of API certification did not render Russian OCTG non-fungible with

domestic and imported OCTG.  In addition to Petitioners' responses to Commissioner questions

originally cited by the Commission,[120] other evidence also indicates that the suspension of API

---

minimum quality specifications and on comparability pertain only to Russian OCTG prior to March 17, 2022.

[118] TMK Comments at 13–14; CR at II-19.

[119] *See Confidential Views* at 23–24; *Original Views*, USITC Pub. 5381 at 18 ("Of particular note, according to TMK, is that, as of March 2022, [███████████████████████████ ███████████████████████████████████████████████████████ ███████████████████].")*; see also Confidential Views* at 30 n.116; *Original Views*, USITC Pub. 5381 at 23, n.116 ("We also note Petitioners' argument that the [███████████ ████████████████] would not eliminate Russian-produced OCTG from being sold in the U.S. market with the [████████████████████].  According to Petitioners, Russian producers can still sell green tubes to API-certified processors in the United States or a third country, and once those green tubes are processed, the finished OCTG can be stenciled with the [████████████] by the processor and sold in the U.S. market.").

[120] *See* Petitioners' Posthearing Br., Exh. 1 (Answers to Commissioner Questions) at II-56–57.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

certification services would not prevent sales of green tubes from Russia from being further processed [ ███████████████████ ] in the United States.  Specifically, API 5CT specification instructs that processors who heat treat green tubes "shall remove any identity that is not indicative of the new condition of the product as a result of heat treatment (for example, prior grade identity and original pipe manufacturer's name or logo.)"[121]  Thus, Russian OCTG producers could sell non-API certified green tube into the U.S. market and have any indication that it was previously not API-certified, or even that it was produced in Russia, removed by the U.S. processor – in essence, the processed product would be indistinguishable from other API-certified OCTG competing in the U.S. market.  Moreover, subject imports from Russia were sold to processors during each year of the POI and in interim 2022, allowing these processors to have existing relationships with suppliers of Russian OCTG.[122]  For example, domestic producer [ ████████ ], reported buying subject imported green tube from Russia for processing into finished OCTG.[123]

Additionally, the record reflects that limited service OCTG (*i.e.*, OCTG that does not meet API specifications), can still be used in certain OCTG applications.[124]  Indeed, the scope of these investigations and the domestic like product were defined to include both API certified and non-API certified OCTG, and the record indicates that:  (1) non-API certified Russian OCTG

---

[121] Petitioners' Posthearing Br., Exh. 12 (API 5CT Specification (2019 Ed.) at 66.
[122] Petitioners' Posthearing Br., Exh. 1 (Answers to Commissioner Questions) at II-56–57, n.239.
[123] *Confidential Views* at 14, n.45; *Original Views*, USITC Pub. 5381 at 12, n.45; CR at III-30; [ ████████ ] U.S. Producer Questionnaire Response at II-19.  Domestic producers reported obtaining unprocessed/green OCTG from domestic sources, imported sources, or both during each year and interim period of the POI and engaging in processing operations.  *See* CR at Tables F-2–3, F-6–10, F-12, F-15, and F-17.
[124] CR at I-20.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

imported into the U.S. market could compete with other limited service OCTG and (2) non-API certified OCTG from Russia (still produced to API specification) that could be processed in the United States and affixed with the API monogram.[125]  Therefore, upon further consideration on remand, we find that the cessation of API certification does not prevent Russian green tube from being fungible and competing with domestic or imported green tube – either in limited service environments or after being processed in the United States. Thus, we continue to find that the record supports the Commission's finding that Russian OCTG was fungible with domestic and imported OCTG.[126]

With respect to the Commission's fungibility finding concerning Russian OCTG, as well as its finding of simultaneous market presence, the Court directed the Commission to consider "contrary evidence on the record pertaining to the effects of the sanctions on Russian OCTG, especially the loss of API-certification on Russian OCTG."[127]  Specifically, the Court instructed the Commission to address a letter from API appended to TMK's Prehearing Brief,[128] and the hearing testimony of Luca Zanotti, President of Respondent Tenaris USA, indicating the suspension of API certification services would be "a major setback for Russia."[129]  The API letter states in its entirety:

---

[125] CR at I-10–11, 19–20; Petitioners' Posthearing Br., Exh. 1 (Answers to Commissioner Questions) at II-56–57; Exh. 12 (API 5CT Specification (2019 Ed.)) at 66.

[126] We note inventories of Russian OCTG held in the U.S. and Russia would have been eligible for API certification if produced prior to the suspension and imports of those inventories would directly compete with API certified domestic product.  Russian producers maintained [ ▮ ] short tons of OCTG in inventories in interim 2022.  CR Table VII-15.

[127] Slip Op. 24-48 at 23, 27.

[128] Slip Op. 24-48 at 22 (*citing* TMK Prehearing Brief at Exh. 2)).

[129] Slip Op. 24-48 at 22 (*citing* Hearing Tr. at 248 (Zanotti)).  The Court had identified this testimony as from "a witness from API."  Slip Op. 24-48 at 22.  While Dr. Dean Foreman, the Chief Economist of the API, did testify about demand trends during the POI, he did not discuss the effects of

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED



[                                                                    ]¹³⁰

Notably, this letter confirms that certification services were [                    ]

[                                                                                    ]

[                                                                                    ]

[                    ].¹³¹

---

the suspension of API certification on Russian OCTG. *See* Hearing Tr. at 187–190 (Foreman). TMK highlights additional testimony from Luca Zanotti on the same point, stating:

> I would say that, with few exceptions maybe in Russia or China, I would not consider, based on the knowledge, that these materials or the Russian material without the API monogram can be a valuable solution for any operation. Not small, not big. Probably even a big operator would be even more sensible, or, say, attentive to the API monogram issue for the quality issue that Adam was mentioning.

TMK's Comments at 8 (*citing* Hearing Tr. at 250 (Zanotti)).
¹³⁰ TMK's Prehearing Br., Exh. 2 (emphasis added).
¹³¹ TMK Prehearing Brief at Exhibit 2.

Second Luca Zanotti, President of Respondent Tenaris USA, testified:

> {The suspension of API certification} is a major setback for Russia because while in some domestic market, maybe in Russia, they could keep on selling the price, even without the monogram, in the rest of the world, this would not be possible. *I have to assume* that in the United States and in the rest of international market, no reasonable operator or end user would ever run the risk of running casing or tubing into their wells without an API monogram.[132]

Thus, this testimony reflects the assumptions of Respondent's President pertaining to how purchasers in the United States and other markets would react to the suspension of API certification, not the actual views of U.S. and global purchasers on this issue.

Tenaris and TMK in their Remand Comments also urge the Commission to consider additional evidence that they assert shows that uncertified Russian products could no longer be sold in the United States.  They point to the testimony of Adam Lange, Vice president of Drilling for Tap Rock Operating, LLC, who stated "from an engineering part of it, {using uncertified OCTG} would be a very difficult obstacle to overcome."[133]  In context, however, Mr. Lange testified:

> {F}rom an engineering part of it, {using uncertified OCTG} would be a very difficult obstacle to overcome because it is something that we have become very comfortable with knowing, that something has an API stamp and what comes along with it. *Perhaps the company that could do their own review of the internal QC and stuff and things of that nature*.[134]

Notably, Mr. Lange testified that, even absent the API stamp, purchasers could independently review the quality of Russian OCTG to ensure they met their minimum quality specifications.

---

[132] Hr'g Tr. at 248 (Zanotti).

[133] Tenaris's Comments at 12 and TMK's Comments at 8 (*citing* Hearing Tr. at 249 (Lange)).

[134] Hr'g Tr. at 249–250 (Lange).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

Indeed, many purchasers reported having such quality control systems in place, meaning that API certifications were not necessary to qualify as a supplier or singularly critical to purchasers' assessment of quality.  For example, of the 10 purchasers that reported purchasing subject imports from Russia and reported that they require suppliers to undergo a certification process, six ([ ████████████████████████████████████ ████████████████████████████████ ]) reported that they have internal or contracted audit or quality control programs that are done as part of the certification process.[135]  While [ ███████████████ ] reported that it did not require its suppliers to be certified, it clarified that this was because [ █████████████████████ ██████████████████████████████████████ ███████████████████████████████ ████████ ], indicating that well established sources need not go through a pre-qualification process.[136]  [ ███████ ] reported that the question of whether they require supplier qualification was [ ██████████████████████████████ ██████████████████████████ ], again, indicating that once a supplier's quality is established in the market, certifications are of a lesser concern.[137]

---

[135] *See* U.S. Purchaser Questionnaire Responses of [ ████████████████████████ ██████████ ] at III-21.

[136] U.S. Purchaser Questionnaire Response of [ ███████████████ ] at III-21.

[137] *See* U.S. Purchaser Questionnaire Responses at III-21; *see also* CR at II-29 ("These processes involved assessing quality and supplier capabilities, as well as meeting API standards.  Multiple purchasers also described supplier relationships as playing a key role in certification.")

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

Given the above, Tenaris's emphasis on purchaser responses rating "quality meets industry standards" as "very important"[138] would not necessarily mean that purchasers would cease purchasing Russian OCTG, as there is no indication that the quality of these products actually declined, as discussed in the API letter.[139] [140]  Indeed, no responding U.S. purchaser that had purchased subject imports had listed the suspension of API certification as a reason for refusing to certify a supplier since January 1, 2019.[141]  Additionally, of the 16 U.S. purchasers that reported purchasing subject imports from Russia during the POI and that responded to question III-25 ("what characteristics does your firm consider when evaluating the quality of OCTG?"), seven [                                                                                    



].[142]  Of the remaining nine responding purchasers, six reported that the product [                    

] was important to their evaluation of a product's quality,[143] but only three

---

[138] Tenaris's Comments at 12 (*citing* CR Table II-11).

[139] *See* CR Table II-12 (showing that 15 of purchasers with knowledge of the issue reported that subject imports from Russia always or usually met minimum quality specifications while only two indicated that they sometimes met minimum quality specifications, and none reported that they never met minimum quality specifications.); *see also Original Views*, USITC Pub. 5381 at 20, n.95.

[140] We also consider that four purchasers reported that "the start of the Russia-Ukraine war had led to imports from Russia dropping to zero."  CR at II-15.  These responses fail to indicate the timeframe of these imports "dropping to zero," nor do they assert that previously shipped OCTG could no longer be held in inventory and shipped.  More notably, 24 of the 28 purchasers furnishing responses to the Commission's questionnaire reported no such absence of Russian OCTG entering the U.S. market.

[141] *See* Purchaser Questionnaire Responses at III-22.

[142] *See* Purchaser Questionnaire Responses of [                                                                        ] at III-25.

[143] *See* Purchaser Questionnaire Responses of [                                                                                ] at III-25.

reported that the product must be [          ].[144]  Thus, API certification is not the sole

consideration purchasers consider in qualifying suppliers or in assessing the quality of OCTG,

especially when the OCTG remains produced to API specification, as is the case with Russian

OCTG.[145]

       ***Supplemental Analysis of Simultaneous Presence in the U.S. Market Given the***

***Imposition of Sanctions.***  With respect to the Commission's analysis of simultaneous presence

in the U.S. market, the Court held that the Commission failed to address that Russian import

levels during March and May 2022 may not have accurately reflected the effects of sanctions,

given the alleged lag of the sanctions taking effect.[146]  The Court cited to the existence of:  the

April 2022 revocation of Russia's MFN status; the barring of Russian ships in April 2022; and an

unintended gap in Column 2 of the HTSUS tariff tables in May 2022 that imports may have

taken advantage of, which were later eliminated by the President's proclamation 10420 that

raised the tariff rate from 1.0 to 35.0 percent.[147]

       As discussed in Section III.B., the Commission is not required to assess competitive

overlap up to and including vote day.  Indeed, the Commission cannot do so in light of its

statutory obligation to provide the parties with an opportunity for final comment.  Thus, to the

extent that these sanctions may have had a lag in having an effect *following* the POI, this is

---

      [144] *See* Purchaser Questionnaire Responses of [                                    
          ] at III-25.

      [145] *See Original Views*, USITC Pub. 5381 at 20, n.95.

      [146] Slip Op. 24-48 at 26–27.

      [147] Slip Op. 24-48 at 26.  The Court had described HTSUS 7306.29.2000 as "not intended for 'Oil
or Gas Drilling.'"  *Id*.  We note that the relevant provision under which virtually all of the post-invasion
imports of OCTG from Russia were entered was HTSUS 7306.29.2000, which explicitly falls under the
superior text of "Casing and tubing of a kind used in drilling for oil or gas."  HTS Chapter 73 (2022 Basic
Ed.)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

beyond the purview of what the Commission is required to consider.  Additionally, consistent

with our longstanding approach toward addressing the cumulation factors, we assessed and

continue to assess whether there existed a reasonable overlap of competition across the entire

42-month POI, not just the final four months of the period of investigation.  There is no dispute

that both imports and inventories of OCTG from Russia were simultaneously present in the U.S.

market in the vast majority of those months.[148]  Nonetheless, in light of the Court's instructions,

we give additional consideration to whether the sanctions highlighted by the Court and the

parties prevented subject imports from Russia from being simultaneously present in the U.S.

market during the POI, including during the post-invasion portion of the POI.



TMK highlights that in its Foreign Producer Questionnaire, Table II-8, it reported [████

██████████████████████████████████ ]), and that it has stated it [████████

████████████████████████████████████████████████████████

████████████████████████████████████ ].[149]

Regardless of TMK's stated plans to [████████████████████████ ] into

the United States during the first quarter of 2022, TMK does not account for the entirety of the

Russian OCTG industry.[150]  Moreover, we observe that official import statistics show that

subject imports from Russia did in fact enter into the United States in interim 2022, despite

---

[148] *See* CR Tables IV-18 and IV-23.

[149] TMK Comments at 9 (*citing* CR at II-12; TMK Foreign Producer Questionnaire Table II-8; TMK Prehearing Br. at Exh. 1.).

[150] CR at VII-17 (indicating that TMK Group's exports to the United States accounted for approximately [████ ] percent of U.S. imports of OCTG from Russia in 2021, based on official Commerce import statistics).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

TMK [⬛⬛⬛⬛⬛⬛⬛⬛] to the United States during this period.[151]  Similarly, despite the statement contained in Exhibit 1 of TMK's Prehearing Brief, subject imports from Russia also entered into the U.S. market in the second quarter of 2022 in relatively high volumes, as discussed below, were shipped in the U.S. market in interim 2022, and were held in importers' inventory at the end of interim 2022.[152]

On remand, and consistent with the approach we have uniformly taken in other investigations, we continue to base our analysis of a competitive overlap on the totality of evidence reflecting trends throughout the POI – the data the Commission collected covered a three-and-a-half-year period which ended on June 30, 2022.  Import data during the final four months of the POI showed that previously imposed sanctions did not eliminate the Russian imports from the U.S. market.[153]  First, the Section 232 duties were in place since 2018 and did not prevent subject imports from Russia from competing in the U.S. market throughout the POI.[154]  Second, the Section 232 duties (2018) and the suspension of API certification (March 17, 2022), did not prevent subject imports from Russia from entering into the U.S. in March 2022 in volumes that were 69.0 percent higher than in March 2021.[155]  Third, all of these sanctions combined, plus the revocation of Russia's MFN status (April 18, 2022) and bans on Russian ships from entering U.S. ports (April 2022) did not prevent subject imports from Russia from entering

---

[151] *See* CR Table IV-18.  While this may be a function of the lead time required for [⬛⬛⬛⬛⬛⬛⬛⬛], it may also reflect imports from the other [⬛⬛] percent of the Russian OCTG industry.  [⬛⬛] Foreign Producer Questionnaire at II-8.
[152] *See* CR Tables IV-18, C-1, C-2, and G-4.
[153] *Original Views*, USITC Pub. 5381 at 22–23.
[154] *See* CR at I-12.
[155] *Calculated from* CR Table IV-18.  We note that the volume of subject imports from Russia was 40.0 percent higher in interim 2022 than in interim 2021, prior to the imposition of any sanctions with the exception of the Section 232 duties.  CR Table C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

into the U.S. market in May 2022 in volumes 25.0 percent higher than in May 2021.[156] In

particular, the combined volume of subject imports from Russia was 47.5 percent higher in

March and May 2022, after the imposition various sanctions, than in March and May 2021.[157]

 In Tenaris's Remand Comments, Tenaris emphasizes data that we have already

discussed in the Commission's Original Views, specifically that subject imports from Russia

accounted for a lower share of apparent U.S. consumption in interim 2022 than in interim

2021.[158]  As explained in the Original Views, the Commission determined to give less weight to

volume data for interim 2022 based on its finding that declines in cumulated subject imports'

share of apparent U.S. consumption were due to the filing of the petitions.[159]  Even then,

notwithstanding the decline in the share of apparent U.S. consumption for *all* cumulated

subject imports between interim periods, the share of subject imports and shipments of subject

imports from Russia accounted for [       ] respectively of subject imports as

well as importers' U.S. shipments of subject merchandise in interim 2022 than in interim

2021.[160]  Specifically, Russian OCTG accounted for [   ] percent of U.S. importers' shipments

of subject OCTG in interim 2022 compared to [   ] percent in interim 2021.[161]  Likewise,

imports from Russia accounted for [   ] percent of subject imports in interim 2022 compared

to [   ] percent of subject imports in interim 2021.[162]  Thus, while the market share of all

---

[156] *Calculated from* CR Table IV-18.  We also note that other subject imports and the domestic product compete not with just post-sanction imports of Russian OCTG, but also with imports of these products already entered into the United States and held in U.S. inventories.  *See* CR Table VII-27.
[157] *Calculated from* CR Table IV-18.
[158] Tenaris's Comments at 13 (*citing* CR Table C-1).
[159] *Original Views*, USITC Pub. 5381 at 32, n.184; see 19. U.S.C. § 1677(7)(I).
[160] *See* CR Table C-1.
[161] *Calculated from* CR Tables G-4 and G-6.
[162] *Calculated from* CR Table IV-3.

Public Version

subject imports declined due to the effect of the filing of the petitions, the volume of subject

imports from Russia and shipments of these imports remained high relative to those of subject

imports from other sources, further corroborating that, during the POI, the sanctions did not

affect whether of Russian OCTG competed with other subject imports or the domestic like

product.

### D.  The Commission's Consideration of Nonsubject Imports from South Korea.[163]

The Court remanded aspects of the Commission's cumulation analysis relating to its

consideration of OCTG from South Korea.  Specifically, it held that the Commission's

consideration of data relating to non-subject imports (*i.e.*, Hyundai imports) from South Korea

in its cumulation analysis was not in accordance with law.[164]

The Court found that this affected the Commission's analysis of two of the cumulation

factors, specifically:  responses on interchangeability and comparability contained in Tables II-

15–II-17 (utilized in the Commission's fungibility analysis);[165] responses relating to the

importance of factors other than price in purchasing decisions Tables II-18–II-20 (also utilized in

the Commission's fungibility analysis);[166] and official import data on borders of entry in Table

IV-17 (relating to the Commission's geographic overlap analysis).[167]  Although not identified by

the Court, the Commission also cited to Table II-14 (comparability across purchasing factors) in

---

[163] For the purposes of these remand determinations, this section discusses points 3 and 4 of the Court's remand instruction.
[164] Slip Op. 24-48 at 37.
[165] Slip Op. 24-48 at 38–39.
[166] Slip Op. 24-48 at 39–40.
[167] Slip Op. 24-48 at 39–40.

its fungibility analysis and to Table IV-18 in its simultaneous presence analysis, which provides

monthly import data by country and includes data relating to nonsubject imports.[168]

**Petitioners' Arguments**.  As an initial matter, Petitioners clarify that the Commission

never cumulated nonsubject imports with subject imports in material injury analysis.[169]  They

contend that the tables contained in the Commission's Supplemental Memorandum continue

to support [ ███ ] the Commission's original fungibility, geographic overlap, and simultaneous

presence conclusions.[170]

They explain that, with respect to its fungibility finding, the Commission relied in part on

market participant responses regarding interchangeability, the importance of factors other than

price in purchasing decisions, and purchaser responses on comparably across purchasing

factors.[171]  Petitioners argue that Supplemental Table 3 reflects that [ ██████████ ] of

importers reported that subject imports from South Korea are always or frequently

interchangeable with OCTG from all other sources, regardless of the level of exclusion

utilized.[172]  Similarly, they argue that Supplemental Table 4 reflects that [ ██████ ] of

purchasers consider subject South Korean imports as always or frequently interchangeable with

[ ████████ ], regardless of the level of exclusion.[173]  They also note that Supplemental

---

[168] *See Original Views*, USITC Pub. 5381 at 20, n.99 and 22, n.112; *see also* Table IV-18 at note. Although the Court stated it was remanding for further consideration of the "ITC's determination to cumulate non-subject imports from Korea" we clarify that in neither our Original Views nor in this remand determination did we include the non-subject imports from Korea in our assessment of the volume, price effects, and impact of the cumulated subject imports on the domestic industry.

[169] Petitioners' Comments at 2, n.8.

[170] Petitioners' Comments at 2–6.  The Commission did not consider nonsubject imports in its channels of distribution analysis, so the Supplemental Memorandum does not supplement this discussion.

[171] *Original Views*, USITC Pub. 5381 at 19.

[172] Petitioners' Comments at 3.

[173] Petitioners' Comments at 3.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

Tables 5 and 6 reflect that [ ███████ ] importers and purchasers reported that factors other than price are sometime or never significant in purchasing decisions in every comparison.[174]

Finally, Petitioners claim that Supplemental Tables 7 through 11 reflect that [ ███████ ███████ ] of responding purchasers rated South Korean imports as comparable in all comparisons across [ █████ ] purchasing factors, regardless of the level of exclusion utilized.[175]

While highlighting that the supplemental tables continue to support the Commission's original findings, Petitioners caution against utilizing exclusion 3, which excludes responses from U.S. purchasers that reported purchases of South Korean OCTG from [ ███████ ███████ ] that was listed as a customer of Hyundai Steel; [ ██████ ] also was listed [ ██████ ███████████████████████████████████████████████████████████ ██████████ ].[176]  They argue that exclusion 3 is too attenuated to reasonably be characterized as reflecting the exclusion of nonsubject imports from South Korea and may improperly exclude subject imports from the Commission's analysis as well.[177]  They emphasize that the Commission is not required to rely on perfect data and, in situations where it is not possible to precisely delineate which data reflects subject and nonsubject imports, their preferred approach would not be to disregard the source entirely – especially in instances where [ ██████████████████████████████████████████████████████ ].[178]

***Respondent Tenaris's Arguments***.  Tenaris argues that both the Commission's original tables and the tables contained in the Supplemental Memorandum fail to reliably exclude

---

[174] Petitioners' Comments at 4–5.
[175] Petitioners' Comments at 5.
[176] Petitioners' Comments at 5; *see e.g.*, Supplemental Memorandum Table 4, note.
[177] Petitioners' Comments at 5–6.
[178] Petitioners' Comments at 6.

nonsubject imports from South Korea for the purposes of its fungibility analysis, and reliance on these tables will not comply with the Court's order.[179]  Tenaris, however, concedes that Supplemental Tables 1 (relating to the Commission's assessment of geographic overlap) and 2 (relating to the Commission's assessment of simultaneous presence) separate data concerning nonsubject imports from subject imports from South Korea.[180]

Tenaris argues that the remaining tables (relating to the Commission's assessment of fungibility) utilize qualitative information that does not ensure that nonsubject imports are eliminated and therefore do not satisfy the Court's order.[181]  First, Tenaris claims that separation of Hyundai's response in Supplemental Tables 3 (importer responses on interchangeability) and 5 (importer responses on the significance of differences other than price) do not ensure that the remaining responding importers were only referring to subject imports in furnishing their responses and any attempt to review questionnaire responses to ascertain whether this is the case would be speculative.[182]  Second, Tenaris argues that Supplemental Tables 4 (importer responses on interchangeability), 6 (purchaser responses on the significance of differences other than price), and 7–11 (purchaser responses on comparability by purchasing factor) suffer from the same flaw in that, regardless of whether a purchaser purchased imports from Hyundai or a distributor Hyundai sold to, its responses still

---

[179] Tenaris's Comments at 15–25.
[180] Tenaris's Comments at 17–18.
[181] Tenaris's Comments at 18.
[182] Tenaris's Comments at 19–20.  Tenaris implies, inapposite to the arguments it advanced before the CIT, that exclusion of Hyundai's importer responses in Supplemental Tables 3 and 5 may be inappropriate, as its responses cannot conclusively be determined to only correspond to only its own OCTG.  *Id.*

might reflect their impressions of Hyundai's OCTG.[183]  Third, for each exclusion contained in Supplemental Tables 4, 6, and 7–11, Tenaris claims that it is not possible to know if the excluded responses covered only nonsubject imports from South Korea or if they also exclude subject imports from South Korea.[184]  Fourth, Tenaris argues that when responses are excluded from the tally of total responses, the number of responses supporting the Commission's fungibility finding declines (*e.g.*, "when all three exclusions apply, the number of U.S. purchasers reporting OCTG from South Korea is 'always' interchangeable with OCTG Argentina or Mexico reduces from 5 to 2, and the number reporting OCTG from South Korea is 'frequently' interchangeable reduces from 5 to 3 for Argentina and 6 to 4 for Mexico.")[185] Finally, Tenaris contends that other record evidence shows that subject imports from Argentina and Mexico primarily or exclusively consist of seamless OCTG while subject imports from South Korea consists of welded OCTG, limiting their fungibility.[186]  They also cite to differences in AUVs between OCTG from South Korea and OCTG from Argentina and Mexico as limiting fungibility.[187]  According to Tenaris, this Commission should rely on this other record evidence, rather than the qualitative tables and find that the imports from Argentina and Mexico are not fungible with imports from Russia and Korea.[188]

    ***Respondent TMK's Arguments.***  TMK does not advance arguments concerning the Commission's consideration of nonsubject imports from South Korea.

---

[183] Tenaris's Comments at 20–23.
[184] Tenaris's Comments at 22–23.
[185] Tenaris's Comments at 23–24.
[186] Tenaris's Comments at 25.
[187] Tenaris's Comments at 25.
[188] Tenaris's Comments at 25.

Public Version

*Analysis*.  We continue to emphasize that nothing in this record indicated that there were meaningful producer-specific differences among imports of OCTG from South Korea. Indeed, despite Commerce's negative preliminary determinations with respect to imports from South Korea, no party requested that the Commission examine distinctions in products exported from different Korean producers in its draft questionnaires.[189]  Moreover, Respondents continuously referred to South Korean imports, as a whole, making no distinction between subject and Hyundai imports.[190]

Nonetheless, in order to comply with the Court's instructions, the Commission retabulated the data to assure that it was not including non-subject Hyundai OCTG in its analysis of competitive overlap.  The Commission segregated South Korean data in various different permutations contained in the Supplemental Tables 1–11.[191]  As explained in this

---

[189] *See* Tenaris's Comment on draft Questionnaires, EDIS Doc. 763299 (February 15, 2022).  As discussed in Section I, above, Commerce's preliminary negative CVD determinations with respect to South Korea were rendered on March 14, 2022, and the Commission issued Questionnaires to market participants on June 12, 2022.  Commerce did not render its final CVD determinations until September 29, 2022, finding a *de minimis* rate for only Hyundai.  Given this timing, which would be the case for nearly all investigations, it would be impossible for the Commission to anticipate *de minimis* rates for any specific producer/exporter.  Thus, absent any request or argument from parties to the contrary distinguishing products from specific producers/exporters, the Commission generally asks market participants on their impressions of in-scope merchandise from whole countries subject to investigation.

[190] *See e.g.*, *Original Views*, USITC Pub. 5381 at 18 ("Tenaris argues that imports from Argentina and Mexico should not be cumulated with imports from South Korea.  Imports from Argentina and Mexico, it contends, primarily comprise seamless OCTG sold to end users, while imports from South Korea primarily comprise welded OCTG sold to distributors.").

[191] Supplemental Memorandum.  Tables 1 and 2 present geographic and monthly official import statistics adjusted using proprietary, Census edited Customs records to reclassify imports from Hyundai as "nonsubject imports" (corresponding to CR Tables II-17 and II-18).  Tables 3 and 5 present importer questionnaire responses regarding interchangeability and the significance of differences other than price, and separate and exclude responses by importer Hyundai (corresponding to CR Tables II-16 and II-19).  Tables 4 and 6 present purchaser questionnaire responses regarding interchangeability and the significance of differences other than price, and separate and exclude responses by firms that purchased, or might have purchased, OCTG imported by Hyundai Steel USA (corresponding to CR Tables II-17 and II-20).  Tables 7 through 11 present purchaser questionnaire responses comparing 15

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

supplemental remand document, geographic and monthly official import statistics were

adjusted to distinguish between subject imports from South Korea and nonsubject imports

from South Korea for its geographic overlap and simultaneous presence analyses.[192]  Similarly,

the data for interchangeability, comparability, and the significance of differences other than

price show three different permutations, removing to varying degrees responses from U.S.

purchasers that reported purchasing from Hyundai, U.S. purchasers that Hyundai reported

selling to, or U.S. purchasers that reported purchasing from a distributor who purchased from

Hyundai.[193]  Thus, these exclusions eliminate from the pool of responses impressions of

purchasers who may have had Hyundai's OCTG in mind when furnishing responses on

interchangeability, comparability, and the importance of non-price factors.  Hyundai's importer

---

characteristics of OCTG from South Korea and other sources, and separate and exclude responses by
firms that purchased, or might have purchased, OCTG imported by Hyundai (corresponding to CR Table
II-14).

[192] Supplemental Memorandum, cover note.

[193] Supplemental Memorandum, cover note.  **Exclusion 1** excludes from the dataset the
response of the U.S. purchaser that reported purchasing specifically from Hyundai in its list of top
suppliers in the U.S. purchasers' questionnaire response (question II-6), [ ▮▮▮▮▮ ].

**Exclusion 2** excludes from the datasets the responses of the U.S. purchaser in Exclusion 1 and
the U.S. purchasers besides [ ▮▮▮▮ ] that the U.S. importer Hyundai listed in its list of top U.S.
customers in its U.S. importers' questionnaire response (question III-23):  [ ▮▮▮▮▮▮ ].  While [ ▮▮
▮▮ ] was listed by Hyundai Steel as a customer, [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ] (U.S. purchasers'
questionnaire, question II6).

**Exclusion 3** excludes from the datasets responses from the U.S. purchasers in Exclusions 1 and 2,
and U.S. purchasers that reported purchasing South Korean OCTG from [ ▮▮▮▮▮▮▮▮▮▮ ] that
was listed as a customer of Hyundai:  [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ ].  The [ ▮▮▮▮▮▮▮▮▮▮ ], however, also was listed [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ ].  *See e.g.*, Supplemental Memorandum Table 6 note.

These exclusions only apply to purchaser responses in Supplemental Memorandum Tables 4, 6-
11.

questionnaire response was also separated from the U.S. importer responses in the

Supplemental Tables.[194]

Each table in the supplemental memorandum, from the least stringent exclusion 1 to

the most stringent exclusion 3, continues to support the Commission's original fungibility,

geographic overlap, and simultaneous presence findings.[195]

As stated in the Commission's original analysis of fungibility, "{m}ajorities of responding

domestic producers, importers, and purchasers, when comparing the domestic like product

with imports of OCTG from each subject country and when comparing imports from the subject

countries with each other, reported that these products are always or frequently

interchangeable."[196]  This remains true even after excluding the response of Hyundai from

importer responses[197] and regardless of the level of exclusion applied to purchaser

responses.[198]  The Commission also stated that, "majorities of responding domestic producers,

importers, and purchasers reported that factors other than price are only sometimes or never

significant in purchasing decisions between and among imports from each subject country and

the domestic like product.[199]  Again, this remains accurate even after excluding the response of

Hyundai from importer responses[200] and regardless of the level of exclusion applied to

purchaser responses.[201]  Finally, the Commission stated that, "majorities or pluralities of

---

[194] *See e.g.*, Supplemental Memorandum Tables 3 and 5.
[195] The exclusions are applied cumulatively. Thus, the responses taken into account under exclusion 3 includes responses from all purchasers less those excluded in exclusions 1, 2 and 3.  *See e.g.*, Supplemental Memorandum Table 4.
[196] *Original Views*, USITC Pub. 5381 at 19.
[197] *See* Supplemental Memorandum Table 3.
[198] *See* Supplemental Memorandum Table 4.
[199] *Original Views*, USITC Pub. 5381 at 19.
[200] *See* Supplemental Memorandum Table 5.
[201] *See* Supplemental Memorandum Table 6.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

responding purchasers rated imports from each source as comparable with both each other and the domestic like product with respect to at least 14 of 15 purchasing factors."[202]  Yet again, this remains true regardless of the level of exclusion applied to purchaser responses.[203]  Thus, we find that by any permutation, after the exclusion of importer and purchaser responses that may relate to nonsubject imports from South Korea, the remaining questionnaire responses continue to support the Commission's original finding of fungibility between subject imports from South Korea and each other subject country, as well as with the domestic like product.

With respect to the analysis of geographic overlap, the Commission stated in its Original Views that "nearly all subject imports from all four sources entered the United States through the Southern border of entry."[204]  Supplemental Table 1 shows that, even if Hyundai imports are excluded, the vast majority ([ ███ ] percent) of subject imports entered into the U.S. market through the southern border.[205]  Thus, we find that this table corroborates the Commission's original finding that imports from each subject country and domestically produced OCTG were sold in overlapping geographical areas.

With respect to its analysis of simultaneous market presence, the Commission stated in its Original Views that , "{t}he domestic like product and subject imports from all subject countries were simultaneously present throughout almost the entire POI."[206]  We find that

---

[202] *Original Views*, USITC Pub. 5381 at 19.
[203] *See* Supplemental Memorandum Tables 7–10.  Responses in these table actually reflect comparability across all 15 purchasing factors.  *Id*.
[204] *Original Views*, USITC Pub. 5381 at 22.
[205] *See* Supplemental Memorandum Table 1.
[206] *Original Views*, USITC Pub. 5381 at 22.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

Supplemental Table 2, adjusted to exclude Hyundai's nonsubject imports, shows that subject imports from South Korea were present in the U.S. market in [ ▮ ] of [ ▮ ] months of the POI, thereby supporting the Commission's original simultaneous presence finding.[207]

To the extent the Court appeared to agree with the Commission that the record supported a reasonable overlap of competition between OCTG from Mexico and Argentina and OCTG from South Korea if non-subject imports are excluded from the cumulation analysis,[208] Supplemental Tables 3 and 4 also continue to support this conclusion, with majorities of importers and purchasers reporting that subject imports were "always" or "frequently" interchangeable in every comparison, regardless of the level of exclusion applied.[209]  Likewise, Supplemental Table 1 remedies the Court's concern that the Commission's finding of a geographic overlap supporting cumulation was supported by evidence on the record but for Table IV-7's inclusion of nonsubject imports.[210]

Tenaris argues that, when responses are excluded from the tally of total responses, the number of responses supporting the Commission's fungibility finding declines.[211]  While the total number of responses supporting and detracting from its fungibility decline as progressively restrictive exclusions are applied, the proportion of these responses supporting the Commission's original fungibility findings remains consistent with the original

---

[207] *See* Supplemental Memorandum Table 2.
[208] Slip Op. 24-48 at 39.  In the underlying investigations, Respondents had argued that subject imports from Argentina and Mexico were not fungible with other subject imports and the domestic like product because:  (1) subject imports from South Korea primarily consist of welded OCTG, whereas subject imports from Argentina and Mexico primarily or exclusively consist of seamless OCTG and (2) subject imports from Argentina and Mexico hid higher average unit values ("AUVs") compared to the AUVs of subject imports from Russia and South Korea.  *See Original Views*, USITC Pub. 5381 at 20–21.
[209] Supplemental Memorandum Tables 3 and 4.
[210] Slip Op. 24-48 at 40.
[211] Tenaris's Comments at 23–24.

**Public Version**

investigations.  In relevant part, "{m}ajorities of responding . . . importers, and purchasers . . . reported that these products are always or frequently interchangeable{,}" "majorities of responding . . . importers, and purchasers reported that factors other than price are only sometimes or never significant in purchasing decisions{,}" and "majorities or pluralities of responding purchasers rated imports from each source as comparable with both each other and the domestic like product with respect to at least 14 of 15 purchasing factors."[212]  While Tenaris focuses on the impossibility of knowing precisely what responding firms were thinking when responding,[213] this would be the case for any qualitative question utilized in any investigation.  As discussed above, these supplemental tables and associated exclusions are aimed at increasing the likelihood that qualitative responses only refer to subject imports by excluding the response of Hyundai from importer responses, by excluding the responses of any purchaser who listed Hyundai as a supplier or vice versa, and by excluding the responses of any purchaser that may have purchased OCTG from a distributor that purchased from Hyundai.[214]

### E.  Addressing Arguments on the Effects of the Existing AD Order on Subject Imports from South Korea.

The Court directed the Commission to address party arguments concerning "the possible effects resulting from subject imports from South Korea that were under an antidumping {duty} order in its final determination."[215]

---

[212] *Original Views*, USITC Pub. 5381 at 19.
[213] Tenaris's Comments at 15–25.
[214] As noted above, Petitioners argue that exclusion three is *too stringent*.  Petitioners' Comments at 6.  Yet, even so, this Table also corroborates our findings of overlap of competition.
[215] Slip Op. 24-48 at 41.

Public Version

***Petitioners' Arguments***.  Petitioners argue that nothing on the record supports that the existing AD order on subject imports from South Korea prevented such imports from sharing a reasonable overlap of competition with other subject imports and the domestic like product.[216] Petitioners dispute Respondents' assertion that, because dumping for subject imports from South Korea has already been remedied by the imposition of an AD order, any "harm to the U.S. industry attributable to South Korean imports would have to be based solely on underselling caused by subsidies, but these subsidies were found to be a *de minimis* {sic} amount of 1.33% on a portion of South Korean imports."[217]  They argue that it was inaccurate to characterize the 1.33 percent CVD margin as *de minimis*, as Congress fixed the *de minimis* threshold at 1.0 percent, and "neither the Commission nor the Court can raise the bar to redress this actionable subsidization."[218]  They also argue that the AD duties applicable to these imports remedy dumping but do not preclude cumulation to analyze the effects of and address the unremedied subsidization.[219]  Petitioners maintain that the cumulation provision explicitly contemplates cumulation under 19 U.S.C. § 1671a(b) and § 1673a(b), the CVD and AD sections of the statute

---

[216] Petitioners' Comments at 6–11.  Petitioners also dispute Respondents' earlier allegations that cumulation under these circumstances is inconsistent with the WTO Antidumping Agreement and Subsidies and Countervailing Measures Agreement.  Petitioners' Comments at 7–8, (*quoting Corus Staal BV v. Dep't of Com.*, 395 F.3d 1343, 1348 (Fed. Cir. 2005)); *see also* 19 U.S.C. § 2504(a) ("No provision of any trade agreement ... nor the application of any such provision to any person or circumstance, which is in conflict with any statute of the United States shall be given effect under the laws of the United States.").  The Commission need not address these arguments, since its determination must be based on U.S. law, not the WTO Agreements.  Likewise, Tenaris's discussion of the WTO Agreements in its Comments are not pertinent to the Commission's remand determination.  *See* Tenaris's Comments at 26.

[217] Petitioners' Comments at 7 (*quoting* Slip Op. 24-48 at 34). We note that Commerce did not find that the subsidization rate for subject imports from South Korea were *de minimis*, as 1.33 is above the 1.0 percent *de minimis* threshold.

[218] Petitioners' Comments at 8 (*citing* 19 U.S.C. §§ 1671b(b)(4)(A), 1671d(a)(3)).

[219] Petitioners' Comments at 9.

and "promote{s} certainty in antidumping and countervailing duty investigations by defining, at the time of filing, the countries potentially subject to cumulative analysis."[220]  Finally, Petitioners highlight that Respondents' sole support for the proposition that a low subsidization margin is relevant to any aspect of the Commission's analysis is a citation to dissenting views in *Pads For Woodwind Instrument Keys From Italy*, a single-country case in which the majority found that the domestic industry was materially injured by imports with a 1.09 percent dumping margin.[221]

    ***Respondent Tenaris's Arguments.***  On this issue, Tenaris largely relies on arguments made by TMK during the preliminary and final investigations.  Specifically, Tenaris states that the Commission failed to address the implications of the existing AD order, imposed years prior to the current investigations on subject imports from South Korea.[222]  Tenaris insists that the Commission must "finally address" the argument that subject imports from Korea are subject to different conditions of competition due to the disciplining effect of the AD order on prices for subject imports from South Korea.[223]

    ***Respondent TMK's Arguments.***  TMK does not advance arguments concerning the existing AD order on South Korean imports.

---

[220] Petitioners' Comments at 9 (*citing* 19 U.S.C. § 1677(7)(G)(i)(I) and *quoting SAA*, H.R. Doc 103-316, Vol. 1 (1994) at 848).

[221] Petitioners' Comments at 10–11 (*citing Pads For Woodwind Instrument Keys From Italy*, Inv. No. 731-TA-152 (Final), USITC Pub. 1566 (Aug. 1984) at 20 (minority Views of Chairwoman Paula Stern and Vice Chairman Liebler).  Petitioners argue that TMK had presented these views as the views of the Commission majority before the CIT.  TMK Rule 56.2 Brief at 29.

[222] Tenaris's Comments at 25–27.

[223] Tenaris's Comments at 27.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

*Analysis*.  As an initial matter we note that, notwithstanding an order remedying the dumping of OCTG imports from South Korea, Commerce found the non-Hyundai imports from South Korea to still be unfairly traded through subsidization at above *de minimis* levels.[224]  The dumping order would not address injury resulting from the subsidization of these imports, and the dumping order is only capable of discipling the level of dumping not the level of subsidization.  In addition, the existence of the AD order did not result in differences in the way these imports competed in the U.S. market to render cumulation inappropriate based on the Commission's four cumulation factors.  As reviewed below, analysis of the four factors used in the Commission cumulation analysis show that subject imports from South Korea were fungible with imports from other subject countries, sold in overlapping channels of distribution and in overlapping geographic markets, and simultaneously present in the U.S. market.  Furthermore, the record shows that, even while under the discipline of the AD order, subject imports from South Korea [          ] the domestic like product in the [          ] of quarterly price comparisons and Respondents put forward no evidence in support of their assertion to the contrary.[225]

**F.    Summary of Our Four-Factor Analysis of Competitive Overlap, Supplemented by the Commission's Additional Findings on Remand.**

In our original determinations, we found it was appropriate to cumulate subject imports from all four countries because, in relevant part, there was "a reasonable overlap of

---

[224] 19 U.S.C. § 1671d(a)(3) (setting the *de minimis* threshold at 1.0 percent as defined in 19 U.S.C. § 1671b(b)(4)(A)).

[225] CR Table V-17.

**Public Version**

competition between subject imports from Argentina, Mexico, Russia, and South Korea, and among subject imports from each source and the domestic like product."[226]

> ***Fungibility***.  The Commission originally found that:

> > **(1)** Majorities of responding domestic producers, importers, and purchasers, when comparing the domestic like product with imports of OCTG from each subject country and when comparing imports from the subject countries with each other, reported that these products are always or frequently interchangeable. **(2)** Likewise, majorities of responding domestic producers, importers, and purchasers reported that factors other than price are only sometimes or never significant in purchasing decisions between and among imports from each subject country and the domestic like product. **(3)** Moreover, majorities or pluralities of responding purchasers rated imports from each source as comparable with both each other and the domestic like product with respect to at least 14 of 15 purchasing factors. **(4)** Consistent with these responses, the record shows that there was a substantial degree of overlap between U.S. shipments of subject imports from each source and domestically produced OCTG in terms of end finish, grade, and product type in 2021, and that all OCTG, regardless of source, is generally produced in accordance with API standards. **(5)** We also note that there were imports of seamless OCTG from each subject source throughout the POI, and that the domestic industry produced seamless OCTG throughout this period.[227]

In Section III.D., we gave additional consideration to importer and purchaser responses, excluding data from Hyundai and various iterations of purchasers who purchased from Hyundai, directly or indirectly.  With respect to point one, we found that importer responses excluding Hyundai continued to show that majorities of importers reported that subject imports from South Korea imports were always or frequently interchangeable with subject imports from

---

[226] *Original Views*, USITC Pub. 5381 at 19.
[227] *Original Views*, USITC Pub. 5381 at 19–20 (internal citations omitted and numbers added). Point five was not challenged before the Court and did not include consideration of nonsubject imports.

Public Version

Argentina, Mexico, and Russia and with the domestic like product.[228]  We also found that responses of majorities of U.S. purchasers continued to show that subject imports from South Korea imports were always or frequently interchangeable with subject imports from Argentina, Mexico, and Russia and with the domestic like product, regardless of the level of exclusion applied.[229]  Thus, even when excluding responses from its analysis so as to increase the likelihood that qualitative responses only refer to subject imports and not nonsubject imports from South Korea, point one of the Commission's fungibility analysis is supported by importer and purchaser responses.

We also gave additional consideration to purchaser and importer responses regarding the relative importance of non-price factors using the same methodology.  With respect to point two, We found that majorities of importer responses continued to show that non-price factors were sometimes or never significant, even when excluding the response of Hyundai.[230]  Similarly, we found that majorities of purchasers reported the same, regardless of the level of exclusion applied.[231]  Accordingly, the record continues to support point two underpinning the Commission's fungibility finding, even when excluding responses from its analysis so as to increase the likelihood that qualitative responses only refer to subject imports and not to nonsubject imports from South Korea.

On remand, we also considered purchaser responses on the comparability of subject imports from all sources and the domestic product across 15 purchasing factors.  With respect

---

[228] *See* Supplemental Memorandum Table 3.
[229] *See* Supplemental Memorandum Table 4.
[230] *See* Supplemental Memorandum Table 5.
[231] *See* Supplemental Memorandum Table 6.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

to point three, we found that regardless of the level of exclusion applied, majorities or pluralities of purchasers reported that subject imports from South Korea were comparable to imports from each other source and the domestic like product across at all 15 purchasing factors.[232]  Therefore, the record continues to support point three of the Commission's fungibility finding, even when excluding responses so as to increase the likelihood that qualitative responses only refer to subject imports and not nonsubject imports from South Korea.

Finally, we gave additional consideration to the effects of the sanctions imposed on subject OCTG from Russia in the final four months of the POI, including the suspension of API certification services, in Section III.C., above.  We found that, regardless of whether it was stamped with an API monogram, Russian OCTG remained fungible with subject imports from other sources and the domestic product in the context of limited service environments, which do not require API certified OCTG.  We also found that non-API certified unfinished (*i.e.*, green tube) Russian OCTG remained fungible and competed with other unfinished subject imports and the domestic like product in that they could be processed in the United States and affixed with the API monogram.  Beyond these contexts, we did not speculate on the future impact, beyond the POI, of the suspension of API certification.  The record continues to support that Russian OCTG is *produced to API specification* and that it remained fungible with the domestic like product and other subject imports during the POI.

*Channels of Distribution*.  The Commission originally found that:

> Domestic producers and importers of subject merchandise from Russia and South Korea primarily sold OCTG to [ ████████ ] over

---

[232] *See* Supplemental Memorandum Table 7–10.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

the POI while also selling a smaller amount to [ ████████ ]. Importers of subject merchandise from Argentina and Mexico primarily sold OCTG to [ ████████ ] while also selling a smaller amount to [ ████████ ]. Thus, the domestic like product and subject imports from each country source were sold through overlapping channels of distribution during the POI.[233]

The Court has already affirmed this aspect of the Commission's cumulation analysis.[234] Accordingly, there is no reason to give additional consideration to or otherwise supplement these findings.

*Geographic Overlap*.  The Commission originally found that:

> Domestically produced OCTG and subject imports from both Argentina and Mexico were sold in all geographic areas of the United States over the POI. Subject imports from Russia were sold in the Mountain and Central Southwest regions, and subject imports from South Korea were sold in the Northeast, Midwest, Southeast, Central Southwest, and Mountain regions during the period. The record also shows that nearly all subject imports from all four sources entered the United States through the Southern border of entry. The record thus shows that imports from each subject country and domestically produced OCTG were sold in overlapping geographical areas.[235]

In Section III.D., above, we gave additional consideration to the borders of entry for subject imports from South Korea, as the Commissions original analysis of borders of entry data included both subject and non-subject imports.  Using customs data to isolate the borders of entry for subject imports from South Korea, we found that nearly all of these imports entered into the United States through the Southern border of entry, alongside subject imports from

---

[233] *Confidential Views* at 28; *Original Views*, USITC Pub. 5381 at 21–22 (internal citations omitted).

[234] *See* Slip Op. 24-48 at 41–43 (rejecting Tenaris's argument "that OCTG from Argentina and Mexico did not sufficiently share channels of distribution with subject imports from Russia or South Korea to warrant 'a reasonable overlap of competition.'").

[235] *Original Views*, USITC Pub. 5381 at 22 (internal citations omitted).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

each other source.  Thus, the record continues to support this aspect of the Commission's finding of a geographic overlap.

*Simultaneous Presence in Market*.  The Commission originally found that "{t}he domestic like product and subject imports from all subject countries were simultaneously present throughout almost the entire POI."[236]  In Section III.D., above, we gave additional consideration to the presence of subject imports from South Korea, using customs data to exclude any imports from Hyundai.  We found that subject imports from South Korea were present in the U.S. market in [ █ ] of [ █ ] months of the POI.[237]  Thus, the record continues to support that subject imports from each source were present in the U.S. market for nearly the entire POI.

Because our findings concerning the fungibility of all subject imports and the domestic like product, their channels of distribution, their geographic overlap, and their simultaneous presence in the market continue to be supported by the record, we continue to find that there existed a sufficient degree of competitive overlap to require the cumulative assessment of subject imports.  As noted, we adopt in full our analysis and findings from our Original Views concerning all other aspects of our determinations.[238]

## IV.    CONCLUSION

For the foregoing reasons, we again determine that an industry in the United States is materially injured by reason of subject OCTG from Argentina and Mexico that have been found

---

[236] *Original Views*, USITC Pub. 5381 at 22.

[237] Imports from South Korea, prior to this exclusion, were present in 42 of 42 months of the POI.  *Original Views*, USITC Pub. 5381 at 22, n.112.

[238] We also note, that even aside from the cumulation analysis, the Court has already sustained our non-attribution analysis pertaining to the Rig Direct program.  *See* Slip Op. 24-48 at 44–47 (upholding the Commission's "determination that the 'Rig Direct' program was not a cause of the loss of domestic market share" as supported by substantial evidence.).

**Public Version**

by Commerce to be sold in the United States at LTFV and by reason of imports of OCTG from

Russia that have been found by Commerce to be sold in the United States at LTFV and

subsidized by the government of Russia.