**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C., <br><br>       Plaintiffs, <br><br>       and <br><br>TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A., <br><br>       Consolidated Plaintiffs, <br><br>       and <br><br>TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; AND IPSCO TUBULARS INC., <br><br>       Plaintiff-Intervenors, <br><br>       v. <br><br>UNITED STATES, <br><br>       Defendant, <br><br>       and <br><br>UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE USA INC., <br><br>       Defendant-Intervenors. | Consol. Court No. 22-00344 <br><br># NON-CONFIDENTIAL <br>**Business Proprietary Information has been deleted from Pages 26-27.** |

**PLAINTIFFS' COMMENTS ON THE USITC'S REMAND REDETERMINATION**

Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Cristina M. Cornejo

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

September 27, 2024

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     THE COURT'S REMAND ORDER AND INSTRUCTIONS ............................................3

III.    THE SUPREME COURT'S REJECTION OF *CHEVRON* DEFERENCE ........................5

IV.     THE COMMISSION'S DECISION TO CUMULATE SUBJECT IMPORTS FROM RUSSIA WITH SUBJECT IMPORTS FROM ARGENTINA AND MEXICO IS CONTRARY TO LAW AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE........8

    A.    Legal Standard ........................................................................................8

    B.    The Timing of the Commission's Cumulation Analysis Continues to Be Inconsistent with the Statute ..................................................................9

    C.    Contrary Evidence ................................................................................16

V.      THE COMMISSION'S DECISION TO CUMULATE SUBJECT IMPORTS FROM SOUTH KOREA WITH SUBJECT IMPORTS FROM ARGENTINA AND MEXICO IS CONTRARY TO LAW AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE...................................................................................................23

    A.    The Original and New Tables Fail to Reliably Exclude Non-Subject Imports from South Korea, and Reliance on These Tables for the Commission's Fungibility Finding Violates the Statute and Does Not Comply with the Court's Remand Order .................................................23

    B.    The Existing AD Order on OCTG from Korea ....................................31

VI.     CONCLUSION...................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States*,
    475 F. Supp. 2d 1370 (Ct. Int'l Trade 2006) .........................................................32

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984)..........................................................................17

*Chaparral Steel Co. v. United States*,
    901 F.2d 1097 (Fed. Cir. 1990)...............................................................10, 11, 12

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984).......................................................................... passim

*Chr. Bjelland Seafoods A/S v. United States*,
    19 C.I.T. 35 (1995) .........................................................................17, 21

*Chung Ling Co. v. United States*,
    829 F. Supp. 1353 (Ct. Int'l Trade 1993) ................................................29

*Coal. of Gulf Shrimp Indus. v. United States*,
    71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) .........................................31, 32

*Comm. for Fair Coke Trade v. United States*,
    27 C.I.T. 774 (2003) ......................................................................20

*Corning Glass Works v. United States Int'l Trade Comm'n*,
    799 F.2d 1559 (Fed. Cir. 1986)..........................................................12

*DAK Ams. LLC v. United States*,
    517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) .........................................22

*Huaiyin Foreign Trade Corp. v. United States*,
    322 F.3d 1369 (Fed. Cir. 2003)..........................................................17

*Hyundai Steel Co. v. United States*,
    659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) .........................................13

*Kisor v. Wilkie*,
    588 U.S. 558 (2019).........................................................................6

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) ................................................................ passim

*NSK Corp. v. United States,*
    637 F. Supp. 2d 1311 (Ct. Int'l Trade 2009) ...........................................................22, 23, 32

*Nucor Corp. v. United States,*
    318 F. Supp. 2d 1207 (Ct. Int'l Trade 2004) ...................................................................11, 20

*Siderca S.A.I.C. v. United States,*
    391 F. Supp. 2d 1353 (Ct. Int'l Trade 2005) ...................................................................19, 33

*Steel Authority of India v. United States,*
    146 F. Supp. 2d 900 (Ct. Int'l Trade 2001) .....................................................................11, 12

*Sweaters from H.K., Korea & Taiwan,*
    *No. 731-TA-448-450 (Final),* 1992 Ct. Intl. Trade LEXIS 267
    (Ct. Int'l Trade Nov. 30, 1992) ...............................................................................................29

*Swiff-Train Co. v. United States,*
    999 F. Supp. 2d 1334 (Ct. Int'l Trade 2014) ..........................................................................29

*Tenaris Bay City, Inc. et. al. v. United States,*
    Consol. Ct. No. 22-00344, Slip Op. 24-48 (Ct. Int'l Trade, Apr. 19, 2024) .................... passim

*United States Steel Grp. - a Unit of USX Corp. v. United States,*
    873 F. Supp. 673 (Ct. Int'l Trade 1994) .................................................................................20

*USX Corp. v. United States,*
    655 F. Supp. 487 (Ct. Int'l Trade 1987) ............................................................................17, 21

## STATUTES AND REGULATIONS

1 U.S.C. § 1................................................................................................................................13

19 U.S.C. § 1677(5)(D)(ii)........................................................................................................13

19 U.S.C. § 1677(7) ....................................................................................................................7

19 U.S.C. § 1677(7)(I) ................................................................................................................8

19 U.S.C. § 1677(7)(C)................................................................................................................7

19 U.S.C. § 1677(7)(C)(i)............................................................................................................8

19 U.S.C. § 1677(7)(C)(ii)...........................................................................................................8

19 U.S.C. § 1677(7)(C)(iv) (1988) ...........................................................................................10

19 U.S.C. § 1677(7)(G)................................................................................................................8

19 U.S.C. § 1677(7)(G)(i)................................................................................................... passim

## LEGISLATIVE MATERIALS

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
   H.R. Doc. 103-316, vol. I (1994) ...................................................................................9

## ADMINISTRATIVE DETERMINATIONS

*Certain Freight Rail Couplers from Mexico and Parts Thereof*,
   Inv. No. 731-TA-1593 (Final),
   USITC Pub. 5470 (Nov. 2023) ....................................................................................15

*Gas Powered Pressure Washers from China*,
   Inv. Nos. 701-TA-684 and 731-TA-1597 (Final),
   USITC Pub. 5488 (Feb. 2024) .....................................................................................15

*Oil Country Tubular Goods From Argentina, Mexico, and Russia*,
   89 Fed. Reg. 46,419 (ITC May 29, 2024) ("Notice of Remand Proceedings").....................24

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*,
   Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final),
   USITC Pub. 5381 (Nov. 2022) ............................................................................. passim

*Steel Nails from India, Thailand, and Turkey*,
   Inv. Nos. 731-TA-1580, 1582, and 1583 (Final),
   USITC Pub. 5404 (Feb. 2023) .....................................................................................15

## MISCELLANEOUS

OXFORD ENGLISH DICTIONARY,
   https://www.oed.com/dictionary ............................................................................13

## I.    INTRODUCTION

Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (collectively "Tenaris") submit these comments on the Views of the International Trade Commission ("ITC" or "Commission") on Remand ("Remand Determination"), pursuant to the Court's remand order in *Tenaris Bay City, Inc. et. al. v. United States*, Consol. Ct. No. 22-00344, Slip Op. 24-48 (Ct. Int'l Trade, Apr. 19, 2024) ("Remand Opinion and Order").    The Commission's Remand Determination is unsupported by substantial evidence, contrary to law, and fails to comply with the Court's remand instructions.

The Commission's decision to cumulate subject imports from Russia with subject imports from Argentina and Mexico is contrary to law and unsupported by substantial evidence. The Commission's interpretation of the statute and its cumulation analysis continue to be inconsistent with the plain meaning of the statutory phrase "compete with" which uses the present tense and thus denotes that the subject imports in question must compete with the domestic like product and the other subject imports during the months leading up to and including vote day.    The Commission's analysis also violates the Court's clear remand instructions to consider the impact of sanctions and other trade measures imposed on subject imports from Russia during the period leading up to and including vote day.

In addition, the Commission's determination that there was "a reasonable overlap of competition" between subject imports from Russia and subject imports from Argentina and Mexico is contrary to law and unsupported by substantial evidence.    The Commission created an erroneous standard focusing on whether imports from Russia were "prevented" or "prohibited" from entering the U.S. market, essentially requiring proof of a full embargo on Russia.    The Commission speculated about whether such imports "could" technically still enter and be sold in

the U.S. market despite the sanctions. Moreover, the Commission employed this flawed standard in an arbitrary and narrow manner, focusing on only part of the OCTG product market, namely green pipe. Rather than relying on record evidence establishing that Russian OCTG could no longer be API certified and that the lack of certification is a major competitive hurdle to Russian OCTG imports, the Commission instead speculated that the lack of API certification would not affect U.S. purchasers' interest or ability to purchase Russian green pipe. The Commission's limited product analysis coupled with its speculation renders the lack of API certification essentially meaningless and its decision contrary to record evidence. Thus, the Commission's determination to cumulate subject imports from Russia with subject imports from Argentina and Mexico is unsupported by substantial evidence and otherwise contrary to law.

The Commission's decision to cumulate subject imports from South Korea ("Korea") with subject imports from Argentina and Mexico is also contrary to law and unsupported by substantial evidence. The Commission seems to recognize it was unable to fully remove information related to non-subject imports in its revised tables tabulating qualitative responses provided by U.S. purchasers and importers, but nevertheless it continues to rely on them. Yet, the statute is unambiguous. Only subject imports can be included in a lawful cumulation analysis. Accordingly, the Commission's cumulation analysis is contrary to law and unsupported by substantial evidence. The Court must remand and instruct the Commission either (1) not to rely on questionnaire responses for which there is no way to remove the taint of non-subject import information, or (2) to issue new clarifying questionnaires to U.S. purchasers and importers. Finally, rather than follow the Court's order to consider meaningfully the commercial impact on competition in the market of the existing antidumping duty ("AD") order

on subject imports from Korea in its cumulation analysis, the Commission simply reiterates its original findings and thus fails to comply with the Court's remand instructions.

Separately, the law governing this Court's standard of review has changed significantly since the Court's Opinion and Remand Order.  In *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the U.S. Supreme Court explicitly overturned the longstanding administrative law doctrine known as *Chevron* deference, requiring a federal court reviewing an administrative agency decision to defer to the agency's interpretation of statutes, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984).   Accordingly, as this Court considers the Commission's Remand Determination, and the Commission's original determinations regarding volume, price effects, and impact in the material injury determination (those claims in which the Court deferred its ruling), this Court must apply the correct standard of review which requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and prohibits courts from "defer{ing} to an agency interpretation of the law simply because a statute is ambiguous."  *Loper Bright*, 144 S. Ct. at 2273.

## II.    THE COURT'S REMAND ORDER AND INSTRUCTIONS

The Court held that "the Commission's cumulation determination is not supported by substantial evidence and not in accordance with law."  Remand Opinion and Order at 47.  The Court remanded on three issues, instructing the Commission to reconsider:   (1) the Commission's determination "to cumulate subject imports from Russia{;}" (2) the Commission's determination to cumulate "non-subject imports from South Korea{;}" and (3) the Commission's determination to cumulate "subject imports from South Korea under an antidumping order . . . ."  *Id.*

**PUBLIC VERSION**

The Court held the Commission's cumulation analysis related to imports from Russia was flawed in two respects.  First, the Court found that the "timing" of the Commission's cumulation analysis, which considered the 42-month period of investigation ("POI") from January 2019 through June 2022, was not consistent with the statute, which requires the Commission's determination "to be made in the present tense on vote day . . . ."  *Id.* at 16.  Second, the Court found that the Commission's determination that subject imports from Russia were fungible with other subject imports was not supported by substantial evidence because the Commission "did not consider contrary evidence on the record pertaining to effects of the sanctions on Russian OCTG, especially the loss of API-certification on Russian OCTG . . . ."  *Id.* at 22–23.  The Court remanded with instructions for further explanation or reconsideration of the Commission's improper "timing of cumulation," its "fail{ure} to consider potentially contrary evidence on the record{,}" and its failure to file on the Court's record certain pages relied upon from Petitioners' posthearing brief.  *Id.* at 27.

Regarding the Commission's determination to cumulate non-subject imports from Korea (*i.e.*, OCTG produced by Hyundai Steel), the Court concluded that "the ITC's determination to cumulate both subject and non-subject South Korean imports is neither supported by substantial evidence nor in accordance with law{,}" and "remand{ed} the ITC's determination to cumulate South Korean OCTG because non-subject imports from South Korea may not be included in the ITC's cumulation decision."  *Id.* at 41.  Separate and apart from the impermissible cumulation of non-subject imports from Korea, the Court also found that "the ITC did not address the possible effect resulting from the subject imports from South Korea that were under an antidumping order in its final determination."  *Id.*  The Court directed the Commission to do so on remand.  *Id.*

PUBLIC VERSION

Finally, the Court's opinion is clear that the remand was to be limited to the threshold cumulation issues remanded by the Court. The Court explicitly stated that "the Court defers its analysis of the challenges to the ITC's additional determinations regarding volume, price effects, and impact in the material injury determination at this time." *Id.* at 47.

## III. THE SUPREME COURT'S REJECTION OF *CHEVRON* DEFERENCE

In *Loper Bright Enterprises v. Raimondo*, the Supreme Court emphatically rejected and explicitly overruled the longstanding doctrine requiring a federal court reviewing an administrative agency decision to defer to the agency's interpretation of statutes. 144 S. Ct. at 2273. Accordingly, as this Court considers the Commission's Remand Determination, and with respect to the Court's consideration of the Commission's determinations regarding volume, price effects, and impact in the material injury determination (those claims in which the Court deferred its ruling), this Court must undertake the correct standard of review in the wake of *Loper Bright*. In overturning *Chevron*, 467 U.S. at 837, the Supreme Court stated that "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright*, 144 S. Ct. at 2273.

Under *Chevron*, courts employed a two-step framework for an agency's interpretation of statutes that Congress entrusted them to administer. First, a court considered whether Congress had "directly spoken to the precise question at issue{,}" and if Congressional intent was clear, that ended the inquiry. *Loper Bright*, 144 S. Ct. at 2254 (quoting *Chevron*, 467 U.S. at 842). Second, if a court determined that the statute was "silent or ambiguous with respect to the specific issue" before it, the court deferred to the agency's interpretation if that interpretation was "based on a permissible construction of the statute." *Id.* (quoting *Chevron*, 467 U.S. at 843). Federal courts

thus deferred to "reasonable" agency interpretations of statutory ambiguities or gap-filling. *See Chevron*, 467 U.S. at 843–44. The Supreme Court made clear that such deference violates principles of the separation of powers and usurps the key role of the judiciary and therefore such deference can no longer be accorded. *Loper Bright*, 144 S. Ct. at 2273.

In *Loper Bright*, the Supreme Court held that "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . . ." *Id.* The Supreme Court also recognized there are instances in which a statute either expressly or impliedly authorizes an agency to exercise discretion:

> the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes expressly delegate{} to an agency the authority to give meaning to a particular statutory term. . . . Others empower an agency to prescribe rules to fill up the details of a statutory scheme, . . . or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, . . . such as appropriate or reasonable.

*Id.* at 2263 (internal citations and quotation marks omitted). Such discretion is never unbounded, however. Indeed, even in the context of explicitly delegated authority, the reviewing court must "police the outer statutory boundaries of those delegations" to ensure that agencies exercise their discretion in accordance with the law. *Id.* at 2252.

The Supreme Court emphasized that the "courts, not agencies" are the ones that "will decide '*all* relevant questions of law' arising on review of agency action, . . . even those involving ambiguous laws …." *Id.* at 2261 (emphasis in original). As the Supreme Court recognized, "interpretive issues arising in connection with a regulatory scheme often 'may fall more naturally into a judge's bailiwick' than an agency's." *Id.* at 2267 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019)).

**PUBLIC VERSION**

For purposes of this Court's review of the Commission's Remand Determination, none of the issues remanded by this Court involve statutory provisions providing any explicit delegation of authority to the Commission. The statutory provisions at issue on remand, and those issues for which this Court has deferred its analysis, require the Court to consider the Commission's interpretation of several key statutory provisions.

**<u>Statutory interpretation issues on remand</u>**

First, whether the Commission properly interprets 19 U.S.C. § 1677(7)(G)(i) and the meaning of the phrase "compete with" in its analysis of the ability of imports from Russia to compete with other imports and the domestic like product in the U.S. market following the imposition of sanctions and other restrictive measures against Russia in the wake of Russia's invasion of Ukraine. *See* section IV below.

Second, whether under 19 U.S.C. § 1677(7), which directs the Commission to analyze the effects of subject imports, the Commission can continue to rely on information related to ***non-subject imports*** (whether quantitative or qualitative) as the basis for its cumulation analysis in finding material injury. *See* section V.A below.

**<u>Statutory interpretation issues deferred by the Court in its initial decision</u>**

In addition, the Court deferred its analysis of the following issues that implicate statutory interpretation questions:

- Whether the Commission properly considered the conditions of competition in its injury analysis as required by 19 U.S.C. § 1677(7)(C) such that the Commission could properly assess whether subject imports caused injury to the domestic industry? *See* Mem. of P. & A. in Supp. of Pls.' Rule 56.2 Mot. for J. Upon the Agency R., ECF Nos. 45, 46 (May 23, 2023) at 9–17 ("Tenaris Initial Br.");

Reply in Supp. of Pls.' Rule 56.2 Mot. for J. Upon the Agency R., ECF Nos. 55, 56 (Oct. 12, 2023) at 13–21 ("Tenaris Reply Br.").

- Whether the Commission's failure to analyze the subject import volume in the context of the high demand for OCTG and other market conditions in its assessment of whether the volume was "significant" is consistent with 19 U.S.C. § 1677(7)(C)(i).  *See* Tenaris Initial Br. at 25–26; Tenaris Reply Br. at 5–8.

- Whether the Commission's decision to consider decreasing subject import market share rather than increasing subject import volume in assessing post-petition effects is contrary to 19 U.S.C. § 1677(7)(I).  *See* Tenaris Initial Br. at 26–29; Tenaris Reply Br. at 21–24.

- Whether the Commission's price analysis, and its decision not to make a price suppression determination, is consistent with 19 U.S.C. § 1677(7)(C)(ii).  *See* Tenaris Initial Br. at 30–37; Tenaris Reply Br. at 8–13.

Accordingly, in considering all of these issues, this Court "must exercise {its} independent judgment in deciding whether {the Commission} has acted within its statutory authority . . . ."  *See Loper Bright*, 144 S. Ct. at 2273.

## IV.  THE COMMISSION'S DECISION TO CUMULATE SUBJECT IMPORTS FROM RUSSIA WITH SUBJECT IMPORTS FROM ARGENTINA AND MEXICO IS CONTRARY TO LAW AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A.    Legal Standard

The statutory provision governing cumulation is 19 U.S.C. § 1677(7)(G).  Section 1677(7)(G)(i) provides:

In general. For purposes of clauses (i) and (ii) of subparagraph (C), and subject to clause (ii), the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which—

(I) petitions were filed under section 702(b) or 732(b) on the same day,

(II) investigations were initiated under section 702(a) or 732(a) on the same day, or

(III) petitions were filed under section 702(b) or 732(b) and investigations were initiated under section 702(a) or 732(a) on the same day,

if such imports compete with each other and with domestic like products in the United States market.

19 U.S.C. § 1677(7)(G)(i). Pursuant to the statute, "the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries .... if such imports compete with each other and with domestic like products in the United States market." *Id.* The Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("URAA") states that: "the statutory requirement is satisfied if there is a reasonable overlap of competition . . . ." *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. I, at 848 (1994) ("SAA"). The Commission typically considers four factors in determining whether subject imports compete with each other and with domestic like products in the U.S. market: (1) fungibility; (2) channels of distribution; (3) simultaneous presence; and (4) geographic markets. *See* Remand Opinion and Order at 10–11.

**B.    The Timing of the Commission's Cumulation Analysis Continues to Be Inconsistent with the Statute**

The Court found that the "timing" of the Commission's cumulation analysis was not consistent with the terms of the statute, which employs the present tense ("compete with"). *Id.* at 16. The Court held it "unreasonable" for the Commission "to view the conditions of competition over the 42-month period of investigation {i.e., January 2019 through June 2022} without considering the effects of competition at the end of the investigation and on vote day." *Id.* at 16– 17. On remand, the Commission continues to cumulate imports from Russia, and based on its

interpretation of the statute, the Commission asserts it did not need to consider whether imports from Russia compete with other subject imports and the domestic like product at the end of the investigation and on vote day.  *See* Remand Determination at 11–17.  The Commission's interpretation of the phrase "compete with" is contrary to the plain meaning of the statute, and each of the Commission's arguments in support of its interpretation lack merit.

First, the Commission dismisses the relevance of a pre-URAA case cited by this Court, *Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990), where "the Federal Circuit there had deferred to the Commission's interpretation of the pre-URAA cumulation provision, 19 U.S.C. § 1677(7)(C)(iv) (1988)."  Remand Determination at 7, 12–14; *see also* Remand Opinion and Order at 15.

Second, relying on the SAA, the Commission contends that, post-URAA, "current Section 771(7)(G)(i) . . . require{s} cumulation for competing imports when petitions were filed, or the investigations initiated, on the same day."  Remand Determination at 14–15.

Third, the Commission further asserts "that staggered investigations must be based on the record compiled in leading investigations, so the Commission no longer needs to assess whether imports subject to the earlier investigation have any 'continuing effect' on vote day . . . ."  *Id.* at 15 (citing SAA at 848).

Finally, the Commission maintains that "{t}he Commission's obligation to 'cease the collection of information and . . . provide the parties with a final opportunity to comment on the information obtained . . .' prior to making a final determination would be rendered impossible if the Commission was required to collect data on the competitive conditions in the U.S. market up until vote day."  *Id.* at 16 (footnote omitted).

Each of these arguments lack merit as demonstrated below.

As an initial matter, although the Commission dismisses *Chaparral* and appears to favor instead *Steel Authority of India ("SAIL") v. United States*, 146 F. Supp. 2d 900 (Ct. Int'l Trade 2001), the Commission's references to that case are limited. *See* Remand Determination at 10, 10 nn.46–47, 11, 11 n.50. In any event, the Commission improperly dismisses the relevance of *Chaparral*. This Court has relied on the *Chaparral* decision in other post-URAA cases to find that the Commission appropriately focused on "current" conditions in an investigation because this approach is "in accord with the remedial purpose of duties . . . to prevent future harm to the domestic industry by reason of unfair imports that are presently causing material injury." *See, e.g.*, *Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1223–24 (Ct. Int'l Trade 2004) (noting "this Court has held that the ITC 'may of course permissibly focus its analysis on a specific time frame within the POI'" and citing *Chaparral*, 901 F.2d at 1103 for "upholding the ITC's focus on current unfair imports, versus those earlier in the period of investigation, in its cumulation analysis because such construction was 'in accord with the remedial purpose of duties which are intended merely to prevent future harm to the domestic industry by reason of unfair imports that are presently causing material injury'") (internal citation omitted).

The *SAIL* Court determined that because the statutory provision was not clear it employed the *Chevron* doctrine to interpret the meaning of the phrase "compete with" and ultimately deferred to the interpretation of the Commission. 146 F. Supp. 2d at 905–07.

> Contrary to SAIL's argument and despite the use of the present tense, the phrase "compete with" does not have a plain meaning. The only statutory mandate is to cumulate subject imports in cases where "imports compete with each other and with domestic like products" in the U.S. market. 19 U.S.C. § 1677(7)(G)(i). The statute does not specify a precise time period which the Commission must consider in making its cumulation decision. Moreover, the statute fails to define the phrase at issue.
>
> The legislative history of this provision, first added in 1984, also does not provide

11

> any indication of what Congress intended by the phrase, and provides limited
> explanation as to its purpose . . . . As neither the language of the statute nor the
> legislative history is conclusive, we review the Commission's interpretation of the
> statute for reasonableness. *See Chaparral Steel Co. v. United States*, 901 F.2d
> 1097, 1104 (Fed. Cir. 1990) ("Because neither the statutory language nor the
> legislative history <u>conclusively</u> establishes the intended time frame for
> cumulation, we assess the agency's interpretation of the provision to determine
> whether it is reasonable and in accordance with the legislative purpose."); *see also*
> *Corning Glass Works v. United States Int'l Trade Comm'n*, 799 F.2d 1559, 1565
> (Fed. Cir. 1986).   We hold that the Commission reasonably interpreted the
> "compete with" provision in choosing a three-year period of investigation for its
> review of SAIL's presence in the U.S. market.

*Id.* at 906.  *SAIL* does not control this Court's interpretation, however.  Given *Loper Bright*, this

Court must interpret the phrase "compete with" in 19 U.S.C. § 1677(7)(G)(i), and "must exercise

{its} independent judgment in deciding whether {the Commission} has acted within its statutory

authority" and this Court "may not defer to an agency interpretation of the law simply because a

statute is ambiguous." *Loper Bright*, 144 S. Ct. at 2273.  As this Court previously recognized in

its Remand Opinion and Order at 16, the statutory phrase, "compete with" in 19 U.S.C. §

1677(7)(G)(i), uses the present tense of the verb and so the question before the Court now is

whether the Commission's interpretation of "compete with" is consistent with the statute.[1]

The tense of a verb indicates when the action or state of being occurs.  The Oxford

English Dictionary defines a "verb" as follows: "Grammar. A word or lexical unit which is used

to indicate the occurrence or performance of an action or the existence of a state or condition,

and which generally forms the grammatical predicate of the subject, or functions as the predicate

---

[1] Notably, in the underlying investigation at issue in *SAIL*, the Commission considered the full period of investigation when making its cumulation analysis, rather than limiting its analysis to "presently competing imports" because the foreign producer "voluntarily withdrew from the market," which required the Commission to "conduct a more extensive review."  146 F. Supp. 2d at 907.  The facts here require a review of "presently competing imports" including on vote day because Russian producers have not "voluntarily withdrawn" from the market, but rather sanctions were imposed at the end of the period by the U.S. Government that were intended to block or limit imports of goods, including OCTG, from Russia.

of the subject in combination with an adjunct or adjuncts." *Verb*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/verb_n?tab=meaning_and_use#15717435.    The Oxford English Dictionary defines "present tense" as follows: "Grammar. A tense expressing an action now going on or habitually performed, or a condition now existing or considered generally without limitation to any particular time." *Present Tense*, OXFORD ENGLISH DICTIONARY,                                                                    https://www.oed.com/dictionary/present-tense_n?tab=meaning_and_use#10213679.

Congress expressly recognizes that "words used in the present tense include the future as well as the present . . . ."  1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . ***words used in the present tense include the future as well as the present*** . . . .") (emphasis added).  This Court is in accord.  *See. e.g., Hyundai Steel Co. v. United States*, 659 F. Supp. 3d 1327, 1334 (Ct. Int'l Trade 2023) (interpreting phrase "foregoing or not collecting revenue that is otherwise due" from 19 U.S.C. § 1677(5)(D)(ii) the Court held that "Congress's use of the simple present tense 'is' denotes an existent obligation that is due presently or would be due at some time in the future").  The Commission's interpretation of "compete with" is not consistent with the plain meaning of the phrase, and the other arguments offered by the Commission are equally unpersuasive.

The Commission's reliance on the SAA does not support its position.  In fact, the SAA compels the opposite conclusion.  Both the Commission and Petitioners mistakenly conflate the effect of the timing of the petition filing and/or initiation with the separate assessment required by the statute of whether imports "compete with" other imports or the domestic like product in order for them to be cumulated in a manner consistent with the statute.  Indeed, in addition to the threshold requirement in the statute to cumulate imports when petitions are filed on the same

date or investigations initiated on the same date, the statute also mandates that the Commission determine whether the imports "compete with" each other based on the specific criteria the Commission has relied on in its practice to make that determination. *See* 19 U.S.C. § 1677(7)(G)(i). The cumulation criteria considered by the Commission based on its practice in determining whether there exists a "reasonable overlap of competition" include: (1) fungibility; (2) channels of distribution; (3) geographic overlap; and (4) simultaneous presence in the market. Remand Opinion and Order at 10–11. The SAA makes clear that post-URAA the competitive relationship of imports potentially subject to a cumulative injury analysis still must be analyzed as "***new section 771(7)(G)(i) requires imports to compete with each other and with the domestic like product to be eligible for cumulation. The new section will not affect current Commission practice under which the statutory requirement is satisfied if there is a reasonable overlap of competition, based on consideration of relevant factors.***" SAA at 848 (emphasis added). In fact, the SAA itself recognizes that the "requirement of simultaneous filing will promote certainty in antidumping and countervailing duty investigations by defining, at the time of filing, the countries ***potentially*** subject to cumulative analysis." *Id.* (emphasis added).

Accordingly, while there is a threshold mandatory requirement related to the date of the filing of the petitions or initiation of the investigations, the Commission's cumulation analysis remains subject to the additional and independent statutory requirement that the Commission determine whether the subject imports "compete with" other subject imports and the domestic like product. This is the statutory obligation that was remanded by this Court.

Also lacking merit is the Commission's arguments relating to the occasional existence of so called "staggered investigations" and the purported requirement that parties need sufficient time to provide comments on information on the record. Remand Determination at 15–17. As

demonstrated below, neither of these arguments supports the Commission's position.

The occasional existence of a staggered investigation in no way prevents the Commission from following its statutory mandate and giving "compete with" its plain meaning. Nor does the purported need to allow parties to comment on the record prevent the Commission from following the statute. As an initial matter, this case does not even involve a staggered investigation. More importantly, however, the Commission had every opportunity in this investigation to consider the most relevant evidence. Indeed, the Commission could have accessed (without issuing new questionnaires) information regarding subject imports from Russia during the nearly three-month period between the submission of the questionnaire responses (*i.e.*, July 29, 2022) and the filing of final comments (i.e., October 24, 2022). Finally, regarding staggered investigations, the Commission acknowledges the parties' ability to comment on the Department of Commerce's subsequent determination that follows the Commission's initial determination but asserts that "very little can be added to {the} record for purposes of the trailing investigation." *See* Remand Determination at 15–16. Yet, the fact remains that information can indeed be added to the record, establishing that the Commission's analysis does not end at the conclusion of the first investigation. *See, e.g.*, *Gas Powered Pressure Washers from China*, Inv. Nos. 701-TA-684 and 731-TA-1597 (Final), USITC Pub. 5488 at 4 (Feb. 2024) (acknowledging Commerce's final determination and parties' comments on Commerce's determinations); *Steel Nails from India, Thailand, and Turkey*, Inv. Nos. 731-TA-1580, 1582, and 1583 (Final), USITC Pub. 5404 at 4, 6 (Feb. 2023) (same); *Certain Freight Rail Couplers from Mexico and Parts Thereof*, Inv. No. 731-TA-1593 (Final), USITC Pub. 5470 at 4–6 (Nov. 2023) (same).

As set forth below, the evidence demonstrates that imports from Russia did not "compete with" other imports and the domestic like product at the time of the Commission's determination.

### C.    Contrary Evidence

In its original cumulation analysis, the Commission stated "none of the additional measures emphasized by Tenaris and TMK prohibit the entry or sale of Russian OCTG . . . ." *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022) at 23 ("Final Determination") (P.R. 165).   The Commission employed the wrong standard, focusing on whether the measures prohibited imports from Russia:   "These measures did not prevent such imports from entering and being sold in the United States in significant quantities from February 2022 to the end of the POI."  *Id.* at 22–23.

On remand, the Commission indicated it undertook further analysis in two respects. First, the Commission said it performed what it called a "Supplemental Analysis of Fungibility Given the Suspension of API Certification."   Remand Determination at 27–35.   Second, the Commission undertook what it purports to be a "Supplemental Analysis of Simultaneous Presence in the U.S. Market Given the Imposition of Sanctions."   *Id.* at 35–39.   The Commission's "supplemental analyses" did not correct the flaws of the original analysis.  Indeed, the Commission continues to view the evidence through the lens of whether the sanctions and other measures "prevented" or "prohibited" imports from Russia from entering and being sold in the United States.

The cumulation criteria considered by the Commission based on its practice in determining whether there exists a "reasonable overlap of competition" include: (1) fungibility;

(2) channels of distribution; (3) geographic overlap; and (4) simultaneous presence in the market. *See* Remand Opinion and Order 10–11. The evidence demonstrates that the ability of imports from Russia to compete in the U.S. market fundamentally changed after the sanctions measures imposed on Russia following its invasion of Ukraine such that there was no longer "a reasonable overlap of competition" with other imports and the domestic like product. Yet, in evaluating the evidence, the Commission again employed the wrong standard and failed to adhere to the statute. The standard is not whether imports from Russia were "prevented" or "prohibited" from entering the U.S. market but rather whether they "compete with" other imports and the domestic like products in a similar manner, particularly in terms of "fungibility" and "simultaneous presence" in the market.

The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ("taking into account **the entire record**") (emphasis added)). Separately, a determination based on inadequate analysis or conjecture cannot survive the "substantial evidence" standard of review. *See Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citing *USX Corp. v. United States*, 655 F. Supp. 487, 492 (Ct. Int'l Trade 1987)). Here the Commission's Remand Determination fails in both respects: first, in its failure to consider detracting evidence and, second, in its reliance on conjecture.

### Supplemental analysis of fungibility

The Commission states that "the suspension of API certification services did not **prevent** these imports from competing in the U.S. market, alongside other subject imports and the

domestic product, during the final months of the POI." Remand Determination at 28 (emphasis added). This statement highlights the two key flaws with the Commission's approach in evaluating the evidence – the timing and the standard.

As for timing, the Commission's rationale erroneously continues to be tied to the earlier parts of the POI, and not the period of time when the sanctions had their effect, up to and including the Commission's determination, in the assessment of whether, as required by the statute, the imports from Russia "compete with" other imports and the domestic like product. As for the standard under the statute to consider the evidence, whether imports from Russia were "prohibited" or "prevented" from entering the U.S. market is not the proper standard and is not consistent with the statutory terms or the Commission's practice. However, contrary to the statute and the Court's remand instructions, an absolute ban on imports from Russia effectively is the standard that the Commission invokes. For example, the Commission notes that "other evidence also indicates that the suspension of API certification services would not ***prevent*** sales of green tubes from Russia . . . in the United States." Remand Determination at 28–29 (emphasis added). This is the standard imposed throughout the Commission's analysis:

> Therefore, upon further consideration on remand, we find that the cessation of API certification does not ***prevent*** Russian green tube from being fungible and competing with domestic or imported green tube – either in limited service environments or after being processed in the United States. Thus, we continue to find that the record supports the Commission's finding that Russian OCTG was fungible with domestic and imported OCTG.

*Id.* at 30 (emphasis added); *see also id.* at 28 ("this only confirms that the suspension of API certification services did not ***prevent*** these imports from competing in the U.S. market, alongside other subject imports and the domestic product, during the final months of the POI . . . . we have given additional consideration to this argument and find that because Russian-produced green

tubes **can still be sold** to API-certified processors in the United States, the suspension of API certification did not render Russian OCTG non-fungible with domestic and imported OCTG"), 29 ("Russian OCTG producers **could sell** non-API certified green tube into the U.S. market and have any indication that it was previously not API-certified, or even that it was produced in Russia, removed by the U.S. processor"), 29–30 ("the record indicates that: (1) non-API certified Russian OCTG imported into the U.S. market **could compete with** other limited service OCTG and (2) non-API certified OCTG from Russia (still produced to API specification) that **could be processed** in the United States and affixed with the API monogram"), 32–33 ("they assert . . . that uncertified Russian products **could no longer be sold** in the United States . . . . {but} API certifications were not necessary to qualify as a supplier or singularly critical to purchasers' assessment of quality . . . . once a supplier's quality is established in the market, certifications are of a lesser concern") (emphasis added) (footnotes omitted).

The Commission's practice is to determine whether there is "a reasonable overlap of competition" and the lack of API certification, along with the other sanctions and restrictions, necessarily meant there was no longer such an overlap. *See* Tenaris Initial Br. at 6, 24–25; Tenaris Reply Br. at 3 n.1; Tenaris Public Remand Comments, EDIS Doc. 824629 (June 27, 2024) at 9–15 (P.R. 177R) ("Tenaris PR Remand Comments"); Tenaris Confidential Remand Comments, EDIS Doc. 824504 (June 26, 2024) at 9–15 (C.R. 442R) ("Tenaris CR Remand Comments"). The record makes clear that the majority of subject imports from Russia could not compete with other products in the investigation. *C.f. Siderca S.A.I.C. v. United States*, 391 F. Supp. 2d 1353, 1363 (Ct. Int'l Trade 2005) ("As only a 'reasonable overlap' of competition is statutorily required, . . . the court agrees with the ITC that while there may be some Japanese specialty products that have no analogues in the market, **the majority of Japanese production**

*would compete*, and would be fungible with the other products in this review.") (emphasis added).  The Commission improperly focuses its analysis on a smaller segment of the market, green tubes, and finds a reasonable overlap of competition "because Russian-produced green tubes can still be sold to API-certified processors in the United States . . . ."  Remand Determination at 28; *id.* at 28–35.  The Court of International Trade ("CIT") has recognized that concluding that subject imports from one country compete with imports from other countries based on "a small percentage" that competed in the same market "would not be reasonable." *United States Steel Grp. - a Unit of USX Corp. v. United States*, 873 F. Supp. 673, 688–89 (Ct. Int'l Trade 1994) (affirming the Commission's determination not to cumulate Korean subject imports with subject imports from other countries because "{t}o conclude that Korean imports in general competed and thus should be cumulated, based upon the small percentage sold in the merchant market, would not be reasonable"); *see also Nucor Corp.*, 318 F. Supp. 2d at 1269–70 (affirming the Commission's determination of no reasonable overlap of competition based on a lack of geographic market overlap because "virtually all subject imports from Australia" though *not all* subject imports "enter the United States through the West region" and "remained in the West region{} and were not sold in other geographic regions" even though the "ITC recognized that 'completely overlapping markets are not required'").

Moreover, the Commission's analysis relies on improper conjecture rather than substantial evidence.  The CIT has recognized that "the ITC's conclusions must be based on evidence, not conjecture . . . ." *Comm. for Fair Coke Trade v. United States*, 27 C.I.T. 774, 776 (2003).  Here, the Commission speculated, without record evidence, that U.S. processors would continue to purchase non-API certified green pipe from Russia, and that this pipe would compete with API-certified pipe in the same manner as it did when it was API-certified, because these

processors have their own quality control systems, and thus they could confirm that the quality of this pipe was the same regardless of the lack of API certification. Remand Determination at 28–35. More importantly, ***there is no record evidence establishing that U.S. processors would regard non-API certified Russian green pipe as equivalent to API certified green pipe*** – regardless of whether they were "***prohibited***" from using such green pipe or whether they ***could*** perhaps use such green pipe. ***Nor is there any record evidence demonstrating that producers of Russian green pipe would continue to produce green pipe to API standards when they are unable to gain API certification.*** This Court cannot affirm an agency determination based on inadequate reasoning or conjecture under the "substantial evidence" standard of review. *See Chr. Bjelland Seafoods*, 19 C.I.T. at 37 (citing *USX Corp*, 655 F. Supp. at 492). Therefore, a remand is required.

### Supplemental analysis of simultaneous presence in the U.S. market

As this Court stated, the statute's use of the present tense in 19 U.S.C. § 1677(7)(G)(i), ("if such imports compete with each other and with domestic like products in the United States market"), means that "the conditions of competition must exist in the present tense, not in the past tense{,}" and "{i}t is not sufficient if the conditions of competition leading to an unfair determination existed at some point during the period of investigation." Remand Opinion and Order at 16.

The Commission nevertheless reiterates its position that the "Commission is not required to assess competitive overlap up to and including vote day" and that "the Commission cannot do so in light of its statutory obligation to provide the parties with an opportunity for final comment" and therefore, "to the extent that these sanctions may have had a lag in having an effect *following* the POI, this is beyond the purview of what the Commission is required to

consider." Remand Determination at 35–36 (emphasis in original). The Commission's statement is an admission that it would have been possible to consider, in the original investigation or on remand, information – including data that the Commission could access without issuing new questionnaires – regarding subject imports from Russia during the nearly three-month period between the submission of the questionnaire responses (*i.e.*, July 29, 2022) and the filing of final comments (i.e., October 24, 2022). Even though the unique conditions regarding imports from Russia justified consideration of such information in order to evaluate whether imports from Russia "compete with" other subject imports, the Commission declined to do this. Instead, as the statement demonstrates, even though the Commission purported to reevaluate the record, it had effectively pre-determined the outcome based on its preferred interpretation of the statute, despite the remand instructions. This Court "reviews remand results for compliance with its remand order." *DAK Ams. LLC v. United States*, 517 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2021). "The ITC act{s} contrary to law when it fail{s} to genuinely comply with the court's remand instructions." *NSK Corp. v. United States*, 637 F. Supp. 2d 1311, 1319 (Ct. Int'l Trade 2009). In fact, "{t}he failure of an agency to candidly comply with the instructions in a remand order not only shows a disregard for the issuing court's authority, but it is also an act that is contrary to law." *See id.* at 1318. Therefore, the Commission's failure to consider the effect of sanctions in the months leading up until vote day is contrary to law.

Here, the Commission's analysis of simultaneous presence focused only on the months included in the original POI, rather than analyzing data all the way up until vote day. Moreover, the Commission included import data from before Russia's invasion of Ukraine and failed to grapple with the impact of sanctions and other trade measures imposed on Russia in the invasion's aftermath.

> Import data during the final four months of the POI showed that previously
> imposed sanctions ***did not eliminate*** the Russian imports from the U.S. market.
> First, the Section 232 duties were in place since 2018 and did not ***prevent*** subject
> imports from Russia from competing in the U.S. market throughout the POI.
> Second, the Section 232 duties (2018) and the suspension of API certification
> (March 17, 2022), did not ***prevent*** subject imports from Russia from entering into
> the U.S. in March 2022 in volumes that were 69.0 percent higher than in March
> 2021. Third, all of these sanctions combined, plus the revocation of Russia's
> MFN status (April 18, 2022) and bans on Russian ships from entering U.S. ports
> (April 2022) did not ***prevent*** subject imports from Russia from entering into the
> U.S. market in May 2022 in volumes 25.0 percent higher than in May 2021.

Remand Determination at 37–38 (emphasis added) (footnotes omitted).  Because the

Commission failed to follow the Court's explicit instructions on remand, its determination is

contrary to law.  *NSK Corp. v. United States*, 637 F. Supp. 2d at 1318.  The Court must remand

this determination back to the Commission to allow it to engage in the analysis that the Court

requested.

## V.    THE COMMISSION'S DECISION TO CUMULATE SUBJECT IMPORTS FROM SOUTH KOREA WITH SUBJECT IMPORTS FROM ARGENTINA AND MEXICO IS CONTRARY TO LAW AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A.    The Original and New Tables Fail to Reliably Exclude Non-Subject Imports from South Korea, and Reliance on These Tables for the Commission's Fungibility Finding Violates the Statute and Does Not Comply with the Court's Remand Order

For the purposes of the Commission's injury determination, the statute mandates that

only subject merchandise can be assessed in a cumulative injury analysis.  The statute provides

that in investigations "the Commission shall cumulatively assess the volume and effect of

imports of *the subject merchandise* . . . ."  19 U.S.C. § 1677(7)(G)(i) (emphasis added).  This

Court stated that "{i}t is clear to this Court that the statute does not permit non-subject

merchandise to be included in the Commission's cumulation analysis."  Remand Opinion and

Order at 41.  The record establishes that the Commission's original investigation "included non-

subject imports . . . in the Commission's cumulation determination." *Id.* at 36.  The Court determined that "the ITC's cumulation of non-subject South Korean imports is a violation of 19 U.S.C. § 1677(7)(G)(i){,}" *id.* at 37, and "is neither supported by substantial evidence nor in accordance with law" and it "remand{ed} the ITC's determination to cumulate South Korean OCTG because non-subject imports from South Korea may not be included in the ITC's cumulation determination{,}" *id.* at 41.[2]

For its findings of fungibility, geographic overlap and simultaneous presence in the market, the Commission's original cumulation decision relied on Staff Report tables that contain non-subject data and tables that include qualitative information from questionnaire responses that do not distinguish between subject and non-subject data.  *See* Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea—Staff Report (Final and Preliminary) (Oct. 14, 2022) (Confidential Version) at Table II-16 at II-41, Table II-19 at II-44 ("CSR"); Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea—Staff Report (Final and Preliminary) (Oct. 14, 2022) (Public Version) at Table IV-17 at IV-33-34 ("PSR")*.*  On remand, the Commission "reopened" the record and revised the tables it relied on in its cumulation analysis in an attempt to exclude non-subject imports from Korea.  *See Oil Country Tubular Goods From Argentina, Mexico, and Russia*, 89 Fed. Reg. 46,419 (ITC May 29, 2024) ("Notice of Remand Proceedings") (P.R. 173R).

---

[2] In the Final Determination, the Commission stated that the U.S. Department of Commerce ("Commerce") calculated a *de minimis* rate for Hyundai Steel in its final countervailing duty ("CVD") determination, and that, consequently, "OCTG imports from this firm are not subject to these investigations . . . ."  Final Determination at 4 n.9.  The Commission made certain adjustments to remove non-subject imports from import data and from price data.  *See id.* ("Commission staff have accordingly adjusted the import data . . . while other in-scope imports from South Korea are classified as subject imports"); *id.* at Appendix J (Price data for Hyundai Steel's Nonsubject OCTG).

PUBLIC VERSION

The Commission issued a Supplemental Memorandum with 11 tables that correspond to tables in the Staff Report that the Commission relied on for its cumulation findings. *See* Oil Country Tubular Goods from Argentina, Mexico, and Russia, Inv. Nos. 701-TA-671 and 731-TA-1571-1573 (Final) (Remand) – Supplemental Memorandum INV-WW-060, EDIS Doc. Nos. 823291, 823487 (June 7, 2024) (P.R. 174R) (C.R. 440R).[3]    In new Table 1 (corresponding to original Table IV-17) and Table 2 (corresponding to original Table IV-18), which reflect quantitative data used to support the Commission's "overlapping geographical markets" and "simultaneous presence findings," the Commission was able to separate the data for non-subject imports from subject imports. *See* Supplemental Memorandum PR at Tables 1–2 at 1–4; *see also* Tenaris PR Remand Comments at 17–18.

However, as discussed below, the Commission was not able to do so for revised Tables 3 through 11.    These tables, which reflect qualitative information used to support the Commission's fungibility finding, do not ensure that non-subject imports from Korea are eliminated, and, therefore, do not satisfy the Court's remand instructions that "non-subject imports from South Korea may not be included in the ITC's cumulation determination." Remand Opinion and Order at 41.

In the Final Determination, the Commission relied on Tables II-16, II-17, II-19, II-20 and II-14 to support its statement:  "We are unpersuaded by Tenaris's argument that imports from Argentina and Mexico are not fungible with imports from Russia or South Korea."  Final Determination at 20, 20 nn.97–99.  The Commission concluded that "we find that imports of

---

[3] The public version is cited as "Supplemental Memorandum PR" and the confidential version is cited as "Supplemental Memorandum CR."

**PUBLIC VERSION**

OCTG from each subject source are sufficiently fungible with each other and the domestic like product to support a finding of a reasonable overlap of competition." *Id.* at 21.

The Commission's new Tables 3 through 11 (that pertain to qualitative responses from importers and purchasers that the Commission relied on for its finding that OCTG from South Korea is fungible with subject imports from Argentina and Mexico) do not reliably correct the failure in the original tables to exclude non-subject imports. The Commission explained that its "supplemental tables and associated exclusions are aimed at increasing the likelihood that qualitative responses only refer to subject imports by excluding the response of Hyundai from importer responses, by excluding the responses of any purchaser who listed Hyundai as a supplier or vice versa, and by excluding the responses of any purchaser that may have purchased OCTG from a distributor that purchased from Hyundai." Remand Determination at 49 (footnote omitted). These tables, relating to the Commission's assessment of fungibility, continue to utilize qualitative information that does not ensure that non-subject imports are eliminated. Therefore, reliance on these tables does not satisfy the Court's remand order and is inconsistent with the statute.

First, the separation of Hyundai's response in Supplemental Table 3 (replacing Table II-16) (importer responses on interchangeability) and Table 5 (replacing Table II-19) (importer responses on the significance of differences other than price) do not ensure that the remaining responding importers were only referring to subject imports in furnishing their responses and any attempt to review questionnaire responses to ascertain whether this is the case would be speculative. *See* Tenaris PR/CR Remand Comments at 19–20. New Tables 3 and 5 [

].

**PUBLIC VERSION**

Supplemental Memorandum CR at cover page.  In new Table 3, Hyundai reports that imports

from South Korea are [                                                              ].  *See*

Supplemental Memorandum CR at Table 3 at 5.[4]   Hyundai's [


                                                                      ].  *See id.*

However, because this is a qualitative rather than a quantitative response, it is not possible to

know if the importer Hyundai is [

                                                              ].  [

] in Table 5, Hyundai reports that differences other than price are [

                                                              ].  *See*

Supplemental Memorandum CR at Table 5 at 7.[5]  Therefore, it is not possible to be certain that

new Tables 3 and 5 effectively eliminate responses regarding non-subject imports, [

                                    ].   In addition, it is not possible to know if other reporting

importers considered Hyundai's non-subject imports from Korea when responding to the

questionnaire.

        Second, Table 4 (which replaces Table II-17) (purchaser responses on

interchangeability), Table 6 (which replaces Table II-20) (purchaser responses on the

significance of differences other than price), and Tables 7 through 11 (which replace Table II-14)

(purchaser responses on comparability by purchasing factor) suffer from the same flaw in that,

regardless of whether a purchaser purchased imports from Hyundai or a distributor Hyundai sold

---

[4]  The Note at the bottom of Table 3 states that "South Korea, subject is all responding firms minus Hyundai responses."  Supplemental Memorandum PR at Table 3 at 5.
[5]  The Note at the bottom of Table 5 states that "South Korea, subject is all responding firms minus Hyundai responses."  Supplemental Memorandum PR at Table 5 at 7.

to, its qualitative responses still might reflect their impressions of Hyundai's OCTG.  *See* Tenaris PR/CR Remand Comments at 21–24.  These tables are revised to show the original responses for all responding purchasers and then three "exclusions" are applied that cover the responses of certain U.S. purchasers ostensibly to attempt to eliminate responses that reflect non-subject data.  *See* Supplemental Memorandum CR/PR at Table 4 at 6–7, Table 6 at 8–9, Tables 7–11 at 10–29.  The new tables show the results for (1) all purchasers responding, (2) each exclusion on its own, and then (3) applying (*i.e.*, eliminating) different combinations of exclusions (*i.e.*, all less exclusion 1, all less exclusions 1 and 2, and all less exclusions 1, 2, and 3).  *See id.*  However, none of the "exclusions" approaches ensures that eliminating the qualitative response of the excluded purchaser(s) will remove the effect of non-subject imports or will remove the effect of only non-subject imports.  The Commission seems to take the position that compliance with the statute would be too exacting:  "While Tenaris focuses on the impossibility of knowing precisely what responding firms were thinking when responding, this would be the case for any qualitative question utilized in any investigation."  Remand Determination at 49 (footnote omitted).  However, the statute provides for consideration of only subject imports, and therefore if there is not a way to know whether the response to the question relies in all or in part on non-subject import information, the statute does not permit that response to be relied upon by the Commission in its cumulation analysis.

Third, for each exclusion contained in Supplemental Table 4, Table 6, and Tables 7–11, it is not possible to know if the excluded responses covered only non-subject imports from Korea or if they also exclude subject imports from Korea.  *See* Tenaris PR/CR Remand Comments at 21–23.

Fourth, when responses are excluded from the tally of total responses, the number of responses supporting the Commission's fungibility finding declines. As Tenaris explained, "for new Table 4, if all three exclusions apply, the number of U.S. purchasers reporting OCTG from South Korea is 'always' interchangeable with OCTG Argentina or Mexico reduces from 5 to 2, and the number reporting OCTG from South Korea is 'frequently' interchangeable reduces from 5 to 3 for Argentina and 6 to 4 for Mexico." Tenaris PR Remand Comments at 23 (citing Supplemental Memorandum PR at Table 4 at 6). In response to this point, while conceding that the number of responses declines, the Commission simply relies on purported "majorities" or "pluralities" of importers' or purchasers' responses – and does so even though there is uncertainty as to whether the importers and purchasers may be referring to or considering non-subject imports. Remand Determination at 48–49.

To properly comply with the Court's remand instructions, and to be consistent with the statutory requirement, the Commission could have issued new questionnaires to the purchasers and importers asking them to confirm that they only take into consideration *subject* imports in responding to the questions. The Commission has re-opened the record and solicited new information from parties on remand in the past. *See, e.g.*, *Swiff-Train Co. v. United States*, 999 F. Supp. 2d 1334, 1338–39 (Ct. Int'l Trade 2014) (affirming the Commission's decision to issue new questionnaires to U.S. producers on remand without receiving comments from the plaintiffs); *Chung Ling Co. v. United States*, 829 F. Supp. 1353, 1357 (Ct. Int'l Trade 1993) ("Following remand, the ITC issued revised questionnaires to domestic producers and received briefs from the parties."); *Sweaters from H.K., Korea & Taiwan, No. 731-TA-448-450 (Final)*, 1992 Ct. Intl. Trade LEXIS 267, at *8-9 (Ct. Int'l Trade Nov. 30, 1992) (On remand, "the Commission issued revised questionnaires to the domestic sweater producers . . . ask{ing}

**PUBLIC VERSION**

producers again to supply financial and pricing information both for all sweaters and for MMF sweaters, and to respond to specific questions about the production of any blends"). The Commission could have done so here to ensure that its analysis was supported by substantial evidence on the record and complied with the statute, as required by law.

Finally, the Commission's reliance on non-subject imports renders its determination unsupported by substantial evidence. In this case, record evidence before the Commission shows that subject imports from Argentina and Mexico primarily or exclusively consist of seamless OCTG while subject imports from South Korea consist of welded OCTG, limiting their fungibility. *See* Tenaris PR Remand Comments at 25; Tenaris Initial Br. at 18–21; Tenaris Reply Br. at 3. The record evidence also reflects that differences in AUVs between OCTG from South Korea and OCTG from Argentina and Mexico confirms limited fungibility. Tenaris PR Remand Comments at 25; Tenaris Initial Br. at 20–21; Tenaris Reply Br. at 3. Accordingly, the Commission should rely on this other record evidence, rather than the flawed qualitative tables containing non-subject import information, as the basis for its determination of whether imports from Argentina and Mexico are fungible with imports from Russia and Korea. The record evidence demonstrates they are not.

**PUBLIC VERSION**

### B.    The Existing AD Order on OCTG from Korea

Separate and apart from the impermissible cumulation of non-subject imports from Korea, the Court also found that "the ITC did not address the possible effect resulting from the subject imports from South Korea that were under an antidumping order in its final determination."  Remand Opinion and Order at 41.  The Court directed the Commission to do so on remand.  *Id.*  Exporters operating under an AD order, which aims to offset an advantage obtained through dumping, operate differently from exporters that are not constrained by the discipline of an AD measure that affects commercial behavior and thus affects competition in the market and therefore should be considered in assessing how such imports "compete with" other imports and whether there is a reasonable overlap of competition.

The CIT has upheld the Commission's consideration of the disciplining effects of existing AD orders in its determination.  *See Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1374 (Ct. Int'l Trade 2015) (upholding the ITC's negative threat determination based in part on "the existence of 'outstanding U.S. antidumping duty orders on shrimp' which were 'likely to have a disciplining effect on the volume and prices of imports from {China, India, and Vietnam} at least for the imminent future'").  The SAA acknowledges the disciplining effect of AD and countervailing duty ("CVD") orders in the context of sunset reviews noting that "the Commission must consider its prior injury determination(s), including the volume, price effect, and impact of imports on the industry during the period preceding the issuance of an order or acceptance of a suspension agreement.  This consideration is important, because this period is the most recent time during which imports of subject merchandise competed in the U.S. market ***free of the discipline of an order or agreement***."  SAA at 884 (emphasis added).  Moreover, several cases recognize the importance of examining pre-order data in sunset reviews because of the

31

discipline that the orders impose on the commercial behavior of an exporter subject to an AD order. *See, e.g.*, *Allegheny Ludlum Corp. v. United States*, 475 F. Supp. 2d 1370, 1381 (Ct. Int'l Trade 2006) ("The value of pre-order data is widely recognized. The Statement of Administrative Action emphasizes the significance of pre-order data . . . . Thus, considering pre-order information was not contradictory to the prospective nature of the sunset inquiry").

Rather than meaningfully address the disciplining impact of the existing AD order as a condition of competition affecting subject imports from Korea, the Commission simply reiterates its original analysis, with a passing mention of the AD order. *See* Remand Determination at 52. By failing to consider the commercial and competitive impact of the AD order on subject imports from Korea in the market, as ordered by this Court, *see* Remand Opinion and Order at 41, the Commission's analysis is unsupported by substantial evidence and contrary to law. *See Gulf Shrimp Indus.*, 71 F. Supp. 3d at 1374; *NSK Corp*, 637 F. Supp. 2d at 1318.

PUBLIC VERSION

## VI.    CONCLUSION

For the reasons set forth above, in Tenaris' Initial Brief, and Tenaris' Reply Brief, Tenaris respectfully requests that the Court find that the Remand Determination did not comply with the Court's remand instructions, is contrary to law, and is unsupported by substantial evidence.  Tenaris also respectfully requests that the Court grant Tenaris' Rule 56.2 motion for judgment on the agency record.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Cristina M. Cornejo

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A.*

September 27, 2023

## CERTIFICATE OF COMPLIANCE

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures. The word count for Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A.'s ("Plaintiffs'") Comments on the Commission's Remand Determination, as computed by the White & Case word processing system (Microsoft Word 2016), is 9,991.

           /s/Gregory J. Spak
           Gregory J. Spak