UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C., | ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A., | ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| and | ) ) |
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; AND IPSCO TUBULARS INC., | ) ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) ) |
| Defendant, | ) ) |
| and | ) ) ) |
| UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE USA INC., | ) ) ) ) ) ) ) ) ) ) ) |
| Defendant-Intervenors. | ) ) |

Court No. 22-00344

COMMENTS OF
TMK GROUP IN OPPOSITION TO INTERNATIONAL TRADE
COMMISSION'S REMAND REDETERMINATION

PUBLIC VERSION

CONTAINS PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER DELETED FROM PAGES 19-20

WINTON & CHAPMAN PLLC
1100 13th Street, NW, Suite 825
Washington, D.C.  20005
(202) 774-5500

Attorneys for TMK Group

September 27, 2024

PUBLIC VERSION

Table of Contents

Page

BACKGROUND .................................................................................................. 3

ARGUMENT ..................................................................................................... 5

A.  The Commission's Rejection of the Court's Instruction that Its
Cumulation Decision Must Reflect the Conditions of Competition that
Prevailed on Vote Day in This Proceeding Case Was Incorrect ......................... 5

B.  The Commission's Conclusion that There Was a Reasonable
Competitive Overlap Between Russian OCTG Imports and OCTG
imports from Other Subject Countries IN the Latter Months of the
Period of Investigation Is Not Supported By Substantial Evidence ................... 10

    1.  The Commission's Remand Determination that the Russian
    Producers Loss Of API-Certification Did Not Fundamentally Alter
    Russian OCTG Product's Ability to Compete in the U.S.
    Marketplace Is Not Supported by Substantial Evidence. ........................... 11

        a.  The Loss of The Ability to API-Certify Russian OCTG
        Rendered Russian OCTG Non-Fungible in the Majority of
        the U.S. OCTG Marketplace ............................................................ 12

        b.  The Competitiveness of Fully Sanctioned, Non-API-
        Certified Russian OCTG In the "Fungible Applications"
        Identified by the Commission is Unclear and Not Supported
        by Substantial Evidence .................................................................. 13

            (1)  Substantial Tariffs and Other Sanctions Are Likely to
            Limit the Ability of Russian OCTG to Compete in the
            Limited Service Portion of the OCTG Marketplace ................... 13

            (2)  Serving Primarily as a Source of Green Tube for
            Further Manufacturing into API-Certified by U.S.
            Producers Would Alter the Nature of the Competitive
            Overlap, If Any, Between Russian Imports of OCTG
            and OCTG Imports from Other Subject Countries ..................... 14

            (3)  The Proposition That Some Purchasers of OCTG
            Products Would Choose to Self-Certify Non-API-
            Certified Russian For Use in Applications that
            Normally Require API-Certification Is Speculative and
            Is Not Supported By Substantial Evidence ................................ 15

<u>Page</u>

2.    The Commission Failed to Comply with the Court's Instruction to
      Address Potential Contrary Evidence Regarding the
      Competitiveness of Russian OCTG Imports Relative to OCTG
      Imports from Other Subject Countries In the Latter Months of the
      Period of Investigation and On Vote Day ................................................... 16

CONCLUSION ..................................................................................................... 21

PUBLIC VERSION

<u>Table of Authorities</u>

<u>Page</u>

U.S. COURT DECISIONS

*Chaparral Steel Co. v. United States*
    901 F.2d 1097 (Fed. Cir. 1990) ...................................................................................... 6,7

*NUCOR CORP. V. UNITED STATES*
    318 F. Supp. 2d 1207 (Ct. Int'l Trade 2004) .................................................................. 7

STATUTES AND REGULATIONS

19 U.S.C. § 1677(7)(G)(i)(I), (II) ........................................................................................ 4

OTHER AUTHORITIES

Uruguay Round Agreements Act
    Statement of Administrative Action,
    H.R. Doc. No. 103-316, vol. 1(1994) reprinted in 1994 U.S.C.C.A.N. 4040) .................. 4

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C.,<br><br>Plaintiff,<br><br>and<br><br>TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A.,<br><br>Consolidated Plaintiffs,<br><br>and<br><br>TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; AND IPSCO TUBULARS INC.,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE USA INC.,<br><br>Defendant-Intervenors. | Court No. 22-00344 |

PUBLIC VERSION

Comments of
TMK Group In Opposition to International Trade
Commission's Remand Redetermination

This brief is submitted on behalf of Plaintiff TMK Group ("TMK") to comment on the remand determination by the International Trade Commission ("the Commission") in the investigation of Oil Country Tubular Goods ("OCTG") from Argentina, Mexico, Russia, and South Korea. *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final)(Remand), USITC Pub. 5540 (Aug. 2022)("*Remand Determination*")(PR 181R, CR 443R).

In its remand order, the Court directed the Commission to address two key issues regarding its decision to cumulate imports of subject merchandise from Russia with those from Argentina, Mexico, and South Korea in its material injury determinations. *Tenaris Bay City et al v. United States*, Court No. 22-00344, Slip Op. 24-48, 12-27 (Ct. Int'l Trade, April 19, 2024) ("*Slip Op. 24-48*").   The Court instructed the Commission to (1) assess whether the conditions of competition required for cumulating Russian OCTG imports with imports from other subject countries (i.e., a "reasonable competitive overlap'") existed at the time of the Commission's decision (referred to as "Vote Day") and not just during the period of investigation considered by the Commission, and (2) reassess, and provide substantial evidence to support, its conclusion that Russian merchandise remained competitive with other imports during the latter months of the investigation. *Slip Op. 24-48*, at 17 and 27. This reassessment should account for potentially contrary evidence on record, which suggests that such competition was significantly reduced in the last four months of the investigation and may have been effectively eliminated by Vote Day.

In its Remand Determination, the Commission rejected the Court's conclusion that the conditions necessary for cumulating Russian OCTG imports with those from other subject countries must be present on Vote Day for the purpose of cumulating imports for its Commissions material injury analysis. *Remand Determination*, at 14-17 (PR 181R, CR 443R). The Commission also determined that a supplemental review of the contrary evidence regarding Russian imports' ability to compete in the U.S. market during the final months of the 42-month investigation did not require any changes to its original conclusion. The Commission maintained that Russian OCTG imports remained competitive with OCTG imports from other subject countries throughout the investigation period and could therefore be cumulated with imports from other subject countries for the purposes of assessing material injury.

In this remand proceeding, the Court should reject the Commission's assertion that it does not need to consider whether the necessary conditions for cumulation existed on Vote Day. The Court should confirm that, in the circumstances of this case, the statute requires these conditions to be present as of Vote Day before the Commission can cumulate Russian OCTG imports with imports from other subject countries for the purpose of the material injury analysis. Furthermore, the Court should find that the Commission's conclusions regarding the competitiveness of Russian OCTG in the U.S. during the latter months of the investigation are not supported by substantial evidence

BACKGROUND

The assessment of whether there was a "reasonable competitive overlap" between imports of subject merchandise from Russia and those from other subject countries— required by statute before Russian imports can be cumulated with others for the Commission's material injury analysis  —is complicated in this case. *Slip Op. 24-48*, at 9-

10 (citing 19 U.S.C. § 1677(7)(G)(i)(I), (II) and Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 848 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4190). This is because the Commission's 42-month investigation period includes two distinct and vastly different competitive environments for Russian imports in the U.S., as a result of external factors beyond the industry's control (*e.g.*, geopolitical issues and sanctions) and unrelated to the filing of the petition that initiated this investigation.

The *First Competitive Environment* refers to the conditions that existed when the petition for this proceeding was filed and continued through most of the investigation period. This environment included key factors such as: (1) API certification for Russian OCTG products, (2) Most-Favored-Nation (MFN) status for Russian imports into the U.S., (3) access for Russian ships to U.S. ports, and (4) the absence of sanctions or boycotts preventing the sale of Russian products in the U.S. market.

The *Second Competitive Environment* began in February 2022, continued to the of the period of investigation, and persisted until Vote Day. This environment became increasingly unfavorable for Russian imports, ultimately leading to their effective exclusion from the U.S. market before the investigation ended and by the Commission's Vote Day.

Record evidence shows that Russia's ability to compete in the U.S. market was significantly and intentionally restricted during the Second Competitive Environment. Key milestones include: (1) the revocation of API certification for Russian products on March 17, 2022, (2) the withdrawal of MFN status for Russia by the U.S. on April 18, 2022, (3) the ban on Russia-affiliated vessels from entering U.S. ports on April 21, 2022, (4) the imposition of a 35% tariff on Russian merchandise on

June 27, 2022, and (5) private sector shipping boycotts and severe banking sanctions. *See* TMK Initial Brief, at 9-14 (PR 122, CR 406).

Given the developments in the latter months of the investigation period, it is clear that critical aspects of the First Competitive Environment were no longer applicable to Russian OCTG imports by Vote Day. As a result, any competitive overlap that may have existed between Russian OCTG imports and those from other subject countries under the First Competitive Environment did not necessarily persist into during the Second Competitive Environment, which had its own competitive dynamics.

<u>ARGUMENT</u>

A.  *The Commission's Rejection of the Court's Instruction that Its Cumulation Decision Must Reflect the Conditions of Competition that Prevailed on Vote Day in This Proceeding Case Was Incorrect*

In its Remand Order, the Court recognized that record evidence showed a significant shift in the competitive conditions facing Russian imports during the final months of the 42-month investigation period, compared to the conditions that prevailed earlier in the investigation. *Slip Op. 24-48*, at 14-16. Moreover, the Court recognized that the "reasonable competitive overlap" required for cumulating Russian OCTG imports with those from other subject countries may have existed earlier in the investigation (the First Competitive Environment) may have disappeared by the end of the period of investigation.

Given these changes, the Court held that the decision to cumulate imports must reflect the competitive conditions at the time of the Commission's decision—Vote Day—and cannot be based solely on historical conditions that no longer existed by that point in time, even if those "historical" conditions had existed earlier in the investigation. The Court wrote,

> it is reasonable to require the ITC's determination to be made in the present tense on vote day, meaning that the

> conditions of competition must exist in the present tense, not in the past tense. It is not sufficient if the conditions of competition leading to an unfair determination existed at some point during the period of investigation. The unfair condition must continue to exist on vote day. The Court holds that it was unreasonable for the ITC to view the conditions of competition over the 42-month period of investigation without considering the effects of competition at the end of the investigation and on vote day. *Slip Op. 24-48*, at 16.

In making this decision, the Court did not restrict the Commission's discretion in determining an appropriate period of investigation for its material injury or cumulation analyses, nor did it impose a specific statutory interpretation regarding the time frame to be universally considered for cumulation. Instead, the Court simply required that the Commission's cumulation analysis be reasonable in light of the unique competitive circumstances in this case.

The Court's ruling that the Commission must consider the competitive conditions on Vote Day when making its cumulation decision aligns with the Federal Circuit's decision in *Chaparral Steel Co. v. United States*. In that case, the Federal Circuit upheld the Commission's decision not to cumulate imports from various countries when the requirements for cumulation were not met on Vote Day, even though those conditions had been satisfied earlier in the investigation period. *Chaparral Steel Co.*, 901 F.2d 1097, 1104-05 (Fed. Cir. 1990). In the Remand Determination, the Commission went to some lengths to distinguish the statute that was applied in *Chaparral* and the statute applicable in this case. *Remand Determination*, at 13-17(PR 181R, CR 443R). In short, the main difference is that the rules applied to determine which countries are potential candidates for cumulation have been simplified and narrowed significantly since *Chaparral* was decided. However, nothing in the Commission's discussion suggests that the idea that the required conditions for cumulation (whatever they are) must exist on Vote Day to justify

cumulation. *See, e.g., Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1223-1224 (Ct. Int'l Trade 2004) (noting "{T}his Court has held that the ITC 'may of course permissibly focus its analysis on a specific time frame within the POI' and citing Chaparral Steel, 901 F.2d at 1103 for "upholding the ITC's focus on current unfair imports, versus those earlier in the period of investigation, in its cumulation analysis because such construction was 'in accord with the remedial purpose of duties which are intended merely to prevent future harm to the domestic industry by reason of unfair imports that are presently causing material injury'").

Moreover, the requirement that the conditions relied upon to make a cumulation decision must exist in the present, and not just in the past, aligns with the Commission's stated objective of using evidence to identify trends that will inform its cumulation decision. *Remand Determination*, at 37 (PR 181R, CR 443R). If there was a fundamental change in the competitive environment during the investigation period, any "trend" identified by the Commission based on data from an outdated environment would be inherently inaccurate. In such cases, the most appropriate data for assessing trends at the time of the Commission's decision would need to exclude data from the earlier environment to avoid identifying non-existent "trends." Thus, the Court's instruction to ensure that the Commission bases its cumulation decisions on the conditions prevailing at the time of the decision (and excluding consideration of conditions that no longer exist) is a necessary and practical measure to prevent errors in assessing the trends reflected in record evidence.

In the Remand Determination, however, the Commission rejected the Court's instruction to confirm that the conditions required for cumulation exist in the present and not just the past. The Commission stated, "{w}e assessed and *continue to assess* whether

there was a reasonable overlap of competition across the entire 42-month period of investigation (POI), not just during the final four months." *Remand Determination*, at 36 (*emphasis added*)(PR 181R, CR 443R).

The Commission justified its rejection of the Court's instruction to determine whether the necessary conditions for cumulation existed by Vote Day by arguing that such a requirement would create logistical challenges. Specifically, it claimed that this approach would necessitate collecting data up to Vote Day and would prevent parties from having the opportunity to comment on all the data gathered prior to that point. *Remand Determination*, at 15-17 (PR 181R, CR 443R). The Commission wrote,

> The Commission's obligation to "cease the collection of information and . . . provide the parties with a final opportunity to comment on the information obtained . . . " prior to making a final determination would be rendered impossible if the Commission was required to collect data on the competitive conditions in the U.S. market up until vote day. Had the Commission collected data up to and on vote day, October 26, 2022, parties to the underlying investigations would have been deprived of their reasonable opportunity to submit comments "on the information obtained" as the Commission would have never "ceas{ed} the collection of information" prior to rendering a final determination. *Remand Determination*, at 16-17 (PR 181R, CR 443R).

None of the concerns articulated by the Commission about the logistics of considering conditions competition on Vote Day in the proceeding are well-founded.

As an initial matter, the suggestion that the Commission would have needed to collect data *up to Vote Day* in order to determine whether the appropriate conditions of competition existed on Vote Day—either in the original investigation or on remand— makes no sense. For example, if the Commission had believed that the record was insufficient to determine whether the necessary competitive conditions existed in the Second Competitive Environment to justify cumulation due to the lateness of the change in

competitive environment within the period of investigation, the Commission could have obtained some additional months of post-POI import data to better assess that nature and extent of competition after all public and private sanctions were in place and made these data available to the parties prior to the hearing or submission of final comments. There would have been no need to collect data all the way up to the moment of the Vote.

The Commission's concerns about data collection and party commentary are even more misplaced in the context of this remand proceeding. After the Court instructed the Commission to assess whether the competitive conditions necessary for cumulation existed up to Vote Day, the Commission could have re-opened the record to gather additional import data to determine whether any additional Russian OCTG imports arrived in the United States prior to Vote Day. This would have allowed the Commission to determine whether any further Russian OCTG imports entered the U.S. after all public and private sanctions were fully implemented (and to determine whether the May 2022 importation that was central its cumulation analysis (discussed below) actually reflected post-sanction competitive conditions or was more likely to be an aberration). In turn. the Commission could have shared these data with the parties and allowed for comments before issuing the Remand Determination.

In summary, the Commission offered no valid justification for rejecting the Court's instruction to assess whether the competitive conditions required for cumulation (*i.e.*, a reasonable competitive overlap) existed at the time of Vote Day, rather than relying almost entirely on past conditions, before cumulating Russian OCTG imports with those from other subject countries for the purpose of assessing material injury in this proceeding.

**B.**    *The Commission's Conclusion that There Was a Reasonable Competitive Overlap Between Russian OCTG Imports and OCTG imports from Other Subject Countries IN the Latter Months of the Period of Investigation Is Not Supported By Substantial Evidence*

In addition to instructing the Commission on the appropriate timing of the cumulation decision, the Court also identified certain aspects of the Commission's initial determination that were not adequately supported by substantial evidence and required further consideration on remand. The first issue concerns the Commission's analysis of how the Russian producers' loss of the ability to API-certify their OCTG products impacted the competitiveness of Russian OCTG imports in the U.S. relative to imports from other subject countries. The second issue relates to the Commission's failure to consider potentially conflicting evidence regarding its decision to cumulate Russian OCTG imports with those from other subject countries, in light of the cumulative obstacles faced by Russian OCTG imports into the U.S.

Both of these issues will be addressed below.  However, before addressing those issues, two aspects of the analyses to be performed should be highlighted

First, when evaluating the impact of sanctions on Russian OCTG in the context of the cumulation decision in this proceeding, the relevant inquiry is whether the sanctions *eliminated a "reasonable competitive overlap"* between Russian imports, other subject imports, and domestic products—*not whether the sanctions completely excluded Russian products* from the U.S. marketplace. It is possible, and even likely, that these sanctions may significantly hinder Russian products' ability to compete with products from other countries in all or parts of the U.S. market without formally banning Russian products from the marketplace.  The mere presence of Russian imports after sanctions were fully imposed would not justify cumulation of Russian OCTG imports with OCTG imports from

other subject countries unless there was a reasonable competitive overlap among these imports.

Second, the determination of whether a reasonable competitive overlap existed between fully-sanctioned Russian OCTG imports and those from other subject countries during the latter months of the investigation and through Vote Day should be based on the consideration of the *cumulative effect of all the obstacles* faced by Russian imports. In this regard, it is essential to consider the totality of the effects of the different sanctions the competitiveness of Russian products during the final months of the period of investigation and up to Vote Day.  In this regard, the evaluation of whether sanctions impaired the competitiveness of Russian OCTG imports in the United States must take into account the *cumulative effects* of (1) the inability of Russian producers to API-certify their products, (2) the existence of much  higher tariffs compared to competing products, (3) the existence of substantial logistical challenges (*e.g.*, shipping complications), and (4) the imposition of financial sanctions on transactions with Russian producers .

> 1. *The Commission's Remand Determination that the Russian Producers Loss Of API-Certification Did Not Fundamentally Alter Russian OCTG Product's Ability to Compete in the U.S. Marketplace Is Not Supported by Substantial Evidence.*

One of the first new obstacles faced by Russian imports in the latter months of the review period was the loss of Russian producers' ability to API-certify their OCTG products as of March 17, 2022. In its Remand Order, the Court noted that the Commission concluded that Russian OCTG remained fungible with other subject imports, even without API certification, but did not fully explain or clarify its understanding of the impact that this loss had on the ability of Russian OCTG imports to compete in the U.S. marketplace in its Final Determination. *Slip Op. 24-48*, at 19-23. On remand, the Commission was instructed to provide a more detailed analysis of how the loss of API certification might

- 11 -

have affected the competitiveness of Russian OCTG in the U.S. market, with particular emphasis on how this loss impacted the fungibility of Russian OCTG with OCTG products from other subject countries.

In the Remand Determination, the Commission concluded that the loss of Russian producers' ability to API-certify their OCTG products did not negate the fungibility of Russian OCTG with OCTG at produced by domestic or other subject country producers, as non-API-certified Russian OCTG could still be used in the U.S. under certain specific circumstances. The Commission identified three such circumstances: (1) non-API-certified Russian OCTG could be used as limited service OCTG in certain applications; (2) it could be imported as 'green tube' and transformed into API-certified pipe by a U.S. processor, potentially allowing it to be sold without indicating that Russia was involved in its production; and (3) some U.S. purchasers might accept non-API-certified Russian OCTG by self-certifying it based on their own qualification processes and prior experience with the Russian producer. *Remand Determination,* at 29-33 (PR 181R, CR 443R).

> a. *The Loss of The Ability to API-Certify Russian OCTG Rendered Russian OCTG Non-Fungible in the Majority of the U.S. OCTG Marketplace*

Before examining these options, it is important to note that the Commission's identification of three specific applications where non-API-certified Russian OCTG might still be used implicitly acknowledges that losing the ability to obtain API certification effectively *excludes* Russian OCTG from much of the U.S. marketplace.  In other words, loss of API-certification may not have completely eliminated all fungibility between Russian OCTG imports from other subject countries—but it undoubtedly substantially narrowed the extent of any such fungibility.

As a result, the inability of Russian producers to API-certify their OCTG products effectively eliminated any meaningful competitive overlap between Russian OCTG imports and API-certified products from other countries and U.S. producers in a substantial portion of U.S. OCTG marketplace.

> b. *The Competitiveness of Fully Sanctioned, Non-API-Certified Russian OCTG In the "Fungible Applications" Identified by the Commission is Unclear and Not Supported by Substantial Evidence*

While record evidence indicates that Russian OCTG could technically be fungible with OCTG from domestic and other subject country producers in selected circumstances, it is important to note that (1) the record provides no conclusive evidence that any of these options are actually available to Russian producers on a significant scale, and (2) each option would result in a substantial shift and reduction in the degree of competitive overlap between Russian OCTG and OCTG produced in other subject countries.  Accordingly, the conclusion that Russian OCTG producers' loss of the ability to API-certify their products did not substantially decrease the degree of competitive overlap between Russian OCTG imports and imports from other subject countries is not supported by substantial evidence—especially when the cumulative effects of the lost ability to API certify products and the other sanctions faced by Russian OCTG imports are considered.

> (1) *Substantial Tariffs and Other Sanctions Are Likely to Limit the Ability of Russian OCTG to Compete in the Limited Service Portion of the OCTG Marketplace*

Logically, there is no reason to believe that non-API-certified Russian OCTG could not be used in limited service applications where API certification is not required. Limited service OCTG refers to OCTG that does not meet API specifications but can still be used in specific applications, such as shallower wells with lower pressure. Staff Report, at I-20

(Oct. 14, 2022) (PR 161, CR 431) However, it is sold without the warranties that typically accompany API-certified OCTG. *Id.*

From a competitiveness standpoint, however, the substantial tariffs and logistical challenges associated with using non-API-certified Russian OCTG are likely to make these products a relatively more expensive and/or inconvenient option, thereby limiting their economic fungibility compared to other sources of limited service OCTG.

Furthermore, there is no indication in the record that U.S. users of limited service OCTG actively sought Russian OCTG imports during the latter part of the investigation period or up to Vote Day.

> *(2) Serving Primarily as a Source of Green Tube for Further Manufacturing into API-Certified by U.S. Producers Would Alter the Nature of the Competitive Overlap, If Any, Between Russian Imports of OCTG and OCTG Imports from Other Subject Countries*

From a technical standpoint, it appears feasible for non-API-certified Russian OCTG to be imported as Green Tube and then further processed by a U.S. producer into API-certified OCTG (which could then be sold without any indication that Russian Green Tube was used).

However, there is no evidence in the record to suggest that U.S. producers planned or were likely to use non-API-certified Russian OCTG to manufacture API-certified pipe following the loss of Russian producers' ability to API-certify their OCTG, especially in light of the broad sanctions on Russian OCTG imposed during the final months of the investigation or before Vote Day. The significant tariffs, logistical hurdles, and banking challenges associated with using non-API-certified Russian OCTG as raw material are likely to make Russian it economically impractical for U.S. producers aiming to manufacture API-certified OCTG. As a result, the potential use of non-API-certified

Russian OCTG is unlikely to preserve any meaningful competitive overlap between Russian imports and those from other subject countries, particularly for API-certified applications.

It is also important to note that if Russian OCTG producers were to shift their focus to supplying U.S. manufacturers , this would fundamentally alter the competitive dynamics between Russian OCTG imports and those from other subject countries. Such a shift would likely reduce the degree of competitive overlap in the OCTG market between Russian imports and those from other nations.

> (3)  *The Proposition That Some Purchasers of OCTG Products Would Choose to Self-Certify Non-API-Certified Russian For Use in Applications that Normally Require API-Certification Is Speculative and Is Not Supported By Substantial Evidence*

In the Remand Determination, the Commission noted that some U.S. purchasers of OCTG had their own certification programs and/or prior experience with Russian OCTG. *Remand Determination*, p. 33-34 (PR 181R, CR 443R)  According to the Commission, this may have made these purchasers willing to continue using non-API-certified Russian OCTG for regular (*i.e.*, non-limited service) applications. Based on these observations, the Commission concluded that the loss of Russian producers' ability to API certify their products "would *not necessarily* mean that purchasers would stop buying Russian OCTG, as there is no indication that the quality of these products declined" *Remand Determination*, p. 34 (*emphasis added*)(PR 181R, CR 443R).

The idea that non-API-certified Russian OCTG could be considered fungible with API-certified OCTG from U.S. producers or suppliers from other countries for non-limited-service applications is speculative. The Commission did not provide evidence that other producers had previously self-certified and purchased non-API-certified pipes for applications that typically require API certification. Moreover, there is no record

evidence showing that any such purchase of non-API-certified Russian OCTG have occurred or were planned.

In light of the foregoing, the Commission's conclusion that the loss of API certification did not affect the fungibility of Russian OCTG with OCTG produced by domestic or foreign producers is not supported by substantial evidence. At the very least, this loss significantly reduced the fungibility of Russian OCTG, limiting its competitiveness to only a portion of the U.S. marketplace. Furthermore, there is no evidence to suggest that the remaining technical similarity between non-API-certified Russian OCTG and OCTG from other countries would result in a "reasonable overlap of competition" between these products, particularly when the impact of the other obstacles faced by Russian imports are considered.

> 2.  *The Commission Failed to Comply with the Court's Instruction to Address Potential Contrary Evidence Regarding the Competitiveness of Russian OCTG Imports Relative to OCTG Imports from Other Subject Countries In the Latter Months of the Period of Investigation and On Vote Day*

In its Remand Order, the Court acknowledged the argument that the Commission's cumulation analysis should consider the total impact of government sanctions and other obstacles facing Russian imports by the end of the investigation period. *Slip Op. 24-48*, at 23-27. The Court also recognized that these measures were implemented and became effective over time, rather than being imposed instantly four months before the end of the investigation period. *Id.* These arguments were raised during the investigation, but the ITC remained "unpersuaded by Tenaris' and TMK {Group's} claim that the measures taken in response to Russia's February 2022 invasion of Ukraine prevented Russian imports from competing in the U.S. market, making cumulation of these imports inappropriate." Views of the Commission, USITC Pub. 5381, Inv. Nos. 701-TA-671-72, 731-TA-1571-73 (Final)

(Nov. 18, 2022), PR 1651, at 22. ("Views")  In reaching this decision, the ITC relied

heavily on the fact that Russian OCTG imports still entered the United States during two of

the last four months of the investigation period. *Id.*, at 23.

In its Remand Order, the Court instructed the Commission re-visit this conclusion,

writing,

> While record evidence shows the import of some Russian
> subject merchandise in two post-invasion months, the ITC
> did not provide an adequate explanation to account for the
> lag of the sanction measures taking place or the impact of the
> loss of API-certification services on Russian OCTG's
> competitiveness. The ITC must address the potential
> contrary evidence regarding the competitiveness of imports
> from Russian OCTG relative to the other subject imports
> from Argentina, Mexico, and South Korea. *Slip Op. 24-48*, at
> 27.

Accordingly, pursuant to the Remand Order, the Commission was instructed to consider

evidence on remand regarding the competitiveness of Russin OCTG imports with OCTG

imports from the other countries in the later months of the period of investigation that

suggests that there *was not* a reasonable competitive overlap between Russian imports and

imports from other subject countries during the period of investigation and through Vote

Date.

The Commission largely declined to follow the Court's instruction determination.  In

this regard, the Commission wrote,

> the Commission is not required to assess competitive overlap
> up to and including vote day. Indeed, the Commission cannot
> do so in light of its statutory obligation to provide the parties
> with an opportunity for final comment. Thus, to the extent
> that these sanctions may have had a lag in having an effect
> following the POI, this is beyond the purview of what the
> Commission is required to consider. Additionally, consistent
> with our longstanding approach toward addressing the
> cumulation factors, *we assessed and continue to assess*
> *whether there existed a reasonable overlap of competition*
> *across the entire 42-month POI, not just the final four*

- 17 -

*months of the period of investigation.* There is no dispute that both imports and inventories of OCTG from Russia were simultaneously present in the U.S. market in the vast majority of those months. Nonetheless, in light of the Court's instructions, we give additional consideration to whether the sanctions highlighted by the Court and the parties prevented subject imports from Russia from being simultaneously present in the U.S. market during the POI, including during the post-invasion portion of the POI. *Remand Decision,* at 35-36 (*emphasis added*) (PR 181R, CR 443R).

The Commission's failure to seriously consider the impact of several significant factors—such as the loss of API certification for Russian products, the removal of MFN status, the closure of U.S. ports to Russian ships, the imposition of across-the-board tariffs, private sector shipping boycotts, and significant banking sanctions—on the competitiveness of Russian OCTG in the U.S. marketplace is evident in its ultimate conclusion on the matter: "{D}uring the POI, *the sanctions did not affect whether of Russian OCTG competed* with other subject imports or the domestic like product." *Remand Decision*, at 39 (emphasis added)(PR 181R, CR 443R).

From a logical standpoint, the Commission's conclusion is startling—particularly because one of the primary reasons for the U.S. Government's imposition of extensive sanctions on Russian goods was to severely impair their ability to compete in the U.S. market. It would seem improbable for the Russian OCTG industry avoided the adverse effects of these sanctions. Moreover, in discussing the consequences of losing the ability to obtain API certification, the Commission acknowledged that this loss restricted Russian OCTG's access to the U.S. marketplace to a few limited areas: (1) limited service OCTG applications, (2) use as an input for U.S. manufacturers producing API-certified OCTG, and (3) acceptance by select OCTG purchasers willing to self-qualify and use non-API-

certified Russian OCTG. Such a narrow range of potential uses would logically diminish the ability of Russian OCTG to compete with imports from other subject countries.

The conclusion is also startling given the record evidence that Russian imports of the subject merchandise essentially disappeared from the U.S. marketplace after the various obstacles to Russian imports were put in place. For example, the Staff Report noted that several U.S. purchasers "stated that the start of the Russia-Ukraine war had led to imports from Russia dropping to zero." Staff Report, at II-15, Oct. 14, 2022, PR 161, CR 431. Additionally, U.S. importers reported that they [

                                    ] Staff Report, at VII-35 and Table VII-28, Oct. 14, 2022 (PR 161, CR 431). Furthermore, TMK reported that it "has been unable to compete in the U.S. marketplace since the end of the first quarter of 2022 and has no plans to sell OCTG in the U.S. market for the foreseeable future." TMK's Pre-Hearing Br. at Ex. 1, at 5 (PR 122, CR 406). With one exception (discussed below), the Commission failed to address any of this contrary evidence in its remand before affirming its conclusion from the initial investigation.

In the Commission's Remand Determination, the cornerstone, if not the entire foundation. of its conclusion that the cumulative obstacles faced by Russian imports of OCTG did not impact their competitiveness with other subject imports or domestic products was the fact that Russian OCTG was imported into the U.S. in March and May 2022—two of the last four months of the investigation period. These imports were repeatedly referenced to highlight that "interim 2022" Russian imports were greater than "interim 2021" Russian imports, which the Commission interpreted as evidence that the sanctions faced by Russian imports did not affect Russia's ability to compete in the U.S. marketplace. The Commission wrote:

> First, the Section 232 duties were in place since 2018 and did not prevent subject imports from Russia from competing in the U.S. market throughout the POI. Second, the Section 232 duties (2018) and the suspension of API certification (March 17, 2022), did not prevent subject imports from Russia from entering into the U.S. in March 2022 in volumes that were 69.0 percent higher than in March 2021. Third, all of these sanctions combined, plus the revocation of Russia's MFN status (April 18, 2022) and bans on Russian ships from entering U.S. ports (April 2022) did not prevent subject imports from Russia from entering into the U.S. market in May 2022 in volumes 25.0 percent higher than in May 2021. In particular, the combined volume of subject imports from Russia was 47.5 percent higher in March and May 2022, after the imposition various sanctions, than in March and May 2021. *Remand Determination*, at 37-38 (*citations omitted*) (PR 181R, CR 443R).

In its Remand Order, the Court (1) acknowledged the existence of Russian imports in March 2022 and May 2022, (2) recognized the unique circumstances surrounding each set of imports in light of the cumulative sanctions imposed on Russian imports during the latter part of the review period (i.e., the sanctions were not yet in effect for the March 2022 importation and were only partially in place for the May 2022 importation), and (3) noted the Commission's reliance on these imports to justify its cumulation decision. *Slip Op.-24-48*, at 24-27. Given these factors, the Court instructed the Commission to examine "the potential contrary evidence regarding the competitiveness of imports from Russian OCTG relative to the other subject imports." *Slip Op. 24-48*, at 27.

In its Remand Decision, the Commission did not address the record evidence indicating a lack of planned imports from [                    ], which suggests that the full effect of the sanctions may, in fact, be preventing further imports of Russian OCTG, despite the existence of May 2022 imports. Additionally, the Commission did not reopen the record to obtain updated import data through Vote Day to assess whether Russian OCTG imports continued in light of the cumulative effects of all the sanctions.

The only potentially contrary evidence explicitly addressed by the Commission was TMK's statement that it had been unable to compete in the U.S. marketplace since the end of the first quarter of 2022 and had no plans to sell OCTG in the U.S. for the foreseeable future. The Commission predictably dismissed the significance of TMK's claim, arguing that (1) "TMK does not represent the entire Russian OCTG industry," and (2) "official import statistics show that Russian OCTG imports did, in fact, enter the U.S. during interim 2022." *Remand Determination*, at 36 (PR 181R, CR 443R).

In summary, the Commission failed to comply with the Court's remand instruction to properly consider potentially contrary evidence regarding Russia's ability to compete in the U.S. marketplace with imports from other subject countries throughout the investigation period and up to Vote Day. This matter should be returned to the Commission with instructions to re-examine the issue in a manner consistent with the Court's directives.

CONCLUSION

For the reasons outlined above, the Commission's Remand Determination cannot be upheld. This Court should remand the matter to the Commission once again with instructions for the Commission to re-evaluate its decision to cumulate Russian OCTG imports with imports from other subject countries. The re-evaluation should be consistent with the Court's instructions to properly assess the conditions of competition through Vote Day and thoroughly address the evidence reflecting the full impact of the numerous sanctions imposed on Russian OCTG imports during the later months of the investigation period.

PUBLIC VERSION

Respectfully submitted,

/s/Michael J. Chapman

Michael J. Chapman
Jeffrey M. Winton
Amrietha Nellan
WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for TMK Group

September 27, 2024

PUBLIC VERSION

CERTIFICATE OF COMPLIANCE

I, Michael J. Chapman, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 5,925 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.

/s/Michael J. Chapman
Michael J. Chapman