*PUBLIC VERSION*

---

**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JENNIFER CHOE-GROVES**

---

Consol. Court No. 22-00344

---

**TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, AND SIDERCA S.A.I.C.,**

*Plaintiffs,*

**TMK GROUP; AND TUBOS DE ACERO DE MEXICO, S.A.,**

*Consolidated Plaintiffs,*

and

**TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, AND IPSCO TUBULARS INC.,**

*Plaintiff-Intervenors,*

v.

**UNITED STATES,**

*Defendant,*

and

**UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC.,**

*Defendant-Intervenors.*

---

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S COMMENTS ON REMAND DETERMINATION**

---

**MADELINE R. HEEREN**
Attorney For Defendant
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 708-1529
Fax: (202) 205-3111
madeline.heeren@usitc.gov

**DOMINIC L. BIANCHI**
General Counsel
Telephone (202) 205-3061

**ANDREA C. CASSON**
Assistant General Counsel
  for Litigation
Telephone (202) 205-3105

**DATED: OCTOBER 25, 2024**

**TABLE OF CONTENTS**

Table of Authorities ...................................................................................................... iii

I.      Background ........................................................................................................ 1

II.     The Commission Fully Responded to the Court's Remand Instructions .......................... 2

        A.      Cumulated Subject Imports Were Proven Unfair and the Commission
                Assessed the Correct Timeframe for Its Reasonable Overlap of
                Competition Analysis ........................................................................... 2

        B.      Response to Instructions Regarding Whether to Cumulate Subject
                Imports from Russia with Other Subject Imports ...................................... 3

        C.      Response to Instructions To Consider Only Non-Hyundai Imports in
                the Commission's Assessment of Whether to Cumulate Subject
                Imports from South Korea with Other Subject Imports ............................. 7

        D.      Response to Instructions Regarding the Effects of the Existing
                Antidumping Order on Subject Imports from South Korea .......................... 9

III.    The Commission's Reasonable Overlap of Competition Analysis With
        Respect To Subject Imports from Russia Is Supported by Substantial
        Evidence and In Accordance With Law ....................................................... 10

        A.      The Language in *Chaparral* Concerning Competitive Overlap on
                Vote Day Does Not Apply to the Post-URAA Version of the
                Cumulation Provision ......................................................................... 10

        B.      The Commission's Fungibility and Simultaneous Presence Findings
                Considered the Suspension of API Certification for Russian
                Producers, Contrary Evidence, and Russian Sanctions and Is
                Supported by Substantial Evidence and In Accordance With Law .............. 19

IV.     The Commission's Reasonable Overlap of Competition Analysis With
        Respect To Non-Hyundai Imports from South Korea Is Supported by
        Substantial Evidence and In Accordance With Law ...................................... 24

V.      The Court Should Reject Plaintiffs' Untimely Arguments ............................. 26

VI.     Conclusion ........................................................................................................ 32

## TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*Akzo N.V. v. U.S. Int'l Trade Comm'n,*
    808 F.2d 1471 (Fed. Cir. 1986) ............................................................................................ 31

*AWP Indus., Inc. v. United States,*
    35 CIT 774, 783 F. Supp. 2d 1266 (2011) ........................................................................... 14

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,*
    5 F.4th 1367 (Fed. Cir. 2021) ...................................................................................... 30, 31

*Bureau of Alcohol, Tobacco & Firearms v. FLRA,*
    464 U.S. 89 (1983) ................................................................................................................ 29

*CBOCS West, Inc. v. Humphries,*
    553 U.S. 442 (2008) ...................................................................................................... 15, 30

*Chaparral Steel Co. v. United States,*
    901 F.2d 1097 (Fed. Cir. 1990) ...................................................................... 2, 3, 10, 11, 12, 13

*Chemours Co. FC, LLC v. United States,*
    443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ....................................................................... 14

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ......................................................................................... 15, 27, 28, 30

*Christensen v. Harris County,*
    529 U.S. 576 (2000) .............................................................................................................. 15

*Coal. of Gulf Shrimp Indus. v. United States,*
    71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ........................................................................ 22

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States,*
    66 F.4th 968 (Fed. Cir. 2023) .............................................................................................. 31

*Dickerson v. United States,*
    530 U.S. 428 (2000) ...................................................................................................... 15, 30

*Essar Steel Ltd. v. United States,*
    678 F.3d 1268 (Fed. Cir. 2012) ........................................................................................... 25

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
    216 F.3d 1027 (Fed. Cir. 2000) ........................................................................................... 31

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                                 **Page(s)**

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ............................................................................. 31

*Goss Graphics Sys., Inc. v. United States,*
   216 F.3d 1357 (Fed. Cir. 2000) ........................................................................... 22

*Goss Graphics Sys., Inc. v. United States,*
   22 CIT 983, 33 F. Supp. 2d 1082 (1998), *aff'd,* 216 F.3d 1357 (Fed. Cir. 2000) ....... 21, 22, 24

*Halliburton Co. v. Erica P. John Fund, Inc.,*
   573 U.S. 258 (2014) ................................................................................... 15, 30

*Int'l Indus., Ltd. v. United States,*
   311 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) ................................................... 20, 22

*ITG Voma Corp. v. United States,*
   253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd,* 753 F. App'x 913 (Fed. Cir. 2019) ............................................................................................................. 27

*Jeld-Wen, Inc. v. United States,*
   567 F. Supp. 3d 1344 (Ct. Int'l Trade 2022) ....................................................... 18

*JMC Steel Grp. v. United States,*
   70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ......................................................... 22

*Loper Bright Enters. v. Raimondo,*
   144 S. Ct. 2244 (2024) ................................................................................. *passim*

*Mexichem Fluor Inc. v. United States,*
   29 CIT 86, 179 F. Supp. 3d 1238 (2016) ............................................................ 14

*Mukand Ltd. v. United States,*
   20 CIT 903, 937 F. Supp. 910 (1996) ................................................................. 24

*Nakornthai Strip Mill Pub. Co. v. United States,*
   32 CIT 1272, 587 F. Supp. 2d 1303 (2008) ........................................................ 27

*Nevinnomysskiy Azot v. United States,*
   32 CIT 642, 565 F. Supp. 2d 1357 (2008) ..................................................... 21, 22

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                    **Page(s)**

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ................................................................... 19

*Nitrogen Sols. Fair Trade Comm. v. United States*,
    29 CIT 86, 358 F. Supp. 2d 1314 (2005) ..................................... 14

*Noviant Oy v. United States*,
    30 CIT 1447, 451 F. Supp. 2d 1367 (2006) ............................... 24

*Nucor Corp. v. United States*,
    414 F.3d 1331 (Fed. Cir. 2005) ................................................................... 14

*OCTAL Inc. v. United States*,
    539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ......................... 27

*Sandvik Steel Co. v. United States*,
    164 F.3d 596 (Fed. Cir. 1998) ..................................................................... 18

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ........................................................................... 15, 29

*Smith-Corona Grp. v. United States*,
    713 F.2d 1568 (Fed. Cir. 1983) ................................................................... 31

*Steel Auth. of India, Ltd. v. United States*,
    25 CIT 472, 146 F. Supp. 2d 900 (2001) ........................... 13, 14, 15

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) ............................................................. 20, 22

*United States v. Berkeley*,
    567 F.3d 703 (D.C. Cir. 2009) ................................................................... 27

*United States v. Hunter*,
    786 F.3d 1006 (D.C. Cir. 2015) ................................................................. 27

*Usinor, et al. v. United States*,
    28 CIT 1107, 342 F. Supp. 2d 1267 (2004) ........................... 22

*Wieland Werke, AG v. United States*,
    13 CIT 561, 718 F. Supp. 50 (1989) ....................................... 24

## TABLE OF AUTHORITIES (cont'd)

**Statutes**                                                                 **Page(s)**

5 U.S.C. § 706 .......................................................................................... 30

19 U.S.C. § 1516a(b)(1)(B)(i) .............................................................. 18, 30

19 U.S.C. § 1677(7) ................................................................................ 31

19 U.S.C. § 1677(7)(C)(iii) ..................................................................... 27

19 U.S.C. § 1677(7)(C)(iv) (1988) .......................................................... 11

19 U.S.C. § 1677(7)(G)(i) ............................................. 1, 12, 13, 15, 28

19 U.S.C. § 1677(7)(G)(iii) ............................................................ 16, 17, 18

19 U.S.C. § 1677m(g) ................................................................... 16, 17, 18

19 U.S.C. § 3512(d) ................................................................................ 31

19 U.S.C. § 3513(a)(2) ............................................................................ 31


**Legislative Materials**

Uruguay Round Agreements Act,
  Pub. L. No. 103-465, 108 Stat. 4809 (1994) ...........................2, 3, 10, 11, 12, 13, 31

Statement of Administrative Action to the Uruguay Round Agreements Act,
  H.R. Doc 103-316, Vol. 1 (1994).................................................... 13, 15, 16, 27, 31


**USITC Administrative Proceedings**

*Carbon Steel Structural Shapes from Norway*,
  Inv. No. 731-TA-234 (Final), USITC Pub. 1785 (Nov. 1985) ................................ 12

Defendant U.S. International Trade Commission responds to the comments filed by plaintiffs Tenaris and TMK, concerning the Commission's remand determinations in *Oil Country Tubular Goods from Argentina, Mexico, and Russia Investigation*, Nos. 701-TA-671 and 731-TA-1571-1573 (Final) (Remand) (CR443R) ("RemandViews") (public version available at PR183R). Because the Commission's remand determinations are supported by substantial evidence and otherwise in accordance with law, and fully respond to the Court's remand instructions, we respectfully ask this Court to affirm them.

## I.  Background

On April 19, 2024, this Court remanded several aspects of the Commission's determinations related to whether subject imports from each source and the domestic like product shared a reasonable overlap of competition so as to require cumulation.  *See Tenaris Bay City et al. v. United States*, Court No. 22-00344, Slip Op. 24-48 (April 19, 2024) ("Slip Op. 24-48").  First, the Court found that the Commission unlawfully failed to address whether subject imports from Russia "were proven unfair and had a continuing impact during the full period of investigation {"POI"}, including vote day."  *Id*. at 17.  It remanded the Commission's analysis of overlap of competition given the measures that arose later in the POI in response to Russia's invasion of Ukraine in February 2022.  *Id*. at 13–17.  Second, it remanded the Commission to consider contrary evidence on the record pertaining to the effects of the sanctions on subject imports from Russia, especially the suspension of API-certification on subject imports from Russia and highlighted a letter from the API and testimony from the President of Tenaris USA.  *Id*. at 22.  Third, the Court held that "cumulation of non-subject South Korean imports is a violation of 19 U.S.C. § 1677(7)(G)(i) and is not in accordance with law."  *Id*. at 37.  Fourth, the Court instructed the Commission to reconsider certain factual aspects of the Commission's

cumulation analysis concerning fungibility and geographic overlap, which the Court found were unsupported by substantial evidence because the Commission did not exclude nonsubject (*i.e.*, Hyundai's) imports from South Korea from its consideration in certain aspects of its fungibility, geographic overlap, and simultaneous presence analyses. *Id*. at 38–40. Fifth, the Court remanded the Commission to address party arguments concerning the existing AD order on subject imports from South Korea. *Id*. at 41.

**II.    The Commission Fully Responded to the Court's Remand Instructions**

**A.    Cumulated Subject Imports Were Proven Unfair and the Commission Assessed the Correct Timeframe for Its Reasonable Overlap of Competition Analysis**

The Court instructed the Commission to "reassess the timing and determine whether the imports under investigation were proven unfair and had a continuing impact during the full {POI}, including on vote day." Slip Op. 24-48 at 17.

On remand, the Commission clarified that the Department of Commerce ("Commerce") determines whether subject imports are unfairly traded, not the Commission. RemandViews at 11. In the investigations, Commerce determined that subject imports from all four sources were unfairly traded before the time of the Commission's vote on October 26, 2022. RemandViews at 11.

Addressing *Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990), the Commission explained that the version of the cumulation statute addressed in that case was subsequently amended in 1994 with the passage of the Uruguay Round Agreement Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"). RemandViews at 14. The current statute is no longer silent on the timeframe for determining which imports can be cumulated, but instead requires that competing imports be cumulated if they are subject to petitions filed on the same

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

day, as is the case in these investigations. Thus, some aspects of *Chaparral*, including assessing whether subject imports are candidates for cumulation based on whether they are marketed reasonably coincident in time and are having a continuing impact on vote day, were overridden by the post-URAA cumulation provision.

      **B.    Response to Instructions Regarding Whether to Cumulate Subject Imports from Russia with Other Subject Imports**

With respect to the Commission's fungibility analysis, the Court instructed the agency to consider "contrary evidence on the record pertaining to the effects of the sanctions on Russian OCTG, especially the loss of API-certification on Russian OCTG." Slip Op. 24-48 at 22-23. This potentially contrary evidence highlighted by the Court consisted of a letter from the API stating, in part, [ ███████████████████████████████████ ], and a piece of testimony from the President of Tenaris USA, stating that the suspension of API certification services would be a "major setback" for Russian producers of OCTG. *Id*. at 22.[1] The Court also highlighted that the purchaser responses regarding the ability to meet or exceed industry quality standards "do not reflect responses for quality after the {suspension} of API-certification . . . nor does this information address the competitive impact that losing API-certification would have on the subject Russian products." *Id*. at 20.

In response, the Commission clarified that Russian producers lost their API-certification months prior to the Commission issuing the questionnaires. Thus, the returned questionnaires and data in the staff report do, in fact, reflect purchasers' impressions of Russian OCTG that Russian producers could no longer API certify. RemandViews at 27.

---

[1] The Court referred to testimony from "a witness from API," however, Dr. Dean Foreman, Chief Economist for API, did not opine on the potential effects of the suspension of API certifications in his testimony. RemandViews at 4 n.14.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

Complying with the Court's instructions, the Commission gave additional consideration to the question of whether subject imports from Russia, after the suspension of API-certification, were fungible with other subject imports and the domestic like product.  RemandViews at 28-30.  The Commission found that subject imports from Russia did not change after the suspension of API-certification, as they continued to be produced to API specifications.  RemandViews at 30; Petitioners' Posthearing Br., Ex. 1 (Answers to Commissioner Questions) at II-56–57 n.239 (CR419/PR143); Petitioners' Posthearing Br., Ex. 12 (API 5CT Specification (2019 Ed.)) at 66, 72-73 (CR419).[2]  The Commission determined that

> the scope of these investigations and the domestic like product were defined to include both API certified and non-API certified OCTG and the record indicates that (1) non-API certified Russian OCTG imported into the U.S. market could compete with other limited service OCTG and (2) non-API certified OCTG from Russia (still produced to API specification) that could be processed in the United States and affixed with the API monogram.

RemandViews at 29-30.  The Commission also noted that "inventories of Russian OCTG held in the U.S. and Russia would have been eligible for API certification if produced prior to the suspension and imports of those inventories would directly compete with API certified domestic product" and noted that "Russian producers maintained [ ████ ] short tons of OCTG in inventories in interim 2022."  RemandViews at 30 n.126.

On remand, the Commission also considered potentially contrary evidence such as the API letter, testimony from the President of Tenaris USA, and testimony of one purchaser, Tap Rock Operating.  RemandViews at 29-35.  The Commission noted that the "{API} letter

---

[2] The Court observed that the Responses to Commission Questions was not placed in its entirety on the record filed with the Court.  Slip Op 24-48 at 21.  We will assure that the document with all of the cited pages is included in the Appendix filed pursuant to Rule 56.2(h)(4).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

confirmed that certification services were [ ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ]."

RemandViews at 31.  Additionally, the Commission found that Tenaris's President's testimony

"reflects the assumptions of Respondent's President pertaining to how purchasers in the United

States and other markets would react to the suspension of API certification, not the actual views

of U.S. and global purchasers."  RemandViews at 32.  The Commission acknowledged evidence

raised by plaintiffs, noting that although the Tap Rock representative testified that "{using

uncertified OCTG} would be a very difficult obstacle to overcome," he also testified that "absent

the API stamp, purchasers could independently review the quality of Russian OCTG to ensure

they met their minimum quality specifications."  RemandViews at 32.  Indeed, the Commission

found that record established that "many purchasers reported having such quality control systems

in place, meaning that API certifications were not necessary to qualify as a supplier or singularly

critical to purchasers' assessment of quality."  RemandViews at 33.

The Court also instructed the Commission to assess whether a reasonable overlap of

competition existed during the full 42-month POI given the measures arising later in the POI in

response to Russia's February 2022 invasion of Ukraine, including:  API's suspension of

certification services in Russia in March 2022; Russia's loss of most-favored-nation ("MFN")

status in April 2022; the prohibition on Russian vessels entering U.S. ports as of April 2022; and

tariff increases applicable to Russian merchandise starting in June 2022.  *See* Slip Op. 24-48 at

13–17.

On remand, the Commission continued its longstanding approach of assessing whether a

reasonable overlap of competition existed based on the totality of evidence reflecting trends

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

throughout the POI – the entire 42-month POI, not just the final four months of the POI.

RemandViews at 36-37.  The Commission also gave additional consideration to whether the

sanctions highlighted by the Court and the parties prevented subject imports from Russia from

being simultaneously present in the U.S. market during the POI, including during the post-

invasion portion of the POI.  RemandViews at 36-39.

The Commission also considered the potentially contrary information on the record and

found:

> Regardless of TMK's stated plans to [ █████████
> █████████ ] into the United States during the first
> quarter of 2022, TMK does not account for the entirety of the
> Russian OCTG industry.  Moreover, we observe that official import
> statistics show that subject imports from Russia did in fact enter into
> the United States in interim 2022, despite TMK [ ████████
> █████████ ] to the United States during this period.
> Similarly, despite the statement contained in Exhibit 1 of TMK's
> Prehearing Brief, subject imports from Russia also entered into the
> U.S. market in the second quarter of 2022 in relatively high
> volumes, as discussed below, were shipped in the U.S. market in
> interim 2022, and were held in importers' inventory at the end of
> interim 2022.

RemandViews at 36-37.

In its remand determination, the Commission further found that the section 232 duties

imposed in 2018, suspension of API certification in March 2022, and the revocation of Russia's

MFN status and bans on Russian ships entering U.S. ports in April 2022 did not prevent subject

imports from Russia from entering the U.S. market in May 2022 in volumes 25.0 percent higher

than in May 2021.  The Commission found that the volume of subject imports from Russia

remained high relative to those of subject imports from other sources in interim 2022 compared

to interim 2021, and further corroborated that, during the POI, the sanctions did not affect

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

whether of Russian OCTG competed with other subject imports or the domestic like product. RemandViews at 38-39.

### C.    Response to Instructions To Consider Only Non-Hyundai Imports in the Commission's Assessment of Whether to Cumulate Subject Imports from South Korea with Other Subject Imports

The Court held that the Commission's consideration of data relating to non-subject (*i.e.*, Hyundai) imports from South Korea in its cumulation analysis was not in accordance with law. The Court questioned the Commission's reliance on unfiltered questionnaire responses regarding interchangeability and comparability contained in Tables II-15–II-17 (utilized in the Commission's fungibility analysis) and the importance of factors other than price in purchasing decisions Tables II-18–II-20 (also utilized in the Commission's fungibility analysis). The Court's concerns also encompassed the official import data on borders of entry in Table IV-17 (relating to the Commission's geographic overlap analysis). *See* Slip Op. 24-48 at 38–40.

On remand, the Commission retabulated the data in compliance with the Court's instructions to assure that its cumulation analysis did not rely on data or industry participants' perceptions regarding Hyundai's imports. As explained in the Commission's Opening Brief, data for Hyundai already were excluded from the data relied on by the Commission in its injury analysis leading to the determination that the domestic industry was materially injured by reason of the cumulated subject imports. *See* ITC Opening Brief at 8-9, 10 at n.2 (ECF 51). Specifically, on remand, the Commission retabulated the data to remove non-subject Hyundai OCTG from its reasonable overlap of competition analysis. *See* Supplemental Remand Report at Tables 1-11 (CR440R) ("SuppReport"). As the Commission explained, there were purchasers that reported buying OCTG from Hyundai, purchasers that Hyundai reported selling OCTG to, and purchasers that bought OCTG from [ ███████████████████████████ ].

RemandViews at 45-46 n.193.  As such, the Commission presented three different permutations of purchaser data, excluding purchasers to varying degrees, from the least conservative dataset, Exclusion 1, to the most conservative dataset, Exclusion 3.  RemandViews at 46.  The exclusions eliminated from the pool of responses impressions of purchasers who may have had Hyundai's OCTG in mind when furnishing responses on interchangeability, comparability, and the importance of non-price factors.  RemandViews at 45-46.

The Commission found that after excluding Hyundai and purchasers that may have had Hyundai's nonsubject OCTG from South Korea in mind (regardless of whether examining Exclusion 1, 2, or 3), the remaining questionnaire responses supported the Commission's original finding of fungibility between subject imports from South Korea and imports from each subject country, as well as with the domestic like product.  RemandViews at 47.  Specifically, after excluding the response of Hyundai from importer responses and regardless of the level of exclusion applied to purchaser responses:  (1) majorities of responding domestic producers, importers, and purchasers, when comparing the domestic like product with imports of OCTG from each subject country and when comparing imports from the subject countries with each other, reported that these products are always or frequently interchangeable; (2) majorities of responding domestic producers, importers, and purchasers reported that factors other than price are only sometimes or never significant in purchasing decisions; and (3) majorities or pluralities of responding purchasers rated imports from each source as comparable with both each other and the domestic like product with respect to at least 14 of 15 purchasing factors.  RemandViews at 46-47 (citing SuppReport at Tables 3-10).

Likewise, the Commission retabulated the table showing U.S. imports by border of entry, by excluding Hyundai's imports.  *See* SuppReport at Table 1.  As the Commission found, even

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

with this retabulation, the overwhelming majority ([ ▮ ] percent) of subject imports from South Korea entered into the U.S. market through the southern border, along with the majority of imports from Argentina, Mexico, and Russia.  RemandViews at 47.

Lastly, the Commission reconsidered the simultaneous presence of subject imports from South Korea based on U.S. import data that excluded non-subject imports from Hyundai.  *See* SuppReport at Table 2; RemandViews at 57.  Here again, the Commission found that the retabulation did not in any meaningful way alter its original cumulation analysis.  Specifically, the Commission found that subject imports from South Korea were present in the U.S. market in [ ▮ ] of [ ▮ ] months of the POI.  Thus, the record continues to support that subject imports from each source were present in the U.S. market for nearly the entire POI.  RemandViews at 57.

As the Commission explained, the supplemental tables and associated exclusions were "aimed at increasing the likelihood that qualitative responses only refer to subject imports" by excluding (1) Hyundai's response from importer responses, (2) the "responses of any purchaser who listed Hyundai as a supplier or vice versa," and (3) "responses of any purchaser that may have purchased OCTG from a distributor that purchased from Hyundai."  RemandViews at 49.  *See* SuppReport at Tables 3-11.  The data the Commission relied upon on remand were probative as to the issues for which they were cited.

## D.    Response to Instructions Regarding the Effects of the Existing Antidumping Order on Subject Imports from South Korea

The Court directed the Commission to address party arguments concerning "the possible effects resulting from subject imports from South Korea that were under an antidumping {duty} order in its final determination."  Slip Op. 24-48 at 41.  The Commission fully addressed the party arguments, observing that:

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

> {N}otwithstanding an order remedying the dumping of OCTG imports from South Korea, Commerce found the non-Hyundai imports from South Korea to still be unfairly traded through subsidization at above *de minimis* levels. The dumping order would not address injury resulting from the subsidization of these imports, and the dumping order is only capable of discipling the level of dumping not the level of subsidization. In addition, the existence of the AD order did not result in differences in the way these imports competed in the U.S. market to render cumulation inappropriate based on the Commission's four cumulation factors. . . . Furthermore, the record shows that, even while under the discipline of the AD order, subject imports from South Korea [ ████ ] the domestic like product in the [ █████ ] of quarterly price comparisons and Respondents put forward no evidence in support of their assertion to the contrary.

RemandViews at 52.

This passage demonstrates that the Commission addressed the arguments and provided a reasoned explanation for its analysis and conclusion, which were supported by substantial record evidence.

### III.    The Commission's Reasonable Overlap of Competition Analysis With Respect To Subject Imports from Russia Is Supported by Substantial Evidence and In Accordance With Law

#### A.    The Language in *Chaparral* Concerning Competitive Overlap on Vote Day Does Not Apply to the Post-URAA Version of the Cumulation Provision[3]

To the extent the Court expressed concern that the Commission only cumulate subject imports that are determined to be *unfairly traded* on vote day, the Commission addressed this. It

---

[3] TMK raised its new statutory construction argument related to overlap of competition and relied on *Chaparral* for the first time in its reply brief, despite having the opportunity to do so in its opening brief. TMK Reply Br. at 7 (ECF 57). Although there was some discussion of *Chaparral* at oral argument in response to written questions posed by the Court, neither the Commission nor Defendant-Intervenors had the opportunity to brief or provide a fulsome discussion of that case and its complicated factual background, or to address TMK's new statutory construction argument prior to the remand. Hence, it was necessary for the Commission to address the relevance of *Chaparral* in its Remand Views, and in these Reply

clarified that Commerce, not the Commission, determines whether subject imports are unfairly traded, and that Commerce had determined that subject imports from all four sources were unfairly traded as of the Commission's vote.  RemandViews at 11.

On remand, the Commission also emphasized that its approach in *Chaparral,* to assess whether imports subject to recent orders were candidates for cumulation with imports currently under investigation if they enter the market "reasonably coincident" in time, was a function of the pre-URAA cumulation provision and no longer applicable as of 1994 under the amended URAA cumulation provision.  *See Chaparral*, 901 F.2d at 1099.

In *Chaparral*, the U.S. Court of Appeals for the Federal Circuit affirmed the Commission's determination that certain imports were ineligible for cumulation based on the then-threshold mandatory criteria (*i.e.*, whether imports were "subject to investigation") on vote day in accordance with the 1988 pre-URAA cumulation provision.  *Chaparral*, 901 F.2d at 1104-05.  The cumulation statute, as it read at that time,

> {M}andate{d} cumulation of the volume and effect of imports "subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market."

*Id*. at 1101 (quoting 19 U.S.C. § 1677(7)(C)(iv) (1988)).

In the investigations underlying *Chaparral*, the Commission found the imports from three countries were ineligible for cumulation under the threshold mandatory requirement because the imports from Poland and Spain were no longer subject to antidumping investigations due to these countries entering voluntary restraint agreements and the imports from Spain and South Africa

---

Comments, including an explanation showing that the statute had been amended after *Chaparral*, thereby rendering many aspects of TMK's belated argument irrelevant to the case at hand.

were subject to countervailing duty orders and no longer marketed at unfair prices because of the imposition of duties. *Id*. at 1101. Consequently, the Commission declined to conduct a cumulation analysis to determine whether the imports "compete with" each other, *Carbon Steel Structural Shapes from Norway*, Inv. No. 731-TA-234 (Final), USITC Pub. 1785 (Nov. 1985) at 3-4. The Federal Circuit affirmed the Commission's conclusion that these imports were not "subject to investigation" on vote day based on the agency's interpretation of that threshold mandatory requirement contained in the 1988 pre-URAA cumulation provision.

Tenaris correctly notes that the cumulation provision (both pre- and post-URAA) requires the Commission to first determine whether imports are "candidates," *i.e.*, eligible, for cumulation by meeting a threshold mandatory requirement before the Commission assesses whether imports "compete with" other subject import and the domestic like product under traditional four factors. TenarisRemandComments at 13-14 (ECF 80). The *Chaparral* court's discussion of "vote day" referred only to the threshold mandatory requirement, namely whether imports were "subject to investigation" or "marketed reasonably coincident in time." *Chaparral*, 901 F.2d at 1101, 1104-05, 1107-08. Congress, however, subsequently addressed this issue when it passed the URAA and amended the statute with current Section 771(7)(G)(i) to require cumulation for competing imports when petitions were filed, or the investigations initiated, on the same day. 19 U.S.C. § 1677(7)(G)(i) (1994). The current statute therefore removes the timeframe ambiguity that the Federal Circuit had noted in *Chaparral* concerning which imports are eligible for cumulation, *viz.*—any imports that Commerce has found to be unfairly traded based on investigations that were initiated on the same day.

While the court in *Chaparral* noted that the cumulation provision, including to "compete," is in present tense, it did not address the appropriate timeframe for assessing whether

imports "compete with" each other and the domestic like product, but instead concluded that neither the statutory language nor the legislative history conclusively established the intended timeframe for cumulation and assessed the reasonableness of the agency's interpretation of the threshold mandatory requirement. *Chaparral*, 901 F.2d at 1104. The *Chaparral* court deferred to the Commission's interpretation of the 1988 pre-URAA cumulation provision as requiring the Commission to "evaluat{e} candidates for cumulation on the basis of their unfair trading or the effects of proven unfair trading as of vote day." *Chaparral*, 901 F.2d at 1105. Since imports did not meet the threshold mandatory requirement, the Court did not proceed to address the appropriate timeframe for assessing a reasonable overlap of competition, *i.e.*, the issue here. Thus, even under the pre-URAA provision, nothing in *Chaparral* required the Commission to focus its assessment of an overlap of competition up until and on vote day.

To the extent plaintiffs nonetheless continue to question the Commission's adherence to its longstanding approach of assessing the cumulation factors based on a consideration of the behavior of subject imports during the POI as a whole, their contestations are contradicted by case precedent and the Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ("SAA") to the URAA. For example, subsequent to *Chaparral*, this Court found that "the ITC's interpretation of the 'compete with' clause {in the current statute, 19 U.S.C. § 1677(7)(G)(i), which granted} the agency the discretion to choose the three-year {POI} as the appropriate time frame for its investigation and assessment of the level of imports . . . ." *Steel Auth. of India, Ltd. v. United States*, 25 CIT 472, 478, 146 F. Supp. 2d 900, 906-07 (2001) ("*SAIL*"). In construing the current cumulation provision, this Court explained that "compete with" is in not just the present tense, but the *simple* present tense, and thus "'imports compete with' refers to the state of the subject imports, broadening the scope of

the cumulation provision to include imports that 'compete' during the time of investigation."
*SAIL*, 25 CIT at 477-78, 146 F. Supp. 2d at 907.  The *SAIL* reasoning supports the Commission's
reliance on the POI as the operative timeframe for its overlap of competition analysis.
Moreover, the Federal Circuit subsequently relied on *SAIL* finding that the "Commission has
broad discretion with respect to the {POI} that it selects for purposes of making a material injury
determination."  *Nucor Corp. v. United States*, 414 F.3d 1331, 1337 (Fed. Cir. 2005) (citing
*SAIL*, 25 CIT at 477-78, 146 F. Supp. 2d at 906-07).

Indeed, this Court has consistently upheld the Commission's broad discretion in choosing
the timeframes for its investigations and analyses.  *See e.g.*, *Mexichem Fluor Inc. v. United
States*, 29 CIT 86, 96-87, 179 F. Supp. 3d 1238, 1254 (2016) (quoting *Nitrogen Sols. Fair Trade
Comm. v. United States*, 29 CIT 86, 96-97, 358 F. Supp. 2d 1314, 1325 (2005)); *see also
Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1331 (Ct. Int'l Trade 2020)
("Determining the appropriate {POI} is within the discretion of the Commission.").  Similarly,
recognizing the lack of necessity to rely on post-POI data, this Court has also held that "there is
no requirement to include . . . post-POI data, as the POI is the centerpiece of the investigation's
time frame."  *AWP Indus., Inc. v. United States*, 35 CIT 774, 790, 783 F. Supp. 2d 1266, 1282
(2011).

Contrary to Tenaris's suggestion, *SAIL* is not rendered obsolete by the Supreme Court's
decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).[4]
TenarisRemandComments at 11-12.  While emphasizing that the *SAIL* Court examined the

---

[4] We address Tenaris's overreliance on *Loper Bright* in this remand proceeding, *infra*.
Specifically, as discussed *infra*, Tenaris should not be heard to raise new statutory construction
arguments at this point in the proceeding.

"compete with" issue under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 838 (1984) (which in part was overturned by *Loper Bright*), Tenaris omits that the *SAIL* Court further explained that "the Commission reasonably interpreted the 'compete with' provision in choosing a three-year {POI} for its review of { } presence in the U.S. market" under both *Chevron* and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *SAIL*, 25 CIT at 477-78 n.10, 146 F. Supp. 2d at 906-07 n.10 (the Commission's interpretation of the statute is persuasive, and therefore "entitled to respect" under the less deferential standard set forth in *Skidmore*) (citing *Skidmore*, 323 U.S. at 140; *Christensen v. Harris County*, 529 U.S. 576 (2000)).

Indeed, as discussed further below, *Loper Bright* held that courts should continue to "seek aid" and "guidance" from agency statutory interpretations under Skidmore. *Loper Bright*, 144 S. Ct. at 2262-63 (quoting *Skidmore*, 323 U.S. at 140, 65 S. Ct. 161). Additionally, the Supreme Court emphasized that its decision in *Loper Bright* does not call into question prior cases that relied on the *Chevron* framework. Instead, it found that "{t}he holdings of those cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself— are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Id.* at 2273 (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014); *Dickerson v. United States*, 530 U.S. 428, 443 (2000)). Thus, the *SAIL* analysis sustaining the Commission's use of the POI for its cumulation analysis under 19 U.S.C. § 1677(7)(G)(i) remains highly persuasive under *Skidmore* and the principle of statutory *stare decisis*.

On remand, the Commission noted that the SAA explains that staggered investigations must be based on the record compiled in leading investigations, so the Commission no longer needs to assess whether imports subject to the earlier investigation have any "continuing effect"

on vote day. RemandViews at 15-16; SAA, H.R. Doc 103-316, Vol. 1 at 848 (1994). Contrary to Tenaris's objection (TenarisRemandComments at 15), the Commission did not include this discussion to suggest the instant case is a staggered investigation. Rather, the SAA passage clarifies that Congress plainly did not intend for "vote day" to be the operative timeframe for assessing the cumulation factors. The static assessment of both cumulation and material injury on vote day (or even at the close of the record in the trailing case) would be inconsistent with Congressional intent, as the leading case's record would necessarily have closed prior to the record closing in the trailing case, as well as prior to the votes in both the leading and trailing investigations. As explained in the SAA, however, cumulation in a trailing investigation would still be mandatory even though the evaluation of the competition factors would necessarily be based on facts established well before vote day because the record of the leading investigation would have already closed. Moreover, the statute only allows the record of trailing investigations to be supplemented with Commerce's final determinations and parties' comments that only address Commerce's final determinations. *See* 19 U.S.C. § 1677(7)(G)(iii). Thus, the additional information allowed on the record for trailing investigations is very narrow and does not change the timeframe for assessing the four cumulation factors.

The Commission also explained that assessing competitive overlap for purpose of cumulation on vote day would be inconsistent with the Commission's statutory obligation under 19 U.S.C. § 1677m(g). RemandViews at 16. The Commission is required to "cease collecting information and . . . provide the parties with a final opportunity to comment on the information obtained . . . " prior to making a final determination, which would be rendered impossible if the Commission was required to collect data on the competitive conditions in the U.S. market up until vote day. 19 U.S.C. § 1677m(g). Had the Commission collected data up to and on vote

16

day, October 26, 2022, parties to the underlying investigations would have been deprived of their reasonable opportunity to submit comments "on the information obtained" as the Commission would have never "ceas{ed} the collection of information" prior to rendering a final determination.  RemandViews at 16-17; *see also* 19 U.S.C. § 1677m(g).  The data upon which the Commission relies on its four factor cumulation analysis, by nature, must cover a time period prior to vote day.  RemandViews at 17.  Any other approach would conflict with the Commission's statutory obligation to examine the impact of subject imports on the domestic industry through an analysis of data obtained during the course of a proceeding, and with the comment requirement contained in 19 U.S.C. § 1677m(g).  RemandViews at 17.

Tenaris mistakenly claims that because 19 U.S.C. § 1677(7)(G)(iii) requires the Commission, in staggered investigations, to place Commerce's final determinations and parties' comments on those determinations on the subsequent record, information can be placed on the record for the first investigation after the record closes.  TenarisRemandComments at 15.  Tenaris overlooks that Section 1677(7)(G)(iii) indicates that for staggered investigations

> . . . the Commission shall make its determinations based on the record compiled in the first investigation in which it makes a final determination, except that when the administering authority issues its final determination in a subsequently completed investigation, the Commission shall permit the parties in the subsequent investigation to submit comments concerning the significance of the administering authority's final determination, and shall include such comments and the administering authority's final determination in the record for the subsequent investigation.

19 U.S.C. § 1677(7)(G)(iii).

The statute indicates that there is a record compiled in the first investigation, and a record for the subsequent investigation which must include Commerce's final determinations and may include party comments on those final determinations.  For trailing determinations, the

Commission makes its determinations based on the record compiled in the first investigation and the record in the subsequent investigation. Nothing in Section 1677(7)(G)(iii) relieves the Commission of its statutory obligation to "cease collecting information and . . . provide the parties with a final opportunity to comment on the information obtained . . . " prior to making a final determination. *See* 19 U.S.C. § 1677m(g).

TMK claims that requiring vote day information to be included in a cumulation determination would not require the Commission to collect data up to the moment of the vote. TMKRemandComments at 6, 8-9 (ECF 82). Any determination the Commission makes as to whether there was an overlap of competition on vote day would require substantial evidence support on the record, which in turn would require the Commission to collect information up to and on vote day. 19 U.S.C. § 1516a(b)(1)(B)(i). TMK contends that logistical considerations, such as collecting data, would not be of concern, but fails to explain how the Commission could consider conditions of competition on vote day without also collecting substantial data up until that day. TMKRemandComments at 8.

To bolster its argument, TMK creates a fictional construct of "First Competitive Environment" and "Second Competitive Environment." *Id*. at 4. Not only is this a new theory raised for the first time by TMK in its briefing, and therefore waived for failure to exhaust administrative remedies (*Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998); *Jeld-Wen, Inc. v. United States*, 567 F. Supp. 3d 1344, 1357 (Ct. Int'l Trade 2022)), but it also lacks any grounding in the statute. Nowhere in the statute or in the Commission's traditional approach to cumulation is there a reference to dividing up a POI into separate "competitive environments" based on changes that take place during the POI. Indeed, under TMK's approach to cumulation—which focuses myopically on only vote day—if imports from a particular subject

country fail to meet any of the cumulation criteria for all or almost all of an entire POI, but then meet the criteria on the vote day, the Commission could, and should be required to, ignore the absence of competition throughout virtually the entire POI and cumulate based on post-POI changes in the "competitive environment." *See* TMKRemandComments at 7 (reading instructions as requiring decision based on "conditions prevailing at the time of decision (and excluding consideration of 'conditions that no longer exist.'")). In short, under TMK's approach, the Commission need not have collected information relevant for its cumulation analysis for most of the POI, because in TMK's view, the data covering most of the POI reflected an "outdated environment." *Id.*

### B. The Commission's Fungibility and Simultaneous Presence Findings Considered the Suspension of API Certification for Russian Producers, Contrary Evidence, and Russian Sanctions and Is Supported by Substantial Evidence and In Accordance With Law

As an initial matter, plaintiffs do not contest the four cumulation factors the Commission relied upon in determining whether there is an overlap of competition. Instead, plaintiffs rely on their own preferred analyses of the evidence and create arbitrary tests to weigh the evidence. They overlook that the Commission's findings are supported by substantial evidence when "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1358 (Fed. Cir. 2006) (quotations and citations omitted). The Federal Circuit has emphasized the deference owed to the Commission in making such findings:

> {W}hen the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder—here the majority of the Presidentially-appointed, Senate-approved Commissioners—to decide which side's evidence to believe. So long as there is adequate basis in support of the Commission's choice of evidentiary weight, the Court of

International Trade, and {the Federal Circuit}, reviewing under the
substantial evidence standard, must defer to the Commission.

*Id*. at 1359.  *See also U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Int'l*

*Indus., Ltd. v. United States*, 311 F. Supp. 3d 1325, 1333 (Ct. Int'l Trade 2018).

As discussed above, the Commission gave additional consideration to the question of

whether subject imports from Russia, after the suspension of API-certification, were fungible

with other subject imports and the domestic like product.  RemandViews at 28-30.  The

Commission clarified that Russian producers lost their API-certification months prior to the

Commission issuing the questionnaires.  Thus, the returned questionnaires and data in the staff

report do, in fact, reflect purchasers' impressions of Russian OCTG that Russian producers could

no longer API certify.  RemandViews at 27.

The Commission found that the nature of subject imports from Russia did not change

after the suspension of API-certification, as they continued to be produced to API specifications.

RemandViews at 30; Petitioners' Posthearing Br., Ex. 1 (Answers to Commissioner Questions)

at II-56–57 n.239; Petitioners' Posthearing Br., Ex. 12 (API 5CT Specification (2019 Ed.)) at 66,

72-73.  The Commission determined that

> {T}he scope of these investigations and the domestic like product
> were defined to include both API certified and non-API certified
> OCTG and the record indicates that (1) non-API certified Russian
> OCTG imported into the U.S. market could compete with other
> limited service OCTG and (2) non-API certified OCTG from Russia
> (still produced to API specifications) that could be processed in the
> United States and affixed with the API monogram.

RemandViews at 29-30.  The Commission also noted that "inventories of Russian OCTG held in

the U.S. and Russia would have been eligible for API certification if produced prior to the

suspension and imports of those inventories would directly compete with API certified domestic

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

product" and noted that "Russian producers maintained [       ] short tons of OCTG in inventories in interim 2022." RemandViews at 30 n.126.

Tenaris wrongly claims that the Commission focused on a smaller segment of the market in its fungibility analysis. TenarisRemandComments at 20. To the contrary, the Commission found that "Russian OCTG is *produced to API specification* and {  } remained fungible with the domestic like product and other subject imports during the POI." RemandViews at 55. In support, the Commission pointed to record evidence that Russian OCTG continued to be produced to API standards and was unchanged by the suspension of API services, with the exception of the API stamp. RemandViews at 30-31. Additionally, the Commission relied on purchaser responses indicating that API certification was not the sole consideration purchasers considered in qualifying suppliers or in assessing the quality of OCTG, especially when the OCTG remains produced to API specifications, as was the case with Russian OCTG. RemandViews at 34-35.

Although TMK claims that there would be tariff, logistical, and banking challenges for non-API certified Russian OCTG that was imported as green tube and further processed into API-certified OCTG in the United States or used in limited service environments, TMK fails to provide any support for these claims. TMKRemandComments at 14.

TMK ignores the substantial evidence the Commission relied upon in finding that certain subject imports from Russia would not be impacted by the suspension of API certification services, and instead puts forth its preferred approach to weighing the evidence. *Id*. at 13-15. In the Commission's role as trier of fact in injury investigations, "the Commission 'has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis.'" *Nevinnomysskiy Azot v. United States*, 32

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

CIT 642, 653, 565 F. Supp. 2d 1357, 1367-68 (2008) (quoting *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000)).  As the fact finder, the "ITC is afforded considerable discretion in evaluating information obtained from questionnaires."  *Int'l Indus.*, 311 F. Supp. 3d at 1333 (quotations omitted). "Congress has allocated to the Commission the task of making these complex determinations," the Federal Circuit has explained, and "{o}urs is only to review those decisions for reasonableness."  *U.S. Steel Grp.*, 96 F.3d at 1357.  In other words, the Court may not "reweigh the evidence or substitute its own judgment for that of the agency."  *Usinor, et al. v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004); *Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1361 (Ct. Int'l Trade 2015) (quoting *Usinor*); *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2015) (also quoting *Usinor*).

The Commission reasonably relied on record evidence that subject imports from Russia were sold to processors during each year of the POI and in interim 2022, allowing these processors to have existing relationships with suppliers of Russian OCTG, and evidence that domestic producer, [                ], reported buying subject imported green tube from Russia for processing into finished OCTG.  RemandViews at 29.  Additionally, given that limited service OCTG does not meet API specifications, it was reasonable for the Commission to find that subject imports from Russia can still be used in certain OCTG applications irrespective of API certification.  RemandViews at 29.  In fact, TMK concedes that non-API certified Russian OCTG can be imported as green tube and then further processed in the United States into API-certified OCTG (without any indication that Russian green tube was used) or be used in limited service applications which do not require API certification.  TMKRemandComments at 13-14. Additionally, the Commission relied on purchaser testimony that purchasers could independently

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

review the quality of OCTG, and purchasers reported having quality control systems in place, thus limiting the importance of the absence of an API certification stamp.  RemandViews at 33.

TMK argues that the Commission failed to address certain information about Russian imports supposedly not entering the U.S. market.  TMKRemandComments at 19-20 (citing Slip Op. 24-48 at 27).  As an initial matter, TMK did not previously raise most of the evidentiary points in its remand comments to the Commission that it now raises in its comment on remand to the Court, and therefore failed to exhaust its administrative remedies with respect to these arguments.  *Compare* TMK Comments to the Commission at 9 (PR176R) *with* TMKRemandComments at 19-20.  Moreover, the Commission found in its remand determination that "TMK {did} not account for the entirety of the Russian OCTG industry{,}" and "official import statistics show that subject imports from Russia did in fact enter into the United States in interim 2022, despite TMK [ ███████████████████ ] to the United States during this period."  RemandViews at 36-37.

Contrary to plaintiffs' argument, the Commission appropriately assessed whether there was a *reasonable* overlap of competition between subject imports from Russia with other subject imports from Argentina, Mexico, and South Korea and the domestic like product, and specifically considered the Russian's producers suspension of API-certification services, the loss of Russia's MFN status, in April 2022, the prohibition of Russian vessels from entering U.S. ports as of April 2022, and the imposition of tariff increases applicable to Russian merchandise in June 2022 in its fungibility and simultaneous presence analysis.  RemandViews at 4, 27-40, 52-57; TMKRemandComments at 10-11, 16-21; TenarisRemandComments at 16-21.  Indeed, the Commission need not find OCTG from Russia was perfectly fungible throughout the POI, but merely that imports were fungible enough to find a reasonable overlap of competition.  *See*

*Goss Graphics*, 22 CIT at 987, 33 F. Supp. 2d at 1087 ("{C}umulation does not require two products to be highly fungible.") (quotation omitted); *Mukand Ltd. v. United States*, 20 CIT 903, 909, 937 F. Supp. 910, 916 (1996); *Wieland Werke, AG v. United States*, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989) ("Completely overlapping markets are not required."). *See also*, *Noviant Oy v. United States*, 30 CIT 1447, 1461, 451 F. Supp. 2d 1367, 1379 (2006) (noting the highly fact-specific nature of the inquiry). Even if the suspension of API certification services reduced the fungibility of OCTG from Russia with other subject imports and the domestic like product in the last four months of the POI, the Commission was not required to ignore that imports of OCTG from Russia were fungible for the remaining 39 months of the POI. In fact, plaintiffs do not challenge that OCTG from Russia was fungible with other subject imports and the domestic like product throughout the POI prior to March 2022.

**IV.    The Commission's Reasonable Overlap of Competition Analysis With Respect To Non-Hyundai Imports from South Korea Is Supported by Substantial Evidence and In Accordance With Law**

Plaintiffs do not contest that the geographic overlap and simultaneous presence analyses and findings with respect to OCTG from South Korea were supported by substantial evidence and in accordance with law. RemandViews at 44-45. Instead, Tenaris claims that the data relied on for the interchangeability analysis was flawed because of the impossibility of knowing precisely what responding firms were thinking when responding (*e.g.*, whether responses referred to imports from Hyundai). TenarisRemandComments at 26-28. Yet this is the case for any qualitative question utilized in any investigation. As the Commission explained:

> {N}othing in this record indicated that there were meaningful producer-specific differences among imports of OCTG from South Korea . . . {and} despite Commerce's negative preliminary determinations with respect to imports from South Korea, no party requested that the Commission examine distinctions in products exported from different Korean producers in its draft questionnaires.

RemandViews at 43-44.  The Commission also noted that "Respondents continuously referred to South Korean imports, as a whole, making no distinction between subject and Hyundai imports." RemandViews at 44.

With regard to the Commission's analysis of the interchangeability data, Tenaris objects to the decline in the number of usable questionnaire responses.  TenarisRemandComments at 29. As the Commission explained on remand "{w}hile the total number of responses supporting and detracting from its fungibility decline as progressively restrictive exclusions are applied, the proportion of these responses supporting the Commission's original fungibility findings remains consistent with the original investigations."  RemandViews at 48-49.  The Commission's approach was reasonable.

Tenaris also contends the Commission should issue new questionnaires to purchasers and importers.  TenarisRemandComments at 29.  But the Federal Circuit has recognized that the Commission has the discretion to ascertain whether it is necessary to reopen a record on remand. *See, e.g.*, *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277-78 (Fed. Cir. 2012).  While Tenaris cites to instances in which the Commission determined that there was reason to do so, those citations do not in way detract from the discretionary nature of the decision whether or not to reopen the record.  In this case, the Commission determined that the data on the record could be retabulated in supplemental tables to exclude nonsubject imports and the responses of importer Hyundai and any purchaser who listed Hyundai as a supplier or vice versa, and by excluding the responses of any purchaser that may have purchased OCTG from a distributor that purchased from Hyundai.  Contrary to Tenaris's contention, subjecting the 56 importers and purchasers to the burden of additional questionnaires merely to confirm what Commission staff was already able to extrapolate from the existing record was unnecessary to ensure that the

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Commission's remand analysis was supported by substantial evidence and complied with the

law.  *See* TenarisRemandComments at 30.

The Commission also addressed the effects of the existing AD order on subject imports

from Korea, as instructed by the Court.  The Commission observed that:

> . . . notwithstanding an order remedying the dumping of OCTG
> imports from South Korea, Commerce found the non-Hyundai
> imports from South Korea to still be unfairly traded through
> subsidization at above *de minimis* levels.  The dumping order would
> not address injury resulting from the subsidization of these imports,
> and the dumping order is only capable of discipling the level of
> dumping not the level of subsidization.  In addition, the existence of
> the AD order did not result in differences in the way these imports
> competed in the U.S. market to render cumulation inappropriate
> based on the Commission's four cumulation factors. . .
> Furthermore, the record shows that, even while under the discipline
> of the AD order, subject imports from South Korea [ █████ ] the
> domestic like product in the [ █████ ] of quarterly price
> comparisons and Respondents put forward no evidence in support
> of their assertion to the contrary.

RemandViews at 52.

Contrary to Tenaris's argument, the Court did not instruct the Commission to do more,

*e.g.,* consider the commercial and competitive impact of the antidumping duty order on subject

imports from South Korea.  TenarisRemandComments at 32; *see* Slip Op. 24-48 at 41.  Nor did

Tenaris even exhaust its administrative remedies as it failed to raise this argument in its

comments to the Commission.  *See generally* Tenaris Comments on Remand to Commission at

15-27 (CR442R).

## V.    The Court Should Reject Plaintiffs' Untimely Arguments

The Court should reject Tenaris's myriad newfound efforts to reframe this case as one

concerning the application of the Supreme Court's recent decision in *Loper Bright*.  *See*

TenarisRemandComments at 5-10.  As an initial matter, several of the issues which Tenaris now

tries to pin a *Loper Bright* analysis are not even within the realm of the remand issues, and therefore improper subjects for these Comments.[5]  *See Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008) (holding that "{t}he court reviews remand determinations for compliance with the court's remand order").

Moreover, having failed to raise some of these statutory construction arguments in their opening briefs, plaintiffs are estopped from raising those new arguments at all at this stage in the proceedings.  *See United States v. Hunter*, 786 F.3d 1006, 1011 (D.C. Cir. 2015) ("It is generally understood that arguments first raised in a reply brief are untimely."); *see also United States v. Berkeley*, 567 F.3d 703, 711 n.4 (D.C. Cir. 2009).  Tellingly, with respect to the cumulation issues that are the subject of these remand proceedings, plaintiffs did not argue this case as one

---

[5] The first non-remand issue noted by Tenaris concerns the Commission's discretionary consideration of post-petition effects—an argument which Tenaris did raise, albeit as an apparent *Chevron* step one question, in its opening brief (ECF 45 at 27), and which the Commission likewise addressed in its opening brief based on the language of the statute and the SAA (ECF 51 at 27-30).  The second non-remand issue noted by Tenaris is whether the Commission was required to separately consider the conditions of competition in its volume analysis.  While Tenaris did raise conditions of competition in its opening brief, nowhere in that discussion did it claim that this was a statutory construction issue.  In fact, Tenaris mainly leaned into its factual argument that the Commission allegedly failed to evaluate *the impact* of subject imports within the context of the conditions of competition.  ECF 45 at 38-47.

The Commission addressed both of these arguments in its opening brief, and in both cases, the Commission explained that it was relying on the facts of these investigations as applied to the plain language of the statute, and has not asked for deference to its interpretation under *Chevron* step two.  *See* ECF 51 at 26-30, 39-40.  In any event, the Commission explained at oral argument that the requirement to consider conditions of competition explicitly is contained only in the impact clause of the statute, 19 U.S.C. § 1677(7)(C)(iii),  while the statute does not impose such a requirement with respect to the Commission's analysis of volume ((C)(i)) or price effects ((C)(ii)).  *See ITG Voma Corp. v. United States*, 253 F. Supp. 3d 1339, 1357 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019); *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1300 (Ct. Int'l Trade 2021).  Thus, even putting aside the improper timing for Tenaris to change its argument in its reply brief and to now raise *Loper Bright* with respect to these issues, that case does not in any way change the analysis of these issues, which the parties have already addressed without reliance on *Chevron* step 2.

involving contested statutory construction issues in their opening briefs.  In fact, to the extent there were any issues concerning statutory interpretation discussed in plaintiffs' opening briefs, all parties agreed on the applicability of the traditional four-factor analysis that the Commission applied here to assess whether there was a reasonable overlap in competition.  *See* TMK's Opening Brief at 15 (ECF 41); Tenaris's Opening Brief at 18 (ECF 45); ITC Opening Brief at 14 (ECF 51).  *See also* Defendant-Intervenors' Opening Brief at 10 (ECF 49).  Thus, Tenaris's belated efforts to raise a new statutory construction issue concerning whether the Commission properly interpreted "compete with" as used in 19 U.S.C. § 1677(7)(G)(i) is not only precluded for failure to raise that issue in its opening brief; it is also a nonissue given that all parties have agreed on the applicability of the Commission's longstanding four-factor competition test.

Likewise, all the parties agreed that the Commission should not be considering non-subject imports in its analysis, although the Court remanded for the Commission to assure as factual matter that it was not including impressions of such non-subject imports in its cumulation analysis.  *See* Slip Op. 24-48 at 36-37.  *See* TMK's Opening Brief at 25-26; Tenaris's Opening Brief at 23; ITC Opening Brief at 22-23; Defendant-Intervenors' Opening Brief at 22-23.  Thus, Tenaris's newfound claim that this is somehow a statutory construction question is likewise meritless.

In any event, nothing in *Loper Bright* changes that the Commission fully complied with the law in these investigations.  In *Loper Bright*, the Court held that "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 144 S. Ct. at 2273.  Although it overruled step two of the *Chevron* framework, in which courts deferred to agencies' reasonable interpretation of silent or ambiguous statutes, the Court stated:

> In exercising such judgment, though, courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" consistent with the {Administrative Procedures Act}.

*Id*. at 2262 (quoting *Skidmore*, 323 U.S. at 140). Further, in cases in which a statutory ambiguity implicates a technical matter, the Court observed that:

> In an agency case in particular, the court will go about its task with the agency's "body of experience and informed judgment," among other information, at its disposal. And although an agency's interpretation of a statute "cannot bind a court," it may be especially informative "to the extent it rests on factual premises within {the agency's} expertise." Such expertise has always been one of the factors which may give an Executive Branch interpretation particular "power to persuade, if lacking power to control."

*Id*. at 2267 (quoting *Skidmore*, 323 U.S. at 140; *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)). Thus, courts are informed by agencies' interpretation and experience with statutes that Congress entrusted them to administer.

Importantly, the Court also recognized there are instances in which a statute either expressly or impliedly authorizes an agency to exercise discretion and flexibility:

> The statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes expressly delegate{} to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as appropriate or reasonable.

*Loper Bright*, 144 S. Ct. at 2263 (citations and quotation omitted). In such instances, reviewing courts "independently interpret the statute and effectuate the will of Congress subject to constitutional limits" "by recognizing constitutional delegations, fix{ing} the boundaries of

{the} delegated authority, and ensuring the agency has engaged in reasonable decision making within those boundaries." *Id*. (citations and quotations omitted).

Additionally, the Court directed that earlier cases relying on *Chevron* remain good law:

> {H}owever, we do not call into question prior cases that relied on the *Chevron* framework.  The holdings of those cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory *stare decisis* despite our change in interpretive methodology.  Mere reliance on *Chevron* cannot constitute a "special justification" for overruling such a holding, because to say a precedent relied on *Chevron* is, at best, just an argument that the precedent was wrongly decided.  That is not enough to justify overruling a statutory precedent.

*Id.* at 2273 (citing *CBOCS West*, 553 U.S. at 457; *Halliburton*, 573 U.S. at 266; *Dickerson*, 530 U.S. at 443).  Thus, precedent sustaining the Commission's and Commerce's interpretations of the antidumping and countervailing duty statutes remains in effect under the principle of *stare decisis* even if a court had reached its decision under step two of the *Chevron* analysis.

It also deserves note that *Loper Bright* construed the APA, which "specifies that courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action, . . . —even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it."  144 S. Ct. at 2261 (quoting 5 U.S.C. § 706) (emphasis by Court).  Unlike *Loper Bright's* reliance on the APA, the standard of review for the Commission's final investigations lacks any similar admonition.  19 U.S.C. § 1516a(b)(1)(B)(i) (standard limited to setting aside determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law").

Nor did *Loper Bright* disturb the Federal Circuit's longstanding recognition that agency determinations in antidumping and countervailing duty matters are entitled to deference distinct from *Chevron*, due to the Act's complex and technical nature.  *Borusan Mannesmann Boru*

*Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374-75 (Fed. Cir. 2021)

(recognizing "deference {that} is both greater than and distinct from that accorded the agency

{Department of Commerce} in interpreting the statutes it administers, because it is based on

Commerce's technical expertise"); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed.

Cir. 1996) (same); *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1582 (Fed. Cir. 1983)

(holding that "review of the statute reveals tremendous deference to the expertise of {}

Commerce in administering the antidumping law"); *F.lli De Cecco Di Filippo Fara S. Martino*

*S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("Commerce's special expertise

makes it the 'master' of the anti-dumping law, entitling its decisions to great deference."); *Akzo*

*N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1486 (Fed. Cir. 1986) ("Not only is an injury

determination intimately wed to the particular facts of each case, but also the determination of

injury is precisely the type of question which Congress has committed to the expertise of the

Commission.")[6]

    Thus, even if the Court were to accept Tenaris's belated invitation to consider the

propriety of the Commission's application of its statutory responsibilities in light of *Loper*

*Bright,* that analysis would only highlight that the Commission properly construed the statute and

that its longstanding approach towards the cumulation and injury analyses should be sustained.

---

[6] The statutory scheme reinforces that Congress intended to delegate significant discretion to Commerce and the Commission in their implementation of the antidumping and countervailing duty laws. *See, e.g.*, 19 U.S.C. § 1677(7) (designating the SAA an "authoritative expression by the United States concerning the interpretation and application of" the URAA. 19 U.S.C. § 3512(d); 19 U.S.C. § 3513(a)(2) (delegating authority to the governmental agencies to issue regulations necessary for implementation of the URAA); *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 66 F.4th 968, 977 (Fed. Cir. 2023) (the URAA grants power to Commerce to adopt such regulations as may be necessary).

## VI.    Conclusion

For the foregoing reasons, we respectfully request that the Court affirm the

Commission's affirmative remand determinations for OCTG from Argentina, Mexico, Russia,

and South Korea.

Respectfully submitted,

*/s/ Dominic M. Bianchi*
Dominic M. Bianchi
General Counsel

*/s/ Andrea C. Casson*
Andrea C. Casson
Assistant General Counsel for
　　Litigation

*/s/ Madeline R. Heeren*
Madeline R. Heeren
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 708-1529
Facsimile: (202) 205-3111
Madeline.heeren@usitc.gov

*Attorneys for Defendant*
*U.S. International Trade Commission*

Dated: October 25, 2024

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATIONS**

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S**

**COMMENTS ON REMAND DETERMINATION** contains 9,950 words, according to the

word-count function of the word processing system used to prepare this brief (Microsoft Word

2010).


Dated: October 25, 2024          */s/ Madeline R. Heeren*
                                 Madeline R. Heeren
                                 Attorney-Advisor
                                 Office of the General Counsel
                                 U.S. International Trade Commission
                                 500 E Street, SW
                                 Washington, DC 20436
                                 Telephone: (202) 708-1529
                                 Facsimile: (202) 205-3111
                                 madeline.heeren@usitc.gov