## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| TENARIS BAY CITY, INC., MAVERICK TUBE CORP., IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., AND SIDERCA S.A.I.C., | ) ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| TMK GROUP, AND TUBOS DE ACERO DE MEXICO, S.A., | ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| UNITED STATES STEEL CORP., BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC., | ) ) ) ) ) ) ) ) ) |
| Defendant-Intervenors. | ) ) ) |

Consol. Court No. 22-00344

**NON-CONFIDENTIAL VERSION**

Business Proprietary Information Removed from Brackets on 3, 22-27, 29-30, and 32-33.

## DEFENDANT-INTERVENORS' COMMENTS IN SUPPORT OF REMAND RESULTS

Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301

*Counsel to United States Steel Corporation*

Roger B. Schagrin
Jeffrey D. Gerrish
Luke A. Meisner

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
Phone: (202) 223-1700
Fax: (202) 429-2522

*Counsel to Borusan Mannesmann Pipe U.S.
Inc., PTC Liberty Tubulars LLC, United
Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial
and Service Workers International Union,
AFL-CIO, CLC, and Welded Tube USA Inc.*

Dated:   October 25, 2024

## **Table of Contents**

Page

INTRODUCTION ..................................................................................................... 2

    A.   The Original Administrative Proceedings.......................................................... 2

    B.   The Court's Remand Order ................................................................................ 5

    C.   The Commission's Remand Redetermination .................................................. 6

ARGUMENT .......................................................................................................... 7

I.    The Commission Adopted a Lawful Framework for Assessing the "Reasonable Overlap of Competition" for Cumulating Injury Data.......................................... 7

    A.   *Loper Bright* Requires the Court to Deploy its "Full Interpretive Toolkit" to Ascertain the Meaning of 19 U.S.C. § 1677(7)(G)(i)'s Reference to "Such Imports" ........................................................................................................ 7

    B.   As the Commission Reasoned, the Statutory Term "Such Imports" in 19 U.S.C. § 1677(7)(G)(i) Concerns Imports During the POI ...................................... 8

        1.   The Interlocking Cumulation and Injury Provisions Demonstrate that the Relevant Time Period for Assessing Competition During an Investigation Is the POI ..................................................................................................... 9

        2.   *Chaparral* Is Inapposite, Outdated Precedent and Was Otherwise Misconstrued in the Court's Opinion Ordering Remand ..................................... 13

        3.   Statutory Due Process Obligations Are Incompatible with a Requirement that the Commission Obtain or Consider New Information Up Through "Vote Day" ..................................................................................................... 18

II.   Substantial Evidence Supports the Commission's Findings of a "Reasonable Overlap of Competition" Regarding Russian and South Korean OCTG.......................................... 19

    A.   *Loper Bright* Preserves Judicial Deference to the Commission's Definition of "Competition" .................................................................................................. 19

    B.   Russian OCTG "Reasonably Overlapped" in POI Competition.................................. 20

        1.   The Commission Reasonably Concluded that Loss of API Certification Did Not Prevent Russian Imports from Being Fungible with Other Subject or Domestic Sources ....................................................................................... 21

            i.    Viable Commercial Options Remained for Non-API Certified OCTG ........ 21

   ii. TMK's "Potentially Contrary Evidence" Bolsters the Commission's Fungibility Finding......................................................................................... 25

  2. Substantial Evidence Supports the Commission's Determination that Simultaneous Presence Survived Any "Lag" in Sanctions ................................... 27

 C. The Commission Excluded Any Data with an Evidentiary Basis for Suspecting Connection to Non-Subject South Korean OCTG from its Cumulation Determination.......................................................................................................... 30

 D. The Commission Addressed Arguments Concerning Whether an Antidumping Order Precluded a "Reasonable Overlap of Competition" with South Korean OCTG ........................................................................................................... 33

CONCLUSION............................................................................................................................. 34

# Table of Authorities

Page(s)

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................32

19 U.S.C. § 1671d(a) ...................................................................................8

19 U.S.C. § 1673d(a) ...................................................................................8

19 U.S.C. § 1673d(b)(1)(A)(i) ..............................................................8, 9, 12

19 U.S.C. § 1673d(b)(1)(A)(ii) ....................................................................11

19 U.S.C. § 1677(7) ....................................................................................20

19 U.S.C. § 1677(7)(B)(i)(III) .......................................................................8

19 U.S.C. § 1677(7)(C)(i) .............................................................................9

19 U.S.C. § 1677(7)(C)(ii) ............................................................................9

19 U.S.C. § 1677(7)(C)(iv) (1988) .........................................................14, 16

19 U.S.C. § 1677(7)(F)(ii) ..........................................................................11

19 U.S.C. § 1677(7)(G)(i) ..................................................................... *passim*

19 U.S.C. § 1677(7)(G)(i)(I) ........................................................................18

19 U.S.C. § 1677(7)(G)(i)(II) .......................................................................18

19 U.S.C. § 1677(7)(G)(i)(III) ......................................................................18

19 U.S.C. § 1677(7)(G)(ii)(II) ......................................................................33

19 U.S.C. § 1677(7)(I) ................................................................................11

19 U.S.C. § 1677m(g) .................................................................................19

19 U.S.C. § 3512(d) ....................................................................................12

28 U.S.C. § 2637(d) ....................................................................................32

Regulations

19 C.F.R. § 207.20(b) .................................................................................32

19 C.F.R. § 207.30(a) .................................................................................19

19 C.F.R. § 207.23 .....................................................................................28

19 C.F.R. § 207.25 .....................................................................................28

Court Decisions

*Autoliv Asp, Inc. v. United States*, 422 F. Supp. 3d 1295 (Ct. Int'l Trade 2019) ........................................................................................................28

*AWP Indus., Inc. v. United States*, 35 C.I.T. 774 (2011) .............................11

*Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990)................................. *passim*

*Chemours Co. FC, LLC v. United States,* 443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020)................................................................................................10

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).................................................................7, 13, 14, 15

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ...............29

*Goss Graphics Sys., Inc. v. United States*, 216 F.3d 1357 (Fed. Cir. 2000) ........................................................................................................21

*Gray v. Powell*, 314 U.S. 402 (1941).........................................................20

*Kenda Rubber Indus. Co. v. United States,* 630 F. Supp. 354 (Ct. Int'l Trade 1986)................................................................................................10

*Loper Bright Ent. v. Raimondo,* 144 S. Ct. 2244 (2024) .................7, 14, 18, 20

*Mexichem Fluor Inc. v. United States,* 179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016)........................................................................10, 11, 19

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ..........................................33

*Nitrogen Solutions Fair Trade Comm. v. United States,* 358 F. Supp. 2d 1314 (Ct. Int'l Trade 2005)....................................................................10

*NLRB v. Hearst Publications, Inc.*, 322 U.S. 111 (1944)..............................20

iv

*Nucor Corp. v. United States*, 28 C.I.T. 188 (2004) ..................................................................15

*Nucor Corp. v. United States,* 414 F.3d 1331 (Fed. Cir. 2005) ........................................... *passim*

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ...........................................................................29

*Sigvaris, Inc. v. United States*, 211 F. Supp. 3d 1353 (Ct. Int'l Trade 2017) ....................................................................................................................33

*Skidmore v. Swift & Co.,* 323 U.S. 134 (1944) ..........................................................................8

*Steel Auth. of India Ltd. v. United States,* 146 F. Supp. 2d 900 (Ct. Int'l Trade 2001) ...........................................................................................12, 13

*Swiff-Train Co. v. United States,* 999 F. Supp. 2d 1334 (Ct. Int'l Trade 2014) ........................................................................................................................11

*Tenaris Bay City, Inc. v. United States,* 698 F. Supp. 3d 1287 (Ct. Int'l Trade 2024) .............................................................................................. *passim*

*United States Steel Grp. v. United States*, 873 F. Supp. 673 (Ct. Int'l Trade 1994) ........................................................................................................23

<u>Administrative Determinations</u>

*Oil Country Tubular Goods From Argentina, Mexico, Russia, and South Korea*, 87 Fed. Reg. 69,331 (Nov. 18, 2022) ..........................................................................2

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea,* Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Preliminary), USITC Pub. 5248 (Nov. 2021) ................................................................4

*Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea,* Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022) .....................................................................................2

*Oil Country Tubular Goods from the Republic of Korea*, 87 Fed. Reg. 59,056 (Sept. 29, 2022) ......................................................................................4

*Oil Country Tubular Goods from Argentina, Mexico, and Russia*, 89 Fed. Reg. 46,419 (May 29, 2024). ...................................................................................6

*Stainless Steel Wire Rod from Brazil and France*, Inv Nos. 731-TA-636-637 (Final), USITC Pub. 2721 (Jan. 1994) ......................................................................13

*Silicomanganese from Brazil, the People's Republic of China, Ukraine, and Venezuela*, Inv. Nos. 731-TA-671-674 (Final), USITC Pub. 2836 (Dec. 1994) ..................................................................................................13, 21

*Carbon Steel Structural Shapes from Norway*, Inv. No. 731-TA-234 (Final), USITC Pub. 1785 (Nov. 1985) ........................................................................17

*Refillable Stainless Steel Kegs from Mexico*, Inv. No. 731-TA-1427 (Final), USITC Pub. 4976 (Oct. 2019) ........................................................................29

Other Legislative Materials

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ............................................. *passim*

Pub. L. 98-573, 98 Stat. 2948 (1984)..........................................................................16

Pub. L. 103–465, 108 Stat. 4809 (1994). ...................................................................19

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC., MAVERICK TUBE CORP., IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., AND SIDERCA S.A.I.C., ) ) ) ) ) | |
| Plaintiffs, ) | |
| and ) | |
| ) | |
| TMK GROUP, AND TUBOS DE ACERO DE MEXICO, S.A., ) ) | |
| ) | Consol. Court. No. 22-00344 |
| Consolidated Plaintiffs, ) | |
| ) | **NON-CONFIDENTIAL** |
| v. ) | **VERSION** |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| and ) | |
| ) | Business Proprietary Information |
| UNITED STATES STEEL CORP., BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC., ) ) ) ) ) ) ) ) ) ) | Removed from Brackets on 3, 22-27, 29-30, and 32-33. |
| Defendant-Intervenors. ) | |

## DEFENDANT-INTERVENORS' COMMENTS IN SUPPORT OF REMAND RESULTS

Pursuant to Rule 56.2(h)(3) of the Rules of the U.S. Court of International Trade and the Court's opinion ordering remand (Slip Op. 24-48, ECF 72), United States Steel Corporation, Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc. (together collectively "Petitioners")

NON-CONFIDENTIAL VERSION

respectfully submit these comments in support of the remand results filed by the U.S.

International Trade Commission (the "Commission") (ECF 75) and respond to the comments of

Tenaris Bay City, Inc., Maverick Tube Corp., IPSCO Tubulars Inc., Tenaris Global Services

(U.S.A.) Corp., Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (together collectively,

"Tenaris") (ECF Doc. 80), and TMK Group (ECF 82) ("TMK") (together collectively

"Plaintiffs").

## INTRODUCTION

### A.    The Original Administrative Proceedings

In response to Petitioners' October 2021 petition for relief, the Commission investigated

whether the domestic OCTG industry was injured by reason of OCTG imports from Argentina,

Mexico, Russia, and South Korea.  The Commission considered data and evidence from the

period of investigation ("POI"), which ran from January 2019 through the first half of 2022 ("H1

2022") and concluded that significant volumes of low-priced subject imports had materially

injured the domestic industry.  *See Oil Country Tubular Goods From Argentina, Mexico, Russia,*

*and South Korea*, 87 Fed. Reg. 69,331 (Nov. 18, 2022), and accompanying "Views of the

Commission," Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381

(Nov. 2022) (C.R.439, P.R.165) (hereinafter "Views") at 3.[1]  An October 26, 2022, vote

formalized this outcome. As the Commission's Views explain, its injury findings were based

upon cumulated 2019-H1 2022 data for subject imports from all four subject countries.

The Commission's decision to cumulate subject imports from all four countries was

consistent with final determinations concerning OCTG in 1995, 2001, 2014, 2020. The

Commission concluded that it was required by 19 U.S.C. § 1677(7)(G)(i) to cumulate subject

---

[1] All citations refer to the confidential version.

imports because the administrative record establishes that "such imports compete with each other and with domestic like products in the United States market," and that the other statutory prerequisites were met. *Id.* at 21, 30. Consistent with the binding interpretation set forth in the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, *see* H.R. Doc 103-316, Vol. 1 (1994) at 848 ("SAA"), the Commission based its conclusion upon a finding of "reasonable overlap of competition" among subject imports informed by its longstanding four-factor framework. *See id.* at 24-30. The Commission concluded that each factor—fungibility, channels of distribution, geographic overlap, and simultaneous presence—favored finding a "reasonable overlap of competition" with respect to OCTG from Argentina, Mexico, Russia, and South Korea. *See id.* at 30.

Relevant to these comments, the Commission rejected TMK's request to decumulate Russia from the 2019-H1 2022 dataset used to determine material injury because of sanctions imposed in response to Russia's invasion of Ukraine. *See id.* at 29-30. The Commission rejected TMK's assertions that Russian OCTG did not "reasonably overlap" in competition during the period for which injury data were collected, reasoning that (1) the sanctions "arose only late in the POI—*i.e.*, subsequent to Russia's February 2022 invasion of Ukraine," *see* Views at 23 n.86; (2) "significant volumes of OCTG from Russia {continued to} enter{} in two out of the four post-invasion months of the POI (March and May of 2022)," *id.* at 29, with H1 2022 totaling a greater volume than H1 2021, *id.* at 29 n.114; (3) sanctions did not "prohibit the entry or sale of Russian OCTG," *id.* at 29; and (4) "the market impact of [

] is not yet clear," *id.* at 30, but Russian producers could, in any case, sell [                                        ] OCTG after further processing in the United States, *id.* at 30 n.116.

The Commission also rejected the argument that an extant Korean antidumping order precluded a "reasonable overlap of competition" in its preliminary phase determination. *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Preliminary), USITC Pub. 5248 (Nov. 2021) at 11-13 (C.R.222, P.R.74) at 31-32 ("Preliminary Views"). For the final phase, Tenaris vaguely asserted that "{c}umulating imports from Korea was always questionable given they are subject to an injury finding that resulted in an antidumping duty order," Tenaris Final Comments at 9 (C.R.437, P.R.164), but no party provided a substantive argument for the Commission to address. As such, the Commission's final phase determination acknowledged the dumping order, Views at 41 n.176, but otherwise rested on its Preliminary Views.

Finally, because Commerce concluded in September 2022 that the South Korean OCTG producer Hyundai received subsidies below *de minimis*, *see Oil Country Tubular Goods from the Republic of Korea*, 87 Fed. Reg. 59,056 (Sept. 29, 2022), Hyundai's products were nonsubject OCTG for purposes of the challenged Commission determination. However, the timing of Commerce's notice presented complications. Notice of Commerce's determination was published one week after the Commission held its hearing and less than a month before "vote day." Final phase questionnaires had been issued in June 2022 and returned in July 2022. *See, e.g.*, U.S. Purchaser's Questionnaire (P.R.92). At that time, no party had suggested responses should be producer-specific. *See* "Views of the Commission on Remand," ECF 75 (Aug. 16, 2024) at 44 ("Remand Views") (C.R.443R, P.R.181R). Given the available record data and a fast-approaching statutory deadline, the Commission removed Hyundai's pricing and import data from its injury analysis dataset, *see, e.g.*, "Staff Report," Memorandum INV-UU-100 (Oct. 14, 2022) at I-5, VII-24, Appendix J (C.R.431, P.R.161) ("Staff Report"), but its cumulation analysis

cited, among other record information, certain qualitative questionnaire responses that had been provided on a countrywide basis, consistent with the Commission's usual practice *see id.* at Tables II-16 (importer responses concerning product interchangeability), II-19 (importer responses concerning product differences), and IV-17 (geographic distribution).

### B.    The Court's Remand Order

Plaintiffs challenged the Commission's cumulation determination, *inter alia*, and the Court addressed these challenges. *See Tenaris Bay City, Inc. v. United States*, Slip Op. 24-48, ECF 72, 698 F. Supp. 3d 1287 (Ct. Int'l Trade 2024) (hereinafter "Opinion") at 47 ("defer{ring} analysis of the challenges to the ITC's additional determinations regarding volume, price effects, and impact in the material injury determination").[2]  The Court sustained the Commission's determination that supposedly unique aspects of Tenaris' distribution of OCTG from Argentina and Mexico did not prevent a finding of "reasonable overlap" with OCTG from Russia and South Korea. Opinion at 41-43.[3] The Court found that substantial evidence supported the Commission's finding of "geographic overlap," including shared sales in the Central Southwest region, as well as its finding of "common channels of distribution," including overlapping sales to end users. *See id.* The Commission's rejection of Tenaris' arguments and its "determination that there was a 'reasonable overlap {of competition}'" was upheld. *See id.*

The Court's remand order identified discrete aspects of the Commission's cumulation determination that the Court considered unsupported by substantial evidence or not in

---

[2] All citations refer to Slip Opinion format.

[3] While not bearing directly upon the cumulation issues discussed in the Commission's remand redetermination, the Court also sustained the Commission's determination that Tenaris' distribution practices were "not a cause of the loss of domestic market share," noting purchaser responses and testimony from industry witnesses indicating that Tenaris' Rig Direct "program" was mere branding of common distributor services. Opinion at 43-47.

accordance with law. *First*, the Commission's cumulation of Russian OCTG was remanded because: (a) "the ITC's timing of cumulation is improper," and (b) "the ITC failed to consider potentially contrary evidence on the record for its cumulation determination and file the Response to Commission Questions with the Court." *Id.* at 27. *Next*, the Commission's cumulation of South Korean OCTG was remanded because: (a) "non-subject imports from South Korea may not be included in the ITC's cumulation determination" and (b) "the ITC did not address the possible effect resulting from the subject imports from South Korea that were under an antidumping order." *Id.* at 41.

### C. The Commission's Remand Redetermination

During remand proceedings, the Commission first prepared revised versions of relevant Staff Report tables that removed any data that could potentially be tied to non-subject South Korean data, "Supplemental Memorandum" (June 7, 2024) (C.R.440R, P.R.174R), and invited the parties to comment "concerning these data and revised tables, and concerning how the Commission could best comply with the court's remand instructions," *Oil Country Tubular Goods from Argentina, Mexico, and Russia*, 89 Fed. Reg. 46,419, 46,419 (May 29, 2024) (P.R.173R). Petitioners, Tenaris, and TMK each filed comments.

Relevant here, the Commission's final remand redetermination "considered the record as a whole in light of the Court's remand instructions," and maintained its determination that a "reasonable overlap of competition" existed between Russian and South Korean OCTG, imports from other subject countries, and domestically produced OCTG. Remand Views at 3. As detailed in the Argument sections, *infra*, the Commission addressed each discrete issue that was remanded in the course of maintaining its original conclusions.

Because the Commission's redetermination complied with the Court's remand order, is lawful, and is supported by substantial evidence, Petitioners respectfully request that the Court

sustain the redetermination with respect to cumulation, proceed to adjudicate Plaintiffs'

remaining issues based on previously submitted papers, and sustain the Commission's final

determinations.

## ARGUMENT

I.    **The Commission Adopted a Lawful Framework for Assessing the "Reasonable Overlap of Competition" for Cumulating Injury Data**

A.    *Loper Bright* **Requires the Court to Deploy its "Full Interpretive Toolkit" to Ascertain the Meaning of 19 U.S.C. § 1677(7)(G)(i)'s Reference to "Such Imports"**

While courts formerly invoked the two-step framework of *Chevron U.S.A. Inc. v. Natural*

*Resources Defense Council, Inc*., 467 U.S. 837, 843 (1984), the Supreme Court overruled

*Chevron* this past term in *Loper Bright Ent. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).  *Loper*

*Bright* instructs courts reviewing administrative determinations to discern the statute's "best

meaning" by "deploying its full interpretive toolkit." *Id.* at 2271. Under this general rule, courts

may not "defer" to the administrative interpretation, but the "thoroughness" and "validity" of the

Commission's analysis of 19 U.S.C. § 1677(7)(G)(i) during remand proceedings confer the

"power to persuade," *see id.* at 2259 (quoting *Skidmore v. Swift & Co*., 323 U.S. 134, 140

(1944); Remand Views at 11-17. This general rule governs interpretation of the underlined

portion of the phrase "such imports compete with each other…" in the statute's cumulation

provision, 19 U.S.C. § 1677(7)(G)(i) (emphasis supplied), and is easily resolved, as discussed

below, by recognition that the purpose of the cumulation provision is to "cumulatively assess the

volume and effect of {those} imports" during the period of investigation defined by the

Commission, 19 U.S.C. § 1677(7)(G)(i), in order to determine whether a U.S. industry "is

materially injured," 19 U.S.C. § 1673d(b)(1)(A)(i) (emphasis supplied).

**B.     As the Commission Reasoned, the Statutory Term "Such Imports" in 19 U.S.C. § 1677(7)(G)(i) Concerns Imports During the POI**

In reliance on inapposite precedent belatedly introduced in TMK's reply brief, the CIT's remand order appeared to impose a new legal requirement found nowhere in the statute that the Commission "determine whether the imports under investigation were proven unfair and had a continuing impact during the full period of investigation, including on vote day." Opinion at 15-17 (citing *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1104 (Fed. Cir. 1990)). This phrasing reflects three misconceptions. *First*, as the Commission explained on remand, the determination as to whether imports were "proven unfair" is made by the U.S. Department of Commerce ("Commerce") and was not contested by any respondent. *See* 19 U.S.C. §§ 1671d(a), 1673d(a); USCIT Ct. No. 22-00343 (pending procedural challenge to Commerce's pre-initiation determination of industry support); Remand Views at 11. *Second*, the Commission defined the "full period of investigation" as January 1, 2019, through June 30, 2022, Views at 14; Remand Views at 18 n.71, which out of practical necessity to both gather and analyze data from industry participants does not include "vote day." *Third*, and relatedly, questions of "impact" relate to injury, ***not*** cumulation, 19 U.S.C. § 1677(7)(B)(i)(III), and the statute asks not whether injury is "continuing," but whether the U.S. industry "is materially inju<u>red</u>," 19 U.S.C. § 1673d(b)(1)(A)(i) (emphasis supplied).[4] As such, compliance with the Opinion's instruction *stricto sensu* was not possible.

---

[4] The statute addresses questions about subject imports' ability to *continue* inflicting injury by requiring five-year reviews. *See* 19 U.S.C. § 1675(c)(1) (assessing whether revocation of the order(s) "would be likely to lead to <u>continuation or recurrence</u> of…material injury.) (emphasis supplied). Forcing the Commission to undertake this inquiry at the conclusion of an investigation would be inconsistent with Congress' orderly framework.

Nevertheless, having had no opportunity to address TMK's last minute citation to *Chaparral* in briefing before this court, the Commission addressed the "vote day" instruction at length in its Remand Views and adopted an analytical framework that represents the best reading of the statute. *See* Remand Views at 11-17. To summarize, the interlocking nature of the statutory provisions governing cumulation and material injury, as well as characterizations of those provisions in the SAA, demonstrate that the cumulation provision's competition analysis must focus on the entire POI. (**Section I.B.1**). *Chaparral*, the authority on which the Opinion relied, is inapposite. *Chaparral* interpreted an earlier statute, reached a fact-specific holding, and was subsequently disavowed in the SAA. (**Section I.B.2**). Moreover, additional statutory context confirms that compliance with a "vote day" requirement in an injury analysis is incompatible with the Commission's due process obligations. (**Section I.B.3**).

> 1.  **The Interlocking Cumulation and Injury Provisions Demonstrate that the Relevant Time Period for Assessing Competition During an Investigation Is the POI**

As explained, the material injury provision applicable to original investigations asks whether a U.S. industry "is materially injur<u>ed</u>." 19 U.S.C. § 1673d(b)(1)(A)(i) (emphasis supplied). Material injury is based on, *inter alia*, assessing subject imports' volume and price. *Id.* § 1677(7)(C)(i)-(ii). The Commission assesses volume and price over a defined period of investigation. *See generally* Views at Section V. Meanwhile, the statute requires that subject import data be cumulated "{f}or purposes of" assessing volume and price where, in relevant part, "<u>such imports</u> compete with each other." 19 U.S.C. §§ 1677(7)(G)(i) (emphasis supplied). Because imports are cumulated for use in assessing their volume and price during the defined POI, the Commission must assess conditions of competition over that same POI, as it did here. *See* Remand Views at 14 n.71.

With respect to the selection of a POI, the Federal Circuit has held:

> the Commission has broad discretion with respect to the period of
> investigation that it selects for purposes of making a material injury
> determination. As the Court of International Trade has explained,
> because the statute "does not expressly command the Commission
> to examine a particular period of time…the Commission has
> discretion to examine a period that most reasonably allows it to
> determine whether a domestic industry is injured by {less than fair
> value} imports."

*Nucor*, 414 F.3d at 1337 (quoting *Kenda Rubber Indus. Co. v. United States*, 630 F. Supp. 354,

359 (Ct. Int'l Trade 1986)); *see also, e.g.*, *Chemours Co. FC, LLC v. United States*, 443 F. Supp.

3d 1315, 1331 (Ct. Int'l Trade 2020) ("Determining the appropriate period of investigation is

within the discretion of the Commission"); *Mexichem Fluor Inc. v. United States*, 179 F. Supp.

3d 1238, 1254 (Ct. Int'l Trade 2016) ("{T}he ITC's broad discretion in choosing the time frame

for its investigation and analysis has consistently been upheld ....") (quoting *Nitrogen Solutions*

*Fair Trade Comm. v. United States*, 358 F. Supp. 2d 1314, 1325 (Ct. Int'l Trade 2005))

(alteration in *Mexichem*).  Thus, when determining whether a domestic industry is materially

injured by reason of subject imports during the POI, that POI is the timeframe during which

competition among "such imports" and the domestic like product must "reasonably overlap."[5]

Here, the Commission applied "its normal practice of considering data for the three most

recent calendar years plus applicable interim periods," *Swiff-Train Co. v. United States*, 999 F.

Supp. 2d 1334, 1351 (Ct. Int'l Trade 2014), *aff'd*, 793 F.3d 1355 (Fed. Cir. 2015), and neither

respondent proposed that the Commission gather data from later periods, *see generally, e.g.*,

Tenaris' Comments on Final Phase Draft Questionnaires (Feb. 16, 2022) (C.R.225; P.R.85);

TMK Group's Comments on Final Phase Draft Questionnaires (Feb. 16, 2022) (C.R.223;

P.R.84). "Just because {respondent} now identifies a different {investigation period}

---

[5] No party's opening brief challenged the Commission's definition of a 2019-H1 2022 POI.

methodology that might support its own narrative does not mean that the Commission's normal practice is unlawful." *Mexichem*, 179 F. Supp. 3d at 1254. As the CIT held in *AWP Indus.*, "there is no requirement to include…post-POI data, as the POI is the centerpiece of the investigation's time frame." *AWP Indus., Inc. v. United States*, 35 C.I.T. 774, 790 (2011). Indeed, Congress specifically provided the Commission with discretion in how it might consider later data. *See* 19 U.S.C. § 1677(7)(I) ("the Commission may reduce the weight accorded to the data for the period after the filing of the petition"); *Nucor*, 414 F.3d at 1341 (the Commission has "discretion in determining how to assess post-filing information."). Here, the Commission reasonably exercised that discretion to discount post-petition data, *see* Confidential Views at 43 n.184, a rationale that applies equally to the cumulation analysis and the injury analysis.

The Court's Opinion also based its "vote day" requirement for material injury on its finding that "the statutory language is written in the present tense." Opinion at 16; *see also* Tenaris Remand Comments, ECF 80 (Sept. 27, 2024) at 12-13 ("Tenaris Cmts."); TMK Remand Comments, ECF 82 (Sept. 27, 2024) at 5-6 ("TMK Cmts."). But "context indicates" that this understanding is incorrect. *See* 1 U.S.C. § 1. In contrast with the "threat of material injury" provision that asks "whether further dumped or subsidized imports are imminent," 19 U.S.C. § 1677(7)(F)(ii); *see also id.* § 1673d(b)(1)(A)(ii), the present material injury provision applied by the Commission in this investigation asks whether a U.S. industry "is materially inju<u>red</u>" and the cumulation provision requires that "<u>such imports</u> compete with each other." 19 U.S.C. §§ 1677(7)(G)(i), 1673d(b)(1)(A)(i) (emphasis supplied). Moreover, the SAA, which constitutes an "authoritative" expression concerning the interpretation and application of the statute, 19 U.S.C. § 3512(d), characterizes cumulation as applicable "when determining whether a U.S. industry <u>has been injured</u> by unfairly traded imports." SAA at 847 (emphasis supplied); *see also id.*

("This analysis recognizes that a domestic industry can <u>be injured</u> by a particular volume of imports and their effects regardless of whether those imports come from one source or many sources.") (emphasis supplied). Tenaris emphasizes the SAA statement that "new section 771(7)(G)(i) requires imports to compete with each other," Tenaris Cmts. at 14 (quoting SAA at 848), but the relevant question is—*what "imports"*? The "imports" are those that will be used to answer the ultimate statutory question of whether a U.S. industry "is materially injured" during the POI, *i.e.*, those that entered between 2019 and H1 2022.

Thus, the "present" versus "past" dichotomy that Tenaris attempts to read into the Opinion would be incorrect as a grammatical matter. *See* Tenaris Cmts. at 12-13; Opinion at 16-17. As anyone who has ever broken a bone knows, one can <u>be</u> injured in the present well after the past triggering event has already concluded. On this point, this Court's prior decision in *SAIL* is instructive. There, the POI ran from January 1996 through June 1999, and the plaintiff had "voluntarily withdr{awn} from the market from July 1998 through June 1999." *Steel Auth. of India Ltd. v. United States*, 146 F. Supp. 2d 900, 908 (Ct. Int'l Trade 2001) ("*SAIL*"). The plaintiff contended that its withdrawal precluded lawful cumulation. *Id.* The CIT rejected the plaintiff's "interpretation of the statute us{ing} the present continuous tense; *i.e.*, as contemplating an action that is not completed or finished at the time," which "would limit the ITC's cumulation to on-going competition that will end in the future." *Id.* at 905 n.9. Instead, the CIT sustained the Commission's reading that "the simple present tense of 'compete' refers to a state rather than an on-going action" such that "'imports compete with' refers to the state of the subject imports, broadening the scope of the cumulation provision to include imports that 'compete' during the time of investigation." *Id.* at 907. Ultimately, the CIT sustained the Commission's cumulation of plaintiff, including its finding that plaintiff's imports were

"simultaneously present," notwithstanding its withdrawal from the U.S. market in a later portion of the POI. *Id.* at 908.

Tenaris questions *SAIL*'s relevance on the basis that *SAIL* ultimately invoked *Chevron* and deferred to the Commission's approach, *see* Tenaris Cmts. at 11-12 (citing *SAIL*, 146 F. Supp. 2d at 905-07), but grammar is not *Chevron*-dependent. Tenaris omits, moreover, that *Chaparral* held that "neither the statute nor the legislative history underlineconclusively establishes the intended time frame for cumulation," *Chaparral*, 901 F.2d at 1104—a proposition for which *SAIL* quoted *Chaparral*, *SAIL*, 146 F. Supp. 2d at 906—and ultimately "defer{red} to the agency's interpretation of the statute" as "permissible," *Chaparral*, 901 F.2d at 1105. Underscoring that *Chaparral* was fact-specific, pre-URAA Commission determinations often focused cumulation analyses on subject imports' presence "underlineduring most of the period of investigation," *e.g.*, *Stainless Steel Wire Rod from Brazil and France*, Inv Nos. 731-TA-636-637 (Final), USITC Pub. 2721 (Jan. 1994) at I-16 (emphasis supplied); *see also Silicomanganese from Brazil, the People's Republic of China, Ukraine, and Venezuela*, Inv. Nos. 731-TA-671-674 (Final), USITC Pub. 2836 (Dec. 1994) at I-13 (considering number of months' presence out of the 42-month POI and finding simultaneous presence based on: 34 for Brazil, 16 for China, 15 for Venezuela, and 8 for Ukraine) ("*SiMn 1994*"), *aff'd* 20 C.I.T. 473 (1996). *Loper Bright* precludes this Court from simply imposing *Chaparral*'s fact-specific deference to the Commission's interpretation of an earlier statute upon the Commission's cumulation determination here.

### 2. *Chaparral* Is Inapposite, Outdated Precedent and Was Otherwise Misconstrued in the Court's Opinion Ordering Remand

The Opinion's exclusive reliance on *Chaparral*, a case interpreting the pre-URAA and pre-SAA cumulation provision (19 U.S.C. § 1677(7)(C)(iv) (1988)), *see* Opinion at 15, is

misplaced. As explained, *Chaparral* merely applied the *Chevron* doctrine, reviewing the Commission's interpretation for permissibility in that case and on those facts.  It did not elucidate or impose a rule of general application. *See Chaparral*, 901 F.2d at 1098-1107. Furthermore, as the Commission explained, Remand Views at 12-14, the facts of *Chaparral* could hardly be more different than these investigations. There, countervailing duty ("CVD") investigations were initiated against steel products from South Africa (February 1982) and Spain (March 1982). CVD orders were subsequently imposed in September 1982 (South Africa) and January 1983 (Spain). More than a year later, antidumping investigations were initiated against steel products from Spain (March 1984), Norway (December 1984), and Poland (December 1984). *Id.* at 1098-1100. Poland and Spain entered into voluntary restraint agreements in early 1985. Consequently, the antidumping investigations were terminated, and Spain's CVD order was revoked. The CVD order against South Africa was revoked for lack of interest, retroactive to October 1984. However, the investigation of Norway continued.

When the Commission concluded its investigation of Norway in October 1985, it first declined to cumulate dumped Polish and Spanish imports, reasoning that the Polish and Spanish imports "were not subject to a pending investigation and thus did not fall under the cumulation provision." *Id.* at 1100-01.  The Commission considered it problematic that the investigation status had changed prior to "vote day." *See id.* Separately, the Commission declined to cumulate Spanish and South African "imports which were subject to the investigations resulting in {CVD} orders," reasoning that the nearly three-year gap between the South African (initiated February 1982), Spanish (initiated March 1982), and Norwegian (initiated December 1984) investigations meant that Spanish and South African CVD investigation period imports "did not enter the U.S. market reasonably coincident in time with the {Norwegian} imports currently under

14

investigation." *See id.* at 1100 (quoting Commission's rationale). The problem facing the

Commission in those cases had nothing to do with alleged intervening change in shipping

patterns subsequent to the POI and prior to "vote day," and everything to do with the fact that the

investigation periods associated with different subject countries were nearly three years apart.

That is, there was no contemporaneous competition.

Nothing in *Chaparral* translates into a requirement that the Commission focus its

evaluation of competition on post-POI, "vote day" conditions. Even the single post-URAA case

highlighted by Tenaris and TMK as citing *Chaparral* concluded that "{t}he statute…makes no

mention of whether the ITC's determination must rest on current imports, earlier imports, or

both" and invoked *Chevron* deference to sustain the Commission's focus on imports during the

last year of the POI. *Nucor Corp. v. United States*, 28 C.I.T. 188, 204 (2004), *aff'd*, 414 F.3d

1331 (Fed. Cir. 2005); *see also* Tenaris Cmts. at 11; TMK Cmts. at 6-7. Nor did that opinion

embrace a focus on *post*-POI conditions, but acknowledged "the limitations of the collected

data," repeatedly characterized the final year of the POI as "current import data," and confirmed

the "permissibility" of the Commission "focus{ing} its analysis on a specific time frame <u>within</u>

the POI." *Id.* at 204-205 (emphasis supplied).

The scarcity of references to *Chaparral* in post-URAA cases dealing with cumulation is

due to intervening changes in the cumulation provision, as the Commission observed. *See*

Remand Views at 14-15. The language *Chaparral* interpreted was introduced in 1984 and

unchanged in the 1988 version. It read:

> (iv) CUMULATION. — For purposes of clauses (i) and (ii), the
> Commission shall cumulatively assess the volume and effect of
> imports from two or more countries of like products <u>subject to</u>
> <u>investigation</u> if such imports compete with each other and with like
> products of the domestic industry in the United States market.

Pub. L. 98-573, Title VI, § 612(a)(2)(A), 98 Stat. 2948, 3033 (1984) (emphasis supplied), *unchanged in* 19 U.S.C. § 1677(7)(C)(iv) (1988).  For dumped Polish and Spanish imports, it was the "subject to investigation" clause of the 1988 statute that formed the basis of the Commission's determination, *Chaparral*, 901 F.2d at 1101 (from the Commission's rationale: "The terminations {of Polish and Spanish investigations} occurred <u>prior to any final determinations as to whether the imports were unfairly traded</u>. The statute does not require cumulation in such circumstances. Because these imports have not been and will not be determined to be unfairly traded and because they are not subject to a <u>pending investigation</u>, we conclude that it is not appropriate to include them in any cumulative analysis.") (emphasis added in *Chaparral*), and the Federal Circuit's affirmance, *id.* at 1106.  The Commission interpreted "subject to investigation" as "still under investigation on vote day." *Id.* at 1104. By contrast, for subsidized South African and Spanish imports entered three years prior, the Commission found the "compete with each other" clause of the 1988 statute unsatisfied, because "the pre-CVD order imports from Spain and South Africa…did not contemporaneously compete with the Norwegian imports." *Id.* at 1101, 1106.

The URAA amendments negated both issues encountered in *Chaparral*. The "subject to investigation" clause was replaced with new subsections (I), (II), and (III):

> For purposes of clauses (i) and (ii) of subparagraph (C), and subject to clause (ii), the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which--
>
> (I) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,
>
> (II) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or

(III) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,

if such imports compete with each other and with domestic like products in the United States market.

19 U.S.C. § 1677(7)(G)(i). This change was intended to "promote certainty…by defining, at the time of filing, the countries potentially subject to cumulative analysis," SAA at 848, and would not have required consideration of subsidized South African and Spanish imports in *Chaparral* for the simple reason that those petitions were not filed on the same day as the Norway petition.

Although the Commission itself never expressly addressed cumulation of imports from South Africa and Spain occurring <u>after</u> imposition of the CVD Orders, *see Carbon Steel Structural Shapes from Norway*, Inv. No. 731-TA-234 (Final), USITC Pub. 1785 (Nov. 1985) at 6-7, the Federal Circuit surmised that such imports could be reasonably excluded because they were "not 'unfair' inasmuch as they are not marketed at unfair prices because of the imposition of duties," *Chaparral*, 901 F.2d at 1104.  But the Federal Circuit did not purport to lay out a broad rule; rather, this observation concerned specific facts before the Court wherein unfair trading had already been remedied by AD or CVD orders—the only method provided by law to cure unfair dumping and subsidization.  *See id.* at 1103 (referring to these as "sales that <u>could not</u> be found unfair.") (emphasis supplied).  Here, such a remedy was only possible after the Commission's vote.

Moreover, in the context of staggered investigations, defined as investigations concerning petitions against multiple countries filed on the same day but which return to the Commission from Commerce on different schedules, the SAA confirms that Congress did not intend the Commission to consider post-POI activity, regardless of when "vote day" occurs, explicitly contrasting Congress's preferred approach to that used in *Chapparal*, 901 F.2d at 1104.

17

> New section 771(7)(G)(iii) provides that the Commission will make its determination in each of the staggered investigations based on the record compiled in the first final investigation in which it makes a determination. **This eliminates the need for the Commission to consider whether imports from the first-decided investigation that are subject to antidumping and countervailing duty orders have a "continuing effect" {sic} on "vote day" of each subsequent investigation**. *Compare Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990)…

SAA at 848. Because the post-URAA cumulation provision now limits cumulation to same-day petitions and initiations, 19 U.S.C. § 1677(7)(G)(i)(I)-(III), only a staggered investigation could present the situation discussed in *Chaparral*, wherein one of the countries considered for cumulation was already subject to an AD/CVD order on "vote day." Consequently, the SAA has eliminated the need to <u>ever</u> adopt a "vote day" framework, including when the Commission is analyzing whether the POI imports used to determine whether a U.S. industry "is materially injured" "compete with" other OCTG. The "best meaning" of the statute must account for the SAA's authoritative interpretation. *See Loper Bright*, 144 S. Ct. at 2271.

3. **Statutory Due Process Obligations Are Incompatible with a Requirement that the Commission Obtain or Consider New Information Up Through "Vote Day"**

As the Commission explained, Remand Views at 16, other statutory requirements preclude interpreting 19 U.S.C. § 1677(7)(G)(i) to require that the Commission consider competitive conditions on "vote day" in determining whether to cumulate imports. *First*, the Commission is subject to statutory deadlines within which it must obtain and analyze information to determine whether a U.S. industry "is materially injured." 19 U.S.C. §§ 1671d(b)(2); 1673d(b)(2). *Second*, the statute requires that the Commission "shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the…Commission…upon which the parties have not previously had an opportunity to comment." 19 U.S.C. § 1677m(g); *see also* 19 C.F.R. § 207.30(a) (implementing

regulation).  This provision was entirely new to the URAA and therefore not part of the statute when *Chaparral* was decided. *See* Pub. L. 103–465, title II, § 231(a), 108 Stat. 4809, 4893 (1994).

As the Commission reasoned, it would not be possible to obtain current information, provide a meaningful opportunity for parties to comment upon the same, and conclude its vote all on the day of October 26, 2022. Implicitly recognizing this impasse, TMK argues that it "makes no sense" for "vote day" to mean the day of the vote. TMK Cmts. at 8-9. But once one moves away from a plain language understanding of "vote day," the supposed requirement becomes just another means of approximation, a *de facto* modification of the POI that the Commission selects at the outset. But Courts have "consistently upheld" the Commission's "broad discretion with respect to the period of investigation that it selects for purposes of making a material injury determination." *Nucor*, 414 F.3d at 1337 (second quote); *Mexichem*, 179 F. Supp. 3d at 1254 (first quote). Practical reality and statutory due process oblige the Commission to render its determination as to whether a U.S. industry "is materially injured" based on data corresponding to a prior time period, Remand Views at 17, and a respondent's curiosity does not dictate what timeframe is "close enough." Furthermore, it would create an illogical disconnect to block the Commission from cumulatively considering injury data for a given period until the Commission assesses whether competition "reasonably overlapped" over some wider, later period.

## II.   Substantial Evidence Supports the Commission's Findings of a "Reasonable Overlap of Competition" Regarding Russian and South Korean OCTG

### A.   *Loper Bright* Preserves Judicial Deference to the Commission's Definition of "Competition"

*Loper Bright* contains a caveat, preserving deference to administrative agencies where "a particular statute empowered an agency to decide how a broad statutory term applied to specific

facts found by the agency." *Loper Bright*, 144 S. Ct. at 2259-60 (discussing the definition of coal "producer" in *Gray v. Powell*, 314 U.S. 402 (1941) and definition of "employee" in *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130 (1944)).  This exception pertains to the Commission's analysis of what it means for imports "compete," *e.g.*, the extent, form, and intensity, when considered for cumulation. Like *Gray* and *Hearst*, the statute prescribes an administrative process by which the Commission develops a factual record to define the meaning of this term. *See* 19 U.S.C. § 1677(7). Moreover, the SAA expressly provides that 19 U.S.C. § 1677(7)(G)(i) "will not affect current Commission practice" and "consideration of relevant factors," SAA at 848, a further indication of Congressionally-intended deference. Thus, *Loper Bright* instructs the Court should to defer to the Commission's overarching understanding of "competition."  The Court must sustain the Commission's evidence-based findings in application of that understanding.

### B.    Russian OCTG "Reasonably Overlapped" in POI Competition

The Commission's determination to cumulate Russian OCTG data for the POI continues to rest on findings that all four "overlap of competition" factors continue to support cumulation: the degree of fungibility, geographic overlap in "sales or offers to sell," "common or similar" channels of distribution, and simultaneous presence in the market. *See* Views at 22; Remand Views at 3, 55-57. Neither Tenaris nor TMK raise any argument against the Commission's findings with respect to the "channels of distribution" or "geographic overlap" factors. Insofar as "no single indicator for weighing competitive overlap is dispositive," *Goss Graphics Sys., Inc. v. United States*, 216 F.3d 1357, 1362 (Fed. Cir. 2000), the Commission's conclusion in undisputedly supported.

Moreover, even the remaining disputes over "fungibility" and "simultaneous" presence affect only the final four months of the 2019-H1 2022 period. Thirty-eight months of essentially

undisputed overlap in competition is certainly "reasonable." *See, e.g.*, *SiMn 1994*, USITC Pub. 2836 at I-13 (subject countries present during 34, 16, 15, and 8 months of POI, respectively, were simultaneously present), *aff'd* 20 C.I.T. 473 (1996). Regarding the short period at the end of the POI, the CIT expressed two broad concerns: (1) the Commission's fungibility analysis needed to further address effects of "the loss of {American Petroleum Institute ("API")}-certification on Russian OCTG,"[6] Opinion at 22-23; and (2) related to the "vote day" requirement above, that the Commission had not adequately "account{ed} for the lag of the sanction measures taking place," Opinion at 27. The Commission addressed both on remand.

1.  **The Commission Reasonably Concluded that Loss of API Certification Did Not Prevent Russian Imports from Being Fungible with Other Subject or Domestic Sources**

i.  *Viable Commercial Options Remained for Non-API Certified OCTG*

The Commission's remand analysis was thorough and considered the potential impact of suspending API certification from several different angles. The Court should not countenance Plaintiffs' attempts to move the goalposts in their remand comments. To begin with, the Commission's original fungibility analysis noted that majorities or pluralities of purchasers had reported that domestic and subject OCTG (including Russia) were interchangeable, comparable across fourteen different purchasing factors, and factors other than price were sometimes or never significant. Views at 24-25. Confirming the applicability of these responses to the period after the suspension of Russian API certification, the Commission noted that those questionnaire responses were filed over three months later, in July 2022. Remand Views at 27. As such, the Commission found "nothing in the relevant questions nor the timing of the responses {to}

---

[6] The Court also noted the omission of certain supporting evidence from the joint appendix, Opinion at 23, an inadvertent oversight that will be rectified in the remand joint appendix.

impl{y} that the responses on OCTG from Russia's ability to meet minimum quality specifications and on comparability pertain only to Russian OCTG prior to {API suspension}." Remand Views at 27 n.117. Purchaser confidence was corroborated by the fact that Russian OCTG imports were 69 percent higher in the month API certification was suspended, compared to the year prior. *See* Remand Views at 37. Even if, as TMK argued [

], production lead times prevented non-API-certified OCTG from entering the U.S. market by the deadline for purchaser questionnaire responses, the Commission reasoned that this would only confirm this supposed "barrier" was a nonfactor even "during the final months of the POI." Remand Views at 28; *see also id.* at 37 n.151 (noting [         ] Russian OCTG producers might [              ]).

Tenaris and TMK attempt to twist the Commission's statement that the loss of API certification "did not prevent" competition, into the inverse proposition, *see* Tenaris Cmts. at 17-19; TMK Cmts. at 10, but contrary to Tenaris' mischaracterizations the Commission never said that it would find fungibility short of "a full embargo on Russia," Tenaris Cmts. at 1. Indeed, as the Commission observed, trends in the record data demonstrated that, on top of the already significant imports spanning the first 36 months of the POI, Russian OCTG was nowhere near dropping out of the market in H1 2022:

> imports from Russia accounted for [                    ] respectively of subject imports as well as importers' U.S. shipments of subject merchandise in interim 2022 than in interim 2021. Specifically, Russian OCTG accounted for [       ] percent of U.S. importers' shipments of subject OCTG in interim 2022 compared to [      ] percent in interim 2021. Likewise, imports from Russia accounted for [      ] percent of subject imports in interim 2022 compared to [      ] percent of subject imports in interim 2021.

Remand Views at 38. It was Plaintiffs whose claims were couched in absolute terms, characterizing the sanctions as, *e.g.*, "eliminat{ing} any competitive overlap," "virtually insurmountable," and "intended to prevent the importation of Russian products;" and describing

Russian OCTG as "absen{t}" and "ha{ving} no meaningful presence."  TMK Supp. Memo

Comments at 6-7, 9 (P.R.176R). That the Commission's Remand Views expressly negate such

extreme assertions confirms that it read and considered Plaintiffs' comments.

The Commission proceeded to detail several ways that Russian OCTG could continue to

be sold in the U.S. market, even without API certification during the POI's last four months.

Unsurprisingly, given that the scope of the investigation includes non-API certified OCTG,

several options were available, *e.g.*, sales of non-API green tube, non-API limited service

OCTG, and API certified inventories. *See* Remand Views at 29-30. TMK questions the "scale" at

which Russian OCTG producers could pursue the options identified, TMK Cmts. at 13, while

Tenaris asserts that the Commission is relying on an impermissibly small proportion to find

fungibility, Tenaris Cmts. at 20, invoking distinguishable cases considering factors other than

fungibility and finding low overlap <u>throughout</u> their respective POIs, *see United States Steel

Grp. v. United States*, 873 F. Supp. 673 (Ct. Int'l Trade 1994) (pre-URAA case assessing

"channels of distribution" factor); *Nucor Corp.*, 318 F. Supp. 2d at 1269 (geographic overlap).

Neither Plaintiff cites record data to substantiate their assertion that the magnitude

attained or attainable during March through June 2022 was "small," but even if their bare

assertions were accepted, nothing impugns the fungibility of the first 38 months' worth of

Russian OCTG imports and sales. As for the end of the POI, [          ] of Russian subject

merchandise was sold to [                    ], a [                        ],

indicating Russian producers' ability to [

] the Commission identified. *See* Remand Views at 29 & n.122; Staff

Report at Table II-1.  For context, this quantity [          ] monthly Russian import volumes for

[        ] months of the POI. *See* Staff Report at Table IV-18. In addition, the [          ] tons of

available API inventory in H1 2022 is uncontested. Staff Report at Table VII-15. The statutory standard is a "reasonable overlap in competition," based on consideration of four separate factors. Having narrower—but still viable and meaningful—sales options for the final four months of the 42-month POI does not defeat such a finding.

The Commission described reasonable, evidence-backed commercial pathways open to Russian OCTG at the end of the POI, which corroborated the record evidence of H1 2022 shipments. *See* Staff Report at [          ]. Non-API green tubes could "still be sold to API-certified processors in the United States." Remand Views at 28 (citing Petitioners' Post-Hearing Brief (Sept. 29, 2022) (C.R.419, P.R.143)). And because API marking instructions require green tube processors to remove any prior markings, further processed Russian green tube would not be prejudiced in the market by its original lack of API certification. *See* Remand Views at 29. TMK concedes, as it must, that this is "feasible," but suggests there is "no evidence" U.S. producers would use Russian green tube. TMK Cmts. at 14.  Tenaris similarly suggests that the Commission's finding is based on "conjecture." Tenaris Cmts. at 20-21. This is incorrect. As the Commission found, domestic processors had ongoing relationships with Russian OCTG suppliers from 2019 through H1 2022. Remand Views at 29. Russian subject imports were sold to processors during every year of the POI and H1 2022, and at least one U.S. processor specifically reported processing Russian green tube into finished OCTG, Remand Views at 29; Staff Report at Table II-1; [          ] U.S. Producer Questionnaire Response at II-19. Plaintiffs' assumption that existing supplier relationships would simply evaporate into thin air is the conjecture lacking record support. As the Commission reasoned by reference to record evidence of purchasers' internal qualification practices, there was no evidence that suspension of API certification for reasons other than quality issues (as was the case here) would defeat a

24

supplier's qualification, and some evidence that it would not matter. *See* Remand Views at 32-34.

As a second option, the Commission also recognized that "limited service" OCTG, for which API certification is irrelevant, "can still be used in certain OCTG applications." Remand Views at 29. Here too, TMK concedes that the sales option is viable. TMK Cmts. at 13. Moreover, the suspension of API certification did not disturb Russian producers' ability to *sell* API-certified OCTG, a point neither Plaintiff contests. As the Commission observed, existing inventories of Russian OCTG held in the U.S. and Russia, which amounted to [      ] tons in H1 2022 and were produced, at least in part, prior to suspension, would be API certified and saleable as such during the POI. Remand Views at 30 n.126. The Commission went above and beyond to not only identify the undisputed evidence of actual sales during the relevant period, but identify viable commercial pathways that remained open to Russian-origin subject merchandise.

    ii.   *TMK's "Potentially Contrary Evidence" Bolsters the Commission's Fungibility Finding*

The Commission also considered the specific "potentially contrary evidence" highlighted by the Court, which were the only pieces of evidence highlighted in TMK's moving brief. *See* Opinion at 21-22 (citing TMK's Pre-Hearing Brief (Sept. 14, 2022) at Ex. 2 (C.R.406, P.R.122); Hearing Transcript at 248 (P.R.136)); TMK R56.2 Opening Brief, ECF 45 (May 23, 2023) at 11-12. Both sources bolstered, rather than detracted from, the Commission's analysis. Neither Plaintiff contends that the Commission's analysis of this evidence was unreasonable or incomplete.

*First*, the letter from the American Petroleum Institute informing TMK of API certification suspension confirms that such services were "[

].” Remand Views at 31. Rather than raise doubts, the circumstances described in the API letter are consistent with purchaser questionnaire responses [

]. *See* Remand Views at 28. Moreover, the letter confirmed the

[

]. *See* Remand Views at 30 n.126. Finally, the letter further clarifies that API [

]. *See* TMK's Pre-Hearing Brief at Ex. 2.

Next, the Commission reviewed the hearing transcript, including the statement of Luca Zanotti, President of Tenaris USA, highlighted by TMK.  Mr. Zanotti claimed that suspending API certification would be "a major setback," but characterized his understanding of how U.S. purchasers would react to API suspension as an "assum{ption}."  Remand Views at 32 (quoting Hearing Transcript at 248).  Later in the hearing, a representative of one of Tenaris' customers offered a practical solution to purchasing non-API certified OCTG, *i.e.*, that customers "could do their own review of the internal {quality control} and stuff – and things of that nature." Remand Views at 32 (quoting Hearing Transcript at 249-50).  This marked a fourth possible channel through which Russian OCTG producers could sell in the United States, and was made all the more viable because "many purchasers reported having such quality control systems in place, meaning that API certifications were not necessary to qualify as a supplier or singularly critical." Remand Views at 33.  TMK characterizes the Commission's conclusion as "speculative," but

fails to address any of the Commission's supporting evidence. *See* TMK Cmts. at 15; Remand Views at 33-35. Conclusory labels do not undermine the substantiality of the record evidence. The Commission cited ten purchasers of Russian OCTG that require suppliers to undergo a certification process, six of which include quality control audits. Remand Views at 33. Moreover, [           ] described supplier qualification as [

        ]. Remand Views at 33 (quoting [      ] Purchaser Questionnaire Response at III-21) (emphasis supplied)). Thus, the Commission reasoned, U.S. purchasers would not necessarily eschew Russian OCTG from producers whose API certification was suspended, given the lack of evidence of actual quality decline. *Id.* at 34.

> ### 2. Substantial Evidence Supports the Commission's Determination that Simultaneous Presence Survived Any "Lag" in Sanctions

In conformity with the Court's remand instruction, the Commission considered certain "possib{le}" effects of sanctions highlighted by TMK: (1) that "virtually all" post-sanction subject imports from Russia entered under one HTSUS code for OCTG;[7] (2) TMK was able to import in March 2022 because the effect of certain sanctions did not manifest until April 2022; and (3) that May 2022 imports exploited a gap in the sanctions that was subsequently closed on June 27, 2022. *See* Remand Views at 35-39; Opinion at 26. The Commission found that these sanctions had not defeated the simultaneous presence of Russian OCTG between 2019 and June 2022 and reiterated that the vast majority of the period was unaffected by *any* of the conditions described above. *See* Remand Views at 35-36. As for any "effect{s} *following* the POI," the Commission found them "beyond the purview of what the Commission is required to consider."

---

[7] As the Commission explained, the HTSUS code in question was in fact intended for oil and gas drilling. *See* Remand Views at 35 n.147.

Remand Views at 35-36; *see also* Section I, *supra*; Views at 23 n.86 (recognizing the Commission cannot reasonably "disregard data covering the majority of the POI.").

Tenaris mischaracterizes this as an "admission that it would have been possible to consider" additional information regarding Russian imports between receipt of the questionnaire responses and the deadline for final comments, "including data that the Commission could access without issuing new questionnaires." Tenaris Cmts. at 21-22. That is the opposite of what the Commission stated. Moreover, had Tenaris and TMK considered this issue important at the time, either party could have offered supporting evidence in their pre- and/or post-hearing briefs. *See Autoliv Asp, Inc. v. United States*, 422 F. Supp. 3d 1295, 1307 (Ct. Int'l Trade 2019) ("The Commission does bear responsibility for making the ultimate legal determinations, but it cannot do so in a vacuum, without the assistance of interested parties."); 19 C.F.R. §§ 207.23, 207.25 (permitting information in pre- and post-hearing briefs). Tenaris submitted no relevant information. *See generally* Tenaris' Post-Hearing Brief (Sept. 29, 2022) (C.R.418, P.R.144). And whereas TMK's post-hearing brief included some data, it was incomplete and unusable, *see* TMK's Post-Hearing Brief (Sept. 29, 2022) at Ex. 2 (C.R.417, P.R.145) (containing data only for Russia, covering only 6 out of 51 ten-digit subject HTSUS subheadings, and extending no later than July 2022), and yet still reported a quantity for May 2022 that was twice as large as the ITC staff report, *compare id.*, *with* Staff Report at Table IV-18. "{T}his Court may not order an administrative agency to reopen the record on remand in the absence of extraordinary circumstances, *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012)), and TMK's attempt cannot succeed where Plaintiffs waived their opportunity to supply this sort of information themselves.

As for the information on the record, the Commission specifically scrutinized the presence of Russian OCTG during the post-sanction portion of 2019 to H1 2022. The Commission noted substantial and increasing imports in both March 2022 (69% YOY increase) and May 2022 (25% YOY increase). Remand Views at 37-38. Indeed, the quantity of Russian OCTG in May 2022 was greater than Argentina and Mexico combined for both May and June 2022. Staff Report at Table IV-18. Moreover, Russian imports accounted for a [

          ] of both subject imports and subject shipments in H1 2022 than H1 2021, Remand Views at 38 (citing Staff Report at Tables IV-3, G-4), a metric highlighted by the Court, *see* Opinion at 25. Indeed, [        ] was the [        ] period in which Russian imports accounted for a [                    ] of subject OCTG imports [        ] H1 2022. *See* Staff Report at Table IV-3. In addition to these imports, the Commission noted that Russian OCTG maintained its presence in the U.S. market through U.S. inventories. *Id.* at 38 n.156. TMK claims, without citing support, that the Commission cannot simply credit the "mere presence" of Russian OCTG, TMK Cmts. at 10-11, but the "simultaneous presence" factor concerns results, not intent, *see Refillable Stainless Steel Kegs from Mexico*, Inv. No. 731-TA-1427 (Final), USITC Pub. 4976 (Oct. 2019) at 23 ("Congress' intent regarding cumulation is clear: that the Commission cumulate subject imports from multiple countries where their simultaneous presence in the U.S. market has a 'hammering effect' on the domestic industry."). Imported Russian OCTG was indisputably "present."

TMK otherwise quotes a U.S. purchaser statement concerning the downturn in Russian OCTG presence, the reported [                                        ] of the POI, and its own stated plans [                                        ], TMK Cmts. at 19-20, and incorrectly claims that the Commission did not address this evidence. In

fact, the Commission rejected the importance of TMK's assertion, because "TMK does not

account for the entirety of the Russian OCTG industry," and entries of Russian OCTG had

occurred [                                                    ]. Remand Views at 36-37.

Whatever TMK's experience, the Commission reasonably declined to decumulate the entire

country of Russia on nothing more than TMK's assurances.[8] The individual purchaser's claims

about "zero" Russian imports are contradicted by the data on <u>actual</u> Russian import volumes. *See*

Remand Views at 37. And, as the CIT found meaningful, U.S. importers' shipments of Russian

OCTG [                    ] in H1 2022 ([                ]) compared to H1 2021 ([                ]).

*See* Opinion at 25; Staff Report at G-12 (Table G-4). As for the [

                              ] the POI, this speaks to issues "beyond the purview of what the

Commission is required to consider." *See* Remand Views at 35-36; Section I, *supra*.

These data demonstrate Russian OCTG producers' ability to <u>compete</u> for sales

notwithstanding the existence of certain measures that did not affect other subject sources. Not

only did the Commission reasonably consider record data to find that Russian OCTG competed

with other subject imports and the domestic like product during the POI, but to find otherwise in

the face of such record evidence would be arbitrary and unlawful.

**C.    The Commission Excluded Any Data with an Evidentiary Basis for
Suspecting Connection to Non-Subject South Korean OCTG from its
Cumulation Determination**

The CIT concluded that "the statute does not permit nonsubject merchandise to be

included in the Commission's cumulation analysis," and ordered the Commission to remove

---

[8] Moreover, were TMK's [                        ], the existence of the antidumping order would
be immaterial and presumably they would invest time and resources to prosecute this appeal.
After all, the combined duty rate applicable to Russian OCTG, including non-AFA duties for
AD/CVD, Section 232, and MFN revocation, is 74.43%, still less than the 78.30% dumping rate
applicable to Argentinian OCTG. Common sense must prevail in the Court's review.

nonsubject imports from South Korea from its cumulation determination on remand.  Opinion at 41. In response, the Commission prepared revised versions of Tables II-14, II-16, II-17, II-18, II-19, II-20, IV-17, and IV-18 which isolate and/or remove data for nonsubject South Korean imports.  *See generally* Supplemental Memorandum. Importantly, the Court recognized that "the record evidence could support a 'reasonable overlap' of competition between OCTG from Mexico and Argentina and OCTG from South Korea in theory, if any non-subject imports are excluded from the cumulation analysis." Opinion at 39-40. In fact, as the Commission found, the data as adjusted in the Supplemental Memorandum continue to support all of the Commission's original conclusions with respect to fungibility, geographic overlap, and simultaneous presence. Remand Views at 46.  Thus, the revised data continue to support an unchanged finding of a reasonable overlap of competition and require cumulation of subject imports.

Tenaris does not challenge the Commission's revised dataset with respect to geographic overlap (Supp.Table 1).[9]  *See* Tenaris Cmts. at 23-30.  However, Tenaris contests the Commission's revision of Supp.Tables 3-11, arguing that the Commission has not ensured nonsubject Korean imports are eliminated. *See id.* But Tenaris fails to connect its assertion to any questionnaire response reflected in the Commission's revised tables. Instead, Tenaris vaguely contends that "any attempt to review questionnaire responses to ascertain whether {exclusion has been accomplished} would be speculative." Tenaris Cmts. at 26. The only way to satisfy Tenaris is to reopen the administrative record, Tenaris Cmts. at 29, yet the Commission's regulations obliged *Tenaris* to present "{a}ll requests for collecting new information" in comments on the draft questionnaires, 19 C.F.R. § 207.20(b). Tenaris did not do so, *see* Tenaris Comments on

---

[9] TMK waived any argument concerning this issue.

Draft Questionnaires (C.R.225), and cannot shift the burden on appeal. *See* 28 U.S.C. § 2637(d) (requiring exhaustion of administrative remedies).

Tenaris attempts to erect an absurdly high standard of proof disconnected from this Court's standard of review. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). The Commission thoroughly reviewed the purchaser responses and eliminated those with any reasonably conceivable link to Hyundai (*i.e.*, nonsubject), in full compliance with the Court's remand instruction.  These included responses by Hyundai itself, any firm that reported purchasing Hyundai OCTG, any firm Hyundai listed as a top purchaser, and any firm that reported purchasing from [

            ] that purchased Hyundai OCTG. *E.g.*, Supplemental Memorandum at 7. Tenaris does not identify any particular response as mistakenly included in the revised tables, and falls back on conclusory statements that it is "not possible to know" what was on the responding parties' minds and responses "still might reflect their impressions of Hyundai's OCTG." Tenaris Cmts. at 28. Such bare conjecture is insufficient to raise a substantial evidence question, and Tenaris identifies no authority for the proposition that further remand is warranted based on no more than Tenaris' musings.

Tellingly, the sole questionnaire response Tenaris highlights is that of Hyundai itself, which Tenaris speculates *might* [                                                    ]. Tenaris Cmts. at 27.  But Tenaris cannot have it both ways.  It originally argued, and the Court held, that the Commission's determination was not in accordance with law because it "included the views of U.S. purchasers on non-subject imports as representative of subject imports." Tenaris R56.2 Opening Br. at 48; *see* Opinion at 41. That issue has now been resolved and because Tenaris omitted this new, contrary argument from its opening brief, it was waived. *See Sigvaris, Inc. v. United States*, 211 F. Supp. 3d 1353, 1364 (Ct. Int'l Trade 2017) ("It is well

established that arguments not raised in the opening brief are waived.") (internal quotations

omitted). Likewise, judicial estoppel applies to "prevent{} a party from prevailing in one phase

of a case on an argument and then relying on a contradictory argument to prevail in another

phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The Court should sustain the

Commission's analysis based on the revised tables.

> **D.      The Commission Addressed Arguments Concerning Whether an
> Antidumping Order Precluded a "Reasonable Overlap of Competition" with
> South Korean OCTG**

The Court remanded the Commission's decision to cumulate South Korean imports for

the Commission to "address the possible effect resulting from the subject imports from South

Korea that were under an antidumping order in its final determination." Opinion at 41. The

Commission noted that subject South Korean imports were found to have been unfairly traded

through subsidization above the Congressionally-fixed *de minimis* level and that the dumping

order was "only capable of disciplining the level of dumping not the level of subsidization."

Remand Views at 52; *see also* 19 U.S.C. § 1677(7)(G)(ii)(II). Indeed, this is the entire purpose of

having separate statutes to govern dumping and subsidy remedies. Despite the existence of a

dumping order, the Commission observed, subject South Korean imports' actual pricing

behavior was to [          ] the domestic like product in the [          ] of quarterly price

comparisons. *Id.* The Commission specifically called out Tenaris' lack of evidence to support its

bare theories, Remand Views at 52, a fatal defect that Tenaris makes no attempt to cure in its

comments before this court, *see* Tenaris Cmts. at 31-32.[10]

Moreover, the SAA undermines Tenaris' theory. *See* Tenaris Cmts. at 31 (citing SAA at

884). It instructs Commissioners conducting sunset reviews of an order that original

---

[10] TMK waived any argument concerning this issue.

investigations for the order under review mark the last time subject merchandise was free of the

discipline of *that order*. SAA at 884. This only underscores that discipline is order-specific. The

Commission has complied with the Court's remand order and Tenaris has failed to identify

anything in the record that the Commission overlooked.

## CONCLUSION

For the reasons explained above, the Court should sustain the Commission's remand

redetermination with respect to cumulation, proceed to adjudicate Plaintiffs' remaining issues

based on previously submitted papers in this proceeding, and sustain the Commission's material

injury finding.


\*      \*      \*


Respectfully submitted,


/s/ Thomas M. Beline                          /s/ Roger B. Schagrin

Thomas M. Beline                              Roger B. Schagrin
Myles S. Getlan                               Jeffrey D. Gerrish
James E. Ransdell                             Luke A. Meisner
Nicole Brunda
                                              SCHAGRIN ASSOCIATES
CASSIDY LEVY KENT (USA) LLP                    900 Seventh Street, N.W.
900 19th Street, N.W.                          Suite 500
Suite 400                                      Washington, DC 20001
Washington, D.C. 20006                         Phone: (202) 223-1700
Phone: (202) 567-2313                          Fax: (202) 429-2522
Fax: (202) 567-2301

                                              *Counsel to Borusan Mannesmann Pipe U.S.*
*Counsel to United States Steel Corporation*  *Inc., PTC Liberty Tubulars LLC, United*
                                              *Steel, Paper and Forestry, Rubber,*
                                              *Manufacturing, Energy, Allied Industrial*
                                              *and Service Workers International Union,*
                                              *AFL-CIO, CLC, and Welded Tube USA Inc.*

NON-CONFIDENTIAL VERSION

## Certificate of Compliance with Chambers Procedures 2(B)(1)

The undersigned hereby certifies that the foregoing brief contains 9,982 words, exclusive of the caption block, table of contents, table of authorities, signature block, braces designating proprietary information, and certificates of counsel, and therefore complies with the maximum 10,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:    /s/ Thomas M. Beline
       Thomas M. Beline